# UNITED STATES COURT OF INTERNATIONAL TRADE

MĀUI AND HECTOR'S DOLPHIN
DEFENDERS NZ INC.,

                    *Plaintiff,*

    v.

NATIONAL MARINE FISHERIES
SERVICE
1315 East-West Highway
Silver Spring, Montgomery County, MD
20910;

EUGENIO PIÑEIRO SOLER, in his
official capacity as ASSISTANT
ADMINISTRATOR for NATIONAL
OCEANIC AND ATMOSPHERIC
ADMINISTRATION FISHERIES
1315 East-West Highway
Silver Spring, Montgomery County, MD
20910;

HOWARD LUTNICK, in his official
capacity as the SECRETARY OF
COMMERCE
1401 Constitution Avenue, NW
Washington, DC 20230;

SCOTT BESSENT, in his official
capacity as the SECRETARY OF THE
TREASURY
1500 Pennsylvania Avenue, NW
Washington, DC 20220;

      and

MARKWAYNE MULLIN, in his official
capacity as the SECRETARY OF
HOMELAND SECURITY
2707 Martin Luther King Jr. Avenue, SE
Washington, DC 20528,

                    *Defendants.*

Case No.   1:26-cv-02462

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

**INTRODUCTION**

1.     New Zealand is home to two of the most endangered marine mammal populations on the planet: the critically endangered Māui dolphin and the endangered Hector's dolphin. Both face an existential threat from bycatch in New Zealand's set net and trawl fisheries.

2.     The Marine Mammal Protection Act (MMPA) requires the U.S. government to ban seafood imports from any foreign fishery that harms or kills marine mammals in excess of U.S. standards. Yet despite significant bycatch of Māui and Hector's dolphins in New Zealand's fisheries, Defendants have repeatedly declined to ban seafood imports from the fisheries. By authorizing imports of seafood from these harmful fisheries, Defendants not only are neglecting their statutory duty, but are facilitating extinction.

3.     Time and time again, the Court of International Trade (CIT) has rejected Defendant National Marine Fisheries Service's (NMFS) arbitrary findings that bycatch in New Zealand fisheries does not exceed U.S. standards. And time and time again, NMFS has issued irrational and unjustified findings to allow seafood imports to continue.

4.     This case challenges the most recent of these findings, published on March 11, 2026 (the 2026 Comparability Finding), for the New Zealand set net and trawl fisheries (the New Zealand Fisheries) that pose the highest risk to Māui and Hector's dolphins, as well as other marine mammals. As with prior findings, the 2026 Comparability Finding violates the MMPA and Administrative Procedure Act (APA).

5.     This case is quite simple: the Māui dolphin and Hector's dolphin are endangered and declining primarily due to bycatch in New Zealand's set net and trawl fisheries. The MMPA is designed to safeguard marine mammal populations abroad to ensure that bycatch in fisheries will not inhibit their recovery. New Zealand has failed to implement measures sufficient to prevent the continuing fisheries-related declines of Māui and Hector's dolphins. Extinction is inevitable under these circumstances. New Zealand's regulatory program does not meet the MMPA's requirements for imports to continue.

6. Rather than confront this simple reality, NMFS has made another futile attempt to paper over the fundamental flaws in New Zealand's regulatory program. This latest iteration of its comparability finding is replete with unsupported assumptions, legal misrepresentations, flawed evidence, and unexplained conclusions. In it, NMFS has: failed to establish that the New Zealand Fisheries meet several key U.S. marine mammal bycatch standards; failed to consider critical ways New Zealand's regulatory program differs from U.S. standards; relied on outdated and overly optimistic data to evaluate New Zealand's regulatory program; reached conclusions on New Zealand's monitoring program that run counter to the evidence; and disregarded recent evidence that clearly demonstrates that Māui and Hector's dolphin bycatch rates exceed U.S. standards.

7. Defendants cannot continue this unlawful practice of abetting the extinction of the Māui dolphin and Hector's dolphin. The MMPA has not allowed any U.S. marine mammal species to go extinct, and it does not permit Defendants to enable extinction outside of the United States.

8. For the reasons herein, Plaintiff Māui and Hector's Dolphin Defenders NZ Inc. (MHDD) asks the Court to: (1) declare that NMFS's 2026 Comparability Finding is arbitrary and capricious and contrary to law, in violation of the MMPA and APA; (2) declare that Defendants have unlawfully failed to ban imports from New Zealand fisheries that catch Māui and Hector's dolphins and other marine mammals; (3) vacate and remand the 2026 Comparability Finding; (4) enjoin imports from the New Zealand fisheries that harm or kill marine mammals in excess of U.S. standards; and (5) order Defendants to promptly execute their legal duty to prohibit such imports.

**JURISDICTION AND VENUE**

9. This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1)(C) because MHDD challenges an action of the U.S. government that arises out of law providing for embargoes "on the importation of merchandise for reasons other than the

3

protection of the public health or safety." The final agency action is reviewable under the APA. 5 U.S.C. § 704.

10.     This Court may grant the relief requested pursuant to the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

**PARTIES**

11.     Plaintiff MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ INC. is a registered New Zealand non-profit organization dedicated to obtaining improved protections for New Zealand dolphins. MHDD is headquartered in Kumeu, New Zealand. MHDD's objectives are to support the protection, recovery, and stewardship of Māui and Hector's dolphins and their habitats—and therefore also other marine species, including other marine mammals—and to improve the health and status of dolphin populations through public awareness, education, involvement, and collaboration with similar groups in New Zealand and overseas. To achieve these objectives, MHDD engages in political advocacy, policy processes, public education, grass-roots activities, and direct action. MHDD is an Incorporated Society and registered Charity under New Zealand law. Committee membership in MHDD is open to anyone interested in the conservation and well-being of Māui and Hector's dolphins. MHDD currently has thirteen committee members. MHDD brings this action for itself and as a representative of its members.

12.     MHDD's members live near and regularly visit Māui and Hector's dolphin habitat along the coast of New Zealand's North Island and Hector's dolphin habitat along the coast of New Zealand's South Island. Members enjoy and benefit from the continued presence of Māui and Hector's dolphin populations for recreational, aesthetic, spiritual, artistic, cultural, commercial, scientific, and environmental purposes. MHDD's members regularly engage in activities in the dolphins' habitats, such as swimming, boating, photography, research, advocacy, education, documentary-making, and visiting cliffs and beaches with the objective of viewing dolphins. Members go out to beaches and spend hours looking for dolphins year-round, and plan to do this over winter and increasingly over the austral summers as the dolphins come closer to shore. This has been and still is a big part of many of the members' lives and activities. During

4

these coastal visits, members also search for other marine species, including common dolphins, fur seals (at sea and resting on beaches and rocks), penguins of various types, orcas, southern right and humpback whales, and other types of marine mammals and seabirds. All of these species are impacted by New Zealand trawl and set net fisheries. Especially in the summer, MHDD members pursue these activities almost every week, and often several times a week. They seek to experience wild animals in their natural environment; raise awareness of the dolphins' plight; celebrate marine biodiversity; promote citizen science; and encourage stewardship of the individual animals, the species, and intact functioning ecosystems distinct to New Zealand.

13.    MHDD's members also plan and execute specific trips elsewhere in the country—in both the North Island and South Island—to speak with locals about Māui and Hector's dolphins, distribute pertinent information, and support related conservation efforts. Members and supporters carry out engagement and advocacy events somewhere in the country almost every week.

14.    The ability of MHDD's members to pursue these interests hinges on the well-being of the Māui and Hector's dolphins and other marine mammals, and on the health of the marine ecosystems on which the species depend.

15.    Defendants' failure to comply with the MMPA and APA has caused and is causing MHDD's members substantive and procedural harms connected to their conservation, recreational, spiritual, scientific, and aesthetic interests. NMFS has found that trawl vessels and set net vessels in New Zealand's fisheries interact with and harm or kill Māui and Hector's dolphins. In addition, the Government of New Zealand (GNZ) has reported that the fisheries catch and kill common dolphins, New Zealand fur seals, and other marine mammals. The United States continues to import seafood from New Zealand's trawl and set net fisheries that catch, harm, and kill marine mammals in excess of U.S. standards. The United States is a significant market for these fisheries. The MMPA requires Defendants to ensure that the U.S. seafood market does not encourage or sustain New Zealand fisheries that incidentally catch, injure, and kill dolphins and other marine mammals in excess of U.S. standards. GNZ has repeatedly

indicated that avoiding an import ban is an important driver of its management choices for fisheries in Māui and Hector's dolphin habitats. NMFS's failure to insist on reasonable proof from GNZ that it meets U.S. bycatch standards and its issuance of an arbitrary and unlawful Comparability Finding eliminate that driver, thereby allowing GNZ to continue management practices that harm marine mammals while maintaining access to the U.S. seafood market.

16.    The interests of MHDD, its members, and supporters have been, are being, and will be adversely affected by Defendants' violations of federal law, as described herein. These harms can only be remedied if the Court orders Defendants to comply with the MMPA and APA. MHDD has no other adequate remedy at law.

17.    Defendant NATIONAL MARINE FISHERIES SERVICE is the federal agency within the U.S. Department of Commerce responsible for administering and implementing the MMPA with respect to whales, dolphins, porpoises, seals, and sea lions. The MMPA and its implementing regulations charge the Secretary of Commerce with determining whether fish from an exporting nation have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of marine mammals in excess of U.S. standards. The Secretary has delegated that responsibility to NMFS. The principal offices of NMFS are located in Silver Spring, Maryland.

