**UNITED STATES COURT OF INTERNATIONAL TRADE**

MĀUI AND HECTOR'S DOLPHIN
DEFENDERS NZ INC.,

*Plaintiff,*

v.

NATIONAL MARINE FISHERIES
SERVICE, et al.,

*Defendants.*

Case No. 1:26-cv-02462-JCG

Before: Honorable Jennifer Choe-Groves

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ...............................................................................................................1

LEGAL BACKGROUND ....................................................................................................2

FACTUAL BACKGROUND ................................................................................................6

    I.      New Zealand Fisheries Pose a Severe Threat to Māui and Hector's
           Dolphins. ..............................................................................................................6

    II.     The CIT Has Repeatedly Faulted NMFS for Arbitrarily Finding New
           Zealand's Regulatory Program Sufficient. ..........................................................10

    III.    NMFS Issues New Comparability Findings for the New Zealand Fisheries. .........11

STANDARD OF REVIEW ..................................................................................................12

ARGUMENT ......................................................................................................................12

    I.      MHDD Is Likely to Succeed on the Merits. ..........................................................13

          A.      NMFS's ZMRG Conclusion is Arbitrary. ..................................................14

          B.      The 2026 Comparability Finding Does Not Establish that New
                Zealand Implements a Standard Comparable to the MMPA's
                Negligible Impact Standard. .......................................................................17

          C.      NMFS Failed to Insist on Reasonable Proof or Use the Best
                Available Evidence in Concluding the New Zealand Fisheries Are
                Not Exceeding Bycatch Limits. ..................................................................20

          D.      The 2026 Comparability Finding Arbitrarily Found that New
                Zealand Implements Marine Mammal Bycatch Limits That Are
                Comparable to U.S. Standards. ...................................................................25

          E.      The 2026 Comparability Finding Arbitrarily Found that the
                Monitoring Program for the New Zealand Fisheries is Comparable
                to U.S. Standards. .......................................................................................28

          F.      The 2025 Comparability Finding Relies on An Outdated and
                Overly Optimistic Population Estimate Without Explanation. ....................34

    II.     MHDD Is Likely to Suffer Irreparable Harm Absent an Injunction. .....................36

          A.      Māui Dolphins ............................................................................................39

B.      Hector's Dolphins ...................................................................................41

III.    The Balance of Equities and Public Interest Weigh Heavily in Favor of a Preliminary Injunction. ..........................................................................................43

IV.    The Court Should Impose No More Than a Nominal Bond. .................................45

CONCLUSION ...................................................................................................................45

CERTIFICATE OF COMPLIANCE .................................................................................47

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Aluminum Extrusions Fair Trade Comm. v. United States*,
  607 F.Supp.3d 1332 (Ct. Int'l Trade 2022) ...........................................................13

*Am. Radio Relay League, Inc. v. F.C.C.*,
  524 F.3d 227 (D.C. Cir. 2008) ...........................................................................35

*Am. Rivers v. FERC*,
  895 F.3d 32 (D.C. Cir. 2018) ................................................................22, 23, 24, 25

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
  271 F.Supp.2d 230 (D.D.C. 2003) .......................................................................38

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) ..........................................................................................37

*ANR Storage Co. v. FERC*,
  904 F.3d 1020 (D.C. Cir. 2018) .........................................................................33

*Brower v. Evans*,
  257 F.3d 1058 (9th Cir. 2001) ...........................................................................12

*Carlson v. Postal Regul. Comm'n*,
  938 F.3d 337 (D.C. Cir. 2019) ...........................................................................17

*Conservation Law Found. v. Ross* (*CLF*),
  422 F.Supp.3d 12 (D.D.C. 2019) ...................................................................38, 40

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
  789 F.3d 1075 (9th Cir. 2015) ...........................................................................37

*Ctr. for Biological Diversity v. Ross*,
  480 F.Supp.3d 236 (D.D.C. 2020) ......................................................................38

*Defs. of Wildlife v. U.S. Dep't of Interior*,
  931 F.3d 339 (4th Cir. 2019) .................................................................23, 30, 35

*Dow AgroSciences LLC v. NMFS*,
  707 F.3d 462 (4th Cir. 2013) .............................................................................25

*Earth Island Inst. v. Evans*,
  256 F.Supp.2d 1064 (N.D. Cal. 2003) ................................................................39

*Earth Island Inst. v. Mosbacher*,
  746 F.Supp.964 (N.D. Cal. 1990) ...........................................................38, 39, 42

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)..................................................................................................36

*Gen. Chem. Corp. v. United States*,
817 F.2d 844 (D.C. Cir. 1987).................................................................................27

*Humane Soc'y v. Locke*,
626 F.3d 1040 (9th Cir. 2010) ...........................................................................23, 30

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) (en banc) ..................................................................44

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)......................................................................................44

*MHDD v. NMFS*,
1:26-cv-00060-JCG (Ct. Int'l Trade Jan. 5, 2026)..................................................11

*MHDD v. NMFS* (*MHDD I*),
799 F.Supp.3d 1327 (Ct. Int'l Trade 2025) .................................................... *passim*

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983)......................................................................................12, 17, 34

*Nat. Res. Def. Council, Inc. v. Ross* (*NRDC*),
331 F.Supp.3d 1338 (Ct. Int'l Trade 2018) .................................................... *passim*

*Nat'l Wildlife Fed'n v. NMFS* (*NWF*),
886 F.3d 803 (9th Cir. 2018) ......................................................................... *passim*

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) ...................................................................................30

*Sea Shepherd N.Z. v. United States*,
693 F.Supp.3d 1364 (Ct. Int'l Trade 2024) ............................................................10

*Sea Shepherd N.Z. v. United States*,
723 F.Supp.3d 1374 (Ct. Int'l Trade 2024) ............................................................10

*Sea Shepherd N.Z. v. United States* (*Sea Shepherd I*),
606 F.Supp.3d 1286 (Ct. Int'l Trade 2022) .................................................... *passim*

*In re Section 301 Cases*,
524 F.Supp.3d 1355 (Ct. Int'l Trade 2021) ............................................................13

*Sierra Club v. U.S. Army Corps of Eng'rs*,
701 F.2d 1011 (2d Cir. 1983)...................................................................................19

*U.S. Auto Parts Network, Inc. v. United States*,
    319 F.Supp.3d 1303 (Ct. Int'l Trade 2018) ....................................................13, 44

*U.S. Sugar Corp. v. EPA*,
    830 F.3d 579 (D.C. Cir. 2016) .........................................................................23, 27

**Statutes**

5 U.S.C. § 706......................................................................................................11, 12

6 U.S.C. § 203............................................................................................................3

6 U.S.C. § 212............................................................................................................3

16 U.S.C. § 1361..................................................................................................1, 3, 37

16 U.S.C. § 1362...............................................................................................4, 5, 15, 27

16 U.S.C. § 1371.............................................................................................. *passim*

16 U.S.C. § 1386.......................................................................................................4, 5

16 U.S.C. § 1387.............................................................................................. *passim*

**Regulations**

50 C.F.R. § 216.24 .......................................................................................... *passim*

50 C.F.R. § 216.103 .................................................................................................17

50 C.F.R. § 229.2 ...................................................................................................5, 15

**Federal Register**

81 Fed. Reg. 54390 (Aug. 15, 2016)............................................................................5

81 Fed. Reg. 54390 (Aug. 15, 2016)............................................................................6

82 Fed. Reg. 43701 (Sep. 19, 2017) ........................................................................7, 18

85 Fed. Reg. 71297 (Nov. 9, 2020)............................................................................16

90 Fed. Reg. 42395 (Sept. 2, 2025) ............................................................................11

91 Fed. Reg. 11962 (Mar. 11, 2026)..........................................................................12

91 Fed. Reg. 12510 (Mar. 16, 2026)..........................................................................39

**INTRODUCTION**

On February 26, 2026, a Māui dolphin—one of only 50 remaining—was found dead, potentially due to bycatch.

When a marine mammal is on the brink of extinction in the United States, it is treated as an emergency under the Marine Mammal Protection Act (MMPA) and its implementing regulations. That Congressionally mandated urgency is why no U.S. marine mammal has gone extinct since the MMPA was enacted. In fact, the MMPA's purpose is to ensure that marine mammals should never "diminish below their optimum sustainable population." 16 U.S.C. §1361(2). To protect marine mammal populations beyond U.S. waters, Congress mandated that Defendants ban the import of seafood from any foreign fishery that catches marine mammals in excess of U.S. standards.

The story of the Māui dolphin and Hector's dolphin is the opposite. Decades of bycatch in New Zealand's set net and trawl fisheries has caused both populations to plummet far below their optimum sustainable population to the brink of extinction. Yet in the face of this existential threat, the Government of New Zealand (GNZ) continues to allow set net and trawl fishing to excessively catch and kill Māui and Hector's dolphins. While GNZ *could* exercise its considerable management discretion to adopt strict protections for the dolphins throughout their habitat, it has chosen not to. The proof of New Zealand's regulatory inadequacy is in the decline: Māui and Hector's dolphins are steadily declining towards extinction. Defendants have enabled GNZ to continue its lax management by repeatedly giving its fisheries a free pass under the MMPA.

However, the National Marine Fisheries Service's (NMFS) tune is different when acting in its scientific capacity. When the agency completed its recent 5-Year Review of the status of Māui and Hector's dolphins under the Endangered Species Act (ESA) in November 2024, it

1

concluded New Zealand's regulatory program is *inadequate* to prevent bycatch-related population declines. It found GNZ's fishery restrictions, monitoring, and bycatch estimation methods wholly lacking. And it ultimately concluded that GNZ must implement further measures to prevent population declines. Today, the dolphins are as poorly managed and even more imperiled as they were when the 5-Year Review was published. But in its 2026 Comparability Finding, NMFS inexplicably claims the exact opposite: that bycatch risk is insignificant and that New Zealand's regulatory program is adequate. As a result, Defendants continue to grant New Zealand fisheries access to the immense U.S. seafood market while they fish Māui and Hector's dolphins out of existence.

There is no rational basis for the agency's stunning about-face in its bycatch assessment. And there is no evidence or reasoning that can justify NMFS's disregard of the MMPA standards meant to prevent extinction.

If Defendants will not act with the urgency that the MMPA requires, then this Court should. Every day that Māui and Hector's dolphins are forced to live under New Zealand's inadequate management regime is a day closer to disappearance. Every U.S. dollar that supports a fishing net dropped in dolphin habitat is an investment in extinction. And every dolphin unnecessarily killed by fishing vessels is an irreparable loss to the populations and the countless people who value them.

Māui and Hector's Dolphin Defenders NZ Inc. (MHDD) respectfully requests this Court to preliminarily enjoin imports from the New Zealand set net and trawl fisheries that kill Māui and Hector's dolphins in excess of U.S. standards. Time is of the essence; Māui and Hector's dolphins have no time to spare.

## LEGAL BACKGROUND

Congress enacted the MMPA to protect and restore marine mammal populations that

2

"are, or may be, in danger of extinction or depletion as a result of man's activities," and to ensure that these populations do not become "diminish[ed] beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part." 16 U.S.C. §1361(1), (2). To protect not just marine mammals within the United States, but also those abroad, the MMPA includes a provision designed to leverage the United States' position as a major seafood importer. Section 1371(a)(2) of the MMPA [hereinafter the Import Provision] requires the Secretary of the Treasury[1] to ban the import of fish and fish products from foreign commercial fisheries that result "in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." *Id.* §1371(a)(2). This provision holds foreign fisheries accountable to comparable standards as U.S. fishers. In determining whether seafood imports must be banned, the Secretary of Commerce must "insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products." *Id.* §1371(a)(2)(A).

