# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |  |
|---|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Court No. 1:26-cv-02462-JCG |
| NATIONAL MARINE FISHERIES SERVICE, et al., | ) ) ) ) | |
| Defendants. | ) ) ) | |

## <u>ORDER</u>

Upon consideration of defendants' motion to dismiss for lack of jurisdiction, it is hereby

ORDERED that defendants' motion to dismiss is GRANTED; and it is further

ORDERED that the action is DISMISSED.

Dated: _____

    New York, N.Y.

_____

JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |
|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ, INC.,<br><br>   Plaintiff,<br><br>   v.<br><br>NATIONAL MARINE FISHERIES SERVICE, et al.,<br><br>   Defendants. | Court No. 1:26-cv-02462-JCG |

## DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(B)(1)

OF COUNSEL:
MARK HODOR
Office of the General Counsel
National Oceanic & Atmospheric Administration

ZACHARY SCOTT SIMMONS
Office of the Chief Counsel
U.S. Customs and Border Protection

DANIEL PAISLEY
Office of the General Counsel
Department of the Treasury

April 9, 2026

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

AGATHA KOPROWSKI
Trial Attorney
U.S. Department of Justice, Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 507-6081
Fax: (202) 353-0461
Email: agatha.koprowski@usdoj.gov

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Table of Contents..................................................................................................................ii

Table of Authorities ............................................................................................................iii

Introduction.......................................................................................................................... 1

    I.   The Marine Mammal Protection Act......................................................................... 5

    II.  Factual and Procedural Background........................................................................... 6

Summary of the Argument.................................................................................................. 11

Argument ............................................................................................................................ 12

    I.   Standard of Review ................................................................................................. 12

    II.  MHDD Lacks Standing ........................................................................................... 14

        A.   MHDD Asserts That Its Injury May Only Be Redressed by Closure of All Set Net And Trawl Fisheries..................................................................... 14

        B.   An Import Prohibition Under the MMPA Has Never Resulted in the Closure of a Foreign Fishery ...................................................................... 15

        C.   Neither This Court Nor The Government Has Authority To Direct Foreign Regulation Of Commercial Fisheries.......................................................... 21

        D.   MHDD Must Show Causation on a Fishery-by-Fishery Basis.................................. 27

Conclusion ......................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Allen v. Wright*,
   468 U.S. 737 (1984)..................................................................................................... 11, 12

*Animal Legal Defense Fund v. Quigg*,
   932 F.2d 920 (Fed. Cir. 1991)...................................................................................... 12, 23

*Arbaugh v. Y & H Corp.*,
   546 U.S. 500 (2006)....................................................................................................... 12

*Bowman Transp., Inc. v. Arkansas Best Freight Sys., Inc.*,
   419 U.S. 281 (1974)....................................................................................................... 14

*Cedars-Sinai Med. Ctr. v. Watkins*,
   11 F.3d 1573 (Fed. Cir. 1993)....................................................................................... 12

*Christianson v. Colt Indus. Operating Corp.*,
   486 U.S. 800 (1988)....................................................................................................... 20

*Engage Learning, Inc. v. Salazar*,
   660 F.3d 1346 (Fed. Cir. 2011)...................................................................................... 12

*Essar Steel Ltd. v. United States*,
   678 F.3d 1268 (Fed. Cir. 2012)...................................................................................... 21

*Food & Drug Admin. v. Alliance for Hippocratic Med.*,
   602 U.S. 367 (2024)....................................................................................................... 13

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952)......................................................................................................... 4

*Hertz Corp. v. Friend*,
   559 U.S. 77 (2010)......................................................................................................... 12

*Kwan v. United States*,
   272 F.3d 1360 (Fed. Cir. 2001)....................................................................................... 4

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)............................................................................................. 13, 26, 28

*Māui & Hector's Dolphin Defenders NZ Inc. v. Nat'l Marine Fisheries Serv.*,
   799 F. Supp. 3d 1327 (Ct. Int'l Trade 2025) ................................................................. 8

*Mideast Sys. & China Civil Construction Saipan Jt. Venture, Inc. v. Hodel,*
  792 F.2d 1172 (D.C. Cir. 1986) ...................................................................... 11

*Nat. Resources Def. Council v. Ross,*
  331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) ............................................. 18

*Nat. Resources Def. Council v. Ross,*
  348 F. Supp. 3d 1306 (Ct. Int'l Trade 2018) ............................................. 19

*NEXTEEL Co. v. United States,*
  28 F.4th 1226 (Fed. Cir. 2022) ................................................................. 21

*Nippon Steel Corp. v. Int'l Trade Comm'n,*
  345 F.3d 1379 (Fed. Cir. 2003)................................................................. 22

*Reynolds v. Army & Air Force Exch. Serv.,*
  846 F.2d 746 (Fed. Cir. 1988).................................................................. 12

*Sea Shepherd New Zealand v. United States,*
  606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) ................................... *passim*

*Sea Shepherd New Zealand v. United States,*
  693 F. Supp. 3d 1364 (Ct. Int'l Trade 2024) .............................................. 7

*Simon v. E. Ky. Welfare Rights Org.,*
  426 U.S. 26 (1976)............................................................................. 12, 23

*Unemployment Comp. Comm'n of Alaska v. Aragon,*
  329 U.S. 143 (1946)................................................................................. 21

*United States v. Texas,*
  599 U.S. 670 (2023)................................................................................. 20

*United Transp. Union v. Interstate Commerce Comm'n,*
  891 F.2d 908 (D.C. Cir. 1989)................................................................. 21

**Statutes**

5 U.S.C. § 702.............................................................................................. 14

5 U.S.C. § 706..................................................................................... *passim*

16 U.S.C. § 1361 ............................................................................................ 3

16 U.S.C. § 1371...................................................................................*passim*

16 U.S.C. § 1378............................................................................................ 2, 19

28 U.S.C. § 1581..................................................................................... 13, 22, 26

28 U.S.C. § 2640.............................................................................................. 13

28 U.S.C. §§ 1601-08 ..................................................................................... 22

**Rules**

USCIT R. 12 .............................................................................................. 12, 14

USCIT R. 41 ................................................................................................ 9, 10

Fed. R. Evid. 806 ............................................................................................ 13

**Regulations**

50 C.F.R. § 216.24 ....................................................................................... *passim*

**Administrative Determinations**

*Fish and Fish Product Import Provisions of the Marine Mammal Protection Act*,
    81 Fed. Reg. 54,390 (Dep't of Commerce Aug. 15, 2016)................................... 2, 4, 5

*Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection
    Act—Notification of Comparability Findings and Implementation of Import Restrictions;
    Certification of Admissibility for Certain Fish Products*,
    90 Fed. Reg. 42,395 (Dep't of Commerce Sept. 2, 2025) .......................................... 8

*Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection
    Act—Notification of Issuance of Comparability Findings*,
    89 Fed. Reg. 4,595 (Dep't of Commerce Jan. 24, 2024) ........................................... 7

*Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection
    Act—Notification of Comparability Findings*,
    91 Fed. Reg. 11,962 (Dep't of Commerce Mar. 11, 2026)................................... 10, 27

*Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection
    Act-Notification of Rejection of Petition and Issuance of Comparability Findings*,
    85 Fed. Reg. 71,297 (Dep't of Commerce Nov. 9, 2020)............................................. 6

*Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection
    Act—Notification of Comparability Findings*, 91 Fed. Reg. 11,962 (Dep't of Commerce
    Mar. 11, 2026)

*Notification of the Rejection of the Petition to Ban Imports of All Fish and Fish Products From New Zealand That Do Not Satisfy the Marine Mammal Protection Act*, 84 Fed. Reg. 32,853 (Dep't of Commerce July 10, 2019) ........................................................ 6