18.    Defendant EUGENIO PIÑEIRO SOLER is sued in his official capacity as the National Oceanic and Atmospheric Administration's Assistant Administrator for Fisheries. The Assistant Administrator is responsible for implementing and fulfilling NMFS's duties under the MMPA. The office of the Assistant Administrator is located in Silver Spring, Maryland.

19.    Defendant HOWARD LUTNICK is sued in his official capacity as the Secretary of Commerce. The Secretary of Commerce is responsible for implementing and fulfilling the Department of Commerce's duties under the MMPA and for overseeing NMFS. The office of the Secretary of Commerce is located in Washington, D.C.

20.    Defendant SCOTT BESSENT is sued in his official capacity as the Secretary of the Treasury. The Secretary of the Treasury is responsible for implementing and fulfilling the

6

Department of the Treasury's duties under the MMPA. The office of the Secretary of the Treasury is located in Washington, D.C.

21.     Defendant MARKWAYNE MULLIN is sued in his official capacity as the Secretary of Homeland Security. Pursuant to the Homeland Security Act, the Department of Homeland Security is responsible for certain functions of the Secretary of the Treasury relating to the United States Customs Service, which may include implementing import bans under the MMPA. 6 U.S.C. §§ 203(1), 212(a)(1). The office of the Secretary of Homeland Security is located in Washington, D.C.

## STATUTORY BACKGROUND

I.     MARINE MAMMAL PROTECTION ACT

22.     Congress enacted the MMPA in 1972 to protect and restore marine mammal populations that "are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1). Congress sought to ensure that marine mammal species and populations "should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population." *Id.* § 1361(2).

23.     Through the MMPA, Congress intended to protect marine mammal populations both within the U.S. and abroad, recognizing that "marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic, and ... they should be protected and encouraged to develop to the greatest extent feasible." *Id.* § 1361(6).

24.     To this end, the MMPA includes a provision designed to protect marine mammal populations outside of U.S. waters through leveraging the United States' position as a major seafood importer. 16 U.S.C. § 1371(a)(2) requires the Secretary of the Treasury to "ban the importation of commercial fish or products from fish which have been caught with commercial

7

fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards"—hereinafter, the Import Provision.

25.     In determining whether seafood imports should be banned, the Secretary of Commerce "shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States." *Id.* § 1371(a)(2)(A).

A.     United States Standards

26.     "United States standards" within the meaning of 16 U.S.C. § 1371(a)(2) include, but are not limited to, the provisions of the MMPA that are applicable to managing incidental mortality and serious harm to marine mammals from commercial fisheries. *See Sea Shepherd N.Z. v. United States*, 606 F. Supp. 3d 1286, 1294–95 (Ct. Int'l Trade 2022) (identifying "statutory markers of 'United States standards'" under the MMPA). The MMPA addresses incidental catch of marine mammals in commercial fisheries by requiring, among other things, a mandate to reduce bycatch to insignificant levels approaching zero, bycatch limits, take reduction plans, bycatch monitoring programs, and stock assessments.

1.     *Zero Mortality Rate Goal*

27.     First, the MMPA requires that commercial fisheries reduce incidental mortality and serious injury of marine mammals in a relatively short period of time (five to seven years) to "insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. § 1387(b)(1), (f)(2); *accord id.* § 1371(a)(2). NMFS defines "insignificant levels approaching a zero mortality and serious injury rate" numerically, as 10% of the Potential Biological Removal (PBR) level—which is detailed below—for a given marine mammal stock. 50 C.F.R. § 229.2.

28.     To effectuate the Zero Mortality Rate Goal mandate, the MMPA requires NMFS to analyze, for each commercial fishery interacting with a marine mammal stock, "whether [the incidental mortality and serious injury] level is insignificant and is approaching a zero mortality and serious injury rate." 16 U.S.C. § 1386(a)(4). If the rate of incidental mortality and serious

injury is not achieving that objective, NMFS is required to develop and implement a take reduction plan—as described below—with appropriate actions to reduce incidental mortality and serious injury to insignificant levels within five years. *Id.* § 1387(b), (f).

2.    *Potential Biological Removal Level*

29.    Second, the MMPA requires that incidental mortality or serious injury of marine mammals incidentally taken in commercial fisheries be below the calculated PBR level. *Id.* § 1387(f)(2). The MMPA defines PBR as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." *Id.* § 1362(20).

30.    NMFS must estimate the PBR for each marine mammal stock. *Id.* § 1386(a)(6). PBR is the mathematical product of three values: "the minimum population estimate of the stock," by "[o]ne-half the maximum theoretical or estimated net productivity rate of the stock at a small population size," and a "recovery factor of between 0.1 and 1.0." *Id.* § 1362(20).

a.    The "minimum population estimate" is an estimate of the number of animals in a marine mammal stock that is "based on the best available scientific information on abundance" and "provides reasonable assurance that the stock size is equal to or greater than the estimate." *Id.* § 1362(27).

b.    The "net productivity rate" is "the annual per capita rate of increase in a stock resulting from additions due to reproduction, less losses due to mortality." *Id.* § 1362(26).

c.    The recovery factor is set at a value that will ensure the recovery of populations to their optimal sustainable populations. To ensure human-caused harms are addressed with the requisite level of urgency, the default value for threatened species is 0.5, and for endangered species it is the lowest value, 0.1. NOAA, *Guidelines for Preparing Stock Assessment Reports Pursuant to the Marine Mammal Protection Act* 9 (Feb. 7, 2023), https://www.fisheries.noaa.gov/s3/2023-05/02-204-01-Final-GAMMS-IV-Revisions-clean-1-kdr.pdf.

9

31.     If estimates of human-caused incidental mortality and serious injury exceed the calculated PBR for any stock, NMFS must enact measures to reduce mortality and serious injury in fisheries in a take reduction plan, as described below. 16 U.S.C. § 1387(f)(5).

### 3.     Negligible Impact Standard

32.     Third, for marine mammals listed as threatened or endangered under the Endangered Species Act (ESA), the MMPA only allows incidental take in commercial fisheries "if the Secretary, after notice and opportunity for public comment, determines that … the incidental mortality and serious injury from commercial fisheries will have a negligible impact on such species or stock." *Id.* § 1371(a)(5)(E)(i).

33.     Pursuant to NMFS Procedural Directive 02-204-02, NMFS uses a quantitative approach to determine if a fishery has a negligible impact. NMFS, *Criteria for Determining Negligible Impact under MMPA Section 101(a)(5)(E)*, Procedural Directive 02-204-02 (June 17, 2020), https://media.fisheries.noaa.gov/dam-migration/02-204-02.pdf.

    a.  NMFS first calculates a threshold figure that estimates negligible impact for total human-caused mortality and serious injury. *Id.* at 4. For endangered species, this threshold uses the same calculation values as the PBR, so the threshold is equivalent to the PBR. *Id.* at 4–5, 12, 14 (tbl. 1). For threatened species, the threshold is 20% of PBR. *Id.* at 14 (tbl. 1).

    b.  If the total human-caused mortality and serious injury for a stock exceeds this threshold, then NMFS will calculate a second, lower threshold to evaluate whether an individual commercial fishery has a negligible impact. *Id.* at 4. For endangered species, this smaller threshold equals 13% of the PBR. *Id.* at 5, 14. For threatened species, the lower threshold equals 2.6% of the PBR. *Id.* at 14.

    c.  If mortality and serious injury in a fishery exceeds that threshold, then it has more than a negligible impact. *Id.* at 9.

34.     If the incidental mortality or serious injury from commercial fisheries "has resulted or is likely to result in an impact that is more than negligible on the endangered or

10

threatened species or stock," NMFS is required to use its emergency authority "to protect such species or stock, and may modify any permit ... as necessary." 16 U.S.C. § 1371(a)(5)(E)(iii).

### 4.    Take Reduction Plans

35.    The MMPA requires NMFS to effectuate the Zero Mortality Rate Goal and PBR limit by developing and implementing a "take reduction plan" for any marine mammal "strategic stock" that interacts with commercial fisheries. *Id.* § 1387(f). A strategic stock includes any species listed, or likely to be listed, as threatened or endangered under the ESA, as well as any other marine mammal stock suffering human-caused mortality exceeding the PBR. *Id.* § 1362(19). The Māui dolphin is listed as endangered under the ESA and the Hector's dolphin is listed as threatened under the ESA. Both are therefore considered strategic stocks.

36.    A take reduction plan must be designed to achieve two incidental take level goals. The "immediate goal" must be to reduce the level of incidental mortality and serious injury in commercial fisheries below the PBR within six months of implementation. *Id.* § 1387(f)(2). The "long-term goal" must be to reduce the level of incidental mortality and serious injury in commercial fisheries "to insignificant levels approaching a zero mortality and serious injury rate" within five years. *Id.*

37.    If the "incidental mortality and serious injury from commercial fisheries exceeds" the established PBR, the plan "shall include measures the Secretary expects will reduce ... such mortality and serious injury to a level below" the PBR within six months. *Id.* § 1387(f)(5).

### 5.    Bycatch Monitoring

38.    The MMPA requires NMFS to establish "a program to monitor incidental mortality and serious injury of marine mammals during the course of commercial fishing operations." *Id.* § 1387(d). One purpose of the monitoring program is to determine whether and when bycatch limits are exceeded.