The term "United States standards" as used in the Import Provision encompasses, at a minimum, the provisions of the MMPA that are relevant to managing incidental mortality and serious harm to marine mammals from commercial fisheries (known as bycatch). *Sea Shepherd N.Z. v. United States* (*Sea Shepherd I*), 606 F.Supp.3d 1286, 1294-95 (Ct. Int'l Trade 2022) (identifying "statutory markers of 'United States standards'" with reference to MMPA requirements). As relevant here, the MMPA requires implementing: 1) a mandate to reduce bycatch to insignificant levels approaching zero [hereinafter Zero Mortality Rate Goal (ZMRG)];

---

[1] The Homeland Security Act imposes a responsibility on the Department of Homeland Security to implement import bans. 6 U.S.C. §§ 203(1), 212(a)(1).

2) bycatch limits based on scientifically established thresholds; 3) take reduction plans; 4) bycatch monitoring programs; and 5) stock assessments. 16 U.S.C. §§1386(a), 1387(b), (d), (f).

The MMPA's key metric for establishing bycatch limits and guiding mitigation action is the Potential Biological Removal (PBR) level. *See, e.g.*, 16 U.S.C. §§1362(19), (20), 1387(f); *see also Nat. Res. Def. Council, Inc. v. Ross* (*NRDC*), 331 F.Supp.3d 1338, 1363 (Ct. Int'l Trade 2018) (finding "PBR level is also a marker of 'United States standards' for the purposes of the Imports Provision"). The MMPA defines PBR as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." 16 U.S.C. §1362(20).[2]

PBR is a numerical value calculated as: the minimum population estimate of the stock, times one-half the maximum theoretical or estimated net productivity rate of the stock at a small population size, times a recovery factor of between 0.1 and 1.0. *Id*. The PBR value effectively represents the tolerance the U.S. government has for human-caused harm to marine mammal populations. When harm exceeds the PBR level, it indicates the stock requires corrective action to reduce the harm. *E.g.*, *id.* §1387(f) (requiring implementation of take reduction plan to reduce bycatch below PBR level within six months). NMFS thus uses the PBR value to evaluate several factors under the MMPA, such as the ZMRG, bycatch limits, stock assessments, and monitoring requirements—both domestically and when assessing imports.

The ZMRG requires commercial fisheries to reduce marine mammal bycatch to "insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. §1387(b)(1), (f)(2); *accord id.* §1371(a)(2). NMFS defines this goal numerically as 10% of the

---

[2] A "stock" is a term of art defined by the MMPA as "a group of marine mammals of the same species or smaller taxa in a common spatial arrangement, that interbreed when mature." 16 U.S.C. § 1362(11).

PBR. 50 C.F.R. §229.2. If bycatch exceeds that value, NMFS is required to develop and implement appropriate actions to reduce incidental mortality and serious injury to insignificant levels within five years. 16 U.S.C. §1387(b), (f).

The MMPA imposes even stricter standards for the management of marine mammal stocks that are either currently or likely to be listed under the ESA. *Id.* §1386(a)(4); *see id.* §1362(19) (defining "strategic stock" to include ESA-listed species). Fisheries that pose a risk to these vulnerable stocks must abide by recovery plans, lower bycatch limits, and stricter monitoring requirements. *Id.* §§1371(a)(5)(E)(i), 1387(d)(4). For example, the MMPA only allows fisheries to incidentally take ESA-listed marine mammals "if the Secretary, after notice and opportunity for public comment, determines that … the incidental mortality and serious injury from commercial fisheries will have a negligible impact on such species or stock." *Id.* §1371(a)(5)(E)(i). Bycatch of these marine mammals cannot exceed 13% of PBR for endangered species and 2.6% of PBR for threatened species.[3]

The Import Provision's plain text requires the Secretary of the Treasury to ban imports if an export fishery's bycatch rate is "in excess of" what the bycatch limit would be under U.S. standards. *Id.* §1371(a)(2). An export fishery also operates in excess of U.S. standards if it lacks regulatory measures comparable in effectiveness to those in the United States. *Id.*; 50 C.F.R. §216.24(h).

NMFS has promulgated regulations [hereinafter Import Regulations] to assist in determining whether these conditions are met, based on the consideration of several mandatory factors. 81 Fed. Reg. 54390 (Aug. 15, 2016) (codified at 50 C.F.R. §216.24(h)); *see Sea*

---

[3] *See* NMFS, *Criteria for Determining Negligible Impact under MMPA Section 101(a)(5)(E)*, at 14 (June 17, 2020), https://media.fisheries.noaa.gov/dam-migration/02-204-02.pdf.

*Shepherd I*, 606 F.Supp.3d at 1311-15. NMFS reviews each foreign export fishery that may incidentally catch marine mammals and publishes a "comparability finding" if it finds the fishery is in compliance with the Import Provision. 81 Fed. Reg. 54390, 54391-93 (Aug. 15, 2016). Imports must be prohibited from any fishery without a "valid" comparability finding "in effect." 50 C.F.R. §216.24(h)(1)(i)-(ii), (h)(9); *see Sea Shepherd I*, 606 F.Supp.3d at 1324 (explaining imports from such fisheries are "per se in excess of U.S. standards"). Exporting nations can apply for a comparability finding by submitting "reasonable proof" of the effects that their export fisheries have on marine mammals and documentary evidence demonstrating that they comply with the Import Provision's standards. 16 U.S.C. §1371(a)(2)(A); 50 C.F.R. §216.24(h)(6)(i)-(ii). To issue a comparability finding, NMFS must rationally find that the exporting nation "maintains a regulatory program with respect to the fishery that is comparable in effectiveness to the U.S. regulatory program with respect to incidental mortality and serious injury of marine mammals in the course of commercial fishing operations." 50 C.F.R. §216.24(h)(6)(iii)(B). NMFS must make certain specified findings and consider mandatory factors before making such a finding. *Id.* §216.24(h)(6)(iii), (h)(7); *see Sea Shepherd I*, 606 F.Supp.3d at 1312. A comparability finding is operative for four years from its publication, unless otherwise indicated. 50 C.F.R. §216.24(h)(8)(iv).

## FACTUAL BACKGROUND

**I.**     **New Zealand Fisheries Pose a Severe Threat to Māui and Hector's Dolphins.**

New Zealand's Māui and Hector's dolphins are two of the most imperiled dolphins in the world. Entanglement in New Zealand's set net and trawl fisheries has caused their precipitous decline, and those same fisheries continue to place them at risk of extinction in the near future.

The Māui dolphin is the world's most endangered marine dolphin, with less than 50 individuals over one year old left in existence. Decl. of Elisabeth Slooten, Ph.D. ¶ 16, filed

herewith. The few remaining individuals are primarily found along the west coast of New Zealand's North Island, in harbors and coastal waters out to the 100-meter depth contour. *Id.* ¶ 15. In recognition of its imperiled status, NMFS has listed the Māui dolphin as endangered under the ESA. 82 Fed. Reg. 43701 (Sep. 19, 2017). The dolphin is also listed as "Critically Endangered" by the International Union for the Conservation of Nature (IUCN) and as "Nationally Critical" under the New Zealand Threat Classification System. Slooten Decl. ¶ 17.

The closely related Hector's dolphin inhabits coastal waters primarily around New Zealand's South Island. Slooten Decl. ¶ 22. The population has declined from approximately 50,000 dolphins in 1975 to less than 15,000 dolphins today. *Id.* ¶ 24. The decline continues. *Id.* NMFS has listed the Hector's dolphin as threatened under the ESA. 82 Fed. Reg. at 43701. It is listed as "Endangered" by the IUCN and "Nationally Vulnerable" under the New Zealand Threat Classification System. Slooten Decl. ¶ 23.

Capture and drowning in commercial fisheries has been and continues to be the primary cause of decline for both the Māui dolphin and Hector's dolphin. *Id.* ¶ 29. The dolphins are especially at risk of accidental entanglement in the set net and trawl fisheries along the west coast of the North Island and the entire coast of the South Island. Slooten Decl. ¶ 30–31.

There is widespread agreement—including from NMFS—that the risk from these fisheries must be eliminated for Māui and Hector's dolphins to avoid extinction, let alone to recover. *Id.* ¶ 43; 82 Fed. Reg. at 43708 ("[I]t is considered unlikely that [the Māui dolphin] will recover unless sources of anthropogenic mortality are eliminated."); NMFS, *Māui's dolphin (*Cephalorhynchus hectori maui*) and South Island Hector's dolphin (*Cephalorhynchus hectori hectori*) – 5-Year Review: Summary and Evaluation* 108 (2024) [hereinafter 5-Year Review], attached as Exhibit A ("[A]ny mortality at all, whether anthropogenic or natural, could quickly

bring the subspecies closer to extinction."). Yet, GNZ has failed to implement a regulatory program that eliminates bycatch risk. Slooten Decl. ¶¶ 40-45; 5-Year Review 108-110.

GNZ manages Māui and Hector's dolphins through a non-statutory framework of goals and objectives known as a Threat Management Plan (TMP).[4] Under the TMP, GNZ employs three mechanisms to manage bycatch risk: 1) spatial closures; 2) fishing-related mortality limits; and 3) an electronic monitoring program.[5] These mechanisms provide only partial, insufficient protection for Māui and Hector's dolphins.

First, GNZ has closed just a subset of Māui and Hector's dolphin habitats to set net and trawl fishing. Slooten Decl. ¶ 44-45. The closures do not include harbors or deeper waters where the dolphins have been found, large portions of the Hector's dolphin's range, or the northern, southern, and eastern extents of the Māui dolphin's range. *Id.* ¶¶ 44-47; 5-Year Review 50-52, 95-98, 107 (finding GNZ's closed areas inadequate because they fail to cover dolphins' "entire range"). Set netting is particularly intensive in harbor habitat in the North Island. Slooten Decl. ¶ 56; 5-Year Review 49.

Second, New Zealand regulations provide for "fishing-related mortality limits" (FRMLs). The only FRML in the North Island is a limit of one Hector's or Māui dolphin within a defined "Māui dolphin habitat zone" (MDHZ).[6] The delineated habitat zone covers only the northern

---

[4] NMFS, *Comparability Findings for New Zealand's North and South Island Multi-species Commercial Set Net and Trawl Fisheries – Decision Memorandum* 17 (2026), [hereinafter 2026 CF], attached as Exhibit B.

[5] N.Z. Dep't of Conservation & Fisheries, *Hector's and Māui Dolphin Threat Management Plan 2020*, at 7-8 (2021) [hereinafter 2020 TMP], https://www.doc.govt.nz/globalassets/documents/conservation/native-animals/marine-mammals/maui-tmp/hectors-and-maui-dolphin-threat-management-plan-2020.pdf.

[6] Fisheries (Fishing-related Mortality Limits of Marine Mammals and Other Wildlife) Regulations 2022, reg 1(7) (N.Z.), https://www.legislation.govt.nz/secondary-legislation/pco-drafted/2022/313/en/latest/#LMS785562 [hereinafter FRML Regulations].

two-thirds of the west coast of the North Island out to 12 nautical miles, omitting large areas where Māui dolphins are found. Slooten Decl. ¶ 44. Dolphin deaths that occur outside of the MDHZ do not count against the FRML. Additionally, the regulations do not identify a temporal metric for the limit, or any consequences if the limit is exceeded or if a serious but non-fatal injury occurs.