**Other Authorities**

Center for Biological Diversity, *et al.*, *North American Environmental Commission Confirms Mexico's Role in Imperiling Vaquita* (Aug. 19, 2025), *available at* https://biologicaldiversity.org/w/news/press-releases/north-american-environmental-commission-confirms-mexicos-role-in-imperiling-vaquita-2025-08-19/email_view/ ...................................................................................................... 18, 20

H.R. Rep. 92-707 (1971) ............................................................................................................ 3

H.R. Rep. No. 100-970 (1998) ................................................................................................... 3

H.R. Rep. No. 92-1488 (1972) (Conf. Rep.) .............................................................................. 3

NMFS, *MMPA Import Provisions Comparability Finding Application Final Report - Mexico* (Aug. 29, 2025), *available at* https://www.fisheries.noaa.gov/s3/2025-08/Mexico-final-2025-508.pdf ......................... 18, 20

Restatement (Fourth) Foreign Relations Law of the United States, Part IV, Introductory Note (Am. Law Inst. 2018) ................................................... 22

S. Rep. No. 92-863 (1972) ..................................................................................................... 1, 3

Defendants, the National Marine Fisheries Service (NMFS), the Assistant Administrator for NMFS, the Secretary of Commerce, the Secretary of the Treasury, and the Secretary of Homeland Security, respectfully file this motion to dismiss the complaint filed by plaintiff, Māui and Hector's Dolphin Defenders NZ Inc. (MHDD) (Mar. 24, 2026), ECF No. 4 (Complaint). For the reasons below, the Complaint should be dismissed because MHDD has not established that it has standing to pursue its claims.

## INTRODUCTION

In repetitive, overlapping actions that MHDD has alternatively pursued aggressively and abandoned abruptly over the course of nearly 18 months, MHDD broadly accuses the United States of ignoring the statutory scheme developed by Congress in the Marine Mammal Protection Act (MMPA) and, in turn, the precarious state of vulnerable marine mammal populations across the globe. MHDD's accusations are misplaced. Central to its theory of relief is MMHD's contention that a single mechanism authorized by the MMPA—the import prohibition of 16 U.S.C. § 1371(a)(2)—is the key to unlocking alleged foreign intransigence to manage New Zealand fisheries in MHDD's preferred manner. To meet its burden to establish constitutional standing, MHDD must demonstrate, without resorting to speculation, that such an import prohibition would likely lead to actual changes in the way foreign fisheries are managed by a foreign sovereign, resulting in decreased commercial fishing using the challenged harvesting technology. It cannot do so, and its claims must therefore fail.

Underscoring the inappropriateness of MHDD's pursuit of judicial interference into Executive Branch priorities is MHDD's disregard for the array of tools provided to the Executive Branch to promote the international partnership and cooperation that Congress deemed necessary to effectively tackle the challenge of marine mammal conservation. *See, e.g.*, S. Rep. No. 92-863, at 10 (1972) ("[U]nilateral action by the United States affecting any species or subspecies of

marine mammal could be fruitless unless other nations involved in the taking of marine mammals work with the United States to preserve and protect these creatures.").

Congress, while mandating prohibitions under certain circumstances, left the *determination* of those circumstances to the Secretary of Commerce, who alone is statutorily authorized to apply the purposefully amorphous phrase "United States standards" to foreign fisheries. 16 U.S.C. § 1371(a)(2). The Secretary of Commerce, acting through NMFS, retained this flexibility in assessing the efficacy of marine mammal protections in foreign commercial fisheries by promulgating regulations that determine "United States standards" with reference to an equally flexible term, "comparability." 50 C.F.R. § 214.26(h)(1). As should be self-evident, comparability does not require one-for-one equality. *See, e.g.*, *Fish and Fish Product Import Provisions of the Marine Mammal Protection Act*, 81 Fed. Reg. 54,390, 54,401 (Dep't of Commerce, Aug. 15, 2016) (MMPA Imports Rule) (explaining that the comparability "approach gives harvesting nations flexibility to implement the same type of regulatory program as the United States or a program that is completely different but achieves the same results").

The statutory tools afforded to the Executive Branch by the MMPA include sticks, such as the § 1372(a)(1) import prohibition, and carrots, including mandates to enter into negotiations for international agreements and to seek to revise treaties to be consistent with the underlying purpose of the MMPA. *See generally* 16 U.S.C. § 1378. Through its regulations, NMFS has elaborated on the foreign policy role Congress envisioned, contemplating particular actions to promote international cooperation and coordination, such as technical assistance, research cooperation, and technology transfers. 50 C.F.R. § 216.24(h)(11). Discussion of any these programs is conspicuously absent from the Complaint and the dozens of papers MHDD has filed in its overlapping actions. *Cf.* Complaint ¶ 24 (alleging that the MMPA was "designed to protect

2

marine mammal populations outside of U.S. waters through leveraging the United States' position as a major seafood importer"). The failure to acknowledge this broad international program is all the more conspicuous because Congress has emphasized again and again the importance of *cooperation* and *negotiations* with trading partners to promote the conservation goals of the MMPA. *See* 16 U.S.C. § 1361(4) ("[N]egotiations should be undertaken immediately to encourage the development of international arrangements for research on, and conservation of, all marine mammals"); Sen. Rep. No. 92-863, at 10 (1972) ("[T]he [MMPA] includes strong directives on international cooperation and coordination."); *id.* at 11 ("The committee wishes to emphasize the need for international cooperation."); H.R. Rep. 92-707, at 14 (1971) ("[T]he Committee felt it to be of vital significance to include strong language exhorting the Department of State to develop more effective international treaties for the protection of these animals, which today have little or no protection."); *id.* at 16 (extolling success of 1911 treaty relating to the taking of fur seals); H.R. Rep. No. 100-970, at 30 (1998) ("[T]he Secretary is directed . . . to develop agreements on cooperative research into alternative fishing methods and population studies, limitations on incidental take levels, and the use of best marine mammal safety techniques and equipment for the purpose of reducing mortality."); H.R. Rep. No. 92-1488, at 25 (1972) (Conf. Rep.) ("Both the House and Senate versions required that the Secretaries initiate international negotiations in order to expand the principles of [the bill] to the high seas and other countries."). In contrast, we are not aware of any statement by Congress that leveraging of the U.S. market was meant to be used as a bullying tactic to attempt to coerce trading partners to change foreign fisheries management, as MHDD appears to prefer.

Balancing the use of these carrots—like technical assistance—against the threat of the stick—an import prohibition—to promote foreign policy objectives and aid in international

3

negotiations is a task for which the Executive Branch is fundamentally equipped to handle and with which the Judicial Branch should be especially cautious to avoid interference. *See, e.g.*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) ("[P]olicies in regard to the conduct of foreign relations . . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."); *Kwan v. United States*, 272 F.3d 1360, 1364 (Fed. Cir. 2001) ("[Government-to-government] negotiations are consigned to the executive branch in its conduct of foreign relations").

Harnessing an incentive, like technical assistance, to extract commitments from international partners to revise existing regulatory regimes, while allowing NMFS to withdraw the threat of an Executive Branch consequence, like an embargo, is essential to effectuating the underlying statutory purpose of promoting conservation efforts globally and not just in the waters under the jurisdiction of the United States. *See, e.g.*, MMPA Import Rule, 81 Fed. Reg. at 54,403 ("NMFS believes that [implementing new regulations or revising existing regulations by foreign harvesting nations] should be encouraged rather than penalized. In those situations, NMFS must determine whether such regulations are likely to, or are making progress toward, reducing marine mammal bycatch."); 50 C.F.R. § 216.24(h)(7)(iii) (requiring NMFS to consider "[w]hether the measures adopted by [a] harvesting nation . . . will *likely* reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit, and the *progress* of the regulatory program toward achieving its objectives") (emphasis added).