39.    The program must be sufficient to "obtain statistically reliable estimates of incidental mortality and serious injury." *Id.* § 1387(d)(1)(A); *see also id.* § 1387(d)(3)(A)

11

(requiring program implementation to be guided by a "requirement to obtain statistically reliable information").

40.     The MMPA does not define the term "statistically reliable." Instead of committing to a definitive metric, NMFS determines observer monitoring coverage on a case-by-case basis depending on the relevant management objectives and science information needs. For example, NMFS requires high (in some cases, 100%) observer coverage when monitoring data are needed to estimate protected (i.e. threatened and endangered) species bycatch, make in-season management decisions, close fisheries when bycatch limits are exceeded, or ensure regulatory compliance.

      6.     *Stock Assessments*

41.     The MMPA requires NMFS to prepare a stock assessment for each marine mammal stock under the agency's jurisdiction. *Id.* § 1386(a).

42.     A stock assessment must contain several elements. It must: (1) describe the stock's range, including any seasonal or temporal variation in such range; (2) provide a minimum population estimate, current and maximum productivity rates, and the current population trend, with supporting information; (3) estimate the annual human-caused mortality and serious injury of the stock; (4) describe commercial fisheries that interact with the stock, including a) the number of vessels in the fishery, b) the estimated annual level of incidental mortality and serious injury by each fishery, c) seasonal or geographic differences in such incidental mortality or serious injury, and d) "the rate, based on the appropriate standard unit of fishing effort, of such incidental mortality and serious injury, and an analysis stating whether such level is insignificant and is approaching a zero mortality and serious injury rate"; (5) categorize the stock's status (as either a "strategic stock" or a stock with a "level of human-caused mortality and serious injury that is not likely to cause the stock to be reduced below its optimum sustainable population"); and (6) estimate PBR, as described above. *Id.*

43.     Stock assessments must be based on the "best scientific information available." *Id.*

B.    Marine Mammal Protection Act Regulations

44.    NMFS has promulgated regulations (the Import Regulations) establishing a process for identifying whether each export fishery complies with the Import Provision. 81 Fed. Reg. 54390 (Aug. 15, 2016) (codified at 50 C.F.R. § 216.24(h)).

45.    Every fishery that exports fish or fish products to the United States is considered to have incidental mortality or incidental serious injury of marine mammals in excess of U.S. standards unless NMFS has issued "a valid comparability finding" for the fishery. 50 C.F.R. § 216.24(h)(1)(i); *see also id.* § 216.24(h)(1)(ii) (making it unlawful to import fish from any fishery that does not have a valid comparability finding in effect).

46.    A harvesting nation must apply for a comparability finding before NMFS can issue one. *Id.* § 216.24(h)(6)(ii). That application must include reasonable proof of the effects of the relevant fisheries on marine mammals and documentary evidence demonstrating that the conditions for a comparability finding have been met. *Id.* § 216.24(h)(6)(i); *see also* 16 U.S.C. § 1371(a)(2)(A) ("insist[ing] on reasonable proof").

47.    The regulations require NMFS to make specified findings and consider mandatory factors before it may issue a comparability finding. 50 C.F.R. § 216.24(h)(6)(iii), (h)(7). In doing so, NMFS "shall consider documentary evidence provided by the harvesting nation *and* relevant information readily available from other sources." *Id.* § 216.24(h)(6)(ii) (emphasis added).

48.    First, NMFS must find that the harvesting nation "[p]rohibits the intentional mortality or serious injury of marine mammals in the course of commercial fishing operations" and "[d]emonstrates that it has procedures to reliably certify that exports of fish and fish products to the United States are not the product of an intentional killing or serious injury of a marine mammal." *Id.* § 216.24(h)(6)(iii)(A).

49.    Second, NMFS must find that the harvesting nation "maintains a regulatory program with respect to the fishery that is comparable in effectiveness to the U.S. regulatory program with respect to incidental mortality and serious injury of marine mammals in the course of commercial fishing operations." *Id.* § 216.24(h)(6)(iii)(B).

13

50.     To qualify as "comparable in effectiveness" to the U.S. regulatory program, the harvesting nation's regulatory program must "provide[] for, or effectively achieve[] comparable results as," among other things: (1) "Marine mammal assessments that estimate population abundance for marine mammal stocks in waters under the harvesting nation's jurisdiction that are incidentally killed or seriously injured in the export fishery"; (2) a calculation of "bycatch limits" (defined as the PBR or a "comparable scientific metric," *id.* § 216.3) for marine mammal stocks that are incidentally killed or seriously injured by the fishery; (3) "A requirement to implement measures in the export fishery designed to reduce the total incidental mortality and serious injury of a marine mammal stock below the bycatch limit"; (4) "Implementation of monitoring procedures in the export fishery designed to estimate incidental mortality or serious injury in the export fishery, ... including an indication of the statistical reliability of those estimates"; and (5) a comparison of the incidental mortality and serious injury levels in the fishery with the bycatch limit and a showing that the fishery does not exceed the bycatch limit. *Id.* § 216.24(h)(6)(iii)(C).

51.     NMFS is also required to consider: (1) "U.S. implementation of its regulatory program for similar marine mammal stocks and similar fisheries"; (2) the extent to which the harvesting nation has successfully implemented measures to reduce incidental mortality and serious injury of marine mammals to levels below the bycatch limit; (3) whether measures for the export fishery "have reduced or will likely reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit"; (4) "[o]ther relevant facts and circumstances, which may include the history and nature of interactions with marine mammals in th[e] export fishery, whether the level of incidental mortality and serious injury ... exceeds the bycatch limit for a marine mammal stock, the population size and trend of the marine mammal stock, ... the population level impacts of the incidental mortality or serious injury of marine mammals," and the conservation status of the marine mammal stocks. *Id.* § 216.24(h)(7).

52.     If NMFS issues a comparability finding, it is valid for four years from its publication, unless otherwise indicated. *Id.* § 216.24(h)(8)(iv). Fisheries for which NMFS has

14

either denied a comparability finding application or issued a comparability finding that is invalid are out of compliance with the Import Regulations and Import Provision. *Id.* § 216.24(h)(1)(i), (ii), (h)(9); *see Sea Shepherd*, 606 F. Supp. 3d at 1323–25 & nn.60–63. Those fisheries remain out of compliance until NMFS issues a valid comparability finding. 50 C.F.R. § 216.24(h)(9).

53.     Absent a valid comparability finding that is in effect, the importation of fish and fish products from the fishery is unlawful and the Secretaries of the Treasury and Homeland Security shall prohibit such imports until such time that NMFS issues a valid comparability finding for the fishery. *Id.* § 216.24(h)(1)(i), (h)(9).

II.     ADMINISTRATIVE PROCEDURE ACT

54.     The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

55.     The APA provides that the reviewing court "shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

56.     The APA also provides that the reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

**FACTUAL BACKGROUND**

I.     MĀUI AND HECTOR'S DOLPHINS ARE AT HIGH RISK OF EXTINCTION.

57.     Māui and Hector's dolphins—two related subspecies—are among the most endangered marine mammals in the world.

58.     The Māui dolphin is the world's most endangered marine dolphin. There are less than fifty individuals ≥1 year old left in existence, with some estimates as low as thirty.[1] The Māui dolphin population has experienced a 97.5% decline over the past fifty years from a population of approximately 2,000. This decline continues: over the past two decades, the population has declined by an average of three to four percent per year. The Māui dolphin's historical and likely current range extends around the entire North Island of New Zealand.

---

[1] Hereinafter, "individuals" refers to individuals ≥1 year old.

However, the few remaining individuals are primarily found along the North Island's west coast, including within harbors, and extending out to the 100-meter depth contour.



**Figure 1.** Photograph of Māui dolphin (by Steve Dawson, University of Otago)

59.     The Hector's dolphin inhabits coastal waters around New Zealand's South Island, although individuals are occasionally seen around the North Island. There are at least four genetically distinct South Island populations: North Coast South Island, East Coast South Island, South Coast South Island, and West Coast South Island. *See* Figure 2. At the time of the last available abundance estimate, only about 15,000 Hector's dolphins remained in total, down from a population of about 50,000 in 1975. The entire population continues to decline.



**Figure 2.** GNZ map of Hector's dolphin subpopulations

60.     NMFS has listed the Māui dolphin as endangered under the ESA. 82 Fed. Reg. 43701 (Sep. 19, 2017). The International Union for the Conservation of Nature (IUCN) has listed the Māui dolphin as critically endangered, meaning it is "considered to be facing an extremely high risk of extinction in the wild."

61.     NMFS has listed the Hector's dolphin as threatened under the ESA. 82 Fed. Reg. 43701. The IUCN has listed the Hector's dolphin as endangered.

62.     NMFS reaffirmed the endangered status of the Māui dolphin and the threatened status of the Hector's dolphin under the ESA in its 2024 5-Year review of Māui's and Hector's dolphins.

63.     New Zealand's Department of Conservation classifies the Māui dolphin as "Nationally Critical" and the Hector's dolphin as "Nationally Vulnerable." Both are "protected species" under New Zealand's Marine Mammal Protection Act (1978) (New Zealand MMPA) and Fisheries Act (1996).

17

64.     Māui and Hector's dolphins have a unique physical appearance with grey, white and black markings, a short snout, and a rounded dorsal fin. They are less than two meters long and weigh up to sixty kilograms.