Third, GNZ requires a fraction of set net and trawl vessels fishing in the Māui and Hector's dolphin habitats to install cameras that record video of fishing effort and, ostensibly, any bycatch. Set net vessels less than 8 meters in length and trawl vessels greater than 32 meters in length are exempt.[7] GNZ reviews only a portion of video footage from cameras in certain fishing areas to detect if there has been a dolphin capture. 5-Year Review 99. GNZ has implemented camera monitoring on less than 27% of fishing vessels in Māui dolphin habitat. *Id.* at 42. GNZ has not published information showing what proportion of South Island vessels have onboard cameras. Because of these shortcomings, NMFS has found it is "likely that bycatch rates are underestimated." *Id.* at 108.

NMFS recently found that GNZ's management of Māui and Hector's dolphins is deficient in its 5-Year Review. For the Māui dolphin, NMFS explained, "there are concerns that the New Zealand Government's regulations and conservation measures are inadequate to protect Māui's dolphin from the risk of bycatch due to: fishing restrictions not covering their entire range; a lack of comprehensive bycatch data; and the potential underestimation of bycatch risk." *Id.* Similarly, for the Hector's dolphin, NMFS explained: "The extent of fishing restrictions, the New Zealand Government's potential underestimates of the level of bycatch, and the proposed

---

[7] Fisheries (Electronic Monitoring on Vessels) Regulations 2017, reg 5, cl 3A (N.Z.), https://legislation.govt.nz/regulation/public/2017/0156/latest/DLM7329212.html.

limits on bycatch mortality for [South Island] Hector's dolphins are of particular concern." *Id.* at 109-110. Ultimately, NMFS concluded Māui and Hector's dolphins remain imperiled in large part due to the "inadequacy of existing regulatory mechanisms" to limit bycatch. *Id.* at 49-54 (Māui), 92-107 (Hector's).

## II.    The CIT Has Repeatedly Faulted NMFS for Arbitrarily Finding New Zealand's Regulatory Program Sufficient.

NMFS's comparability findings for New Zealand's fisheries have been before the Court of International Trade (CIT) twice. Both times, the CIT found NMFS's reasoning, analysis, and determinations fatally flawed.

In 2020, NMFS issued a comparability finding concluding that the West Coast North Island set net and trawl fisheries do not catch Māui dolphins in excess of U.S. standards. *Sea Shepherd I*, 606 F.Supp.3d at 1299-1303. Two conservation groups challenged that finding and moved for a preliminary injunction to enjoin imports from the fisheries. *Id.* at 1303-04. The CIT granted the preliminary injunction in 2022, holding the comparability finding was likely arbitrary and capricious. *Id.* at 1310-23. The CIT also found "given the undisputed instances of Māui dolphin bycatch and the continued threat[,] there exists a likelihood of irreparable harm absent injunctive relief." *Id.* at 1328.

NMFS issued a new comparability finding for those two fisheries in January 2024, and the CIT accordingly lifted the injunction. *Sea Shepherd N.Z. v. United States*, 693 F.Supp.3d 1364 (Ct. Int'l Trade 2024). After the plaintiffs agreed to voluntarily dismiss the case, the CIT observed that the "disposition ... is far from [a] bill of health for a species teetering on the brink of extinction." *Sea Shepherd N.Z. v. United States*, 723 F.Supp.3d 1374, 1381 (Ct. Int'l Trade 2024).

Shortly thereafter, MHDD filed a challenge to the 2024 Comparability Finding. This

10

Court granted summary judgment to MHDD on August 26, 2025, ruling that the comparability finding was arbitrary and unlawful in multiple respects. *MHDD v. NMFS* (*MHDD I*), 799 F.Supp.3d 1327 (Ct. Int'l Trade 2025). Specifically, the Court held NMFS failed to rationally find that New Zealand's regulatory program achieves comparable results to the MMPA's ZMRG and negligible impact standards, and that NMFS's determinations that New Zealand's program achieves comparable results to U.S. standards for a bycatch limit, bycatch monitoring, and stock assessments were arbitrary and contrary to law. *Id.* at 1337-46. The Court also found that NMFS arbitrarily used a Māui dolphin population estimate of 54 animals when assessing comparability to U.S. standards and that NMFS arbitrarily concluded the fisheries do not kill or seriously injure other marine mammal species in excess of U.S. standards. *Id.* at 1342-43, 1346-48. The Court vacated the comparability finding's Decision Memorandum but declined to compel Defendants to implement an import ban under 5 U.S.C. §706(1). *Id.* at 1348-49. The Court noted, however, that its "conclusion that the Decision Memorandum is arbitrary and not in accordance with law may merit the implementation of an import ban going forward, if the agency continues to rely on an arbitrary and unlawful Decision Memorandum that could be regarded as equivalent to denying a comparability finding." *Id.* at 1349.

III.    **NMFS Issues New Comparability Findings for the New Zealand Fisheries.**

Just three days after the Court's merits ruling, NMFS published comparability finding determinations to its website on August 29, 2025, for approximately 2,500 foreign fisheries from 135 nations, including a comparability finding for all of New Zealand's export fisheries. *See* 90 Fed. Reg. 42395 (Sept. 2, 2025). The new comparability findings became effective on January 1, 2026, and would "remain in effect until December 31, 2029, or for such other period as NMFS may specify." *Id.* at 42395-96. MHDD filed a challenge to the 2025 Comparability Finding in the CIT on January 5. *MHDD v. NMFS*, 1:26-cv-00060-JCG (Ct. Int'l Trade Jan. 5, 2026).

11

On March 11, NMFS published a Federal Register notice announcing the availability of yet another new comparability finding for New Zealand's set net and trawl fisheries on the West Coast of the North Island and the entirety of the South Island [hereinafter the New Zealand Fisheries]. 91 Fed. Reg. 11962 (Mar. 11, 2026). According to the notice, "the new findings supersede NMFS' previously published comparability findings for the same fisheries." *Id.* at 11963. The "2026 Comparability Finding," as used herein, consists of the Federal Register notice and the Decision Memorandum for the new findings.

The 2026 Comparability Finding is contrary to the MMPA's Import Provision and its implementing regulations and is based on arbitrary and inaccurate analyses.

## STANDARD OF REVIEW

The CIT reviews challenges to a final agency action under the Administrative Procedure Act (APA) to determine whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2); *see Sea Shepherd I*, 606 F.Supp.3d at 1306. An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). "In reviewing an agency's statutory construction, [a court] must reject those constructions that are contrary to clear congressional intent or frustrate the policy that Congress sought to implement." *Brower v. Evans*, 257 F.3d 1058, 1065 (9th Cir. 2001).

## ARGUMENT

A court considers four factors in ruling on a motion for preliminary injunction: "(1) whether the moving party is likely to prevail on the merits of the claims; (2) whether the moving

party is likely to suffer irreparable harm in the absence of a preliminary injunction; (3) the balance of equities; and (4) whether a preliminary injunction is in the public interest." *Sea Shepherd I*, 606 F.Supp.3d at 1310. "No one factor is necessarily dispositive, because the weakness of the showing regarding one factor may be overborne by the strength of the others." *U.S. Auto Parts Network, Inc. v. United States*, 319 F.Supp.3d 1303, 1307 (Ct. Int'l Trade 2018) (cleaned up). Accordingly, "the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction." *Aluminum Extrusions Fair Trade Comm. v. United States*, 607 F.Supp.3d 1332, 1339 (Ct. Int'l Trade 2022) (citation omitted); *In re Section 301 Cases*, 524 F.Supp.3d 1355, 1362 (Ct. Int'l Trade 2021) ("Thus, where the harm is great, a movant must only 'demonstrate that it has at least a fair chance of success on the merits.'") (citation omitted). Here *all* of the factors weigh heavily in favor of an injunction.

First, MHDD is likely to succeed on the merits of its claims that NMFS failed to insist on reasonable proof regarding bycatch and failed to reach rational, well-supported findings that bycatch in the New Zealand Fisheries is not in excess of U.S. standards. Second, as the CIT found previously, irreparable harm to Māui and Hector's dolphins and MHDD's enjoyment of them is likely absent an import ban. Finally, the balance of the equities and public interest favor an injunction because an import ban would help protect imperiled Māui and Hector's dolphins with little to no burden on Defendants.

## I.    __MHDD Is Likely to Succeed on the Merits.__

MHDD has more than a fair chance of success on the merits, as it is likely to succeed on all of its claims. The 2026 Comparability Finding remains just as unlawful as the three unlawful comparability findings that preceded it. Fundamentally, NMFS: 1) failed to establish that New Zealand achieves comparable results as the ZMRG standard; 2) failed to establish that New

Zealand achieves comparable results as the negligible impact standard; 3) did not insist on reasonable proof or rely on the best available science in evaluating whether New Zealand meets U.S. standards for bycatch limits; 4) arbitrarily found the New Zealand Fisheries meet U.S. standards for bycatch limits despite contrary evidence; 5) arbitrarily found the New Zealand Fisheries meet U.S. standards for monitoring despite contrary evidence; and 6) relied on an outdated and overly optimistic population estimate in evaluating GNZ's regulatory program for Māui dolphin bycatch.

This Court needs to look no further than NMFS's own words to find a likelihood of success on the merits. In its recent 5-Year Review, NMFS concluded New Zealand's regulatory program provides inadequate protection and results in unsustainable bycatch levels for Māui and Hector's dolphins. *See generally* 5-Year Review. The agency identified numerous specific areas in which New Zealand's regulatory program is failing. *E.g.*, *id.* at 49-54, 92-107 (discussing "[i]nadequacy of existing regulatory mechanisms" for both populations). And it identified substantial evidence that bycatch rates are exceeding comparable U.S. limits, sometimes by orders of magnitude. *Id.* 95, 104-107, 108-110. The 2026 Comparability Finding inexplicably does not address any of those findings when concluding New Zealand's regulatory program is more than adequate. NMFS's unexplained and incongruous action is the definition of arbitrary decision-making.

## A.    NMFS's ZMRG Conclusion is Arbitrary.

The MMPA's Zero Mortality Rate Goal requires U.S. fisheries to be managed with the goal of reducing marine mammal bycatch to "insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. §1387(b), (f)(2). This standard requires two elements: a numeric definition of the target (bycatch rates below 10% of the PBR level) and the implementation of regulatory measures that ensure the target is being met or will be met within

14

five years. *Id.* §1387(b), (f); 50 C.F.R. §229.2 (defining "Insignificance threshold"). NMFS failed to establish that GNZ's regulatory program has anything comparable to either element.

The 2026 Comparability Finding makes general assertions that a number of environmental objectives, principles, and policy documents are comparable in effectiveness to the ZMRG standard. None are comparable to ZMRG target bycatch rates nor do any require comparable implementing measures under New Zealand law.

First, NMFS relies on "[e]nvironmental principles" which are "incorporated" into New Zealand's Marine Mammal Protection Act (NZ MMPA) and Fisheries Act; specifically, principles to achieve the "long-term" viability of "associated or dependent" species and to ensure there is "a low risk of collapse of the species and it has the potential to recover to a higher biomass level." 2026 CF 62. However, these principles are not comparable to the ZMRG. GNZ has even stated as much, writing "the [Fisheries] Act does not oblige the Minister to reduce the risk of fishing-related mortalities to zero."[8] Long-term viability and avoiding population collapse are much more modest goals than reducing bycatch "to insignificant levels approaching zero." 16 U.S.C. §1387(b). The former is more akin to the objective of PBR, which is to allow a "stock to reach or maintain its optimum sustainable population." *Id.* § 1362(20). The ZMRG reaches for a concrete, numeric goal which requires bycatch rates to be significantly lower—ten times as much—to eliminate bycatch to the greatest extent feasible.