MHDD's mistaken belief that judicial interference in foreign policy will promote rather than impede international cooperation to improve marine mammal conservation belief cannot be further from the truth. Previously, the imposition of a Court-ordered MMPA import prohibition

4

resulted in profound disruptions of cooperative efforts with an international trading partner and devastating results for a critically endangered species.

This Court should seek to avoid such harmful interference from recurring by dismissing the Complaint for lack of jurisdiction, particularly when there is nothing more than conjecture to support a conclusion that any legal remedy within this Court's authority could provide MHDD with relief from its alleged injuries. Meanwhile, the history of previous MMPA litigation suggests that unintended consequences could prove tragic for the very species MHDD purports to want to protect.

I.    The Marine Mammal Protection Act

The MMPA, among other things, directs the Government to ban imports of commercial fish products following a determination that harvesting of those products results in the incidental killing or serious injury of marine mammals (collectively, take) "in excess of United States standards." *See* 16 U.S.C. § 1371(a)(2).

The authority to implement the MMPA has been delegated to NMFS. In 2016, NMFS promulgated regulations to implement these provisions of the MMPA. *See* MMPA Imports Rule, 81 Fed. Reg. 54,390.

The MMPA Imports Rule established a process for NMFS to determine whether a foreign country maintains a regulatory program that provides for, or effectively achieves comparable results as, the United States' regulatory program. *See* 50 C.F.R. § 216.24(h). Absent a finding of comparability, fish and fish products may not be imported into the United States because those fisheries have been deemed to result in the incidental mortality or incidental serious injury of marine mammals in excess of United States standards. 16 U.S.C. § 1371(a)(2). *See also* 50 C.F.R. § 216.24(h)(1)(ii).

II.    Factual and Procedural Background

On February 9, 2019, two environmental organizations (collectively Sea Shepherd) submitted a petition to NMFS seeking emergency rulemaking to ban the importation of all fish and fish products sourced using fishing activities that resulted in the incidental kill or incidental serious injury of Māui dolphins in excess of United States standards, as required by the MMPA, 16 U.S.C. § 1371(a)(2). NMFS denied Sea Shepherd's petition. *Notification of the Rejection of the Petition to Ban Imports of All Fish and Fish Products From New Zealand That Do Not Satisfy the Marine Mammal Protection Act*, 84 Fed. Reg. 32,853 (Dep't of Commerce July 10, 2019).

Sea Shepherd subsequently filed a complaint in this Court alleging that the United States had unlawfully withheld agency action by failing to ban the importation of commercial fish in the Māui dolphin's range. Complaint ¶ 89. The United States moved for a voluntary remand to allow NMFS to determine whether to issue comparability findings based on then-recently enacted regulations by New Zealand, resulting in another denial of Sea Shepherd's petition and the issuance of comparability findings for certain New Zealand fisheries. *See Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act-Notification of Rejection of Petition and Issuance of Comparability Findings*, 85 Fed. Reg. 71,297 (Dep't of Commerce Nov. 9, 2020).

Sea Shepherd filed a motion for preliminary injunction, which the Court issued on November 28, 2022, directing the United States to prohibit the importation into the United States of products from New Zealand's West Coast North Island commercial set net and trawl fisheries. *Sea Shepherd New Zealand v. United States*, 606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) (*Sea Shepherd I*).

The Government of New Zealand (NZG) subsequently provided additional evidence concerning the regulation of the fisheries subject to the *Sea Shepherd I* injunction and, on January 24, 2024, NMFS published new comparability findings in the Federal Register. *Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act—Notification of Issuance of Comparability Findings*, 89 Fed. Reg. 4,595 (Dep't of Commerce Jan. 24, 2024) (2024 Comparability Findings). On April 1, 2024, in light of the new agency action, the Court dissolved the *Sea Shepherd I* injunction. *Sea Shepherd New Zealand v. United States*, 693 F. Supp. 3d 1364, 1367-68 (Ct. Int'l Trade 2024) (*Sea Shepherd II*).

On December 4, 2024, MHDD filed a complaint challenging the 2024 Comparability Findings. Complaint, *Māui and Hector's Dolphin's Defenders NZ, Inc. v. Nat'l Marine Fisheries Serv.*, No. 24-cv-00218 (Dec. 4, 2024), ECF No. 1 (*MHDD I* Proceedings).

On March 4, 2025, the Government sought to stay the *MHDD I* Proceedings because the terms of a stipulated order issued by this Court in separate litigation brought by unrelated parties required that NMFS issue comparability finding determinations for all foreign fisheries and submit those determinations to the Federal Register on or before September 1, 2025. *See* Stipulation of Dismissal at Attachment 1, *Natural Resources Defense Council v. Raimondo*, No. 24-00148 (Ct. Int'l Trade Jan. 16, 2025) (*Raimondo*), ECF No. 29; Stipulated Order of Dismissal, *Raimondo*, No. 24-00148 (Ct. Int'l Trade Mar. 25, 2025), ECF No. 39; Motion to Stay Proceedings at 23, *MHDD I* Proceedings (Ct. Int'l Trade Mar. 5, 2025), ECF No. 21 (alerting the Court that the *Raimondo* stipulation of dismissal would likely result in determinations rendering MHDD's claims moot in or around September 2025). On March 28, 2025, the Court denied the motion to stay the *MHDD I* Proceedings. Order Denying Motion to Stay, *MHDD I* Proceedings (Ct. Int'l Trade Mar. 28, 2025), ECF No. 23.

Following cross-motions for judgment on the administrative record, the Court vacated the 2024 Comparability Findings and remanded them to NMFS for additional consideration. *Māui & Hector's Dolphin Defenders NZ Inc. v. Nat'l Marine Fisheries Serv.*, 799 F. Supp. 3d 1327 (Ct. Int'l Trade 2025) (*MHDD I* Remand Order).

On September 2, 2025, as required by the stipulated *Raimondo* order, NMFS published in the Federal Register comparability determinations for approximately 2,500 fisheries from 135 harvesting nations, including the New Zealand fisheries that were the subject of the *MHDD I* Remand Order. *Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act—Notification of Comparability Findings and Implementation of Import Restrictions; Certification of Admissibility for Certain Fish Products*, 90 Fed. Reg. 42,395, 42,397-98 (Dep't of Commerce Sept. 2, 2025) (2025 Comparability Findings).

On September 25, 2025, MHDD filed a motion to alter or amend the "judgment" in the *MHDD I* Proceedings. Motion to Alter or Amend, *MHDD I* Proceedings (Ct. Int'l Trade Sept. 25, 2025), ECF No. 43. On November 24, 2025, the Government responded with a motion to dismiss the *MHDD I* Proceedings because MHDD lacked standing and because the 2025 Comparability Findings superseded the 2024 Comparability Findings, rendering them moot. Motion to Dismiss, *MHDD I* Proceedings (Nov. 24, 2025), ECF No. 51.

On January 5, 2026, without responding to the Government's motion to dismiss or moving itself to dismiss the *MHDD I* Proceedings, MHDD filed a complaint challenging the 2025 Comparability Findings. Complaint, *Māui and Hector's Dolphin's Defenders NZ, Inc. v. Nat'l Marine Fisheries Serv.*, No. 26-cv-00060 (Ct. Int'l Trade Jan. 5, 2026), ECF No. 4 (*MHDD II* Proceedings).