65.     Māui and Hector's dolphins are highly intelligent. They have a complex social system and typically live in small groups of two to eight individuals.

66.     The dolphins' biology and distribution make them especially vulnerable to human impacts. They have a lifespan of roughly twenty-five years. Females do not reach sexual maturity until around eight years old and produce just one calf every two to four years. As a result, the populations have extremely low maximum growth rates. Even low levels of human-caused mortality can outpace the populations' natural growth rates, leading to their decline and ultimately, their extinction. According to GNZ, total human-caused mortality of Māui dolphins is at least 4.16 dolphins per year.

II.     NEW ZEALAND FISHERIES INCIDENTALLY CATCH AND KILL MĀUI AND HECTOR'S DOLPHINS.

67.     New Zealand's commercial fisheries incidentally catch, seriously injure, and kill Māui and Hector's dolphins.

68.     Two types of fishing gear in particular pose a risk of bycatch to Māui and Hector's dolphins: set nets and trawl nets.

69.     Set nets (also known as gillnets) are a type of non-selective fishing net, meaning they catch any animal that swims into them. They are hung vertically in the water and left unattended for hours or days at a time to harvest fish and other species. When set nets are placed in the dolphins' habitats, the dolphins can swim into them and become entangled. Deploying set nets in and around habitat where dolphins feed, rest, socialize, and reproduce is well known to result in dolphin bycatch.

70.     Trawl fishing is another non-selective fishing method and involves dragging a large net through the water column or along the sea floor, catching nearly everything in the net's path. New Zealand's multi-species trawl fisheries overlap with areas where Māui and Hector's dolphins forage and target the same prey species that the dolphins eat. Māui and Hector's

dolphins have been observed spending many hours feeding around trawl nets. Other dolphin species have been filmed swimming into trawl nets to feed, and Māui and Hector's dolphins may also engage in this activity. Deploying trawl nets in and around habitat where dolphins feed, rest, socialize, and reproduce is well known to result in dolphin bycatch.

71.    Māui and Hector's dolphins that are entangled in set nets or trawl nets can drown or, in their struggle to free themselves to reach the surface to breathe, suffer serious injuries. There are few reported incidents of dolphins being able to free themselves from nets before drowning, but even then, they can suffer serious health impacts. Some dolphins that drown in nets may be detected as bycatch when the net is retrieved, but others may go unobserved if they fall out of the net before retrieval (referred to as "cryptic mortality").

72.    GNZ stated in its 2021 Aquatic Environment and Biodiversity Annual Review: "Fisheries bycatch, particularly in recreational and commercial set net fisheries and to a lesser extent in commercial trawls, is a known threat to Hector's and Māui dolphins."

73.    In 2022, GNZ published a report estimating levels of bycatch for all marine mammal species found in New Zealand waters. This report estimated an average bycatch rate of 0.38 Māui dolphins per year (roughly one dolphin every three years) and 53.48 Hector's dolphins per year. Darryl I. MacKenzie et al., *Updated spatially explicit fisheries risk assessment for New Zealand marine mammal populations*, New Zealand Aquatic Environment and Biodiversity Report No. 290, at 87 tbl. 38 (2022).

74.    NMFS listed the Māui and Hector's dolphins under the ESA in part because of the harm caused by bycatch in trawl and set net fisheries, and also because existing regulatory mechanisms for those fisheries are inadequately protective. 82 Fed. Reg. at 43708; 81 Fed. Reg. 64110, 64113–19, 64122–23 (Sept. 19, 2016). For the Māui dolphin, NMFS explained that "it is considered unlikely that this subspecies will recover unless sources of anthropogenic mortality are eliminated." 82 Fed. Reg. at 43708. For the Hector's dolphin, NMFS explained that "management measures have not halted population declines" and the "Hector's dolphin is likely to continue to decline unless bycatch mortality is reduced." *Id.* In its 2024 5-Year Review,

19

NMFS concluded that the greatest threat to both dolphin populations continues to be bycatch in fishing gear, especially set nets and trawl nets.

75.    In 2012, the IUCN's World Conservation Congress urged the New Zealand Government to "urgently extend dolphin protection measures, with an emphasis on banning gill net and trawl net use from the shoreline to the 100 metre depth contour in all areas where Hector's and Maui's [*sic*] Dolphins are found, including harbours." IUCN, *Actions to avert the extinctions of rare dolphins: Maui's dolphins, Hector's dolphins, Vaquita porpoises and South Asian river and freshwater dependent dolphins and porpoises*, WCC-2012-Rec-142-EN (2012), https://portals.iucn.org/library/sites/library/files/resrecfiles/WCC_2012_REC_142_EN.pdf. NMFS recently echoed the need to implement this recommendation in its 2024 5-Year Review.

76.    In 2023, the International Whaling Commission (IWC) Scientific Committee recommended that "highest priority should be assigned to management actions that immediately eliminate bycatch of Māui dolphins, including closure of any fisheries within the range of Māui dolphins that are known to pose a risk of bycatch to dolphins (i.e., set net and trawl fisheries)" and emphasized "the need for precautionary management given the critically endangered status of this subspecies and the inherent and irresolvable uncertainty which surrounds information on most small populations."

77.    New Zealand set net and trawl fisheries also catch and kill other species of marine mammals. GNZ has reported incidental captures of common dolphins, New Zealand fur seals, seals or sea lions (unidentified to species), and baleen whales in the set net and trawl fisheries that also catch Māui and Hector's dolphins.

III.    NEW ZEALAND HAS IMPLEMENTED LIMITED PROTECTIONS FOR MĀUI AND HECTOR'S DOLPHINS.

78.    The GNZ has a history of taking only minimal, inadequate steps to protect Māui and Hector's dolphins.

79.    Rather than developing a Population Management Plan (PMP) for the Māui and Hector's dolphins—which would impose a strict limit on fishing-related mortality and other statutory measures to achieve recovery—GNZ elected to develop a non-statutory and non-

binding "planning framework" to inform management of bycatch risk. That framework is referred to as a Threat Management Plan (TMP) for the dolphins, and the latest version was issued in 2020.

80.    In 2020, GNZ issued regulations that marginally extended set net and trawl restrictions in a portion of the Māui dolphin's and Hector's dolphin's ranges. *See* Figure 3. The closures do not include harbors. The closures fall short of the IWC Scientific Committee's, IUCN's, and NMFS's recommendations.



**Figure 3.** Areas within the Māui and Hector's dolphins' range that are closed to set netting (light green), closed to both set netting and trawling (dark green), and left unprotected under current regulations (red).

81.    As a "backstop measure," the regulations also specify a "fishing-related mortality limit" (FRML) within certain zones.

82.    The only FRML in the North Island is a limit of one Hector's or Māui dolphin within a defined "Māui dolphin habitat zone." Fisheries (Fishing-related Mortality Limits of

Marine Mammals and Other Wildlife) Regulations 2022 (2022/313) Part 1(7) (N.Z.), http://www.nzlii.org/nz/legis/consol_reg/fmlommaowr2022829/. The delineated Māui Dolphin Habitat Zone covers just a subset of the Māui dolphin's distribution. *See* Figure 4 (showing Māui Dolphin Habitat Zone). Set net and trawl fishing takes place outside of the Māui Dolphin Habitat Zone and is not subject to the FRML.



**Figure 4.** Map of the delineated Māui Dolphin Habitat Zone

83.     The regulations specify a separate Hector's dolphin FRML for each of six zones for the East Coast South Island and South Coast South Island subpopulations. The FRMLs range from "3 in any 2 consecutive fishing years" to "20 in any fishing year." Fisheries (Fishing-related Mortality Limits of Marine Mammals and Other Wildlife) Regulations 2022 (2022/313) Part 2 (N.Z.), http://www.nzlii.org/nz/legis/consol_reg/fmlommaowr2022829/. The FRML zones

22

do not encompass the entirety of the Hector's dolphin's range, including areas where set net and trawl fishing also occurs. No FRMLs have been set for the North Coast South Island or West Coast South Island subpopulations.

84.     The remainder of New Zealand's measures pertain to monitoring.

85.     The West Coast North Island set net and trawl fleets have zero percent human observer coverage. Department of Conservation, *Conservation Services Programme Annual Plan 2024/25*, at 17, 25 (N.Z.).

86.     Since 2017, New Zealand has mandated the installation of cameras on certain vessels within the North and South Island set net and trawl fleets to monitor bycatch. Cameras are now required on all set net fishing vessels greater than eight meters in length and on all trawl fishing vessels less than thirty-two meters in length. Fisheries (Electronic Monitoring on Vessels) Regulations 2017 (LI 2017/156) (N.Z.). However, less than one quarter of the vessels fishing in the West Coast North Island trawl and set net fisheries have been outfitted with cameras. GNZ has not publicly published information showing what proportion of South Island vessels have onboard cameras. Cameras are not required on smaller set net vessels that fish in harbors.

87.     Under the regulations, GNZ reviews only a portion of video footage from vessel cameras in certain fishing areas that overlap with the Hector's and Māui dolphin's distribution to detect if there has been a dolphin capture.