Second, NMFS relies on "New Zealand's Biodiversity Strategy 2020 and its Conservation General Policy" which "focus on reducing human-related risks (e.g., fishing) to marine protected species to levels approaching zero." 2026 CF 62. This language does not

---

[8] GNZ, *Review of the Maui's Dolphin Threat Management Plan: Consultation Paper* 100 (2012), https://www.doc.govt.nz/documents/conservation/native-animals/marine-mammals/maui-tmp/mauis-tmp-discussion-document-full.pdf.

15

actually exist in either policy document. Even if it did, these cited documents are non-binding and do not impose a legal obligation to implement measures to meet the stated goals, unlike the MMPA.

Third, NMFS relied on population objectives contained in New Zealand's TMP as a "ZMRG equivalent," but only for Māui and Hector's dolphins. *Id.* Specifically, NMFS referenced a Māui dolphin objective of "95% of the maximum number of dolphins the environment can support" and a Hector's dolphin objective to "allow the population to increase to a level at or above 90% of the maximum number of dolphins the environment can support." *Id.* As an initial matter, these objectives are not comparable to the legally mandated ZMRG because the TMP is a non-binding policy document. *See Sea Shepherd I*, 606 F.Supp.3d at 1318 (finding NMFS's reliance on TMP flawed because TMP "does not require New Zealand to do anything on any particular timeframe following a fishery-related interaction with a Māui dolphin in excess of PBR"). Also, the objectives themselves, which are the equivalent of "the population sustainability threshold (PST)," are not comparable to the ZMRG. 2020 TMP 5. The PST for the Māui dolphin is 0.14 dolphins per year[9]—14 times higher than the ZMRG bycatch limit (0.01). The PST for the Hector's dolphin is 74 dolphins per year, 5-Year Review 106 (tbl.13)—nearly 20 times larger than the ZMRG bycatch limit (6.65). This Court previously rejected NMFS's argument that the same PST objectives achieve the ZMRG standard in *MHDD I* because NMFS did not "explain[] how the objectives to prevent deaths of dolphins from exceeding the population sustainability threshold … were comparable in effect to reducing mortality and

---

[9] *See* 85 Fed. Reg. 71297, 71300 (Nov. 9, 2020) (listing "the GNZ PST as calculated in the final TMP" as "0.14").

serious injuries to zero." 799 F.Supp.3d at 1338. The 2026 Comparability Finding does not provide that explanation either.

New Zealand not only lacks a comparable standard, it is also failing to achieve comparable results as the ZMRG standard. The estimated bycatch rates in the 2026 Comparability Finding are far higher than the 0.01 and 6.65 ZMRG bycatch levels for Māui and Hector's dolphins, respectively. *See* 2026 CF 57 (citing 15 observed fishing-related Hector's dolphin mortalities in the 2023/2024 fishing year), 63 (citing Māui dolphin bycatch rate of 0.056 dolphins per year). NMFS does not even address this critical fact that bycatch is "in excess of" the ZMRG U.S. standard. 16 U.S.C. §1371(a)(2); *see State Farm*, 463 U.S. at 43 (action arbitrary if agency "failed to consider an important aspect of the problem"); *see also Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019) (holding agency violated APA "[b]y failing to consider relevant statutory objectives and factors").

In sum, NMFS arbitrarily relied on principles and policies that are not binding, not equivalent, and in some cases, do not even exist to conclude that New Zealand implements an equivalent to the ZMRG standard. MHDD is therefore likely to succeed on the merits of its claim.

> **B.  The 2026 Comparability Finding Does Not Establish that New Zealand Implements a Standard Comparable to the MMPA's Negligible Impact Standard.**

As an additional safeguard to protect imperiled species, the MMPA prohibits NMFS from allowing commercial fishing activities that may incidentally catch endangered or threatened marine mammals unless it determines that bycatch will have no more than a numerically defined negligible impact on their population. 16 U.S.C. §1371(a)(5)(E)(i); 50 C.F.R. §216.103; *see supra* p. 5. While this standard does not apply to every comparability finding, it applies here

17

because Māui and Hector's dolphins are listed under the ESA. 82 Fed. Reg. at 43701. And GNZ is allowing incidental bycatch in the New Zealand Fisheries to far exceed these limits.

For the endangered Māui dolphin, the negligible impact limit is 13% of PBR: 0.013, or one dolphin every 77 years. For the threatened Hector's dolphin, the negligible impact threshold is 2.6% of PBR, or 1.729 dolphins per year.[10] The 2026 Comparability Finding reports bycatch rates that far exceed these limits: 0.56 Māui dolphins per year and 15 Hector's dolphins in the 2023/2024 fishing year. 2026 CF 57, 63. Accordingly, the plain text of the MMPA requires Defendants to ban imports because the rate of bycatch "is in excess of" the U.S. negligible impact standard. 16 U.S.C. §1371(a)(2).

The 2026 Comparability Finding acknowledges the negligible impact limit as a U.S. standard, 2026 CF 7, and then attempts to circumvent this obligation by concluding that the "negligible impact standard is not applicable … because New Zealand's statutory framework does not authorize or permit its commercial fisheries to incidentally take any marine mammals incidental to commercial fishing operations." 2026 CF 64. This is incorrect for multiple reasons. Foremost is that New Zealand law *does* authorize its commercial fisheries to incidentally take marine mammals. New Zealand's MMPA prohibits take of marine mammals *unless* that take is incidental. NZ MMPA Sec. 26(4); *see* 2026 CF 18 (acknowledging NZ MMPA "provides a defense for commercial fishing operations if the death of, or injury to, the marine mammal was accidental, or incidental (not intentional)"). Fishers are allowed to incidentally catch and kill marine mammals so long as they report it. NZ MMPA Sec. 26(4). Accordingly, under New Zealand law, all incidental take is permissible. In fact, much of the regulatory program that NMFS claims GNZ implements is dedicated to monitoring, calculating, and regulating said

---

[10] *See* NMFS, *2020 Criteria*, *supra* note 3, at 14.

bycatch. *See Sierra Club v. U.S. Army Corps of Eng'rs,* 701 F.2d 1011, 1035 (2d Cir. 1983) ("a decision made in reliance on false information, developed without an effort in objective good faith to obtain accurate information, cannot be accepted as a 'reasoned' decision.").

At bottom, NMFS argues that because New Zealand does not have an identical permitting scheme as the one contained in the MMPA, it need not achieve comparable results as the MMPA's negligible impact standard. This hypocritical justification not only conflicts with NMFS's assertions that a comparability determination does not require a harvesting nation to have "identical measures (i.e., a 'like for like')," 2026 CF 66, but it also holds New Zealand to a much lower standard than the MMPA. Because while the MMPA prohibits all incidental take of marine mammals *unless* NMFS authorizes it (subject to the negligible impact limit), 16 U.S.C. §1371(a)(5)(E)(i), New Zealand law authorizes *all* incidental take of marine mammals. The upshot of NMFS's flawed logic is that New Zealand's more permissive incidental take law means its fisheries can kill ESA-listed species in excess of the negligible impact standard without violating the Import Provision. This is flat wrong.

As a back-up, the 2026 Comparability Finding recites a litany of inapposite GNZ processes and states that, regardless of the negligible impact standard's applicability, "NMFS finds that the goals and objectives of New Zealand's regulatory program are comparable in effectiveness because they are designed to limit fishing-related impacts to low enough levels to achieve the same conservation purposes as the negligible impact process." 2026 CF 65. The 2026 Comparability Finding provides no explanation for how those "conservation purposes" are equivalent to the negligible impact limits of 0.013 Māui dolphins and 1.729 Hector's dolphins. And it provides no explanation of which, if any, measures in New Zealand's regulatory program limit bycatch to comparable levels. As explained, they do not. In fact, NMFS's 5-Year Review

19

directly contradicts the 2026 Comparability Finding's assertion that New Zealand is "achiev[ing] the same conservation purposes." NMFS concluded in the 5-Year Review that "the New Zealand Government is likely to be allowing a level of bycatch that is *unsustainable*"—a far worse condition than being merely negligible. 5-Year Review 106 (emphasis added).

New Zealand is allowing its fisheries to incidentally take Māui and Hector's dolphins at levels exceeding the negligible impact standard. NMFS's decision to effectively exempt New Zealand from this U.S. standard is contrary to the Import Provision and its implementing regulations, and is otherwise arbitrary and capricious.

### C.    NMFS Failed to Insist on Reasonable Proof or Use the Best Available Evidence in Concluding the New Zealand Fisheries Are Not Exceeding Bycatch Limits.

The MMPA requires NMFS to "insist on reasonable proof" from harvesting nations that their fisheries do not catch marine mammals in excess of U.S. standards. 16 U.S.C. §1371(a)(2)(A). NMFS is also required to consider both "documentary evidence provided by the harvesting nation *and* relevant information readily available from other sources" when determining if the requirements for a comparability finding are met. 50 C.F.R. §216.24(h)(6)(ii) (emphasis added).

In the 2026 Comparability Finding, NMFS relied on outdated and unsupported bycatch estimates provided by GNZ to conclude that "no bycatch limits were exceeded or even came close to being exceeded for any marine mammal species or stock" in New Zealand. 2026 CF 36.[11] For the Māui dolphin, NMFS compared an estimated bycatch rate of 0.056 mean annual Māui dolphin deaths to a PBR of 0.10. *Id.* at 52-53 (tbl.1). For the Hector's dolphin, NMFS

---

[11] The ZMRG and the negligible impact threshold are also applicable U.S. limits on bycatch under the MMPA, as discussed above. This section focuses only on the PBR-based bycatch limit as specifically defined by the Import Regulations.

compared an estimated Hector's dolphin bycatch mortality and injury rate of 8.8 dolphins per year to a PBR of 66.5. *Id.* at 54. NMFS's reliance on these bycatch estimates is arbitrary and capricious and contrary to law for at least three reasons: 1) NMFS failed to insist on reasonable proof to support the values; 2) NMFS failed to address evidence from its 5-Year Review indicating that the estimates are too low; and 3) NMFS failed to rationally explain why it chose to rely on the estimates over other, more recent and official estimates.

**First**, NMFS accepted GNZ's asserted bycatch estimates with no evidence of the data, methods, or assumptions on which they were based. The only source listed for the bycatch estimates in the 2026 Comparability Finding for both Māui and Hector's dolphins is New Zealand's 2021 comparability finding application and supplementary information submissions. 2026 CF 52, 54. The values are not found in any other publicly available document. Without any evidentiary support for the validity of GNZ's asserted estimates, NMFS failed to "insist on reasonable proof," 16 U.S.C. §1371(a)(2)(A), and failed to "articulate a connection between the record evidence and the determinations," *MHDD I*, 799 F.Supp.3d at 1340. Moreover, the Hector's dolphin estimate of 8.8 dolphins per year is likely a significant underestimate because it was based on data from the 2020-2021 fishing season, before New Zealand implemented its electronic monitoring program on South Island set net and trawl vessels. *See* 2026 CF 69 (showing that on-board cameras only became mandatory on certain South Island set net and trawl vessels in October 2023); 5-Year Review 52 ("Recent camera monitoring (Slooten et al. 2024) suggests that bycatch of [South Island] Hector's dolphins may be higher than [earlier] estimates used for management."). In addition, the 8.8 bycatch estimate also does not incorporate cryptic mortality (i.e., dolphins that are captured and killed but not observed), 2026 CF 54, "which could be a third of all bycatches," 5-Year Review 104. According to NMFS guidelines,

"[w]hen possible, … [bycatch estimates] should be corrected for [cryptic mortality] using the best scientific information available."[12] NMFS instead disregarded its own guidance and arbitrarily relied on an outdated, uncorrected, and negatively biased estimate of bycatch. *See Am. Rivers v. FERC*, 895 F.3d 32, 46 (D.C. Cir. 2018) (holding action arbitrary and capricious where agency "discard[ed] the methodology set forth in its own handbook").