8

On January 6, 2026, the Government filed its remand comparability findings pursuant to the *MHDD I* Remand Order. Confidential Remand Redetermination, *MHDD I* Proceedings (Ct. Int'l Trade Jan. 6, 2026), ECF No. 58. MHDD moved almost immediately for a stay of the *MHDD I* Proceedings. Joint Motion for Stay, *MHDD I* Proceedings (Ct. Int'l Trade Jan. 7, 2026), ECF No. 59. Despite indicating that the parties would seek an equivalent stay in the *MHDD II* proceedings, *id.*, MHDD instead filed a motion for preliminary injunction, Plaintiff's Motion for Preliminary Injunction, *MHDD II* Proceedings (Ct. Int'l Trade Jan. 30, 2026), ECF No. 16. On February 11, 2026, without conceding mootness, MHDD then moved to voluntarily dismiss the *MHDD I* Proceedings pursuant to USCIT R. 41(a)(2). Plaintiff's Motion to Voluntarily Dismiss Without Prejudice, *MHDD I* Proceedings (Ct. Int'l Trade Feb. 11, 2026), ECF No. 72.

On February 27, 2026, after more than three months, MHDD responded in opposition to the Government's motion to dismiss the *MHDD I* Proceedings. Plaintiff's Opposition to Defendants' Motion to Dismiss, *MHDD I* Proceedings (Ct. Int'l Trade Feb. 27, 2026), ECF No. 84.

On March 9, 2026, the Government filed its response in opposition to the motion for preliminary injunction in the *MHDD II* Proceedings and moved to dismiss that action for lack of standing. Defendants' Response in Opposition to Plaintiff's Motion for Preliminary Injunction and Motion to Dismiss Pursuant to Rule 12(b)(1), *MHDD II* Proceedings (Mar. 9, 2026), ECF No. 47.

On March 11, 2026, in order to consolidate the records of the remand redetermination in the *MHDD I* Proceedings and the decision documents supporting the 2025 Comparability Findings challenged in the *MHDD II* Proceedings, NMFS issued new comparability findings for

9

the 15 New Zealand fisheries challenged in the *MHDD I* and *MHDD II* Proceedings.

*Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act—Notification of Comparability Findings*, 91 Fed. Reg. 11,962 (Dep't of Commerce Mar. 11, 2026) (2026 Comparability Findings). NMFS explained its determinations in a decision memorandum dated March 2, 2026. *See* Public Version Comparability Findings for New Zealand's North and South Island Multi-species Commercial Set Net and Trawl Fisheries – Decision Memorandum (NMFS Mar. 2026) (2026 Decision Memorandum, attached as Exhibit A), *available at* https://www.fisheries.noaa.gov/s3/2026-03/NZ-MMPA-Decision-Memo-2026.pdf (last visited Apr. 9, 2026).

On March 13, 2026, the Government filed its reply in support of its motion to dismiss the *MHDD I* Proceedings. Defendants' Reply, *MHDD I* Proceedings (Ct. Int'l Trade Mar. 13, 2026), ECF No. 86.

On March 17, 2026, after contesting mootness for more than six months, MHDD filed a motion for leave to file a sur-reply in the *MHDD I* Proceedings, conceding that the *MHDD I* Proceedings had been rendered moot. Plaintiff's Motion for Leave to File and Sur-Reply in Partial Opposition to Defendants' Motion to Dismiss, *MHDD I* Proceedings (Ct. Int'l Trade Mar. 17, 2026), ECF No. 87. The same day, MHDD filed a notice voluntarily dismissing the *MHDD II* Proceedings pursuant to USCIT R. 41(a)(1)(A)(i). Notice of Dismissal, *MHDD II* Proceedings (Ct. Int'l Trade Mar. 17, 2026), ECF No. 54.

On March 24, 2026, MHDD filed the Complaint challenging the 2026 Comparability Findings. On April 6, 2026, MHDD filed a motion for preliminary injunction. ECF No. 13 (Motion for PI).

Also on April 6, 2026, the Court dismissed the *MHDD I* Proceedings, concluding that those proceedings were moot without reaching the Government's other jurisdictional arguments. *See* Opinion and Order, *MHDD I* Proceedings (Apr. 6, 2026), ECF No. 90.

**SUMMARY OF THE ARGUMENT**

The Court should dismiss the action for lack of subject matter jurisdiction because MHDD cannot establish standing.

Based on the Complaint, the alleged injury to the aesthetic and other interests of MHDD's members can only be redressed by eliminating set net and trawl fishing in all New Zealand commercial fisheries. An import embargo under the MMPA—including the *Sea Shepherd I* embargo affecting some of the same fisheries challenged in this action—has *never* resulted in the closure of a foreign fishery or even a demonstrated decrease in harvesting fish within those fisheries. Even if something less than complete closure could mitigate the alleged injury, MHDD's counsel has admitted that "we don't know" what, if anything, the NZG might do to further regulate commercial fisheries. Status Conference Audio at 1:22:20-21, 1:22:58-23:01, *MHDD I & II* Proceedings (Feb. 12, 2026). Neither this Court nor the United States has any legal authority to direct an independent sovereign nation to take particular regulatory actions. *Cf. Mideast Sys. & China Civil Construction Saipan Jt. Venture, Inc. v. Hodel*, 792 F.2d 1172, 1177 (D.C. Cir. 1986). If "we don't know" what the NZG might do or whether it could redress the injury MHDD alleges and MHDD has identified no specific actions that would plausibly to flow from judicial action in this litigation, then MHDD cannot demonstrate that "relief from the injury [is] 'likely' to follow from a favorable decision," and this Court lacks subject-matter jurisdiction. *Allen v. Wright*, 468 U.S. 737, 751 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

11

Likewise, MHDD cannot establish that any alleged failure on the part of the United States to prohibit certain fish imports is fairly traceable to the alleged proximate cause of its injury—commercial fishing in New Zealand—and it has not even tried to allege that the particular fisheries identified in its complaint are actually contributing to bycatch of Māui or Hector's dolphins in excess of United States standards. At best, MHDD has alleged, Complaint ¶ 15, that the availability of the U.S. market for fish products from the challenged fisheries encourages purportedly injurious actions. Binding precedent confirms that mere encouragement of third-party acts is insufficient to establish causation. *See, e.g.*, *Allen*, 468 U.S. at 758; *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44-45 (1976); *Animal Legal Defense Fund v. Quigg*, 932 F.2d 920, 934 (Fed. Cir. 1991).

## ARGUMENT

I.   Standard of Review

In deciding a motion to dismiss for lack of jurisdiction pursuant to USCIT R. 12(b)(1), the Court accepts as true all uncontroverted factual allegations in the complaint. *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011) (analyzing identical Federal Rule of Civil Procedure). "If the Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction, however, the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993). MHDD bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence, *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988), and "must support [its] allegations by competent proof," *Hertz Corp. v. Friend*, 559 U.S. 77, 96-97 (2010). "[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). *See also* USCIT R. 12(h)(3).

12

Pursuant to Article III of the United States Constitution, a party bringing suit must possess a live case or controversy—that is, "a plaintiff must demonstrate (i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024). The possibility that the alleged injury will be redressed by a favorable decision must be "likely, as opposed to merely speculative." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). (quotation marks omitted). When "a plaintiff's asserted injury arises from the [G]overnment's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed" than when the plaintiff is the intended object of the Government's action. *Id.* at 562. Specifically, MHDD must "adduce facts showing that" the choices of the third parties who are the object of the Government's action "have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* Demonstrating only attenuated links between the Government and the parties directly causing injury, "that is, where the government action is so far removed from its distant (even if predictable) ripple effects" is insufficient to establish standing. *Alliance for Hippocratic Med.*, 602 U.S. at 383.