88.     NMFS has recently expressed its concerns (in the 2024 5-Year Review) that New Zealand's management is deficient. Relating to the Māui dolphin, NMFS explained "there are concerns that the New Zealand Government's regulations and conservation measures are inadequate to protect Māui's dolphin from the risk of bycatch due to: fishing restrictions not covering their entire range; a lack of comprehensive bycatch data; and the potential underestimation of bycatch risk." NMFS made an even harsher assessment of Hector's dolphin management: "[T]here are also major concerns about New Zealand's fishing regulations and the degree of protection they give SI [South Island] Hector's dolphins. The extent of fishing

restrictions, the New Zealand Government's potential underestimates of the level of bycatch, and the proposed limits on bycatch mortality for SI Hector's dolphins are of particular concern."

## IV.    THE COURT OF INTERNATIONAL TRADE REPEATEDLY FINDS NMFS'S COMPARABILITY FINDINGS FOR NEW ZEALAND'S FISHERIES ARBITRARY AND CONTRARY TO LAW.

89.    In 2020, in response to action by Sea Shepherd New Zealand and Sea Shepherd Conservation Society (collectively, Sea Shepherd), NMFS issued a comparability finding concluding that the West Coast North Island set net and trawl fisheries do not catch Māui dolphins in excess of U.S. standards. Sea Shepherd challenged that finding in the CIT and moved for a preliminary injunction to enjoin imports from the two fisheries.

90.    On November 28, 2022, the CIT granted the preliminary injunction, finding the comparability finding was likely arbitrary and capricious. *Sea Shepherd*, 606 F. Supp. 3d 1286.

91.    In January 2024, NMFS issued a new comparability finding for the West Coast North Island set net and trawl fisheries that authorized imports through the end of 2025, and the injunction accordingly was lifted in April 2024. *Sea Shepherd N.Z. v. United States*, 693 F. Supp. 3d 1364 (Ct. Int'l Trade 2024). According to GNZ, the import prohibition resulted in over USD $1.1 million in costs to exporters.[2] GNZ also reported the prohibition "contributed to export volume declines across some species, with snapper down 8 percent, kahawai down 20 percent, dogfish down 8 percent, and trevally down 45 percent."[3]

92.    Sea Shepherd later agreed to voluntarily dismiss its case, at which point the CIT observed that the "disposition ... is far from [a] bill of health for a species teetering on the brink of extinction." *Sea Shepherd N.Z. v. United States*, 723 F. Supp. 3d 1374, 1381 (Ct. Int'l Trade 2024).

---

[2] Hon. Todd McClay & Hon. Shane Jones, *United States Lifts Ban on New Zealand Fish Exports* (Apr. 3, 2024), https://www.beehive.govt.nz/release/united-states-lifts-ban-new-zealand-fish-exports; *see also 'Commonsense' win as fish exports to US given all-clear*, Radio New Zealand (Apr. 3, 2024), https://www.rnz.co.nz/news/national/513301/commonsense-win-as-fish-exports-to-us-given-all-clear.
[3] Ministry for Primary Industries, *Situation and Outlook for Primary Industries* 54 (Dec. 2024), https://www.mpi.govt.nz/dmsdocument/66648-Situation-and-Outlook-for-Primary-Industries-SOPI-December-2024.

93. MHDD filed a challenge to the 2024 comparability finding in the CIT on December 4, 2024. The CIT granted summary judgment to MHDD on August 26, 2025, ruling that the comparability finding was arbitrary and unlawful in multiple respects. *MHDD v. NMFS* (*MHDD I*), 799 F. Supp. 3d 1327 (Ct. Int'l Trade 2025). Specifically, the CIT held NMFS's determinations that New Zealand's regulatory program achieves comparable results to the MMPA's: (1) zero mortality rate goal, (2) negligible impact standard, (3) bycatch limit and regulatory plan to reduce bycatch, (4) monitoring requirements, and (5) stock assessment standards were arbitrary and contrary to law. *Id.* at 1337–46. The CIT also found that NMFS arbitrarily used a Māui dolphin population estimate of fifty-four animals—not the more accurate number of forty-eight—when assessing comparability to U.S. standards, and that NMFS arbitrarily concluded the fisheries do not kill or seriously injure other marine mammal species in excess of U.S. standards. *Id.* at 1342–43, 1346–48. The CIT vacated the Decision Memorandum for the comparability finding but declined to compel Defendants to implement an import ban at that time. *Id.* at 1348–49. The CIT noted, however, that its "conclusion that the Decision Memorandum is arbitrary and not in accordance with law may merit the implementation of an import ban going forward, if the agency continues to rely on an arbitrary and unlawful Decision Memorandum that could be regarded as equivalent to denying a comparability finding." *Id.* at 1349. The CIT ordered NMFS to file remand comparability findings on or before November 24, 2025. *Id.* at 1350. The CIT subsequently extended that deadline to January 6, 2026, due to the government shutdown.

V.    NMFS ISSUES A NEW COMPARABILITY FINDING FOR ALL OF NEW ZEALAND'S FISHERIES.

94. On August 29, 2025, just three days after the *MHDD I* ruling, NMFS announced that it had made comparability finding determinations for approximately 2,500 foreign fisheries from 135 nations. NMFS granted a full comparability finding for all of New Zealand's export fisheries. NMFS published an official notice of the findings in the Federal Register on September 2, 2025. 90 Fed. Reg. 42395 (Sept. 2, 2025) [hereinafter 2025 Comparability Finding]. The new comparability findings became effective on January 1, 2026, and stated they would "remain in

25

effect until December 31, 2029, or for such other period as NMFS may specify." *Id.* at 42395–96.

95.     Shortly after the 2024 Comparability Finding expired and the 2025 Comparability Finding went into effect, MHDD filed a challenge to the 2025 Comparability Finding in the CIT on January 5, 2026.

## VI.    NMFS ISSUES A NEW COMPARABILITY FINDING FOR NEW ZEALAND SET NET AND TRAWL FISHERIES.

96.     On March 11, 2026, NMFS published a Federal Register notice announcing the availability of new comparability findings for New Zealand's multispecies set net and trawl fisheries on the West Coast of the North Island and the entirety of the South Island (New Zealand Fisheries). 91 Fed. Reg. 11962 (Mar. 11, 2026). According to the notice, "the new findings supersede NMFS' previously published comparability findings for the same fisheries." *Id.* at 11963. The new findings were not available at the link provided in the Federal Register notice of availability. As of this date, they still are not available at that link. However, NMFS published the findings at a different link on March 13, 2026.[4] The "2026 Comparability Finding," as used herein, consists of the Federal Register notice and the Decision Memorandum for the new findings.

97.     The 2026 Comparability Finding is contrary to the MMPA's Import Provision and its implementing regulations in several ways and is based on arbitrary and inaccurate analyses.

   A.     <u>NMFS Did Not Establish that the New Zealand Fisheries Have a Standard Comparable to the MMPA's Zero Mortality Rate Goal.</u>

98.     The 2026 Comparability Finding unreasonably concluded that the New Zealand Fisheries have a comparable standard to the MMPA's requirement to reduce incidental mortality and serious harm from commercial fishing "to insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. § 1371(a)(2).

---

[4] NOAA, *Comparability Findings for New Zealand's North and South Island Multi-species Commercial Set Net and Trawl Fisheries - Decision Memorandum* (2026), https://www.fisheries.noaa.gov/s3/2026-03/NZ-MMPA-Decision-Memo-2026.pdf.

99.    In its 2021 application for a comparability finding for the New Zealand Fisheries, New Zealand responded to a question asking whether it has "an overarching regulation the goal of which is to reduce the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations to insignificant levels approaching a zero mortality and serious injury rate" by answering, "No."

100.    The 2026 Comparability Finding points to a number of environmental objectives, principles, and policy documents that it asserts are comparable in effectiveness to the Zero Mortality Rate Goal standard. However, none of these measures achieve comparable results to this standard with respect to Māui and Hector's dolphins, or any other marine mammal stocks.

### 1.    Māui dolphin

101.    For Māui dolphins, a comparable measure to the Zero Mortality Rate Goal standard would require fisheries to be managed with the goal of reducing bycatch to less than 0.01 dolphins per year (10% of the reported PBR[5]). The 2026 Comparability Finding does not establish that New Zealand's regulatory program manages bycatch with a goal of reducing bycatch to that level or even similar levels.

102.    The 2026 Comparability Finding asserts that New Zealand meets the Zero Mortality Rate Goal standard for Māui dolphins despite its application answer to the contrary because: (1) NMFS found that New Zealand implemented a "[Zero Mortality Rate Goal] equivalent as a separate metric—an objective that is '95% of the maximum number of dolphins the environment can support'"; and (2) NMFS found that a bycatch rate of 0.056 Māui dolphins per year "is insignificant approaching a zero mortality and serious injury rate because it is below the estimated PBR of 0.10 dolphins per year."

103.    NMFS failed to explain how New Zealand's non-statutory and non-binding objective to achieve "95% of the maximum number of dolphins the environment can support" is comparable to a Zero Mortality Rate Goal to keep bycatch below 0.01 dolphins per year. New Zealand's Threat Management Plan defines its 95% maximum population outcome for the Māui

---

[5] In its 2026 Comparability Finding, NMFS adopted a PBR of 0.10 for the Māui dolphin.

dolphin to equal a bycatch rate of 0.14 dolphins per year; more than ten times the Zero Mortality Rate Goal limit that would apply under comparable U.S. standards.