**Second,** NMFS's blind reliance on GNZ's bycatch estimates conflicts with the agency's own findings that GNZ's methodology significantly underestimates bycatch. Since 2018, there have only been two official GNZ estimates of Māui and Hector's dolphin bycatch. The first was published in a report by Roberts et al. in 2019, which used a model (SEFRA) to estimate the Māui dolphin bycatch rate at 0.10 dolphins per year and the Hector's dolphin bycatch rate at 45.85 dolphins per year.[13] The Roberts SEFRA model is apparently the basis for the bycatch estimates used in the 2026 Comparability Finding. 2026 CF 52, 54. NMFS scientists reviewed the Roberts report "[f]or the purposes of evaluating comparability of fisheries regulations to management under the US MMPA for Maui dolphins" and concluded that the bycatch rate reported in the assessment is "likely underestimated."[14] And more recently, in its 5-Year Review, NMFS described many "notable concerns about the methodology of [Roberts'] analysis," 5-Year Review 107, and noted that "if a different set of assumptions was used … the mortality rate

---

[12] NMFS, *Guidelines for Preparing Stock Assessment Reports Pursuant to the Marine Mammal Protection Act* 13, NMFS Procedure 02-204-01 (2023), https://www.fisheries.noaa.gov/s3/2023-05/02-204-01-Final-GAMMS-IV-Revisions-clean-1-kdr.pdf.

[13] J.O. Roberts et al., *Spatial risk assessment of threats to Hector's and Māui dolphins (*Cephalorhynchus hectori*)*, N.Z. Aquatic Environment and Biodiversity Report No. 214 (2019), https://www.mpi.govt.nz/dmsdocument/35007-AEBR-214-Spatial-risk-assessment-of-threats-to-HectorsMaui-dolphins-Cephalorhynchus-hectori.

[14] Barbara Taylor & Paul Wade, *Review of PRO201712_HectorsMaui_TMP_risk_assessment_AEBR_Final_4March2019*, 1, 8-9 (2019), attached as Exhibit C.

could be 15-20 times higher." *Id.* at 53. Ultimately, NMFS concluded that "due to low levels of observer coverage and gaps in fisheries data … and several assumptions made in the SEFRA model, the estimates of the impacts of fisheries on Māui's dolphins are likely to be underestimated," *Id.*, and that the model "underestimated the potential risk that fisheries bycatch poses to [South Island] Hectors dolphins." *Id.* 107. These findings directly contradict the agency's unquestioning reliance on the SEFRA model's outputs in the 2026 Comparability Finding to conclude bycatch rates are not exceeding U.S. standards. The 2026 Comparability Finding does not even acknowledge these contradictory findings by its own scientists. *See Humane Soc'y v. Locke*, 626 F.3d 1040, 1048-52 (9th Cir. 2010) ("NMFS cannot avoid its duty to confront these inconsistencies by blinding itself to them."). NMFS's reliance on bycatch estimates the agency itself found flawed renders NMFS's conclusions arbitrary and capricious.[15] *E.g.*, *Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 352-53 (4th Cir. 2019) ("Absent a reasoned discussion of the agency's apparently contradictory positions about the species, we can only conclude that FWS acted arbitrarily…."); *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 650 (D.C. Cir. 2016) (explaining agency decision is arbitrary and capricious "if there are unexplained inconsistencies" (citation omitted)).

**Third**, the 2026 Comparability Finding fails to rationally account for more recent, much higher bycatch rate estimates. In September 2022, GNZ published an "Updated spatially explicit fisheries risk assessment for New Zealand marine mammal populations" [hereinafter MacKenzie

---

[15] GNZ has acknowledged these flaws require a revision of the 2019 report. Slooten Decl. ¶ 54. NMFS's acceptance of GNZ's flawed estimates rather than requiring reasonable proof of accurate estimates for the 2026 Comparability Finding eliminates the incentive for GNZ to revise its bycatch estimates in a timely fashion. Indeed, GNZ has recently delayed publication of the new report until 2027. *Id.*

report].[16] This report used a method "consistent with" the Roberts 2019 report, but applied an updated distribution for Hector's and Māui dolphins. *Id.* at 18-19. The MacKenzie report estimates that the mortality rate of Māui dolphins in New Zealand fisheries is 0.38 dolphins per year. *Id.* at 87. A bycatch rate of 0.38 far exceeds every applicable U.S. standard for the Māui dolphin: the PBR limit (0.10), the negligible impact limit (0.013), and the ZMRG limit (0.010). The MacKenzie report estimates that the mortality rate of Hector's dolphins in New Zealand fisheries is 53.48 dolphins per year. That bycatch rate is far in excess of the negligible impact limit (1.729) and the ZMRG limit (6.65). Further, the 95% confidence interval for the bycatch estimate is 27.8-92.9, which, as a statistical matter, means that NMFS may not conclude that the bycatch rate is below the PBR limit (66.5).

In the 2026 Comparability Finding, NMFS stated it was disregarding these bycatch estimates because the MacKenzie report "is based on fishing effort data from 2016-17 to 2018-19 and … did not include the effect of the 2020 (or 2022) set net fishing restrictions." 2026 CF 53-54 & nn.266, 275. This justification is wholly irrational because the bycatch estimates on which NMFS chose to rely in the 2026 Comparability Finding *also* were based on old data that did not take these restrictions into account. NMFS sourced the 0.056 Māui dolphin bycatch estimate from GNZ's comparability finding application (dated September 2020), which based its bycatch estimate "on commercial fishing effort up to the end of the 2016-17 October fishing year"—*before* the set net restrictions. 2020 Comparability Finding Application 19, attached as Exhibit D. So that estimate relied on even older data than the MacKenzie report. Similarly,

---

[16] Darryl I. MacKenzie et al., *Updated spatially explicit fisheries risk assessment for New Zealand marine mammal populations*, N.Z. Aquatic Environment and Biodiversity Report No. 290 (2022), https://fs.fish.govt.nz/Doc/25300/AEBR-290-Updated-Risk-Assessment-For-New-Zealand-Marine-Mammals-4286.pdf.ashx, attached as Exhibit F to Slooten Decl.

NMFS's 8.8 Hector's dolphin bycatch rate was based on the 2020-2021 October fishing year, which predates many of the set net restrictions. 2026 CF 54, 69.

The 8.8 Hector's dolphin uncorrected bycatch estimate was not even the best uncorrected estimate *available*. The 2026 Comparability Finding notes that "15 Hector's dolphins were reported or observed caught in commercial set net and trawl fisheries" during the 2023/2024 fishing year. *Id.* at 57. But it provides no explanation for disregarding those data in favor of the older data from 2020-2021. *See Dow AgroSciences LLC v. NMFS*, 707 F.3d 462, 473 (4th Cir. 2013) (explaining when "data are either outdated or inaccurate, [agency] should, at the very least, analyze the new data or explain why it nevertheless chose to rely on the older data"). NMFS's 5-Year Review also identified numerous other published bycatch estimates for Māui and Hector's dolphins that are significantly higher than those in the 2026 Comparability Finding and that the 5-Year Review indicates are likely more accurate than those produced by the SEFRA model. 5-Year Review 52-53. NMFS neither acknowledged these estimates, nor explained why it was disregarding them after it credited their accuracy in the 5-Year Review. *See Dow AgroSciences*, 707 F.3d at 473.

MHDD is likely to succeed on its claim that NMFS failed to insist on reasonable proof, failed to use the best available science, and arbitrarily relied on misleadingly low bycatch estimates to evaluate whether bycatch rates exceed U.S. standards for the Māui dolphin and Hector's dolphin.

> **D.     The 2026 Comparability Finding Arbitrarily Found that New Zealand Implements Marine Mammal Bycatch Limits That Are Comparable to U.S. Standards.**

The Import Provision requires that bycatch rates not exceed U.S. standards. And the Import Regulations require exporting nations to implement marine mammal bycatch limits that are comparable to the PBR level for U.S. marine mammal stocks. 50 C.F.R.

§216.24(h)(6)(iii)(C). NMFS concluded that New Zealand has established and implements bycatch limits for the Māui dolphin, Hector's dolphin, and other marine mammal species that are comparable to U.S. standards. 2026 CF 37. However, in reaching this conclusion, NMFS inconsistently relied on three conflicting metrics it referred to as "bycatch limits": PBR limits, FRMLs, and the PST. It is not clear which of these NMFS believes is *the* comparable bycatch limit, but the available evidence shows that none of them actually function to limit marine mammal bycatch in New Zealand fisheries at a level comparable to PBR.

**First**, NMFS concluded that the New Zealand Fisheries meet U.S. standards for bycatch limits because GNZ "adopted" PBR values that NMFS had calculated "for purposes of its 2021 Comparability Finding Application." 2026 CF 52, 54. Essentially, NMFS calculated the "bycatch limits" for GNZ using NMFS's own PBR equation and, unsurprisingly, found that its PBR calculation is comparable to PBR. The problem is that GNZ *does not actually implement* PBR as a bycatch limit for Māui dolphins, Hector's dolphins, or any other marine mammal. And the Import Regulations expressly require harvesting nations to *implement*, and not just *calculate*, comparable bycatch limits. 50 C.F.R. §216.24(h)(6)(iii)(C)(*3*)(*ii*) (requiring nation to "implement measures in the export fishery" to reduce bycatch "below the bycatch limit"), *id.* §216.24(h)(6)(iii)(C)(*5*) (requiring "[c]alculation of bycatch limits"); *see MHDD*, 799 F.Supp.3d 1340-41 ("The MMPA and implementing regulations require NMFS to evaluate whether a harvesting nation has a 'bycatch limit' and whether the harvesting nation implements measures [to reduce bycatch] below that bycatch limit." (citations omitted)). Bycatch limit calculations that exist only within NMFS's comparability finding application platform do nothing to actually limit bycatch, and therefore cannot be considered "bycatch limits" at all. They cannot be comparable in *effectiveness* to U.S. standards when they have no regulatory *effect*.

26

NMFS's approach of calculating bycatch limits on behalf of the harvesting nation is also contrary to the Import Regulations' requirement that "*the harvesting nation* maintains a regulatory program that provides for … [c]alculation of bycatch limits for marine mammal stocks in waters under its jurisdiction." 50 C.F.R. §216.24(h)(6)(iii)(C) (emphasis added). In addition, NMFS's platform arbitrarily generated nonsensically large bycatch limits for some of the marine mammals caught by the New Zealand Fisheries. For example, the 2026 Comparability Finding cites a common dolphin PBR of 109,567 dolphins. 2026 CF 58. There are only 128,726 common dolphins within New Zealand waters.[17] The PBR calculation is clearly erroneous; it would mean New Zealand's commercial fisheries can kill 85% of the country's entire common dolphin population *every year* and the species would somehow "maintain its optimum sustainable population." 16 U.S.C. §1362(20). NMFS has failed to demonstrate that its automatic formula is accurate or rational. *See U.S. Sugar*, 830 F.3d at 650 (explaining agency "had a duty here to examine and justify the 'key assumptions' underlying its decision"). NMFS appears to have applied the same automatic formulas to calculate all of the bycatch limits through its application platform, making NMFS's bycatch limit analysis arbitrary and capricious with respect to all marine mammal species.

**Second**, the 2026 Comparability Finding relied on New Zealand's FRMLs to conclude that the New Zealand Fisheries have comparable bycatch limits to U.S. standards, but also stated the FRMLs do "not function as a bycatch limit." 2026 CF 56-58. That inherent contradiction is enough to render NMFS's conclusion arbitrary and capricious. *See Gen. Chem. Corp. v. United*

---

[17] MacKenzie et al. 2022 (5,596,800 global population x 0.023 [proportion of population found within New Zealand Exclusive Economic Zone] = 128,726.4)

27

*States*, 817 F.2d 844, 857 (D.C. Cir. 1987) (holding action arbitrary where analysis was "internally inconsistent and inadequately explained").