This Court has exclusive jurisdiction over any civil action "aris[ing] out of any law of the United States providing for . . . embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety." 28 U.S.C. § 1581(i). This Court reviews actions brought pursuant to § 1581(i) as provided in the Administrative Procedure Act (APA). *Id.* § 2640(e); 5 U.S.C. § 706. The APA establishes a private cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."

13

5 U.S.C. § 702. A person identified in § 702 may seek a court to "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), or to "hold unlawful and set aside" agency actions that are, among other things, "arbitrary, capricious . . . or otherwise not in accordance with law," *id.* § 706(2)(A). *See also* Complaint ¶¶ 10, 55-56, 155, 160-61. The Court's role in determining whether an agency action is arbitrary or capricious is "narrow." *Bowman Transp., Inc. v. Arkansas Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974). It is ultimately limited to determining whether the agency's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (internal quotation marks omitted). "The court is not empowered to substitute its judgment for that of the agency." *Id.*

II.    MHDD Lacks Standing

MHDD cannot establish standing to pursue its claims because it has failed to demonstrate that its alleged injury is fairly traceable the actions of the defendants and because its alleged injury cannot be redressed by this Court; the action must be dismissed. USCIT R. 12(b)(1), (h)(3).

A.    MHDD Asserts That Its Injury May Only Be Redressed by Closure of All Set Net and Trawl Fisheries

MHDD alleges that its members "enjoy and benefit from the continued presence of Māui and Hector's dolphin populations for recreational, aesthetic, spiritual, artistic, cultural, commercial, scientific, and environmental purposes," and regularly search for "other marine species," all of which are purportedly "impacted by New Zealand trawl and set net fisheries." Complaint ¶ 12.[1]

_____

[1] Although MHDD references other marine mammals, all of its specific allegations, as well as the arguments in its Motion for PI, relate to Māui and Hector's dolphins.

14

As alleged, the direct, proximate cause of the lessened enjoyment of MHDD's members is the diminished health of various marine mammals due to the vague "impact" of New Zealand's commercial set net and trawl fisheries.

Throughout its overlapping actions, MHDD has repeatedly argued that the only solution for MHDD and its members to avoid injury is to eliminate the use of set net and trawl fisheries. *See* Complaint ¶ 5 (alleging that, due to bycatch of Māui and Hector's dolphins in New Zealand's set net and trawl fisheries, "[e]xtinction is inevitable"); Declaration of Elisabeth Slooten, Ph.D. ¶ 29, ECF No. 13-28 (Slooten Decl) ("As long as set net and trawl fishing continues within the dolphins' range, the subspecies are at significant risk of extinction."); *id.* ¶ 40. *See also* Motion for PI at 7 ("[T]he risk from these fisheries must be eliminated for Māui and Hector's dolphins to avoid extinction, let alone to recover."). Although MHDD has suggested at times that something less than complete closure of the allegedly injurious fisheries could theoretically remedy its injury, MHDD has never identified any specific action that could redress the injury to the alleged aesthetic and other interests of its members. *E.g.*, Motion for PI at 38-39. [2]

### B. An Import Prohibition Under the MMPA Has Never Resulted in the Closure of a Foreign Fishery

An import embargo under the MMPA, whether ordered by this Court or following the denial of a comparability finding, has *never* led to the closure of a single foreign commercial

---

[2] In a status conference in the *MHDD I* and *MHDD II* Proceedings, counsel for MHDD offered several concrete examples of what he speculated that NZG could do to ameliorate the alleged harm to its members' aesthetic and other interests: "close certain areas off"; "[r]estrict the times that fisheries are in certain areas"; and engage in "monitoring." Conference Audio at 1:22:20-23:01, *MHDD I & II* Proceedings (Feb. 12, 2026). In fact, NZG has already implemented each of these measures in the challenged fisheries. *See* 2026 Decision Memorandum at 28-35 (area and time closures); *id.* at 41-48 (monitoring).

fishery, as illustrated by the history of this litigation and of previous litigation involving Mexican fisheries and their impact on the critically endangered vaquita.

On November 28, 2022, this Court enjoined the agency's comparability finding and ordered an immediate ban of nine species of fish caught in certain set net and trawl fisheries operating off New Zealand's North Island. Further Order on Plaintiffs' Motion for Preliminary Injunction, *Sea Shepherd* (Ct. Int'l Trade Nov. 28, 2022), ECF No. 109.

In support of their request for injunction, the expert hired by the *Sea Shepherd* plaintiffs, confidently predicted that a ban on imports would cause New Zealand to close the challenged set net and trawl fisheries. *See* Declaration of Dr. Glenn Simmons in Support of Plaintiffs' Renewed Motion a [sic] for Preliminary Injunction ¶ 61, ECF No. 13-24 (Simmons 2020 Decl.) ("[I]t is my expert opinion that New Zealand would respond positively to a U.S. imposed seafood trade ban by taking the necessary management and enforcement measures to prevent the Māui dolphin from becoming extinct."). Of course, this prediction that NZG would take all allegedly "necessary. . . measures to prevent the Māui dolphin from becoming extinct" by closing the challenged fisheries did not come to pass during the duration of *Sea Shepherd I* injunction from November 2022 to April 2024, as MHDD has admitted. *See* Slooten Decl. ¶ 41 ("The Government of New Zealand has not amended its regulations relating to the Māui dolphin since 2020."); Declaration of Christine Rose ¶ 68, ECF No. 13-8 (Rose Decl.) ("Despite the increased knowledge of the elevated bycatch rate levels, the New Zealand government has not issued any new regulations designed to reduce bycatch since 2020."); Status Conference Audio at 1:31:37-48, *MHDD I & MHDD II* Proceedings (Ct. Int'l Trade Feb. 12, 2026) (statement of counsel for NZG: "All I know is what [the NZG] did last time, which is they stood by what they had done. They believed it was supported by the science, not by opinion."). Yet MHDD has continued to

rely on this same expert and, indeed, this same declaration. Declaration of Dr. Glenn Simmons, PHD ¶ 5, ECF No. 13-23 (Simmons 2026 Decl.) ("I affirm that the expert analyses, opinions, and conclusions set forth in [the Simmons 2020 Decl.] remain accurate and represent my current expert analyses, opinions, and conclusions for submission in this matter."). *See also id.* ¶¶ 14, 16. MHDD has not provided any coherent explanation for its apparent belief that a slightly different import prohibition would be more effective than the previous *Sea Shepherd I* ban, nor has its self-proclaimed expert explained why his failed predictions should nonetheless be credited.

At best, MHDD's expert appears to suggest that an import prohibition in this action would be more effective than the previous embargo that had not lived up to his expectations because a "properly implemented" prohibition would affect seafood exports from New Zealand that are harvested *outside of the targeted set net and trawl fisheries. Id.* ¶¶ 20-21. This is an astounding position. MHDD's expert proposes that, in order to redress MHDD's injury and avoid irreparable harm, an embargo from this Court would and should prohibit New Zealand products harvested from fisheries *that are not being challenged by MHDD*. Even if MHDD's demonstrably fallible expert were correct about the reactions to such economic pressures—although the Court can only speculate that his current predictions are any more reliable than his previous ones—MHDD clearly cannot rely on the economic impact caused by prohibiting products that are not even *alleged* to have been "caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards," 16 U.S.C. § 1371(a)(2), to establish standing to pursue its claims.