104.    NMFS also failed to explain how a bycatch rate of 0.056 dolphins per year is a comparable result to the Zero Mortality Rate Goal of 0.01 dolphins per year. Moreover, NMFS ignored evidence that the bycatch rate of Māui dolphins is higher than 0.056 dolphins per year, as explained below.

### 2.    Hector's dolphin

105.    For Hector's dolphins, a comparable measure to the Zero Mortality Rate Goal would require fisheries to be managed with the goal of reducing bycatch to less than seven dolphins per year (10% of the reported PBR[6]). The 2026 Comparability Finding does not establish that New Zealand's regulatory program manages fisheries with the goal of reducing bycatch to that level or even similar levels.

106.    The 2026 Comparability Finding asserts that New Zealand meets the Zero Mortality Rate Goal standard for Hector's dolphins despite its application answer to the contrary because: (1) NMFS found that New Zealand "established a population outcome for Hector's dolphin as managing human impacts to 'allow the population to increase to a level at or above 90% of the maximum number of dolphins the environment can support;'" and (2) NMFS found that "the measures aimed at the South Island Hector's dolphins are … designed to reduce the mean estimated rate of Hector's dolphin bycatch."

107.    NMFS failed to explain how New Zealand's non-statutory and non-binding objective to achieve "90% of the maximum number of dolphins the environment can support" is comparable to a Zero Mortality Rate Goal to keep bycatch below seven Hector's dolphins per year. NMFS also did not address that the TMP manages Hector's dolphin subpopulations with the goal of allowing those "populations to recover to and/or remain at or above 80% of their unimpacted status." New Zealand's Threat Management Plan for the Hector's dolphin defines its maximum population outcome to equal a bycatch rate of 137.59 dolphins per year—nearly

---

[6] In its 2026 Comparability Finding, NMFS adopted a PBR of 66.5 for the Hector's dolphin.

*twenty times* larger than the Zero Mortality Rate Goal limit that would apply under comparable U.S. standards.

108.    NMFS also failed to provide any explanation or evidence for how "measures … designed to reduce the mean estimated rate of Hector's dolphin bycatch" are comparable in effectiveness to the Zero Mortality Rate Goal standard.

109.    NMFS also ignored evidence that bycatch of Hector's dolphins in New Zealand's fisheries is currently exceeding the Zero Mortality Rate Goal that would apply under comparable U.S. standards.

B.    NMFS Failed to Establish that Māui Dolphin and Hector's Dolphin Bycatch in the New Zealand Fisheries Will Have No More Than a Negligible Impact on the Stock.

110.    Because the Māui dolphin is listed as endangered under the ESA and the Hector's dolphin is listed as threatened under the ESA, the MMPA would only allow incidental take of these two stocks by commercial fisheries if the level of incidental mortality and serious injury from the fisheries has no more than a negligible impact on the stocks. 16 U.S.C. § 1371(a)(5)(E)(i).

111.    The 2026 Comparability Finding lacks any analysis of whether the level of incidental mortality and serious injury of Māui dolphins and Hector's dolphins in the New Zealand Fisheries has more than a negligible impact on their respective stocks. Instead, it concludes that the negligible impact standard "is not applicable … because New Zealand's statutory framework does not authorize or permit its commercial fisheries to incidentally take any marine mammals incidental to commercial fishing operations."

112.    New Zealand's Marine Mammal Protection Act of 1978 authorizes and otherwise permits commercial fisheries to incidentally kill or injure marine mammals as long as the death or injury is reported.

113.    NMFS further found that "the GNZ has demonstrated that it manages commercial fisheries risks to depleted marine mammal species or stocks … in a manner comparable in effectiveness to the U.S. regulatory program." Under U.S. standards, fisheries-related mortality

and serious injury to Māui dolphins could only be deemed negligible if it is less than 0.013 Māui dolphins per year (13% of reported PBR)[7]—or approximately one dolphin per seventy-seven years. Under U.S. standards, fisheries-related mortality and serious injury to Hector's dolphins could only be deemed negligible if it is less than two Hector's dolphins per year (2.6% of reported PBR).[8] NMFS failed to explain how New Zealand's regulatory measures are sufficient to ensure that bycatch rates for the Māui dolphin and Hector's dolphin do not exceed these negligible impact thresholds. Available evidence indicates that New Zealand fisheries are exceeding these thresholds for both the Māui dolphin and Hector's dolphin.

C.    NMFS Did Not Rely on the Best Available Evidence in Concluding that New Zealand Fisheries Are Not Exceeding Bycatch Limits.

114.    NMFS relied on bycatch estimates provided in GNZ's 2021 comparability finding application to determine if bycatch rates are exceeding bycatch limits. NMFS did not explain why the five-year-old estimates are the "best available." These bycatch estimates are significantly lower than more recent official estimates published by GNZ.

115.    The 2026 Comparability Finding uses a Māui dolphin bycatch estimate of 0.056 dolphins per year based on GNZ's 2021 comparability finding application. The latest available official assessment of Māui dolphin bycatch by GNZ (MacKenzie 2022) estimates bycatch in the West Coast North Island set net and trawl fisheries is occurring at a rate of 0.38 dolphins per year, nearly seven times the value NMFS used. This bycatch rate is more than three times higher than the reported PBR limit (0.10), nearly thirty times higher than the negligible impact limit (0.013), and nearly forty times higher than the Zero Mortality Rate Goal limit (0.010) that would be comparable to U.S. standards. NMFS did not rationally explain why it disregarded this bycatch estimate in favor of an even older bycatch estimate.

116.    The 2026 Comparability Finding uses a Hector's dolphin bycatch mortality and injury rate of 8.8 dolphins per year based on data from the 2020–2021 fishing year. NMFS acknowledged that this estimate does not incorporate cryptic mortality (i.e., dolphins that are

---

[7] 13% x 0.1 dolphins/year = 0.013 dolphins/year.
[8] 2.6% x 66.5 dolphins/year = 1.729 dolphins/year.

captured and killed but not observed). NMFS did not account for this underestimate of mortality in the reported bycatch rate.

117. NMFS also failed to explain why the Hector's dolphin bycatch rate it used is the best available when other information indicates the bycatch rate is much higher. In the 2023–24 fishing year, there were fifteen documented Hector's dolphin captures (not including cryptic mortality). And the latest available official assessment of Hector dolphin bycatch (which includes cryptic mortality) (MacKenzie 2022) estimates a bycatch rate of 53.48 Hector's dolphins per year. This bycatch rate exceeds the negligible impact and Zero Mortality Rate Goal levels that would be comparable to U.S. standards. GNZ has acknowledged that observed Hector's dolphin mortality since 2022 has been even greater than the assessment's predictions.

118. The 2026 Comparability Finding does not list bycatch estimates for any other species besides the New Zealand fur seal and common dolphin. For these two species, the 2026 Comparability Finding cites bycatch estimates of 42.1 fur seals per year (26.1 in set net fisheries and 16 in inshore trawl fisheries) and 5.4 common dolphins per year (3.5 in set net fisheries and 1.9 in inshore trawl fisheries). The latest publicly available bycatch model report for New Zealand's marine mammal stocks (MacKenzie 2022) estimates a bycatch rate of 1,172.35 fur seal deaths per year and 87.17 common dolphin deaths per year in all New Zealand fisheries (and 56 observable common dolphin captures per year in the set net and trawl fisheries alone). NMFS did not provide a rational explanation for why it disregarded these estimates in favor of the lower estimates.

    D.    <u>NMFS Arbitrarily Found that New Zealand Implements Bycatch Limits for Māui and Hector's Dolphins That Are Comparable to U.S. Standards.</u>

119. In its 2026 Comparability Finding, NMFS found that New Zealand has established and implements bycatch limits for Māui and Hector's dolphins that are comparable to U.S. standards. However, in reaching this conclusion NMFS inconsistently relied on three conflicting metrics it referred to as "bycatch limits": PBR limits, fishing-related mortality limits (FRML), and "population sustainability thresholds" (PST). NMFS failed to provide evidence that

31

any of these so-called "bycatch limits" actually function to limit Māui and Hector's dolphin bycatch in New Zealand fisheries.

120.    NMFS stated that New Zealand adopted NMFS's PBR calculation of 0.10 as its bycatch limit for the Māui dolphin and NMFS's PBR calculation of 66.5 as its bycatch limit for the Hector's dolphin. In concluding that "New Zealand's bycatch limit is comparable in effectiveness to Potential Biological Removal," NMFS only considered whether New Zealand had *calculated* a bycatch limit comparable to the PBR level, and not whether New Zealand actually *implements* a bycatch limit comparable to U.S. standards in its fisheries. NMFS did not identify any New Zealand law or regulatory measure that limits bycatch to 0.10 Māui dolphins per year or 66.5 Hector's dolphins per year. NMFS did not explain how "adopt[ing] NMFS' PBR calculation … for the purposes of [GNZ's] 2021 Comparability Finding Application" is comparable in effectiveness to the MMPA's statutorily required bycatch limits.

121.    NMFS also found that New Zealand was not required to calculate PBR itself, but that it was sufficient for it to rely on bycatch limits calculated automatically by NMFS through the agency's application platform "for purposes of its 2021 Comparability Finding Application." However, for at least some marine mammal stocks, NMFS's automatic PBR calculations were arbitrarily high. For example, the 2026 Comparability Finding cites a common dolphin PBR of 109,567 dolphins. The total population of common dolphins in New Zealand's entire EEZ is 128,726 dolphins. This means that NMFS's calculated PBR limit for the common dolphin would allow New Zealand fisheries to catch and kill roughly 85% of the country's entire common dolphin population. Further, NMFS did not provide the inputs it used to calculate these PBR values, including key inputs such as the population estimates and recovery factors NMFS decided to adopt.