**Third**, the 2026 Comparability Finding refers to the PST as New Zealand's "domestic bycatch limits." 2026 CF 54. The PST is not a regulatory limit, however. It is New Zealand's non-regulatory estimate for the maximum number of dolphin deaths that can occur while still allowing GNZ's population outcome objective for the stock to be achieved. 2020 TMP 5. New Zealand law does not mandate the implementation of bycatch reduction measures if PST is exceeded. The PST also cannot be considered comparable to PBR numerically for two reasons. One, because it includes "a general policy parameter for population recovery" which "is left to the GNZ managers" to choose. 2026 CF 51. And two, because the population input to calculate PST uses a mean population estimate, not the minimum population estimate as for PBR; which results in PST values that are higher than PBR (because the mean population estimate will be higher than the minimum population estimate). 5-Year Review 53 & nn.43-44. In fact, NMFS's Five-Year Review criticizes GNZ for using PST to guide its management: "The key issue is that PST estimates are substantially larger than PBR values …. Therefore, the New Zealand Government is likely to be allowing a level of bycatch that is unsustainable." 5-Year Review 106.

### E.   The 2026 Comparability Finding Arbitrarily Found that the Monitoring Program for the New Zealand Fisheries is Comparable to U.S. Standards.

The MMPA requires NMFS to implement monitoring programs for threatened and endangered marine mammal stocks that are sufficient to produce "statistically reliable estimates of incidental mortality and serious injury." 16 U.S.C. §1387(d)(1)(A); *see also id.* §1387(d)(3)(A). For highly imperiled marine mammals, a monitoring program needs to be capable of "reliably detect[ing] any non-zero capture rate." *Sea Shepherd I*, 606 F.Supp.3d at

1328 n.64; *see also* 5-Year Review 54 (indicating monitoring must be sufficient to "detect all bycatch"). NMFS's conclusion that New Zealand's bycatch monitoring program is comparable in effectiveness to U.S. standards is based on incorrect assumptions, fails to consider important factors, and runs counter to NMFS's own findings that the program does *not* produce reliable bycatch estimates.

In its 5-Year Review, NMFS determined "[a]ccurate information on bycatch ... is [a] data gap." 5-Year Review 112. For both the Māui dolphin and Hector's dolphin, NMFS found that the "[i]nadequacy of existing regulatory mechanisms" includes deficiencies in monitoring. *Id.* at 52-53, 98-104. For the Māui dolphin, NMFS explained: "Any entanglements of Māui's dolphins in fishing gear could endanger the survival of the subspecies and it is essential that *any* instances are reported so that emergency conservation actions can be taken." *Id.* at 49 (emphasis added). Accordingly, NMFS expressed concern that "only 4% of the vessels from the most problematic fishery [set nets] have cameras, and several areas with intense fishing effort (such as harbors) have no monitoring." *Id.*; *see also id.* at 39 (stating "there has been little monitoring of inshore [trawl] fisheries"). NMFS warned that "monitoring of fisheries interactions is insufficient to detect all bycatch" under GNZ's current monitoring program. *Id.* at 54. It concluded that "due to low levels of observer coverage and gaps in fisheries data … the estimates of the impacts of fisheries on Māui's dolphins are likely to be underestimated." *Id.* at 53. For the Hector's dolphin, NMFS explained that "despite the intended camera coverage, the probability of bycatch being detected will still likely be low as the New Zealand Government's targets for viewing collected video data in many areas is only about a third, or less, of the video collected." *Id.* 99. Around the Banks Peninsula—a core of the Hector's dolphin east coast population—NMFS determined "it is very unlikely that bycatches would be detected." *Id.* Ultimately, to decrease GNZ's bycatch

29

"data gap," NMFS recommended "[m]onitoring of set gillnet and trawl fisheries should be increased in areas where Māui's and [South Island] Hector's dolphins occur." *Id.* at 112.

The 2026 Comparability Finding does not even acknowledge those findings, much less provide a reasoned explanation for discarding them. *See Defs. of Wildlife*, 931 F.3d at 352-53; *Humane Soc'y*, 626 F.3d at 1048-52; *see also Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015) ("[A]n agency may not simply discard prior factual findings without a reasoned explanation."). Instead, NMFS arbitrarily concluded New Zealand's monitoring program *is* sufficient to detect bycatch. Aside from being wholly inconsistent with its prior findings, there are multiple flaws in NMFS's assessment.

For the Māui dolphin, NMFS based its monitoring determination on its finding that GNZ "has been able to attain at least 90% monitoring coverage … within the coastal portion of the MDHZ (excluding harbors)." 2026 CF 47. That ignores the extensive portion of Māui dolphin habitat where there is effectively *no* monitoring of fishing effort. *See* 5-Year Review 42 ("At present, approximately 21%-27% of fishing vessels in Māui's dolphin habitat have onboard cameras for monitoring."). The 2026 Comparability Finding does not define what the "coastal portion" of the MDHZ means. We know it explicitly excludes harbors, which are still "part of the Māui's dolphin range." *See id.* at 50; 2026 CF 44, 76 (describing evidence of harbor use). Indeed, GNZ included harbors within its designated MDHZ, and a Māui dolphin mother and calf were sighted interacting with fishing nets within the Waikato River harbor on multiple occasions in January 2025.[18] The 2026 Comparability Finding acknowledges that there is 0% monitoring of

---

[18] J. Roberts, *Harbour use by Māui/Hector's dolphin and commercial net fisheries*, N.Z. Aquatic Environment and Biodiversity Report No. 363, at 7 (2025), https://fs.fish.govt.nz/Doc/26003/AEBR-363-2025-Harbour-use-by-Maui-Hector-dolphin-and-commercial-net-fisheries.pdf.ashx.

95-99% of the set net fishing effort in the MDHZ. 2026 CF 44. This is a critical gap in the program's ability to detect Māui dolphin bycatch. 5-Year Review 49. It also means monitoring coverage in the MDHZ as a whole is far lower than 90%. It is also undisputed that Māui dolphins are found *outside* of the MDHZ. *See* 2026 CF 75 ("Historical and other information such as DNA and intermittent public sightings and acoustic detections suggest the occasional presence of Hector's and/or Māui dolphins in the transition zone."); 5-Year Review 24 (discussing evidence "of Māui's dolphins from the east coast of the North Island"). By focusing on the monitoring percentage in just a portion of the MDHZ, which is just a portion of the Māui dolphin's distribution, NMFS considered an inflated coverage value that conceals the major gaps in monitoring.

In order to evaluate the reliability of New Zealand's monitoring program, NMFS needed to evaluate monitoring coverage across the dolphin's entire distribution, not just a subset. Its choice to instead consider monitoring coverage levels for only a portion of the area where Māui dolphins are found is arbitrary and not comparable in effectiveness to US standards. This is because, for the Māui dolphin, 100% of bycatch needs to be detected in order to ensure that any bycatch limit is not exceeded and to take "emergency conservation actions" if there is a death. 5-Year Review 49; *see also id.* at 54 (stating "there are concerns that monitoring of fisheries interactions is insufficient to detect all bycatch" and "observers or cameras are needed on all fishing vessels"). Both NMFS and GNZ have recognized the need for 100% monitoring. *See id.* at 42 (recognizing need for "100 per cent observer coverage of any gill net or trawling vessels allowed to operate in any part of the range of Hector's and Maui's Dolphins"); Dep't of Conservation & Fisheries New Zealand, *Protecting Hector's and Māui Dolphins: Supporting*

31

*Information and Rationale* 30 (June 17, 2019)[19] (stating there must be "100% monitoring of vessels fishing using trawl or set net in areas of risk" to determine if a bycatch limit is exceeded"); *Sea Shepherd I*, 606 F.Supp.3d at 1328 & n.64 ("Defendants themselves recognize that 'the level of monitoring coverage must be high enough to reliably detect any non-zero capture rate' of Māui dolphins."). Māui dolphins are at risk of bycatch wherever they overlap with set net and trawl vessels. *See* 5-Year Review 50-51. By myopically focusing only on monitoring within a subset of that overlap, NMFS failed to consider the important aspect of the problem that there is almost no monitoring in a large portion of the area where Māui dolphins are at risk of being caught. Without evaluating monitoring in the entirety of the Māui dolphin's range, NMFS failed to establish that New Zealand's monitoring program is sufficient to produce statistically reliable estimates of Māui dolphin bycatch or detect non-zero bycatch as necessary to protect such an imperiled species. *See* 5-Year Review 53 (finding "the estimates of the impacts of fisheries on Māui's dolphins are likely to be underestimated" due in part to inadequate monitoring).

Similarly, for the Hector's dolphin, NMFS based its monitoring determination on a finding that "there is nearly 100% monitoring coverage across all in-scope[20] vessels." 2026 CF 45. Once again, NMFS arbitrarily considered monitoring coverage for only part of the risk: this time arbitrarily excluding "out-of-scope" vessels from its evaluation. Such out-of-scope vessels still pose a bycatch risk to Hector's dolphins when fishing within their range. NMFS also did not

---

[19] https://www.mpi.govt.nz/dmsdocument/34974-Protecting-Hectors-and-Maui-Dolphins-Supporting-Information-and-Rationale-.

[20] GNZ defines "in-scope vessels" as "trawling vessels 32 meters or less excluding those that exclusively target scampi, set netting vessels 8 meters or longer, and surface longline, bottom longline, Danish seine or purse seine vessels." 2026 CF 43.

provide any explanation for why the coverage levels it cited are sufficient to produce statistically reliable estimates of Hector's dolphin bycatch.

NMFS also failed to consider multiple shortcomings with the electronic monitoring GNZ uses. While it acknowledged that "electronic monitoring in the U.S. currently lacks the ability to perform accurate species identification, measuring, weighing, or sample collection, and its reliability for detecting marine mammal bycatch is still developing and depends on the fishery characteristics (e.g., EM may not be as effective for night time hauling …)," 2026 CF 39, it disregarded these limitations when concluding New Zealand's "EM [electronic monitoring] is capable of observing marine mammal bycatch 100% of the time," *id.* at 47; *see ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018) (An agency's "reasoning cannot be internally inconsistent."). These limitations can undermine the accuracy of bycatch estimates in the New Zealand Fisheries. Notably, set netting and trawl fishing are both permitted to occur at night, and studies have found that the dolphins are at an even greater risk of bycatch at night than during the day.[21] In addition, electronic monitoring is incapable of distinguishing between Māui and Hector's dolphins because they are visually identical; only human observers are able to collect the genetic samples required "to identify which subspecies an individual belongs to." 2026 CF 21.

Finally, electronic monitoring can only detect bycatch if footage is reviewed. And according to NMFS's 5-Year Review, "the probability of bycatch being detected will still likely be low as the New Zealand Government's targets for viewing collected video data in many areas is only about a third, or less, of the video collected." 5-Year Review 99. So even 100% electronic

---

[21] Ilias Foskolos et al., *Subsurface Behaviors of Hector's Dolphins Could Increase Their Risk of Bycatch*, Conservation Letters 6-7 (2025), attached as Exhibit G to Rose Decl.

monitoring coverage would not be capable of detecting a non-zero bycatch rate unless footage review is also 100%. The 2026 Comparability Finding's redacted discussion of footage review rates does not address whether the level of review is sufficient to manage Māui dolphin bycatch. NMFS failed to consider the "important aspect of the problem" that cameras likely are *not* as effective as human observers for monitoring bycatch of Māui and Hector's dolphins. *State Farm*, 463 U.S. at 43.