The vaquita litigation that MHDD has repeatedly cited likewise demonstrates the historical *ineffectiveness* of Court-ordered import bans on closing foreign commercial fisheries. *E.g.*, Simmons 2020 Decl. ¶¶ 62-69. In July 2018, this Court issued a preliminary injunction

17

banning imports of fish and fish products from Mexico caught with gillnets in the range of the vaquita, a critically endangered porpoise endemic to the Upper Gulf of California. *Nat. Resources Def. Council v. Ross*, 331 F. Supp. 3d 1338, 1371-72 (Ct. Int'l Trade 2018) (*Ross*). Rejecting the Government's standing arguments, the Court concluded that "the third parties in question" (specifically, Mexico and commercial fishers and illegal poachers operating in Mexico) "are likely to respond to a United States import ban in a way that reduces danger to the vaquita and consequently harm to plaintiffs' recreational and esthetic interests." *Id.* at 1359. Despite import bans that have continued to this day, gillnet fishing by Mexican commercial fishers continue to endanger the survival of the vaquita. *See, e.g.*, NMFS, *MMPA Import Provisions Comparability Finding Application Final Report - Mexico* at 2 (Aug. 29, 2025) (2025 Mexico Final Report), *available at* https://www.fisheries.noaa.gov/s3/2025-08/Mexico-final-2025-508.pdf ("Mexico still fails to implement a regulatory program to reduce or eliminate vaquita bycatch that is comparable in effectiveness to the United States.").

Recognizing the failure of the MMPA import prohibitions to redress their injuries, the same environmental organizations that successfully obtained injunctive relief in *Ross* sued again *four years later*, alleging that another import prohibition under a separate statutory authority was required to redress the ongoing, *unredressed* injury to their aesthetic and other interests in the vaquita. *See generally* Complaint, *Ctr. Biological Diversity v. Haaland*, Court No. 1:22-cv-00339 (Ct. Int'l Trade Dec. 14, 2022), ECF No. 4.

Public statements by these same groups indicate that, after more than *seven years*, the MMPA prohibitions *still have not had* the intended effect on their alleged injuries. *See, e.g.*, Center for Biological Diversity, *et al.*, *North American Environmental Commission Confirms Mexico's Role in Imperiling Vaquita* (Aug. 19, 2025), *available at* https://biologicaldiversity.org/

18

w/news/press-releases/north-american-environmental-commission-confirms-mexicos-role-in-imperiling-vaquita-2025-08-19/email_view/ (last visited Apr. 9, 2026) (attributing the continued drive of the vaquita to extinction to Mexico's failure to enforce fishery regulations and the elusion of the trade embargo by Mexican fishers).

It is likely that the interference by this Court during the *Ross* litigation materially undermined the effectiveness of then-ongoing negotiations to increase vaquita protections. In a 2018 letter, the then-Ambassador to the United States from Mexico, Gerónimo Gutiérrez Fernández, explained that the preliminary injunction imposed by the *Ross* Court had disrupted "sensitive consultations" between the United States and Mexico and that the "embargo ordered by the Court . . . threaten[ed] to disrupt the implementation of the extensive Vaquita-protective measures Mexico has put in place by diverting critical government resources to the implementation of the embargo nationwide," potentially resulting in "significant socio-political and economic impacts that might adversely affect the ability of the Mexican Government to continue the implementation of important actions of the existing Comprehensive Program." Letter from the Ambassador of Mexico to NMFS, *Natural Resources Defense Council v. Ross*, Case No. 18-55 (Aug. 24, 2018), ECF No. 43-2 (attached as Exhibit B). The *Ross* Court simply ignored this evidence of the negative impact of *judicial* interference in foreign relations. *See generally Natural Resources Defense Council, Inc. v. Ross*, 348 F. Supp. 3d 1306 (Ct. Int'l Trade 2018). The very diversion away from implementation that the Ambassador predicted appears to have followed. *See* 2025 Mexico Final Report at 16 ("In fact, information indicates that Mexico has largely failed to implement its Regulatory Agreement of September 2020 and that Mexico does not implement and enforce its regulatory program."). The *Ross* plaintiffs have publicly acknowledged the samefailures: "Mexico's unwillingness to enforce its own wildlife

19

protection and trade laws is driving the extinction of the critically endangered vaquita porpoise." *North American Environmental Commission Confirms Mexico's Role in Imperiling Vaquita.*

Among other things, the MMPA Imports Rule requires NMFS to consider both the established and *likely* progress of a harvesting nation's regulatory efforts. 50 C.F.R. § 216.24(h)(7)(iii). The MMPA and the Rule also authorize NMFS to provide technical assistance to assist harvesting nations to develop fisheries management consistent with the MMPA and negotiate, through the Secretary of State, agreements with harvesting nations to reduce marine mammal take caused by commercial fishing operations. *Id.* § 216.24(h)(11); 16 U.S.C. § 1378. Inherent in these actions is the discretion to determine the types of commitments harvesting nations could make to be consistent with the MMPA. Retaining that discretion over foreign policy objectives is precisely why the type of lawsuit brought by MHDD is not thought to be traditionally redressable through the judicial process. *See United States v. Texas*, 599 U.S. 670, 679-81 (2023) (holding that states lacked standing to challenge immigration enforcement policies when, among other things, such policies implicate foreign policy).

That the MMPA import prohibitions have been inadequate to convince the Government of Mexico to take sufficient measures to protect the vaquita from commercial fishing activities is disappointing. But that does not justify the expansion of this Court's jurisdiction beyond constitutional and statutory limitations. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818 (1988). This is especially so when judicial intervention in this area has already hampered cooperative efforts at international engagement, as the Ambassador warned.

Even if Congress had limited the Government's international engagement under the MMPA solely to the imposition of import embargoes—and it did not—both Congress and

MHDD are free to rely on mere hope to establish chains of causation and redress, but this Court cannot: "[C]ourts should bear in mind that when Congress predicts that an injury is caused by a certain behavior or phenomenon and when it predicts the likely impact of legislation, it performs a task that is quite different from both the 'fairly traceable' and 'redressability' portions of the Article III standing inquiry." *United Transp. Union v. Interstate Commerce Comm'n*, 891 F.2d 908, 916 (D.C. Cir. 1989). "A court's causation inquiry is much more rigorous . . . it must determine that the causal nexus is firm." *Id. See also Doe 1 v. Apple Inc.*, 96 F.4th 403, 410 (D.C. Cir. 2024) ("Article III provides a constitutional minimum that cannot be lowered by Congress.").

Accordingly, without anything other than MHDD's conjecture that its requested relief would redress its alleged injury despite all historical evidence to the contrary, MHDD lacks standing.

C.  Neither This Court Nor The Government Has Authority To Direct Foreign Regulation Of Commercial Fisheries

The legal authorities of both the Court and the Government could not bind any party to take any action to redress MHDD's alleged harm. This Court may conclude—as MHDD alleges—that NMFS issued its comparability findings in a manner not in accordance with law, and so "hold unlawful and set aside" those final agency actions. 5 U.S.C. § 706(2)(A). But it may not step into the shoes of an agency and direct it to reach a foregone conclusion that United States standards have been exceeded. *Unemployment Comp. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946); *NEXTEEL Co. v. United States*, 28 F.4th 1226, 1238 (Fed. Cir. 2022); *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1279 (Fed. Cir. 2012); *Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381-82 (Fed. Cir. 2003).

21

NMFS may conclude—as MHDD alleges—that a foreign commercial fisheries management regime results in marine mammal take in excess of U.S. standards, thereby triggering an import prohibition. But none of the Government agencies named in this action, or any other, can direct a foreign sovereign nation to undertake specific policy actions or to regulate the actions of commercial fishers operating in waters on the other side of the world. *See, e.g.*, Restatement (Fourth) Foreign Relations Law of the United States, Part IV, Introductory Note (Am. Law Inst. 2018). This Court likewise has no authority to direct a foreign sovereign to take any particular action. *Cf.* 28 U.S.C. § 1581. And any Court exercise of jurisdiction over a foreign nation is cabined by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1601-08, and customary international law, which do not permit a trial court to direct an independent, sovereign nation to undertake a discretionary regulatory or policy action in a predetermined manner.