122.    NMFS cited New Zealand's FRMLs to conclude that New Zealand has a process for establishing bycatch limits comparable to U.S. standards. However, NMFS stated that the FRML "does not function as a bycatch limit." NMFS did not explain how an FRML that does not function as a bycatch limit is comparable in effectiveness to U.S. regulatory bycatch limits.

32

123.    FRMLs are not comparable in effectiveness to U.S. regulatory bycatch limits. New Zealand law does not require any non-discretionary action if the FRML is exceeded. Further, the Māui dolphin FRML does not limit dolphin deaths over a specified time frame, nor does it limit dolphin deaths outside of the designated "Māui dolphin habitat zone" (which does not encompass the entire Māui dolphin distribution). The FRMLs for the Māui dolphin and for some Hector's dolphin stocks are also higher than the PBR.

124.    The 2026 Comparability Finding also refers to the PST as a "bycatch limit." The PST is New Zealand's non-regulatory estimate for the maximum number of dolphin deaths that can occur while still allowing GNZ's population outcome objective for the stock to be achieved. NMFS did not identify any New Zealand law or regulatory measure that actually limits bycatch below the PST level. New Zealand's formula for calculating PST results in a higher value than PBR. NMFS did not even identify the PST value for the Māui dolphin or Hector's dolphin. NMFS failed to explain how the calculated PST value is comparable in effectiveness to U.S. regulatory bycatch limits.

125.    Ultimately, available evidence indicates that GNZ does not implement regulatory bycatch limits for either the Māui dolphin or Hector's dolphin that are comparable in effectiveness to applicable U.S. bycatch limits.

E.    NMFS Used an Inappropriate Population Estimate to Evaluate Whether Māui Dolphin Bycatch Is in Excess of the U.S. Standard for a Bycatch Limit.

126.    In its 2026 Comparability Finding, NMFS compared the estimated mean annual deaths from the set net and trawl fisheries to a PBR of 0.10 for the Māui dolphin.

127.    That PBR value appears to be sourced from New Zealand's 2021 application for a comparability finding. The 2021 application indicates the PBR value is based on an abundance estimate of "54 dolphins aged 1+, with a 95 percent confidence that the number of dolphins over one year old is between 49 and 64."

128.    The IWC Scientific Committee published a report in 2023 that estimated the Māui dolphin population at 48 individuals. The report used the same data as the 54-dolphin estimate,

33

but "corrected" that estimate to account for dolphin deaths between survey years; which the 54-dolphin estimate failed to account for.

129.    The 2026 Comparability Finding rejected the IWC's lower population estimate, but its stated grounds for doing so—that the IWC's estimate is not sufficiently reliable—ignores that the IWC estimate was calculated to improve the reliability compared to the 54-dolphin estimate. NMFS failed to justify relying on the higher, uncorrected population estimate.

130.    In addition, New Zealand's most recent Threat Classification System assessment of Māui dolphin status estimates a population of "48 individuals (more than 1 year old) based on genetic mark-recapture technique in 2020/21." NMFS did not consider or address this evidence.

131.    If NMFS had used a smaller population size to calculate Māui dolphin PBR, the PBR value necessarily would have been smaller than the 0.10 PBR value that NMFS used because the other variables remain constant. NMFS failed to consider whether bycatch estimates or their confidence intervals exceed the smaller PBR.[9]

F.    NMFS Arbitrarily Found that the Monitoring Program for the New Zealand Fisheries Is Comparable to U.S. Standards.

132.    NMFS concluded in its 2026 Comparability Finding that New Zealand's monitoring program for marine mammals is comparable in effectiveness to U.S. standards.

133.    For the Māui dolphin, NMFS based that conclusion on its finding that "New Zealand ... has been able to attain at least 90% monitoring coverage ... within the [Māui Dolphin Habitat Zone]." NMFS did not provide any evidence to support this 90% coverage estimate. Available evidence indicates New Zealand has attained less than 90% monitoring coverage in the Māui Dolphin Habitat Zone. For example, there is no monitoring on vessels fishing in harbors, which constitutes "95–99% of set net fishing effort across the entire [Māui Dolphin Habitat Zone]." Further, NMFS did not establish that monitoring levels either inside or outside the Māui Dolphin Habitat Zone are sufficient to detect bycatch.

---

[9] According to GNZ, mitigation measures are necessary whenever PBR is within or below the estimated bycatch confidence interval. GNZ, *Hector's and Māui Dolphin Threat Management Plan: Technical Advice, Part B3: West Coast North Island (Māui Dolphin)* 3 (2019).

134.    For the Hector's dolphin, NMFS based its conclusion on a finding that "cameras are installed on 220 vessels operating in the South Island and there is nearly 100% monitoring coverage across all in-scope vessels." NMFS did not explain why the reported coverage levels and footage review rates are sufficient to produce statistically reliable estimates of Hector's dolphin bycatch. NMFS did not address monitoring of out-of-scope vessels that still pose a bycatch risk to Hector's dolphins. Available evidence indicates that actual coverage levels are much lower than 100%.

135.    The 2026 Comparability Finding is devoid of any analysis of whether monitoring coverage levels across the New Zealand Fisheries are sufficient to produce statistically reliable estimates of bycatch of other marine mammal species incidentally caught by these fisheries, such as common dolphins, bottlenose dolphins, orcas, pilot whales, New Zealand sea lions, and New Zealand fur seals.

136.    In addition, NMFS did not adequately evaluate the degree to which the electronic monitoring method New Zealand uses is comparable to the human observer monitoring method the United States primarily uses. Electronic monitoring has limitations in its ability to record captures that human observers do not. NMFS did not address the effect of these differences.

137.    Even recorded captures may not be detected by New Zealand regulators because only a subset of camera footage is reviewed for the set net and trawl fisheries. There is also evidence that actual review rates are lower than the aspirational footage review rates on which NMFS relied. NMFS failed to adequately address whether the actual monitoring rates are comparable in effectiveness to U.S. standards.

138.    Further, NMFS failed to adequately address whether higher levels of monitoring than what GNZ reported are required to regulate bycatch of a critically endangered marine mammal like the Māui dolphin. NMFS requires much higher levels of monitoring coverage—as high as 100%—in similar circumstances, such as when managing bycatch of endangered species, when in-season management (e.g., fishery closures) is supported by observer data, when higher levels of precision for bycatch estimates may be desired, or when monitoring for regulatory compliance is a priority. For the Māui dolphin, where fisheries interactions may be rare but just

one death can have significant population-level effects, monitoring must be as near as possible to 100% to detect if a dolphin is caught in the fishery (i.e., a non-zero catch rate). In fact, GNZ has stated that there must be "100% monitoring of vessels fishing using trawl or set net in areas of risk" to determine if a bycatch limit is exceeded. Dep't of Conservation & Fisheries New Zealand, *Protecting Hector's and Māui Dolphins: Supporting Information and Rationale* 30 (June 17, 2019). NMFS did not establish that monitoring of Māui dolphin bycatch is sufficient to manage bycatch in a manner that is comparable in effectiveness to U.S. standards.

G.     NMFS Arbitrarily Found That New Zealand's Regulatory Program Provides for Comparable Māui Dolphin Stock Assessments.

139.     In its 2026 Comparability Finding, NMFS found New Zealand's regulatory program provides for stock assessments that are comparable to U.S. standards because "both [U.S. and New Zealand] legal frameworks require an understanding of the biology and status of marine mammal species, their range, and population estimates." In support, NMFS cited a provision of New Zealand's Marine Mammal Protection Act that only applies to population management plans. This provision is not applicable to the Māui or Hector's dolphin because New Zealand has not prepared a population management plan for them. NMFS did not cite to any other New Zealand laws requiring a similar assessment of the stock assessment components.

140.     NMFS found that New Zealand has collected "much" of the information that is required to be included in U.S. stock assessments. NMFS failed to explain how the cited New Zealand assessments, which occur every few years, are comparable in effectiveness to U.S. stock assessments for endangered and threatened species, which must be reviewed annually. NMFS also ignored evidence that the last comprehensive abundance estimate for Hector's dolphins was based on data collected from 2010 to 2015.

141.     Further, the 2026 Comparability Finding contains no evaluation or evidence of New Zealand's methods for estimating the abundance, range, and status of marine mammal species besides Māui and Hector's dolphins, including the common dolphin, bottlenose dolphin, orca, pilot whale, New Zealand sea lion, New Zealand fur seal, or other marine mammals that are caught and killed in the fisheries. The 2026 Comparability Finding provides no source for these

36

abundance estimates besides GNZ's 2021 comparability finding application and contains no assessment of the reliability of these estimates.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION – The 2026 Comparability Finding for the New Zealand Fisheries Is Arbitrary and Capricious and Contrary to Law, in Violation of the MMPA and APA.**

142.    The allegations made in paragraphs 1–141 are realleged and incorporated by this reference.

143.    The MMPA prohibits the importation of seafood products caught by a fishery "which results in the incidental kill or incidental serious injury" of marine mammals "in excess of United States standards." 16 U.S.C. § 1371(a)(2). The Secretary of Commerce "shall insist on reasonable proof from the government of [the harvesting nation] of the effects on ocean mammals" from the fishery to determine if the import standard is met. *Id.* § 1371(a)(2)(A).