NMFS's conclusions in the 2026 Comparability Finding run directly counter to its findings in the 5-Year Review that monitoring is inadequate and underestimates bycatch. And its myopic assessment of monitoring in only certain areas and on certain vessels ignored a substantial portion of the risk. NMFS's conclusion that monitoring in the New Zealand Fisheries is comparable in effectiveness to U.S. standards is arbitrary and capricious.

### F.    The 2025 Comparability Finding Relies on An Outdated and Overly Optimistic Population Estimate Without Explanation.

The 2026 Comparability Finding compares estimated Māui dolphin bycatch to a PBR of 0.10 to conclude that "no bycatch limits were exceeded." 2026 CF 52-53. However, this PBR value is inflated because NMFS calculated it using an outdated, uncorrected minimum population estimate of 54 dolphins that both the IWC and NMFS itself had concluded is arbitrarily high. A smaller minimum population estimate would produce a smaller PBR value, in which case reported Māui dolphin bycatch may be in excess of PBR, contrary to NMFS's conclusion. *Supra* p. 4 (describing inputs to PBR calculation). NMFS's decision to nonetheless use the higher discredited population estimate for the 2026 Comparability Finding without a reasonable explanation is arbitrary and capricious and contrary to the best available science.

NMFS sourced the 54-dolphin estimate from New Zealand's 2021 comparability finding application. 2021 Comparability Finding Application, *Māui dolphins: Summary Information*,

attached as Exhibit E. Two years after GNZ submitted that application, however, the IWC

Scientific Committee published a report estimating the Māui dolphin population at 48

individuals. Slooten Decl. Ex. H, at 10. The report used the same raw data as the 54-dolphin

estimate, but "corrected" that estimate to account for dolphin deaths between survey years. IWC,

*Report of the Abundance Steering Group, 21-23 April 2023, Bled, Slovenia, SC/69A/REP/02*, at 4

(2023), attached as Exhibit F. The 2026 Comparability Finding's rationale for rejecting the

IWC's lower population estimate is illogical. NMFS states it rejected the estimate "principally"

because the IWC endorsed it as "Category 3," meaning it is "subject to various possible concerns

that preclude" use in implementation of IWC management procedure. 2026 CF 25. What NMFS

ignores, though, is that the IWC estimate was calculated to correct one of the concerns with the

54-dolphin estimate and produce a *more reliable* estimate. NMFS did not rationally justify

relying on an uncorrected population estimate over a corrected estimate. *Cf. Defs.*, 931 F.3d at

346 ("The [ESA's] best-available-data standard also means that [the agency] is not free to

disregard other 'available biological information' that 'is in some way better than the evidence

[the agency] relies on.'" (citation omitted)); *see also Am. Radio Relay League, Inc. v. F.C.C.*,

524 F.3d 227, 241 (D.C. Cir. 2008) (holding action arbitrary and capricious where agency

"offered no reasoned explanation for its dismissal of empirical data").

 NMFS's assertion that the 48-dolphin estimate is "not deemed to be the best data

available," 2026 CF 25, also conflicts with the agency's own findings elsewhere that it *is* the best

available estimate. New Zealand's 2024 Threat Classification System (NZTCS) estimates the

Māui dolphin population to be "48 individuals (more than 1 year old) based on genetic mark-

35

recapture technique in 2020/21."[22] The 2026 Comparability Finding describes the NZTCS assessment as "the best available scientific information on species, including existing estimates of population size, trends over time, and distribution." 2026 CF 20. But the 2026 Comparability Finding gives no explanation or even acknowledgement for discarding this "best available" information in favor of the 2021 estimate. NMFS's 5-Year Review concludes that the Māui dolphin population was "an estimated 48 in 2021." 5-Year Review 13. The 2026 Comparability Finding does not provide an explanation for discarding that estimate either. *See F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 537 (2009) ("An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate.").

If NMFS had used a smaller population size to calculate Māui dolphin PBR, the PBR value necessarily would have been smaller than 0.10 because the other variables remain constant. If the PBR bycatch limit is any lower than 0.10, NMFS could not have lawfully concluded that Māui dolphin bycatch does not exceed PBR. Indeed, all publicly available bycatch estimates would exceed a PBR calculated with a 48-dolphin minimum population estimate. This error alone is fatal to the Comparability Finding.

## II.    MHDD Is Likely to Suffer Irreparable Harm Absent an Injunction.

The CIT previously held, "given the undisputed instances of Māui dolphin bycatch and the continued threat[,] there exists a likelihood of irreparable harm absent injunctive relief." *Sea Shepherd I*, 606 F.Supp.3d at 1328. The only difference now is that the existential threat to Māui dolphins has worsened. There is also a likelihood of irreparable harm to Hector's dolphins given the documented, ongoing mortality of those dolphins in the South Island Fisheries. Every

---

[22] *Assessment Details*, New Zealand Threat Classification System, https://www.nztcs.org.nz/assessments/14852, attached as Exhibit G.

Hector's dolphin death shrinks the already imperiled population, hastening its current decline towards endangerment. These are the exact harms that Congress sought to prevent by requiring an MMPA import ban in a situation like this.

"A determination of irreparable harm should … be guided by reference to the purposes of the statute being enforced." *NRDC*, 331 F.Supp.3d at 1369; *accord Nat'l Wildlife Fed'n v. NMFS* (*NWF*), 886 F.3d 803, 818 (9th Cir. 2018). The core purpose of the MMPA is to conserve marine mammals and the ecosystems that support them. 16 U.S.C. § 1361. Given this conservation purpose, "establishing irreparable injury should not be an onerous task for plaintiffs." *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015) (citing 16 U.S.C. § 1531).

A showing of irreparable harm "comprises two elements: (1) whether any harm arising in the absence of injunctive relief will be *irreparable*; and (2) whether any such irreparable harm is *likely*." *Sea Shepherd I*, 606 F.Supp.3d at 1326-27. These elements are satisfied for MHDD's interests in both the Māui and Hector's dolphins.[23]

First, it is well-established that environmental harm is "irreparable" because no monetary payment could remedy the harm. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *Sea Shepherd I*, 606 F.Supp.3d at 1326–27; *NRDC*, 331 F.Supp.3d at 1368. As in *Sea Shepherd I*, "fishing-induced deaths [of Māui or Hector's dolphins] constitute irreparable harm." 606 F.Supp.3d at 1327.

---

[23] MHDD has standing to bring this action on behalf of its members to address substantive and procedural harms, as demonstrated by the attached Declarations of Christine Rose, Gemma McGrath, and Moira Barber, filed herewith. *See, e.g.*, *Sea Shepherd I*, 606 F.Supp.3d at 1307 n.38 (holding plaintiffs had standing to challenge comparability finding because Plaintiffs had "established the tripart requirements for Article III standing" (citing *NRDC*, 331 F.Supp.3d at 1356-61); *see also* Slooten Decl. (supporting redressability); Decl. of Glenn Simmons, Ph.D., filed herewith (same).

Second, irreparable harm is likely because set net and trawl fisheries continue to pose a daily threat of bycatch to both Māui and Hector's dolphins. "[T]he injury complained of need not have been inflicted when the application is made, or be certain to occur." *NRDC*, 331 F.Supp.3d at 1368 (citation omitted). A "continued threat" of bycatch is enough. *Sea Shepherd I*, 606 F.Supp.3d at 1328. "[S]howing an extinction-level threat to [a] species is not required" under this factor, either. *NWF*, 886 F.3d at 819. A likelihood of harm to individual members of a population is sufficient because "[o]nce a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult." *Id.* at 818 (alteration in original) (citation omitted); *see, e.g.*, *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F.Supp.2d 230, 258-59 (D.D.C. 2003) (finding potential loss of even "relatively few" birds out of an at-risk population established likelihood of irreparable harm (citation omitted)); *Earth Island Inst. v. Mosbacher*, 746 F.Supp.964, 975 (N.D. Cal. 1990) (finding "risk of unnecessary dolphin deaths and injury to the dolphin population" in foreign fisheries sufficient to establish irreparable harm absent import ban). Even a likelihood of sublethal harm to individual marine mammals can satisfy this injunction factor. *E.g.*, *Ctr. for Biological Diversity v. Ross*, 480 F.Supp.3d 236, 252 (D.D.C. 2020). The loss of individual Māui or Hector's dolphins would result in fewer animals in fewer locations, making it less likely that MHDD's members will be able to observe and enjoy them. *See Conservation Law Found. v. Ross* (*CLF*), 422 F.Supp.3d 12, 34 (D.D.C. 2019) ("Even short of extinction, each death causes the declarant [plaintiff] members individualized personal and professional anguish that money damages would not redress."); Rose Decl. ¶ 39; Barber Decl. ¶ 9; McGrath Decl. ¶¶ 7, 15–16.

In addition, it is not necessary to show that the injunction will eliminate all sources of harm. *NWF*, 886 F.3d at 819. It is sufficient to show that the injunction will either reduce or

38

"forestall" the harm; even partial changes to management are enough. *Id.* For instance, it is not necessary for an injunction to result in the New Zealand Fisheries shutting down entirely (or even partially) to satisfy this factor. Any reduction in bycatch risk reduces the harm and is sufficient for an injunction, even if not necessarily sufficient to prevent extinction. The CIT has repeatedly recognized that, in the precise situation presented here, enjoining imports under the MMPA will address likely irreparable harm to marine mammals and the plaintiffs who enjoy them. *Sea Shepherd I*, 606 F.Supp.3d at 1326-30; *NRDC*, 331 F.Supp.3d at 1368-69; *see also Mosbacher*, 746 F.Supp. at 975 (entering injunction to ban imports from foreign fisheries and stating, "This is exactly the type of injury which the [MMPA] was designed to prevent").[24] When "the very purpose of the [2026 Comparability Finding] is to provide [New Zealand] fishermen who use [set net and trawl] nets access to the United States [seafood] market," continued operation of the 2026 Comparability Finding is likely to cause irreparable harm, because access to those lucrative U.S. markets incentivizes fishing effort. *Earth Island Inst. v. Evans*, 256 F.Supp.2d 1064, 1076 (N.D. Cal. 2003).

Even NMFS recognizes that the greatest threat to both Māui and Hector's dolphins is bycatch in set net and trawl gear. NMFS 5-Year Review 108. As set net and trawl fishing continue to overlap with both Māui and Hector's dolphin habitat, bycatch is not just likely, but inevitable without an injunction. Slooten Decl. ¶ 51.

## A.    Māui Dolphins

In *Sea Shepherd I*, the CIT found a likelihood of irreparable harm to Māui dolphins and the plaintiffs' enjoyment of them absent an injunction. 606 F.Supp.3d at 1326-29. The situation

---

[24] In fact, shortly after NMFS announced import bans for certain fisheries in September 2025, three nations took prompt action to improve protections for marine mammals, which allowed NMFS to lift the import bans just last month. 91 Fed. Reg. 12510 (Mar. 16, 2026). MMPA import bans work.

here is no better. Irreparable harm is happening; in February of this year, a Māui dolphin was found dead. The necropsy report "was unable to exclude the possibility of entanglement as a contributory factor." *See* Slooten Decl. Ex. E; Rose Decl. ¶¶ 40-41. And the Māui dolphin population is only continuing to decline. Slooten Decl. ¶ 16; 5-Year Review 108 (finding a 14% population decline between the most recent 2020-21 and 2015-16 population estimates and "no evidence of recovery"); Rose Decl. ¶ 52. Further, available data show that Māui dolphin bycatch rates are exceeding NMFS's calculated PBR limit by as much as three times, which means the downward population trajectory will continue. *See supra* p. 24. There is no reason this Court should find any differently than the *Sea Shepherd I* Court on the likelihood of irreparable harm to Māui dolphins and MHDD's interests in them.