In the absence of any legal authority to order redress, MHDD instead relies on the purported "encouragement" of NMFS to sustain New Zealand commercial fishing practices allegedly causing MHDD's injury. Complaint ¶ 15 (alleging that "[t]he MMPA requires Defendants to ensure that the U.S. seafood market does not encourage or sustain New Zealand fisheries that incidentally catch, injure, and kill dolphins and other marine mammals in excess of U.S. standards"); Motion for PI at 44 ("Banning imports from the fisheries that pose the highest bycatch risk to Māui and Hector's dolphins would serve the public interest by effectuating Congress's tool of choice under the MMPA for encouraging foreign fisheries to better protect their marine mammal populations,"). Putting aside the fact that the MMPA has no such requirement and that Congress's "tool of choice" was international negotiation, precedent instructs that encouragement alone cannot establish standing. *Simon*, 426 U.S. at 43-45 (plaintiffs could not establish standing when challenged tax rule merely "encouraged" hospitals to withhold

22

certain services that were the direct cause of the alleged injuries); *Animal Legal Defense Fund*, 932 F.2d at 934 (alleged monetary injuries to farmers could not be fairly traced to the mere "encouragement" of certain research and development activities due to change in patent policy).

The chain of causation here is far more attenuated than that rejected in *Simon* and *Animal Legal Defense Fund*. In those cases, the alleged encouragement of U.S. Government agencies targeted persons over which those agencies had direct legal authority and who were, in turn, the alleged proximate cause of the plaintiffs' injuries. In this action, MHDD has alleged that the direct cause of MHDD's injury is commercial fishing in New Zealand. The United States does not regulate commercial fishing in New Zealand. Any management of those fisheries is overseen by the NZG, an independent sovereign state over which neither this Court nor the Government may exercise control.

Even if the Government's purported "encouragement" of commercial set net and trawl fishing in New Zealand ended, it is far from clear what consequences for commercial fishing in New Zealand, if any, would follow. Counsel for MHDD readily conceded that "we don't know" what New Zealand might do in response to an import prohibition. Status Conference Audio at 1:22:20-21, 1:22:58-23:01, *MHDD I & II* Proceedings (Ct. Int'l Trade Feb. 12, 2026). MHDD alleges, without providing specific support, that the NZG "has repeatedly indicated that avoiding an import ban is an important driver of its management choices for fisheries in Māui and Hector's dolphin habitats." Complaint ¶ 15. But, based on the record in the *MHDD II* Proceedings, the NZG is likely *precluded* under its domestic law from considering the level of export market access when determining whether to modify its current fisheries management practices. Declaration of Emma Taylor in Support of the NZG's Opposition to the Plaintiff's PI Motion ¶ 4, *MHDD II* Proceedings (Mar. 9, 2026), ECF No. 46-1 (Taylor Decl., attached as

23

Exhibit C). MHDD's conjecture that the NZG will be so motivated by an import prohibition imposed by a tertiary export market that it will disregard its own legal restrictions cannot support MHDD's standing theory, and MHDD can cite no appellate precedent that supports its attenuated theory of "encouragement."

MHDD has obliquely suggested that economic pressures could alter fishers' behaviors by relying on a purported decrease in exports during the *Sea Shepherd I* injunction. *E.g.*, Rose Decl. ¶ 77 (citing to "volume declines across some species, with snapper down 8 percent, kahawai down 20 percent, dogfish down 8 percent, and trevally down 45 percent"). Even assuming that the statistics cited in MHDD's hearsay declaration were accurate, this tautology could not demonstrate that *fishing operations* in the embargoed fisheries were affected by the prior injunction. Although economic pressures are not irrelevant to any individual decisionmaker, MHDD leaves us to guess the elasticity of markets for these fisheries, the extent with which their sales rely on domestic demand, or other factors that would be required for an informed economic analysis.

Other evidence from the *MHDD II* Proceedings strongly suggests that an import prohibition would not likely result in decreased fishing in the set net and trawl fisheries challenged by MHDD. According to the New Zealand Ministry of Primary Industries, New Zealand maintains a large seafood export market, with total exports valued around $2.2 billion annually, of which approximately half can be attributed to the type of finfish fisheries challenged in this litigation. Taylor Decl. ¶ 26. The largest destinations for those finfish exports are Australia and China, which collectively account for approximately four times (33 percent) the market share of finfish exported to the United States (eight percent). *Id.* MHDD alleges that the losses caused by the *Sea Shepherd* prohibition were around $1.1 million over the

24

17-month embargo, the equivalent of approximately $777,000 million annually. Complaint ¶ 91. Assuming MHDD's figure is correct, simple market forces would suggest that the roughly $363 million annual finfish export market to Australia and China, alone, could likely absorb another $777,000, or 0.21 percent, in additional export sales.

Whether, as MHDD's self-proclaimed experts asserts, this cost "materially understates the true economic costs" or diversion to these markets might not occur immediately, Simmons 2026 Decl. ¶¶ 21-22, is entirely beside the point. That MHDD, the Government, and this Court can only guess whether and how the NZG and New Zealand fishers will react to an import prohibition is the reason that MHDD cannot demonstrate that the alleged injury to the aesthetic and other interests of its members could be redressed by a favorable judicial decision.

Evidence also suggests that New Zealand fishers may already have been preparing to exit the U.S. market for other reasons, including changes in tariff rates, slow economic growth, and inflation. Taylor Decl. ¶ 27. These factors, as well as a recent free trade agreement executed with the European Union, have encouraged export fishers to diversify into markets in Europe and Africa. *Id.* Indeed, the assertions by MHDD's self-proclaimed expert equally underscore that fishing efforts in the challenged fisheries are actually *unlikely* to decrease in the face of an import prohibition. Dr. Simmons represents that the NZG "is actively seeking to double the value of its fisheries and seafood export markets as part of its 'export-led recovery' strategy." Simmons 2026 Decl. ¶ 27. Although the Government does not dispute that this expansion *could* provide an incentive for the NZG to alter its fisheries management, *id.*, the desire for expansion also creates

25

an incentive to *increase production* in these, and other fisheries, in response to a U.S. import prohibition to reach the stated recovery goals. [3]

Could the NZG offer subsidies to these fishers to divert to other markets to protect its stated goals? Could the fishers find adequate domestic or export markets outside of the United States? Would the fishers seek to harvest significantly *more* fish in the challenged fisheries to compensate for falling prices in the face of artificially decreased demand caused by an import embargo? Would the costs of investing in new fishery gear significantly outweigh the costs of renegotiating purchaser contracts? As with so much of MHDD's case, "we don't know," Status Conference Audio at 1:22:20-21, 1:22:58-23:01, *MHDD I & MHDD II* Proceedings (Ct. Int'l Trade Feb. 12, 2026), exactly how fishers might react to the loss of the U.S. export market and can only guess whether its closure would decrease fishing efforts, increase them, or have no effect at all, *cf. Lujan*, 504 U.S. at 571 & n.6.

While "we don't know" what New Zealand might do in response to a future order, we do know how harvesting nations, including New Zealand, have previously responded to MMPA import bans: they have allowed commercial fishing to continue unabated. *See* Slooten Decl. ¶ 44; Rose Decl. ¶ 68; Status Conference Audio at 1:31:37-48, *MHDD I & MHDD II* Proceedings (Ct. Int'l Trade Feb. 12, 2026).