144.    The Import Regulations prohibit importation of seafood from a fishery "that does not have a valid comparability finding in effect." 50 C.F.R. § 216.24(h)(1)(ii)(A). To issue a valid comparability finding, NMFS must reasonably find "that the harvesting nation for an export ... fishery has met the applicable conditions specified in § 216.24(h)(6)(iii) subject to the additional considerations for comparability determinations set out in § 216.24(h)(7)." *Id.* § 216.3.

145.    The 2026 Comparability Finding is a final agency action as defined by the APA, for which there is no other adequate remedy in a court.

146.    NMFS did not insist on reasonable proof from GNZ of the effects of the New Zealand Fisheries on marine mammals that are caught in the fisheries. 16 U.S.C. § 1371(a)(2)(A).

147.    The 2026 Comparability Finding is arbitrary and capricious and contrary to law in multiple respects.

148.    First, NMFS was required to establish that the regulatory program for the New Zealand Fisheries has a comparable standard or achieves comparable results to the U.S. standard that incidental mortality and serious injury of marine mammals in commercial fisheries must be

reduced to "insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. §§ 1371(a)(2), 1387(b), (f). NMFS failed to establish that New Zealand's non-statutory, non-binding, and non-quantitative policy objectives are effective at achieving this standard. The New Zealand Fisheries lack an equivalent to this U.S. standard.

149.    Second, NMFS was required to establish that the regulatory program for the New Zealand Fisheries has a comparable standard or achieves comparable results to the U.S. standard that incidental mortality and serious injury of endangered and threatened marine mammals in commercial fisheries have no more than a "negligible impact" on the species. *Id.* § 1371(a)(2), (a)(5)(E)(i); 50 C.F.R. § 216.24(h)(7)(i). NMFS's conclusion that this standard is not applicable to New Zealand is arbitrary and capricious. And the New Zealand Fisheries lack an equivalent standard. Based on available values for PBR, the evidence of total human-caused mortality, and the evidence of fisheries-related mortality or serious injury, incidental mortality and serious injury of Māui dolphins and Hector's dolphins in the West Coast North Island set net and trawl fisheries and South Island set net and trawl fisheries, respectively, exceeds the negligible impact threshold that would be comparable to U.S. standards.

150.    Third, NMFS was required to insist on reasonable proof from GNZ and consider readily available and relevant information about bycatch of marine mammals in issuing its 2026 Comparability Finding. NMFS concluded that Māui dolphin and Hector's dolphin bycatch is not in excess of U.S. standards based on arbitrarily low bycatch estimates. NMFS did not consider or address more recent readily available evidence that Māui dolphin bycatch and Hector's dolphin bycatch rates are in excess of U.S. standards. NMFS relied on arbitrarily low bycatch estimates in concluding that bycatch rates are not in excess of U.S. standards for any other marine mammal stock.

151.    Fourth, NMFS was required to establish that the New Zealand Fisheries have a bycatch limit that is comparable in effectiveness to the U.S. standard for a bycatch limit and that GNZ implements measures designed to reduce bycatch below the bycatch limit. *See* 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*), (*5*), (*6*). The Import Regulations specify that the bycatch limit must be the PBR or a comparable metric. 50 C.F.R. § 216.3. NMFS's finding that

New Zealand meets this standard because it adopted NMFS's automatically calculated PBR for the purposes of its comparability finding application is arbitrary and capricious and contrary to law. NMFS did not identify any New Zealand law or regulatory measure that limits bycatch to PBR for any marine mammal species. Bycatch exceeds PBR for the Māui dolphin and several Hector's dolphin subpopulations. NMFS failed to establish that GNZ's regulatory program achieves comparable results as statutorily mandated and enforceable bycatch limits under U.S. standards.

152.    Fifth, NMFS was required to establish that the rates of mortality or serious injury of marine mammal bycatch are not in excess of U.S. standards. *See* 16 U.S.C. § 1371(a)(2); *see also* 50 C.F.R. § 216.24(h)(6)(iii)(C)(*6*). NMFS used an arbitrarily low Māui dolphin PBR calculation when evaluating whether Māui dolphin mortality and injury rates in the West Coast North Island set net and trawl fisheries exceed PBR. In doing so, NMFS failed to use the best available science for the population estimates. *See* 16 U.S.C. § 1362(27).

153.    Sixth, NMFS was required to establish that the New Zealand Fisheries have monitoring procedures that are comparable to U.S. standards for monitoring in similar circumstances. *Id.* §§ 1371(a)(2), 1387(f)(2), (5); 50 C.F.R. § 216.24(h)(7)(i). NMFS's finding that New Zealand's monitoring procedures for the West Coast North Island set net and trawl fisheries are comparable to U.S. standards is arbitrary and capricious because it erroneously assumed there is 90% monitoring coverage in the Māui Dolphin Habitat Zone. NMFS failed to evaluate whether higher levels of monitoring or camera review are necessary either in or outside the Māui Dolphin Habitat Zone to adequately detect Māui dolphin bycatch, given the circumstances. NMFS's finding that New Zealand's monitoring procedures for the South Island Fisheries are comparable to U.S. standards is arbitrary and capricious because it did not evaluate coverage levels across the entire fleet, including out-of-scope vessels. NMFS did not establish that New Zealand's monitoring programs in the North Island or South Island fisheries produce statistically reliable results given the circumstances.

154.    Seventh, NMFS was required to establish that New Zealand's regulatory program provides for stock assessments that are comparable to the MMPA's stock assessment

39

requirements. 16 U.S.C. §§ 1371(a)(2), 1386(a). NMFS arbitrarily found New Zealand's regulatory program provides for comparable stock assessments based on an inapplicable law. NMFS did not explain how New Zealand's population assessments are comparable in effectiveness to U.S. stock assessments for endangered and threatened species, or for any other marine mammal stock. New Zealand lacks an equivalent stock assessment requirement for the Māui dolphin and Hector's dolphin.

155.    Accordingly, NMFS's 2026 Comparability Finding for the New Zealand Fisheries is arbitrary and capricious and contrary to law, in violation of the MMPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2)(A); 16 U.S.C. 1371(a)(2); 50 C.F.R. § 216.24(h).

**SECOND CAUSE OF ACTION – Defendants Failed to Ban the Importation of Fish from the New Zealand Fisheries as Required by the MMPA.**

156.    The allegations made in paragraphs 1–155 are realleged and incorporated by this reference.

157.    The MMPA requires the Secretary of the Treasury to ban the importation of seafood products caught by a fishery "which results in the incidental kill or incidental serious injury" of marine mammals "in excess of United States standards." 16 U.S.C. § 1371(a)(2). The Homeland Security Act imposes a responsibility on the Department of Homeland Security to implement import bans. 6 U.S.C. §§ 203(1), 212(a)(1).

158.    A fishery without a "valid comparability finding in effect" is deemed to "result[] in the incidental mortality or incidental serious injury of marine mammals in excess of U.S. standards." 50 C.F.R. § 216.24(h)(1)(i). It is unlawful to import fish from "a fishery that does not have a valid comparability finding in effect at the time of import." *Id.* § 216.24(h)(1)(ii)(A).

159.    Despite the fact that the New Zealand Fisheries result in the incidental killing or serious injury of Māui dolphins and Hector's dolphins in excess of U.S. standards, the Secretaries of the Treasury and Homeland Security have not banned the importation of fish and fish products from those fisheries, in violation of MMPA section 1371(a)(2).

160.    An import ban is a final agency action that can be compelled under the APA, 5 U.S.C. § 706(1).

40

161.    The failure to act by the Secretaries of the Treasury and Homeland Security constitutes "agency action unlawfully withheld or unreasonably delayed," for which this Court may order relief under the APA. 5 U.S.C. § 706(1).

## REQUEST FOR RELIEF

1.    WHEREFORE, Plaintiff prays that this Court:

2.    Declare that the 2026 Comparability Finding violates the MMPA, its implementing regulations, and the APA;

3.    Vacate the Comparability Finding, in full or in part;

4.    Enjoin imports of fish and fish products from the New Zealand Fisheries;

5.    Remand the Comparability Finding to NMFS;

6.    Require Defendants to implement a prohibition on imports from the New Zealand Fisheries as required by the MMPA, its implementing regulations, and the APA;

7.    Grant any injunctive relief necessary to bar imports from the New Zealand Fisheries;

8.    Maintain jurisdiction over this action until Defendants are in compliance with every order of this Court;

9.    Award Plaintiff its costs and reasonable attorney fees pursuant to 28 U.S.C. § 2412; and

10.    Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 24th day of March, 2026.

*/s/ Sabrina Devereaux*
Sabrina Devereaux
Christopher Eaton
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T (206) 343-7340
sdevereaux@earthjustice.org
ceaton@earthjustice.org

41

Natalie Barefoot
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
T (415) 217-2000
nbarefoot@earthjustice.org

*/s/ Brett Sommermeyer*
Brett Sommermeyer
Catherine Pruett
Law of the Wild
7511 Greenwood Avenue North, #4214
Seattle, WA 98103
T (206) 774-0048
brett@lawofthewild.org
catherine@lawofthewild.org

*Attorneys for Plaintiff Māui and Hector's Dolphin Defenders NZ Inc.*