It is undisputed that the West Coast North Island Fisheries have caused the deaths of Māui dolphins and that those fisheries continue to operate in at least portions of the Māui dolphin's habitat. *See, e.g.*, 2026 CF 42-45 (describing monitoring of vessels fishing in Māui habitat); 5-Year Review 50 (finding "Māui's dolphins continue to be exposed to potential entanglement risk despite the fishing prohibition zones"). These two facts alone establish "a likelihood of irreparable harm absent injunctive relief." *Sea Shepherd I*, 606 F.Supp.3d at 1328; *see also CLF*, 422 F.Supp.3d at 33 (finding fishing in whale's habitat "is likely to cause irreparable injury to these whales and thus to [plaintiff] and its members"). The fact that the current bycatch rate exceeds PBR, as well as other applicable U.S. standards, pp. 22-26, is an additional basis on which to find irreparable harm is likely. *See, e.g.*, *NRDC*, 331 F.Supp.3d at 1369. Moreover, NMFS has concluded that the available "estimates of the impacts of fisheries on Māui's dolphins are likely to be underestimated." 5-Year Review 53.

Insofar as Defendants may argue that the dolphin's scarcity makes bycatch unlikely, the CIT has considered and rejected that argument. To accept it would "deny MMPA protections to marine mammal populations that need them most." *Sea Shepherd I*, 606 F.Supp.3d at 1329. Even NMFS agrees that "[a]ny entanglements of Māui's dolphins in fishing gear could endanger the survival of the subspecies." 5-Year Review 49, 108 ("[A]ny mortality at all…could quickly bring the [Māui dolphin] closer to extinction."). The death of a Māui dolphin "could happen at any moment" and has. Slooten Decl. ¶ 32. "[W]here there is 'so little margin for error,'" the risk of another Māui dolphin death weighs heavily in favor of injunctive relief. *Sea Shepherd I*, 606 F.Supp.3d at 1329 (citation omitted).

## B.    Hector's Dolphins

As with the Māui dolphin, it is undisputed that the South Island Fisheries have caused the deaths of Hector's dolphins and that those fisheries continue to operate in the Hector's dolphin's habitat. Slooten Decl. ¶¶ 29, 38-42; 5-Year Review 109 (noting very high trawl fishing effort in areas with high densities of Hector's dolphins). But unlike the Māui dolphin, there are over fifty fishing-related Hector's dolphin deaths *every year*. Slooten Decl. Ex. F, at 87. While the data for the last fishing year (October 2024-September 2025) are not yet complete, at least nine Hector's dolphin deaths were documented as bycatch, including two pregnant females. Rose Decl. ¶¶ 45, 47. And recent analyses following a year of onboard cameras show that Hector's dolphin bycatch has been substantially underestimated in the trawl fisheries. 5-Year Review 86 (finding it "likely that the trawl fishing mortality rate [for the east coast Hector's dolphin population] will substantially exceed [GNZ's modeled] estimate in 2024"); Slooten Decl. ¶¶ 40–41; Rose ¶ 8. *But see supra* p. 9 (describing continued lack of sufficient monitoring in South Island Fisheries). Therefore, additional bycatch is highly likely to occur while this litigation proceeds. "[G]iven the undisputed instances of [Hector's] dolphin bycatch and the continued threat[,] there exists a

41

likelihood of irreparable harm absent injunctive relief." *Sea Shepherd I*, 606 F.Supp.3d at 1328;

*see also Mosbacher*, 746 F.Supp. at 975.

These deaths are not inconsequential. The Hector's dolphin population is far from healthy

and is likely to meet the same fate as the Māui dolphin if fishing-related mortality continues. *See*

5-Year Review 110. ("[T]here is not an appreciable sign of recovery for the [] Hector's

dolphins"); Slooten Decl. ¶¶ 26-28. NMFS recognizes that the population's decline is due

primarily to bycatch in fishing gear, with "decades of unsustainable levels of bycatch." 5-Year

Review 107, 109 (approximately 70% decline in abundance since the 1970s); Slooten Decl. ¶ 29.

Fisheries have not only caused the population as a whole to decline, but have wiped out local

populations. 5-Year Review 110. Fragmentation isolates the remaining populations, thereby

making each local population much more vulnerable. Slooten Decl. ¶¶ 25-26. In these

fragmented, smaller populations, "the death of one individual, especially if a mature female"

could push that population towards extirpation. *Id.* ¶ 28. With some small Hector's dolphin

populations currently suffering high rates of bycatch, including pregnant females, this trend of

disappearing populations is likely to continue. *Id.* ¶ 39; 5-Year Review 95 (noting there is "little

to no protection for several vulnerable, fragmented, small populations"), 107 ("several of the

remaining fragmented subpopulations continue to be at risk"); Rose Decl. ¶¶ 47 (two pregnant

females killed in fishing interactions in the 2024/25 fishing season alone). Fishing-induced

fragmentation makes it harder to preserve the species as a whole. Slooten Decl. ¶ 26. Given the

imperiled status of the entire population, even a small number of Hector's dolphin deaths each

year would make "the task of preserving that species … all the more difficult." *NWF*, 886 F.3d at

818 (citation omitted). And far more than that are being killed each year by the South Island

Fisheries. In fact, NMFS's 5-Year Review concluded that estimated bycatch is far exceeding the

42

PBR for every regional and local population of Hector's dolphins, as well as for the subspecies as a whole. 5-Year Review 106 (tbl. 13), 110 ("By allowing a level of bycatch that is sometimes an order of magnitude higher than the PBR it is unlikely that the SI Hector's dolphin will recover sufficiently to be delisted from the ESA in the near future."); *see NRDC*, 331 F.Supp.3d at 1369 (explaining irreparable harm is necessarily established if mortality rate exceeds what the MMPA would allow).

The ongoing threat of lethal and harmful bycatch of Hector's dolphins is significant. It comes from multiple set net and trawl fisheries. *See NWF*, 886 F.3d at 820 (explaining court need not "find irreparable harm solely from" one source and may "base the injunction on a finding of irreparable harm from [multiple sources] as a whole"). NMFS has found that "current management and regulations are likely to leading to inadequate protection and unsustainable bycatch rates." 5-Year Review 95. The harm from the ongoing likely loss of dolphins from the imperiled and declining Hector's dolphin population justifies injunctive relief.

*    *    *

"[G]iven the undisputed instances of Māui dolphin [and Hector's dolphin] bycatch and the continued threat[,] there exists a likelihood of irreparable harm absent injunctive relief." *Sea Shepherd I*, 606 F.Supp.3d at 1328. "[T]o hold otherwise would undermine the very purpose of the MMPA." *Id.*

## III.    The Balance of Equities and Public Interest Weigh Heavily in Favor of a Preliminary Injunction.

The impact to MHDD and the broader public from the death and possible extinction of imperiled dolphins is great. The risk to the Māui dolphin, in particular, cannot be overstated. In contrast, the administrative burden of an injunction on the U.S. government to implement an import ban is minimal. *Sea Shepherd I*, 606 F.Supp.3d at 1329.

43

In considering the balance of equities and public interest prongs, a court's inquiry must be "guided by reference to 'the underlying statutory purposes at issue.'" *Id.* at 1330 (quoting *NRDC*, 331 F.Supp.3d at 1371). The MMPA's "explicit" purpose is "to be administered for the benefit of the protected species rather than for the benefit of commercial exploitation." *Id.* Banning imports from the fisheries that pose the highest bycatch risk to Māui and Hector's dolphins would serve the public interest by effectuating Congress's tool of choice under the MMPA for encouraging foreign fisheries to better protect their marine mammal populations. *See Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc) ("[P]reserving environmental resources is certainly in the public's interest."), *abrogated on other grounds*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008). In contrast, "[t]here is generally no public interest in the perpetuation of unlawful agency action," as is the case with Defendants' reliance on yet another arbitrary and capricious comparability finding to authorize New Zealand seafood imports. *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also U.S. Auto Parts*, 319 F.Supp.3d at 1311 (recognizing "public benefits from the efficient administration and enforcement of the law"); *cf. MHDD I*, 799 F.Supp.3d at 1349 (noting import ban may be merited "going forward, if the agency continues to rely on an arbitrary and unlawful Decision Memorandum").

These imperiled dolphins face a threat of irreparable harm with every entangling net deployed in their habitats. As in *Sea Shepherd I*, "extinction is likely should the Māui dolphin population decline much further. Any such extinction poses a direct threat to [MHDD's] interests." 606 F.Supp.3d at 1329 (citations omitted). And while extinction may not be as imminent for the Hector's dolphin, the current rate of mortalities is sending the subspecies in that direction and impairing MHDD's interests in having a healthy Hector's dolphin population. Any

44

reduction in harmful fishing pressure within Māui and Hector's dolphin habitat is in the interest of their survival, and thus in the interests of both MHDD and the broader public.

Conversely, there will be little to no harm or burden to the Defendants as a result of the requested injunction. This Court has held that "the administrative inconvenience of administering an embargo can be characterized as 'routine.'" *Id.* at 1329 (quoting *NRDC*, 31 F.Supp.3d at 1370). Defendants are currently implementing MMPA import bans for over 200 fisheries from approximately 43 nations, and are well equipped to quickly implement an import ban on a handful of fisheries from one additional nation.

Therefore, these two preliminary injunction factors weigh heavily in favor of granting MHDD's motion.

## IV.    The Court Should Impose No More Than a Nominal Bond.

Courts have discretion to determine the amount of any bond required as security for a preliminary injunction motion. *See* CIT R. 65(c) (requiring security "in an amount that the court considers proper"). In light of the routine administrative costs to Defendants, the interest in preserving MHDD's access to courts, and the fact that MHDD's requested relief is in the public interest and aligns with the Congressional intent of the MMPA, this Court should impose only a nominal bond. *See Sea Shepherd*, 606 F.Supp.3d at 1332 n.71 (requiring $1.00 bond "[g]iven the routine administrative costs associated with implementing the import ban [under the Import Provision] and the interest in preserving Plaintiffs' ability to obtain judicial review of the Government's conduct"); *NRDC*, 331 F.Supp.3d at 1371 (same).

### CONCLUSION

The 2026 Comparability Finding is the latest in a pattern of arbitrary and capricious attempts by Defendants to keep imports flowing from New Zealand fisheries that are driving

45

Māui and Hector's dolphins into extinction and causing irreparable harm to MHDD's interests.

For the reasons above, this Court should enter MHDD's requested preliminary injunction.

Respectfully submitted this 3rd day of April, 2026.

*/s/ Sabrina Devereaux*
Sabrina Devereaux
Christopher Eaton
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T (206) 343-7340
sdevereaux@earthjustice.org
ceaton@earthjustice.org

Natalie Barefoot
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
T (415) 217-2000
nbarefoot@earthjustice.org

*/s/ Brett Sommermeyer*
Brett Sommermeyer
Catherine Pruett
Law of the Wild
7511 Greenwood Avenue North, #4214
Seattle, WA 98103
T (206) 774-0048
brett@lawofthewild.org
catherine@lawofthewild.org

*Attorneys for Plaintiff Māui and Hector's Dolphin Defenders NZ Inc.*

46

**CERTIFICATE OF COMPLIANCE**

This document complies with the word count limitations as provided for in the Court's

Standard Chambers Procedures 2(B) because it contains 13,992 words, excluding the parts of the

brief exempted by Standard Chambers Procedures 2(B)(1)(c).


*/s/ Sabrina Devereaux*
Sabrina Devereaux