---

[3] The Government should be permitted to cross-examine each of MHDD's declarants before the Court relies on hearsay declarations to establish standing. *See* Fed. R. Evid. 806 (permitting the party against whom a hearsay statement was admitted to call the declarant as a witness and cross-examine the declarant on the statement). As an action pursuant to 28 U.S.C. § 1581(i) proceeds without discovery, the Government would respectfully request an evidentiary hearing at which each of MHDD's expert and fact declarants would appear as a witness for cross-examination.

D. MHDD Must Show Causation on a Fishery-by-Fishery Basis

Even if the Court were to accept MHDD's attenuated conjecture to hold that the behavior of New Zealand commercial fishers overall is fairly traceable to the U.S. Government decisionmakers or that this Court could adequately redress the alleged aesthetic injuries of its members, MHDD would still fail to establish standing because it has made no effort to allege that the particular fisheries it challenges have led to marine mammal bycatch in excess of U.S. standards.

MHDD does not specifically identify any fisheries in its Complaint. But the 2026 Comparability Findings allow the continued importation from all New Zealand set net and trawl fisheries, which are identified by the Fishery ID Numbers assigned by NMFS: 1883, 1968, 1969, 1977, 1978, 2041, 2046, 2047, 2051, 2052, 2053, 2054, 2064, 2067, and 2077. 91 Fed. Reg. at 11,963.

Determinations of comparability findings are made on a fishery-by-fishery basis. 50 C.F.R. §§ 216.24(h)(1)(i), (6).[4] Yet MHDD nowhere attempts to make allegations specific to the fisheries covered by the 2026 Comparability Findings. In fact, its self-proclaimed expert has repeatedly emphasized that products caught in New Zealand fisheries *cannot* be traced to

---

[4] That NMFS provided a single *analysis* for all of New Zealand's set net and trawl fisheries does not indicate that determinations were made other than on a fishery-by-fishery basis. NMFS explained that it "consolidated [its evaluation of the 15 identified fisheries] into an overarching set of conclusions because the set net and trawl gear at issue in these fisheries have the potential to result in similar effects to marine mammals" and because "[b]ased on the record currently before the agency, NMFS does not have any reason to believe that any one fishery or set of fisheries is resulting in a disproportionate impact such that an individual fishery-by-fishery analysis is warranted in this case." 2026 Decision Memorandum at 15-16 n.81. Unlike MHDD, NMFS acknowledged differences between the fisheries, concluding that at least three deepwater fisheries challenged in this action, "based on vessel size (i.e., >32 meters in overall length), specific target fish species, fishing effort, location of fishing, and other restrictions, are not expected to overlap with Māui or Hector's dolphins." *Id.*

products imported into the United States. Simmons 2026 Decl. ¶ 17 ("Given the lack of a complete and accurate net-to plate traceability system, New Zealand is unable to show that exported seafood products are not impacting the Hector's dolphin."); Simmons 2020 Decl. ¶ 20 ("[I]t will be impossible to determine the origin in New Zealand waters of the fish products . . . whether any of those products are from Māui dolphin habitat."); *id.* ¶ 28 ("In short, the New Zealand fishery suffers from a severe lack of traceability that renders it extremely difficult, if not virtually impossible, to attribute marine mammal bycatch to specific FMAs, QMAs, or fisheries statistical areas."). Double negatives aside, if New Zealand cannot demonstrate that its fisheries are not impacting dolphins due to lack of traceability, how can MHDD meet its burden to demonstrate that those particular fisheries *are* leading to either Māui or Hector's dolphins bycatch in the absence of adequate tracing?

To establish causation, MHDD must demonstrate that the continued operation of each challenged fishery allegedly endangering Māui and Hector's dolphins is "fairly traceable" to NMFS's decision to issue comparability findings (and thus the United States to continue to allow imports from those fisheries). *E.g.*, *Lujan*, 504 U.S. at 560. MHDD appears to dedicate only one statement in its Complaint to linking actions in the United States to actions of commercial fisheries in New Zealand: the "United States is a significant market for these fisheries." Complaint ¶ 15. And it relegates standing in its Motion for PI to a single footnote in which it states in a wholly conclusory manner: "MHDD has standing to bring this action on behalf of its members to address substantive and procedural harms, as demonstrated by the attached Declarations of Christine Rose, Gemma McGrath, and Moira Barber, filed herewith." Motion for PI at 37 n.23. MHDD does not allege that set net and trawl fisheries would not operate but for the U.S. export market, much less that the grant of a comparability finding (or denial thereof)

28

would have any effect on commercial fishing in specified fisheries operating in the waters surrounding New Zealand.

Furthermore, if there is no way to trace particular products to bycatch, how can MHDD demonstrate that NMFS's determination "encourages," much less causes, for example, the continued use of *set nets* to catch white trevally in Fishery ID No. 1969 and not the use of Danish seines (Fishery ID No. 2035), ring nets (Fishery ID No. 1895), or purse seines (Fishery ID No. 1881) to catch the same species and export them to the United States?

MHDD also does not attempt to demonstrate that any particular fishery it challenges has resulted in bycatch of Māui or Hector's dolphins. Rather, it broadly argues that *all* set net and trawl fisheries pose a danger to the species. *E.g.*, Complaint ¶ 5. The origination of the harm matters. MHDD has recognized that the range of the Māui and Hector's dolphins is disputed. *E.g.*, Slooten Decl. ¶ 15 (stating without certainty that the Māui dolphin "may have been extirpated from the east coast" of the North Island). MHDD has also represented that there are different subspecies of Hector's dolphins that inhabit different areas of the South Island with drastically different population levels. *Id.* ¶¶ 25-26. NMFS's determinations directly contradict MHDD's assertion, Complaint ¶ 4, that *all* of the challenged fisheries equally pose a threat to Māui or Hector's dolphins, 2026 Decision Memorandum at 15-16 n.81 (concluding that three of the challenged fisheries likely pose no risk to either species).

Which, if any, of the challenged fisheries contribute to the bycatch that MHDD alleges is continually causing injury to its members? Unfortunately, "we don't know." Status Conference Audio at 1:22:20-21, 1:22:58-23:01, *MHDD I & MHDD II* Proceedings (Ct. Int'l Trade Feb. 12, 2026). Yet, MHDD wants this Court to prohibit all exports from these fisheries—and possibly

29

many more, *e.g.*, Simmons 2026 Decl. ¶ 20—when it can only guess whether the specific fisheries targeted have *ever* contributed to bycatch or are likely to do so in the future.

An allegation of NMFS's "encouragement" of fishing generally in New Zealand without any connection to a single specific fishery that MHDD contends contributes to its injuries cannot satisfy the causation requirement, and the complaint must be dismissed.

## CONCLUSION

For these reasons, we respectfully request that the Court dismiss the complaint for lack of jurisdiction.

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

OF COUNSEL:                                      PATRICIA M. MCCARTHY
MARK HODOR                                       Director
Office of the General Counsel
National Oceanic & Atmospheric Administration

                                        /s/Agatha Koprowski

ZACHARY SCOTT SIMMONS                            AGATHA KOPROWSKI
Office of the Chief Counsel                      Trial Attorney
U.S. Customs and Border Protection               U.S. Department of Justice Civil Division
                                                 P.O. Box 480, Ben Franklin Station
DANIEL PAISLEY                                   Washington, D.C. 20044
Office of the General Counsel                    Tel: (202) 507-6081
Department of the Treasury                       Fax: (202) 353-0461
                                                 Email: agatha.koprowski@usdoj.gov

April 9, 2026                                    *Attorneys for Defendants*

30

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this Response in Opposition to Plaintiff's Motion for Preliminary Injunction and Motion to Dismiss Pursuant to Rule 12(b)(1)contains 8,991 words, excluding any materials excluded from those Procedures' requirements, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/Agatha Koprowski