**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |  |
|---|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| NATIONAL MARINE FISHERIES SERVICE, et al., | ) ) ) | Court No. 26-02462 |
| Defendants, and | ) ) ) | |
| NEW ZEALAND GOVERNMENT, | ) ) | |
| Defendant-Intervenor. | ) ) ) | |

**OPPOSITION OF THE GOVERNMENT OF NEW ZEALAND TO THE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Submitted by:

Warren E. Connelly
Robert G. Gosselink
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
Phone: 202-223-3760

wconnelly@tradepacificlaw.com

Date: May 1, 2026

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................... ii

I.  INTRODUCTION .................................................................................................1

    A.  Factual Errors and Misrepresentations in the PI Motion's Introduction and Factual Background Section ................................................................................................1

    B.  The NMFS 5-Year Review ................................................................................4

    C.  Species and Fisheries Covered by MHDD's PI Motion ..........................................7

II.  THE GNZ MAINTAINS A STANDARD COMPARABLE TO THE MMPA'S ZERO MORTALITY RATE GOAL ...................................................................................8

III.  THE "NEGLIGIBLE IMPACT" STANDARD IS IRRELEVANT TO THE MANNER IN WHICH THE GNZ ADMINISTERS ITS FISHERIES .......................................................13

IV.  NMFS CORRECTLY DETERMINED THAT THE GNZ'S BYCATCH LIMITS FOR MĀUI AND HECTOR'S DOLPHINS COMPLY WITH U.S.STANDARDS ..................16

V.  NMFS RELIED ON THE MOST ACCURATE AND MOST RECENT POPULATION ESTIMATE FOR MĀUI DOLPHINS ..........................................................................22

VI.  NMFS RELIED ON REASONABLE PROOF THAT NEW ZEALAND'S FISHERIES ARE NOT EXCEEDING BYCATCH LIMITS .............................................................25

VII.  THE GNZ MAINTAINS A MONITORING PROGRAM THAT IS COMPARABLE TO U.S. STANDARDS ................................................................................................35

VIII.  MHDD HAS FAILED TO DEMONSTRATE THAT IT WILL SUFFER IRREPARABLE INJURY WITHOUT A PRELIMINARY INJUNCTION .................................................41

IX.  CONCLUSION ...................................................................................................44

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Sea Shepherd New Zealand v. United States,* 606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) ..........29

*Māui and Hector's Dolphin Defenders NZ, Inc. v. National Marine Fisheries Service*,
799 F. Supp. 3d 1327 (Ct. Int'l Trade 2025) ................................................................1, 24

**Statutes**

16 U.S.C. § 1362(20) ................................................................................................16, 19

16 U.S.C. § 1371(a)(5)(E)(i) ......................................................................................13, 14

16 U.S.C. § 1375 ..............................................................................................................14

16 U.S.C. § 1387(f) ....................................................................................................12, 18

16 U.S.C. § 1387(g) ..........................................................................................................4

16 U.S.C. § 1532(5)(A) ....................................................................................................3

**Regulations**

50 C.F.R. § 424.12(b) ........................................................................................................3

50 C.F.R. § 600.746 ........................................................................................................37

**Federal Register Notices**

81 Fed. Reg. 54,390 (Aug. 15, 2016) ..............................................................................8

88 Fed. Reg. 7,362 (Feb. 3, 2023) ..................................................................................10

## I. INTRODUCTION

NMFS' March 2, 2026 "Comparability Findings for New Zealand's North and South Island Multi-species Commercial Set Net and Trawl Fisheries" ("2026 CF") provide comprehensive and compelling responses to each deficiency concerning Māui dolphin protections that this Court identified in *Māui and Hector's Dolphin Defenders NZ, Inc. v. National Marine Fisheries Service*, 799 F. Supp. 3d 1327 (Ct. Int'l Trade 2025) ("*MHDD I*"). It also responds fully to the Māui and Hector's Dolphins Defenders' ("MHDD") new allegations of insufficient protections afforded to Hector's dolphins,

For those reasons, the New Zealand Government ("GNZ") opposes the MHDD's Motion for Preliminary Injunction ("PI Mot."). Put simply, MHDD has failed to demonstrate that the GNZ's extensive marine mammal-related fishing restrictions and comprehensive monitoring provisions are not comparable in effectiveness to the standards in the Marine Mammal Protection Act ("MMPA") or its implementing regulations.[1] However, before the GNZ addresses each MHDD allegation, we identify significant methodological and factual errors in MHDD's Motion.

### A. Factual Errors and Misrepresentations in the PI Motion's Introduction and Factual Background Section

First, MHDD attributes a Māui dolphin death in February 2026 to entanglement with a net. PI Mot. at 1. However, the necropsy report contains the consensus opinion of four international marine mammal experts that "none of the observed lesions and defects are considered typical or diagnostic of entanglement or peracute underwater entrapment." *See* Exhibit E to Slooten Declaration at 3. In fact, the last documented death of a Māui or Hector's

---

[1] This Court should not reach the issue of whether MHDD has satisfied the criteria for a preliminary injunction because MHDD has failed to satisfy the Constitutional standing requirement for the reasons described in Defendants' April 9, 2026 Motion to Dismiss Pursuant to Rule 12(b)(1). ECF No. 16.

dolphin [subspecies unknown] off the west coast of the North Island attributable to commercial fishing occurred in 2012. *See* 2024 Comparability Finding at 16. ECF No. 15-2, NMFS_001250 (Court no. 24-00218). The dolphin was retained for genetic testing, but it could not be determined if it was a Māui or Hector's dolphin. MHDD speculates that more Māui dolphins have died from commercial fishing activity since 2012, but has not provided documentary evidence, such as necropsy reports, that this has occurred.

Second, MHDD asserts that the Hector's dolphin population has plummeted "to the brink of extinction." PI Mot. at 1. However, the most recent survey found a population of 14,894 individuals. 2026 CF at 22-23. MHDD has not challenged this figure.

Third, MHDD asserts that NMFS has "concluded that New Zealand's regulation program is inadequate to prevent bycatch-related population declines." PI Mot. at 1-2. The alleged source of this conclusion is NMFS' 5-Year Review, but that Review does not say this. Rather, it states that there are "concerns" that the GNZ's measures are inadequate. Review at 108. However, the three cited references to these "concerns" are those expressed by Declarant Slooten, not by NMFS. *See* Review at Sections 2.4.2.5.3.1, 2.3.2.5.2, and 2.3.2.5.3.

Fourth, MHDD recites what it purports to be the history of the decline of the Māui dolphin population. PI Mot. at 6-7, Slooten Decl. at para.16. However, her assertion that the population was once 2,000 individuals is not based on a population survey. Instead, it is based on "back casting" of more recent population estimates and is, therefore, highly dependent on the assumptions used. More important, Ms. Slooten's assertion that "less than 50" Māui dolphins remain is contradicted by the most recent abundance survey that the GNZ conducted, which estimated the population at 54, with a 95% confidence interval ("CI") of 48 to 66 individuals

over 1 year of age. MHDD does not challenge the accuracy of this estimate. Rather, it claims that a "mortality correction" to it is required.

Fifth, MHDD relies on Figures 1 and 2 in the Slooten Declaration, which purport to show the Māui and Hector's dolphin "habitat" sightings and the risk posed by set net and trawl fishing. PI Mot. at 7. These figures are unreliable because, first, in Figure 1, MHDD erroneously claims that the entire coastlines of both islands out to the 100-meter depth contour represent dolphin habitat, which is an oversimplification. Dolphin habitat is where environmental conditions (e.g., oceanographic conditions and prey availability), are *suitable* for dolphins even though dolphins may not inhabit a particular area.. Depth contour alone is insufficient to characterize suitable dolphin habitat. *See* 16 U.S.C. § 1532(5)(A) and 50 C.F.R. § 424.12(b). The former distinguishes a species' broad geographic range from its observed distribution and distinguishes both from its legally cognizable habitat which, under the Endangered Species Act, must be defined by specific physical or biological features essential to conservation rather than by presence alone or coarse spatial proxies such as depth.

Thus, MHDD's reliance on the 100-meter depth contour also confuses suitability for residence with where dolphins currently *actually* reside, i.e., their current distribution. Moreover, Figure 2 fails to specify the time periods of the set net and trawl fishing efforts that are shown, nor does it specify the relative or absolute intensity of effort between different commercial fishing areas. Nor does Figure 2 reflect the current areas within the North and South Islands where set nets and trawl fishing are now banned, following the significant expansion of the closed areas in October 2020 and December 2022.

The sighting information also does not specify the time period to which it applies, which is inherently misleading. Figure 2 does not identify whether those sightings represent current or

3

historical presence. Nor do those sightings demonstrate the relative or absolute density of dolphins in an area. Such details are important when MHDD uses Figures 1 and 2 to represent current fisheries risk to Hector's and Māui dolphins.

Sixth, MHDD asserts that the MMPA requires closure of all areas where a marine mammal may "range." PI Mot. at 8. The term "range" means the alongshore distance inhabited by any particular dolphin during its lifetime. However, no U.S. standard requires that the entire range be closed to commercial fishing, and MHDD identifies no such standard.

Seventh, MHDD asserts that "Dolphin deaths that occur outside of the MDHZ [i.e., the Māui Dolphin Habitat Zone] do not count against the FRML [i.e., the GNZ's Fishing Related Mortality Limit.]" PI Mot. at 9. However, this is intentionally misleading because, under the U.S. standard, which the GNZ observes, a death or serious injury is counted against the bycatch limit, i.e., the potential biological removal level ("PBR"), *regardless of where it occurs*. Exceeding the PBR would trigger the GNZ's obligation to take steps comparable to the "emergency regulations" standard under 16 U.S.C. § 1387(g). 2026 CF at 57, fn. 291. In contrast, the FRML is not a U.S. standard, nor has the GNZ ever asserted that it is.[2]

Eighth, MHDD has grossly mischaracterized the nature and extent of monitoring coverage after the GNZ's completion of its rollout of its enhanced electronic monitoring program in May 2025. PI Mot. at 9. We discuss the relevant facts in Section VII below.

### B.     The NMFS 5-Year Review

MHDD relies heavily throughout its PI Motion on a "5-Year Review: Summary and Evaluation" of Māui dolphins and South Island Hector's dolphins. ("Review") *See* Exhibit A to

---

[2]  The FRML in the MDHZ is not an annual limit because it is not time bound. This means that, in the event of a fishing-related incident or mortality, additional measures would apply for as long as necessary to ensure that neither PBR nor PST is threatened. 2026 CF at 55, fn. 283.

PI Mot. The Review was issued by the NMFS Office of Protected Resources. It was not prepared by the Office within NMFS responsible for issuing comparability findings, which is the Office of International Affairs, Trade, and Commerce. For that reason, the Review does not address any U.S. standard under the MMPA, much less address whether the GNZ maintains a program that is comparable to any such U.S. standard. Instead, the purpose of the Review "is a periodic analysis of a species' status conducted to ensure that the listing classification of a species currently listed as threatened or endangered . . . is accurate." *Id.* at Section 1.2.

In essence, the 5-Year Review is exactly that, a review of approximately 400 articles and opinions, almost all of which were issued before the GNZ enacted its comprehensive fishing restrictions in 2020 and 2022, as well as before the GNZ completed the rollout of its comprehensive electronic monitoring requirements in May 2025. Furthermore, it is unclear whether this Review complied with the peer review guidelines contained in NMFS Procedure 02-110-15, available at: https://media.fisheries.noaa.gov/dam-migration/02-110-15.pdf. These guidelines are entitled "Procedures for Conducting 5-Year Reviews Under the Endangered Species Act." Section 2.3, concerning peer review, states that:

> If a 5-year review results in a recommendation to leave the status unchanged but is based on new information that has not been subject to peer review, or the level of public interest and/or scientific uncertainty or controversy is high, *peer review of the information underlying the recommendation should be conducted.*[3]

(Emphasis added.)

Despite this requirement, the Review extensively refers to a non-peer reviewed article co-authored in 2024 by MHDD's Declarant, Elizabeth Slooten, entitled "New information on

---

[3] *See also* NOAA's Information Quality Guidelines, which requires peer review of highly influential scientific assessments, available at: https://www.noaa.gov/organization/information-technology/policy-oversight/information-quality/information-quality-guidelines. In this Opposition, the GNZ uses hyperlinks to relevant information like this one in anticipation of the

Hector's and Māui dolphin bycatch from camera monitoring," which she submitted to the Small Cetaceans Subcommittee of the International Whaling Commission's Scientific Committee. *See* Exhibit G to Slooten Declaration.[4] However, MHDD did not provide the cover page to the Slooten article, which bears the designation SC/69B/HIM/05Rev1.

The cover page states that "Papers submitted to the IWC are produced to advance discussions within that meeting; they may be preliminary or exploratory." Moreover, Annex Q to the Report of the Scientific Committee explains that disagreement existed within the members of the SC as to the accuracy of the "levels of observer coverage and camera monitoring" described in Ms. Slooten's article. For these reasons, the Slooten article does not constitute the findings or the recommendations of either NMFS or the International Whaling Commission. Moreover, Ms. Slooten's Declaration (at 4) acknowledges that she "was asked to provide a summary of Otago University's research on Hector's and Māui dolphins for NMFS' 5-Year Review."

Equally important, the 5-Year Review almost always couches its citations to articles as expressing: a "concern;" a "suggestion;" an "estimation'" or some other conditional or qualifying language, thereby further demonstrating that the Review does not constitute an agency finding as to any aspect of whether the GNZ implemented a program that is comparable to the standards

---

fact that the administrative record will include at least some of the documents available at these hyperlinks. Many of the documents available through these hyperlinks are either cited or quoted in the 2026 CF. In addition, the Appendix attached to this Opposition identifies most of the sources upon which NMFS expressly relied in reaching the conclusions in the 2026 CF. It is essential that the administrative record contain all these documents, which the GNZ urges the Court to review before reaching a decision on the PI Motion.

[4] The Review uncritically recites the studies, working papers, or comments authored in full or in part by the MHDD's Declarant, Elizabeth Slooten, expressed in 23 separate "References" listed in its Section 5.0. The Review cites the contents of articles authored by Ms. Slooten over 160 times. Most of the post-2020 references are not peer reviewed publications.

set forth in the MMPA or its implementing regulations. MHDD nevertheless repeatedly attempts to characterize the Review's discussions as NMFS' own "findings," but they are not. Instead, they are merely the Review's synthesis of publications, reports, and summaries of third-party opinions.

The evaluation of whether a foreign fishery maintains measures that are comparable to U.S. standards under the MMPA requires a far more rigorous approach than the 5-Year Review takes because it requires, among other things: a quantitative assessment of bycatch limits and bycatch risk; analysis of fishery specific impacts; analysis of whether current protective measures are sufficient; assessment of comparability to U.S. standards; and a determination that information that NMFS relies upon is the best scientific data available. The 5-Year Review does none of these things, but the 2026 CF does.

C.      Species and Fisheries Covered by MHDD's PI Motion

MHDD's Motion (at 13) covers Māui and Hector's dolphins, not other marine mammals. It identifies the fisheries where it claims the GNZ has not implemented sufficient protections under U.S. standards as the set net and trawl fisheries on the West Coast of the North Island and the entirety of the South Island, which it calls the "New Zealand Fisheries." Compl. at para. 96. As MHDD knows, ID numbers are assigned to each of those fisheries, but MHDD has failed to identify the ID numbers of the fisheries for which it seeks an import ban. At a minimum, this Court should find that MHDD's Motion should  not include Fishery ID nos. 2067, 1883, and 2041, which are deepwater fisheries that, based on vessel size, specific target fish species, fishing effort, location of fishing, and other restrictions are not expected to overlap with Māui or Hector's dolphins. 2026 CF at 15-16, fn. 81. It should also find that MHDD has failed to establish a violation of U.S. standards with respect to the four north coast and east coast North

Island set net and trawl fisheries since there is no evidence of a resident dolphin population along either coast (ID nos. 2064, 1968, 2053, and 2054). The GNZ's February 2025 supplemental information submission (at 37-48) explains in detail why these seven fisheries pose virtually no commercial fishing risk to Māui or Hector's dolphins.

## II. THE GNZ MAINTAINS A STANDARD COMPARABLE TO THE MMPA'S ZERO MORTALITY RATE GOAL

NMFS has provided a thorough explanation of the reasons why the GNZ maintains a standard comparable to the MMPA's Zero Mortality Rate Goal ("ZMRG"), so we need not repeat that discussion here. 2026 CF at 59-63. Instead, the GNZ responds to each challenge that MHDD has raised. PI Mot. at 14-17.

MHDD first claims that the GNZ has not enacted a "numeric definition of the target (bycatch rates below 10% of the PBR level) and implementation of regulatory measures to ensure the target is being met or will be met within five years." *Id.* at 14-15. However, a standard that is "comparable" to the ZMRG does not require a bycatch rate below 10% of the PBR or achievement of the 10% of the PBR level within five years. Rather, the regulations that implement the import provisions of the MMPA state that the agency has:

> prioritized reducing bycatch to sustainable levels (e.g., below the bycatch limit) and will consider the application of the ZMRG, *or metrics/measures comparable in effectiveness to ZMRG*, to foreign fisheries providing the same flexibility to foreign fisheries as it has applied to analogous U.S. fisheries that have not met the ZMRG.

81 Fed. Reg. 54,390, 54,398 (Aug. 15, 2016) ("Final Rule") (Emphasis added). The "metrics" that the GNZ has adopted are as follows:

For Māui dolphins, the "goal" is that:

Human impacts are managed to allow the population to increase to a level at or above 95% of the maximum number of dolphins the environment can support. A

population outcome of 95% means that human-induced deaths need to be as near as practicable to zero.

For Hector's dolphins, the "goal" is that:

Human impacts are managed to allow the population to increase to a level at or above 90% of the maximum number of dolphins the environment can support. Since the Hector's dolphin population is much larger than the Māui dolphin population, the acceptable level of impact can be higher while still allowing the population to increase to a very high proportion of the maximum number of dolphins the environment can sustain.

*See* Hector's and Māui Dolphin Threat Management Plan 2020 at 5, available at:

https://www.doc.govt.nz/globalassets/documents/conservation/native-animals/marine-mammals/maui-tmp/hectors-and-maui-dolphin-threat-management-plan-2020.pdf. MHDD does not contend that these goals will not result in "sustainable levels." In fact, that is their precise purpose. Moreover, these goals are comparable to the ZMRG because, as noted in the Final Rule, they are expressly intended to reduce bycatch to "sustainable levels."

Equally important, the fact that a standard comparable to the ZMRG has not been achieved does not require the closure of a U.S. fishery under either the MMPA or the Final Rule. 2026 CF at 60, fn. 313 ("A fishery would not be closed under the ZMRG simply because its incidental mortality and serious injury rate was above the target level at the deadline. The ZMRG states that, if mortality is higher than target levels, then NMFS should take appropriate action under MMPA section 118(f). Specifically, a Take Reduction Plan should be developed and implemented.

This is further demonstrated by NMFS' ongoing efforts to reduce the mortality and serious injury rate of North Atlantic right whales, which are classified as an endangered species under the Endangered Species Act. NMFS has administered various conservation regulations to

reduce anthropogenic threats to North Atlantic right whales, including implementing in 1997 an "Atlantic Large Whale Take Reduction Plan" to reduce entanglement in fishing gear.

That plan has been continuously amended because the PBR has consistently been exceeded and, therefore, the ZMRG has not been met. *See, e.g.,* 88 Fed. Reg. 7,362 (Feb. 3, 2023).[5] 2026 CF at 9 ("The ALWTRP has been amended several times because efforts to meet the MMPA's take reduction goals have fallen short, especially as they relate to mortality and serious injury of North Atlantic right whales, which have continued to be above the PBR level and remain so at present.")[6]

Instead of closing the fisheries contributing to mortality and serious injury of right whales, NMFS, as it noted in the Final Rule, has continued to afford "flexibility" to domestic commercial fishing interests in terms of not finding a violation of either the MMPA or the Final Rule despite the failure of these right whale fisheries to approach the ZMRG. Thus, the "comparable" standard would require a similar approach by the GNZ rather than an import ban.

Second, MHDD asserts that the key defect is that none of the measures that NMFS has relied upon in finding that the GNZ maintains a standard comparable to the ZMRG is that "None are comparable to ZMRG target bycatch rates." PI Mot. at 15. However, here, MHDD mistakenly insists that U.S. standards require the metric of a bycatch rate, whereas NMFS

___

[5] The history of NMFS' longstanding efforts to reduce mortality of Atlantic large whales below PBR is further described at: https://www.fisheries.noaa.gov/new-england-mid-atlantic/marine-mammal-protection/atlantic-large-whale-take-reduction-plan.

[6] *See also* CF at 37 (fn.179): "If the PBR has been exceeded, the US MMPA does not mandate the closure of a fishery. Typically, when PBR is exceeded, NMFS will reconvene the TRT to explore whether additional regulatory measures exist to further reduce bycatch below PBR again. In the past and at present, NMFS has not shut down an entire fishery under this regulatory review process when bycatch of a marine mammal stock exceeds PBR; instead, NMFS has imposed temporary time/area closures." MHDD does not dispute the GNZ's position that it maintains the authority to do the same.

focuses on whether the GNZ's measures are designed to promote sustainability, and there is no question that they do.

Third, MHDD tries to pick apart the elements of the GNZ's comparable standard by criticizing NMFS' reliance on : (1) environmental principles, including the goal of achieving long term viability; and (2) assuring that there is a low risk of collapse of the species and that the species has the potential to recover to a higher biomass level. PI Mot. at 15. Moreover, MHDD insists that GNZ must have a "concrete numerical goal which requires bycatch rates to be significantly lower – ten times as much – to eliminate bycatch to the greatest extent feasible." *Id.*

The defect in these allegations is that the MMPA and the Final Rule nowhere require "a concrete numerical goal." Rather, as NMFS expressly stated in the Final Rule, a comparable standard is one that focuses on reducing bycatch to a sustainable level. Sustainability does not require a "concrete numerical goal," but, even so, the GNZ has set those goals for Māui and Hector's dolphins, which we have quoted above.

Fourth, MHDD challenges the goals contained in the GNZ's Biodiversity Strategy and in its Threat Management Plan (TMP") because they are "non-binding documents." PI Mot. at 15-16. However, neither the MMPA nor the Final Rule addresses the nature of the documents that must contain the comparable standard. Thus, MHDD's focus on the so-called non-binding nature is an invented requirement that does not actually exist. As NMFS states, "TMPs are implemented using a mix of legislative, regulatory, and voluntary measures, which is similar to how the U.S. manages its strategic stocks through TRPs." 2026 CF at 28.

Thus, the issue is not the nature or legal status of the documents within New Zealand, but rather, whether sufficient efforts are being made to achieve their objectives. Equally important,

11

the spatial closures and the Fishing Related Mortality Limits administered by the GNZ are statutory, as is the electronic monitoring program.

Fifth, MHDD asserts that the GNZ's Threat Management Plan "does not require New Zealand to do anything on any particular timeframe following a fishery-related interaction with a Māui dolphin in excess of PBR." PI Mot. at 16. However, the ZMRG does not require "anything on a particular timeframe" when a bycatch occurs. Rather, if excessive bycatch occurs in a domestic fishery, then the required response is the convening of a take reduction team and the development of a take reduction plan under 16 U.S.C. § 1387(f). Moreover, the history of the North Atlantic Right Whale demonstrates that timeframes are extendable and, in fact, have been repeatedly extended. Thus, the absence of a "particular timeframe" does not constitute a failure to administer a comparable program to the U.S. standard.

Sixth, MHDD contends that the GNZ's use of the Population Sustainability Threshold ("PST") "is not comparable to the ZMRG." *Id*. The PST is the maximum number of marine mammal deaths per year that can occur while still allowing the desired population outcome to be achieved, and it is used to assess whether human-caused mortality (especially from fisheries bycatch) is sustainable for the long-term viability of protected species. Thus, determination of the PST is how the GNZ ensures that bycatch does not exceed the level necessary to ensure the sustainability goals that the Threat Management Plan established. As a result, MHDD's focus on the difference between the PST and the ZMRG bycatch limit is irrelevant. Here again, the question is whether the PST is part of the measures that the GNZ uses to ensure sustainability of the Māui and Hector's dolphin populations. MHDD does not assert that the PST is not intended to ensure sustainability.

12

Finally, MHDD asserts that the GNZ is "failing to achieve comparable results as the ZMRG standard" because 15 fishing-related mortalities of Hector's dolphins occurred in the single 2023/2024 fishing year, as well as because the estimated Māui dolphin bycatch rate is 0.056 individuals per year. PI Mot. at 17. However, MHDD's reliance on a single year of Hector's dolphin bycatch data fails to consider inter-annual variability in bycatch (e.g., there were only eight fishing-related mortalities of Hector's dolphins in the 2024/2025 fishing year and one fatality in the first five months of the current 2025/26 fishing year), as well as overall trends in bycatch.[7] The current bycatch estimate for Hector's dolphins, which is 8.8 dolphins per year, excluding cryptic mortality, and 0.056 Māui dolphins per year constitute significant reductions to historical estimates and are moving towards zero, which is what the ZMRG requires.[8] Moreover, the bycatch estimates are well below the calculated PBR levels for both subspecies.

## III. THE "NEGLIGIBLE IMPACT" STANDARD IS IRRELEVANT TO THE MANNER IN WHICH THE GNZ ADMINISTERS ITS FISHERIES

MHDD's assertion that this Court should impose an import ban due to the GNZ's failure to comply with the "negligible impact" standard in 16 U.S.C. § 1371(a)(5)(E)(i) is based on a misunderstanding of the relevance of that provision to the GNZ's measures, as well as a failure to acknowledge that *the U.S. standard under the MMPA does not require the closure of a domestic fishery when that standard is exceeded*. MHDD does not contend that any U.S.

---

[7] The fishing year runs from October 1 through September 30.

[8] In its February 2026 supplemental information submission, the GNZ noted that MacKenzie, et al. 2022 estimated an average bycatch rate of 53.48 Hector's dolphins per year based on fishing effort data from 2016-17 to 2018/19. This is similar to the estimated bycatch rate of approximately 59 Hector's dolphins that the GNZ listed in its 2019 Threat Management Plan consultation document, which was derived from the 2019 SEFRA model based on fishing effort data from 2014/15 to 2016/17. Both published estimates represent bycatch risk before the GNZ implemented additional protection measures in both 2020 and 2022.

standard requires the closure of a *domestic* fishery where the negligible impact standard has been exceeded. Moreover, *NMFS has never closed a U.S. fishery when the negligible impact standard has been exceeded*:

> As a practical matter, many domestic commercial fisheries that overlap with depleted marine mammals species or stocks *continue to operate even in the absence of a section 1371(a)(5)(E) authorization*. Nevertheless, these fisheries are evaluated by NMFS on a regular basis and decisions are made whether, and if so how, to further reduce the incidental mortality and serious injury of marine mammals.

2026 CF at 7.

In short, where an authorized domestic commercial fishery exceeds the permitted bycatch limit established by the negligible impact standard, the remedy that NMFS applies is to take steps needed "to further reduce the incidental mortality and serious injury of the marine mammals" at issue. Thus, under the U.S. standard, MHDD's allegation that the GNZ's fisheries have exceeded the negligible impact standard, even if accurate (which it is not), would not require an import ban.

Instead, the remedy under the MMPA for violation of a U.S. incidental take permit is found in Section 105 of the MMPA, 16 U.S.C. § 1375, which is captioned "Penalties" and which provides financial penalties for a violation of any provision of the MMPA or a violation of any permit or regulation, including any "unlawful taking." Nevertheless, MHDD asserts that "the plain text of the MMPA requires Defendants to ban imports because the rate of bycatch 'is in excess' of the U.S. negligible impact standard." PI Mot. at 18. However, the "plain text" of the MMPA does not say this. Rather, the U.S. standard authorizes financial penalties for unauthorized incidental takings in violation of a permit limit.

The next flaw in MHDD's negligible impact standard argument is that it mischaracterizes the nature and implementation of the GNZ's permitting process. Section 4(1)(b) of the GNZ's

14

Marine Mammals Protection Act 1978 ("NZ MMPA") provides that no person shall "take any marine mammal, whether alive or dead, in or from its habitat . . . without first obtaining a permit to do so from the Minister or from any person or persons authorized in that behalf by the Minister." Section 2 defines the term "take" to include "to take, catch, kill, injure, attract, poison, tranquillise, herd, harass, disturb, or possess." Section 7 describes the "Conditions" under which the Minister may grant or refuse to grant a permit. However, *no listed "condition" authorizes the incidental taking of a marine mammal during commercial fishing activity*. For that reason, the GNZ cannot grant, and has never granted, a permit that authorizes the incidental take of a marine mammal under the same or similar circumstances and requirements as 19 U.S.C. § 1671(a)(5)(E). 2026 CF at 64, fn. 332. That is why NMFS found that the negligible impact standard is irrelevant to the way in which the GNZ administers its incidental taking provisions. 2026 CF at 63-64.

In addition, Section 9 of the NZ MMPA states that it is an "Offence to take {a} marine mammal without permit," and it provides financial penalties and imprisonment for takings without a permit. *See also* Section 23, which lists additional offenses and penalties. Section 26, however, provides a defense where a defendant "proves that the death or injury to the marine mammal was accidental or incidental," so long as Section 16's reporting requirements are complied with in the case of an accidental death or injury. Thus, even assuming that the negligible impact standard applies, the penalty provisions in the GNZ's Fisheries Act 1996 are comparable to the penalty provisions in the MMPA.

Finally, MHDD asserts that "the MMPA prohibits all incidental take of marine mammals *unless* NMFS authorizes it (subject to the negligible impact limit)," while in contrast "New

15

Zealand law authorizes *all* incidental take of marine mammals." PI Mot. at 19. This is simply wrong because incidental take has never been authorized.

## IV. NMFS CORRECTLY DETERMINED THAT THE GNZ'S BYCATCH LIMITS FOR MĀUI AND HECTOR'S DOLPHINS COMPLY WITH U.S. STANDARDS

The MMPA defines the bycatch limit for a marine mammal as the "potential biological removal level," or "PBR."16 U.S.C. § 1362(20). That provision defines PBR as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." The PBR definition requires the use of a formula for its calculation, and the most recent guidance as to how to apply the formula is provided in a February 7, 2023 NMFS document entitled "Guidelines for preparing stock assessment reports pursuant to the Marine Mammal Protection Act," which is available at: https://www.fisheries.noaa.gov/s3/2023-05/02-204-01-Final-GAMMS-IV-Revisions-clean-1-kdr.pdf.[9]

Application of the formula yielded a PBR for Māui dolphins of 0.10 individuals and a PBR for Hector's dolphins of 66.5 individuals. 2026 CF at 52, 54. This means that only one Māui dolphin death or serious injury can occur every 10 years for PBR not to be exceeded. It also means that, if more than 66.5 Hector's dolphins suffer mortality or serious injury in a year, then PBR has been exceeded. 2026 CF at 55-56. These are the maximum numbers of Māui and Hector's dolphins that can be removed from their stocks annually while still allowing the stocks to reach or maintain their optimum sustainable population. *Id.*

---

[9] The PBR formula is PBR = Nmin x 0.5 (Rmax) x Fr, where Rmax is the maximum theoretical or estimated net productivity rate of the stock at a small population size, and Fr is a recovery rate. For Māiui dolphins. the default Rmax recovery factor is 0.1 (which applies to endangered species), while the default net productivity rate is set at 0.04. Nmin equals 51.

MHDD first asserts NMFS did not clarify which of "three conflicting metrics," i.e., the PBR limit, the FRML, or the PST constitutes the bycatch limit that is comparable to the U.S. standard. PI Mot. at 25. This assertion is wrong because the GNZ used the NMFS electronic reporting portal, called IAICRS, to generate the PBRs. The 2026 CF (at 11) defines the IAICRS system as follows:

> NMFS created a web-based information and data collection system (International Affairs Information Capture and Reporting System (IAICRS)) to facilitate implementation of the Final Rule and achieve maximum consistency and standardization in how data were reported by harvesting nations and the type of data reported. IAICRS Users are foreign government agencies of harvesting nations that provided data to NMFS in accordance with guidance developed by NMFS to demonstrate that they met the Final Rule's requirements.

The GNZ submitted the data required by the PBR formula to the IAICRS system, and the NMFS system then calculated the PBRs. That is why NMFS states that:

> Nations were offered a choice as to whether they wanted to supply their own bycatch limits or rely on IAICRS to calculate bycatch limits for each marine mammal stock. The GNZ chose to rely on IAICRS, which used the appropriate values for the net productivity rate and Rmax to calculate bycatch limits for GNZ's marine mammals for purposes of its 2021 Comparability Finding Application.

2026 CF at 52. In other words, the GNZ's "calculation" of the PBRs is identical to NMFS' calculation of the PBRs because the NMFS reporting system calculated those PBRs using the inputs that the GNZ provided.[10] That is why NMFS concluded that "*New Zealand has specifically adopted the U.S. PBR calculation for this application*." 2026 CF at 24, fn. 126.

---

[10] The calculation is as follows: 51 x 0.5(0.1) x 0.04 = 0.102 (which NMFS rounded to 0.10). 2026 CF at 51, fn. 256. The GNZ provided only one input into the PBR formula, which was the minimum population estimate (Nmin) for each marine mammal stock. The NMFS Guidelines for Preparing Stock Assessments Pursuant to the 1994 Amendments to the MMPA, Instruction No. 02-204-01, dated February 22, 2016, define Nmin (at 6) as "the 20th percentile of a log-normal distribution based on an estimate of the number of animals in a stock." There is no dispute that if the population estimate for Māui dolphins is 54, then Nmin equals 51. The remainder of the inputs consisted of the required default values for Rmax and Fr provided in the same document.

Moreover, the GNZ "adopted NMFS' PBR calculation within IAICRS to estimate marine mammal bycatch limits for its fisheries." 2026 CF at 51.[11]

Thus, this Court should ignore MHDD's effort to confuse the U.S. standard of PBR with the GNZ's internal use of FRML and the PST, both of which are irrelevant to the issue of whether the GNZ maintains a comparable standard to PBR. In fact, the GNZ maintains the identical bycatch standard, as NMFS found.[12]

Second, MHDD alleges that "the GNZ *does not actually implement* PBR as a bycatch limit for Māui dolphins, Hector's dolphins, or any other marine mammal." (Emphasis in original.) PI Mot. at 26. However, whether the PBR, i.e., the bycatch limit, has been exceeded is determined by comparing estimated bycatch to the PBR.[13] The estimation of bycatch is an entirely separate matter from the calculation of the bycatch limit, and NMFS has provided an extensive explanation of why the GNZ's bycatch estimation method is comparable to U.S. standards. *See* 2026 CF at 49-51(discussing the GNZ's use of its SEFRA model to estimate bycatch).

MHDD finds further fault with the calculation of a PBR for the common dolphin of 109,567 individuals and calls it "clearly erroneous" because "it would mean that "commercial

---

[11] *See also* 2026 CF at 51, fn. 261: "For purposes of New Zealand's 2021 Comparability Application, New Zealand chose to use PBR as the basis for calculating bycatch limits for its marine mammal species/stock, including Māui dolphins."

[12] For this reason, the Court should reject MHDD's claim that the GNZ does not maintain a "regulatory program" that provides for calculation of bycatch limits. PI Mot. at 27. Of course it does, as NMFS has found. On the other hand, the MMPA contains a similar "management trigger" mechanism to the GNZ's FRML. 2026 CF at 56, fn. 288.

[13] Equally non-sensical is MHDD's assertion that PBRs "have no regulatory effect." PI Mot. at 26. Of course they have an effect, because exceeding PBR triggers the need under U.S. standards to take action. *See* 16 U.S.C. § 1387(f) which authorizes development of a "take reduction plan" when PBR is exceeded. The GNZ possesses similar authority to act when PBR is exceeded. *See* 2026 CF at 56. Here again, the GNZ has a comparable standard.

fisheries can kill 85% of the countries entire common dolphin population *every year*." PI Mot. at 27. However, the PBR for the common dolphin is not erroneous because, where there is insufficient local population data to inform a PBR estimate, the NMFS IAICRS portal allows global stock values to be used to estimate a bycatch limit, which is what the GNZ did in 2021. Thus, the reason why the common dolphin PBR is so high (but accurate) is that the calculation is based on the mean worldwide abundance estimate of 5,832,184 individuals. The GNZ used this worldwide population estimate because the abundance of common dolphins in New Zealand's waters is unknown. More importantly, estimated bycatch of common dolphins in New Zealand waters, across all fisheries, is 58.90 (excluding cryptic mortality), which is well below the PBR.

Third, MHDD asserts that "NMFS has failed to demonstrate that its automatic {PBR} formula is accurate or rational." PI Mot. at 27. However, acceptance of this assertion *would invalidate all PBR calculations for all foreign nations for all their fisheries that elected to have PBR calculated using the IAICRS system*. Moreover, it is up to MHDD to demonstrate that the formula generated an incorrect PBR for Māui and Hector's dolphins. MHDD cannot do this because the PBR formula, as well as the IAICRS calculations of the GNZ's PBRs, comply with the NMFS stock assessment guidelines. Thus, MHDD's complaint that the NMFS bycatch formula is arbitrary and capricious contradicts the statutory definition of PBR in 16 U.S.C. § 1362(20), including the formula in that provision, as well as the two default factor values that the IAICRS system used to calculate PBRs.

Fourth, MHDD asserts that NMFS "relied on New Zealand's FRMLs to conclude that the New Zealand Fisheries have comparable bycatch limits to U.S. standards." That is simply not correct because NMFS found that the GNZ applied the U.S. definition of PBR, not the GNZ's definition of a FRML, to determine the bycatch limits. 2026 CF at 56, fn. 286.

PBRs apply to all of New Zealand's waters, not just certain areas of those waters. FRMLs, in contrast, apply to defined areas. For example, the FRML for Māui dolphins applies to the MDHZ, which is the area that most, but not all, Māui dolphins inhabit. 2026 CF at 57, fn. 286. However, the FRML for the MDHZ has an entirely different purpose, as NMFS thoroughly explained. 2026 CF at 55-57.

Fifth, MHDD tries to further confuse the issue by emphasizing the NMFS statement that the GNZ's PST is a "domestic bycatch limit." Although PBR and PST are somewhat equivalent, the PST is used for a different purpose than the PBR:

> PST is the maximum number of marine mammal deaths per year that can occur while still allowing the population outcome to be achieved and is used to assess whether human-caused mortality (especially from fisheries bycatch) is sustainable for the long-term viability of protected species populations. The population outcome for Māui dolphins is to manage all human-related impacts so the population will "increase to a level at or above 95 percent of the maximum number of dolphins the environment can support." The GNZ has a similar metric for Hector's dolphins: to manage all human-related impacts so the population will "increase to a level at or above 90 percent of the maximum number of dolphins the environment can support, given that the Hector's dolphin population is much larger than the Māui dolphin population and the acceptable level of impact can be higher while allowing the population to reach the desired population outcome."

2026 CF at 50. Thus, NMFS carefully explained that the PST metric is the means by which the GNZ ensures that the population outcomes that it has established (which MHDD has not challenged) are met. However, NMFS has made clear that:

> As discussed above, the GNZ is refining its PST calculations to be used as a PBR equivalent *but adopted NMFS' PBR calculation within IAICRS to estimate marine mammal bycatch limits* for its fisheries for the purposes of its 2021 Comparability Finding Application.

2026 CF at 51. (Emphasis added.) Thus, the GNZ used the precise U.S. standard for determining the bycatch limit as part of its comparability application.

Finally, MHDD asserts that the 5-Year Review "criticizes GNZ for using PST to guide management." In support, MHDD relies on the following excerpt from the Review (at 106):

> The key issue is that PST estimates are substantially larger than PBR values . . . Therefore, the New Zealand Government is likely to be allowing a level of bycatch that is unsustainable.

However, this not a NMFS "criticism." Rather, it is a criticism leveled by MHDD's Declarant, Ms. Slooten, as the full quotation on page 106 of the Review demonstrates:

> The key issue is that PST estimates are substantially larger than PBR values (Slooten and Dawson 2021b, e.g., Table 13). For example, Abraham *et al*. 2017 estimated a PST for SI Hector's dolphins of 95.4 and Roberts *et al*. (2019) estimated a PST of 74. In comparison Slooten and Dawson (2021b) calculated a PBR of just 11 dolphins (Table 13), Therefore the New Zealand Government is likely to be allowing a level of bycatch that is unsustainable.[14]

The "Slooten and Dawson 2021b" "criticism" document, which is designated as SC/68C/HIM/17, is available at:

https://portals.iucn.org/library/sites/library/files/resrecrepattach/SC_68C_HIM_17.pdf. The cover page of the document identifies it as a paper produced to "advance discussions" within a subcommittee/working group meeting of the IWC's Scientific Committee and that such discussions "may be preliminary or exploratory." As such, it is plainly not the opinion or finding of NMFS.

In addition, the 2021 follow-up Report of the Scientific Committee concerning subsequent discussion of Ms. Slooten's working paper is available at:

https://archive.iwc.int/pages/download.php?direct=1&noattach=true&ref=19277&ext=pdf. It states that:

---

[14] Slooten and Dawson failed to explain any of the factor values that they used to derive their PBR figure, so there is no basis to rely upon it.

21

> Some members offered rebuttal comments to HIM 17. Other members offered counters to these. The Committee considered that the issues raise included many of the aspects which had identified in 2019 as needing more time for discussion.

*Id.* at 95. Moreover, "There were different views on these conclusions by participants, including the concerns expressed by the authors of SC/68C/HIM/17. The Committee did not reach any conclusions on these different views." *Id.* at 96. Accordingly, the Slooten and Dawson working paper, in addition to being a non-peer reviewed document reflecting the personal opinions of the authors, cannot be regarded as the dispositive finding by NMFS in the 5-Year Review. Rather, it constitutes the Review's summary of Ms. Slooten's conclusions, which the GNZ vigorously disputes.

## V. NMFS RELIED ON THE MOST ACCURATE AND MOST RECENT POPULATION ESTIMATE FOR MĀUI DOLPHINS

Having failed to establish that NMFS erroneously determined the bycatch limits for any marine mammal using the PBR metric, MHDD asserts that, in the PBR formula, NMFS relied on an "outdated and overly optimistic population estimate without explanation." Specifically, MHDD contends that the PBR calculation is inflated because NMFS used an "uncorrected minimum population estimate of 54 dolphins" in the PBR formula.[15] PI Mot. at 34. This higher, allegedly discredited, population estimate is "arbitrary and capricious and contrary to the best available science." *Id.* Instead, MHDD alleges that NMFS should have used a figure of 48 dolphins in the PBR formula because the IWC's Scientific Committee's Standing Working Group on Abundance Estimates, Stock Status and International Cruises in October 2023 suggested that it should be revised to reflect a "mortality correction." This recommendation is available at:

---

[15] In fact, the Nmin element of the PBR formula uses 51, not 54 individuals, as required by the NMFS stock assessment guidelines described above.

https://archive.iwc.int/pages/download.php?ref=20108&ext=pdf&alternative=6653&noattach=true. It states the following:

> Constantine et al. (2021) report the results from continued genetic monitoring of Māui dolphins during 2020 (Feb) and 2021 (Feb-Mar), which aimed to estimate the abundance and effective population size. Using a Lincoln-Petersen estimator with Chapman's correction, the census abundance of Māui dolphins in 2020–2021 was estimated to be 54 individuals aged 1 year or older (95% CI 48–66) within the survey area. The SWG concluded that a mortality correction should be applied to improve comparability with the currently accepted estimates of Māui dolphins included in the IWC Table of Agreed Abundance Estimates. *The SWG recommended that the new, mortality-corrected abundance estimate for Māui dolphins of 48 (95% CI 40-57), corresponding to 2021, be endorsed as Category 3* because it anticipates that a fully integrated analysis will be provided to the Committee in the future. Specifically, the SWG recommended an update to the fit of the individual-based population model (Cooke et al. 2019) to the Māui dolphin genetic capture-recapture data. The SWG further recommended that the Constantine et al. (2021) estimate of 48 dolphins be footnoted in the IWC Table with reference to this recommended update.

*Id.* at 3. (Emphasis added.) However, *the IWC never adopted the recommendation of the Working Group*, as undersigned counsel's April 25, 2026 visit to the IWC's website, which lists approved abundance estimates, confirms. There, the following Māui dolphin abundance estimates appear:

> Approximate Point Estimate: 57

> Approximate 95% Confidence Interval: 48-71

These estimates are available at: https://iwc.int/about-whales/estimate. Moreover, even if the IWC had adopted the SC's mortality correction estimate of 48 individuals, it would have classified it as a "Category 3" estimate. The IWC classifies its abundance estimates as follows:

- Category 1: acceptable for use in in-depth assessments or for providing management advice;

- Category 2: underestimate - suitable for 'conservative' management but not reflective of total abundance;

- Category 3: while not acceptable for use in (1) or (2), adequate to provide a general indication of abundance, and

Thus, even if the IWC had accepted the SC's recommendation, NMFS would have found it unsuitable for use in the PBR formula because of its classification as a Category 3 estimate, which meant that it was not endorsed by the IWC and was not considered reliable for use in any management context. 2026 CF at 25.

NMFS has provided an extended discussion of why it chose the GNZ's estimate of 54 individuals over the SC's unadopted recommendation that the IWC revise its currently published abundance estimate and substitute 48 for 57. 2026 CF at 21-26. We need not repeat that discussion here, but observe that the NMFS discussion responds fully to the Court's finding in *MHDD I* that "NMFS never explained how this population estimate was determined or why NMFS considered it to be the 'best available scientific information on abundance.'" 799 F. Supp. 3d at 1342.

MHDD nevertheless insists that the 54-dolphin estimate had to be "corrected" in order to produce a "more reliable" estimate. PI Mot. at 35. However, NMFS has explained why it did not regard the SC's recommendation as more reliable than the GNZ's estimate. Mere disagreement is not sufficient to overcome the reasoned explanation that the NMFS has provided in response to the Court's prior finding. 2026 CF at 24-26. Nor did NMFS "disregard" better information, as MHDD claims. *Id.* The 48 estimate is not "better" than the 54 estimate because the IWC's Scientific Committee deemed it unsuitable for management and abundance determination purposes, and one fisheries management purpose under the MMPA is the calculation of the PBR using the best available abundance figure.

Nevertheless, MHDD insists that the GNZ's estimate "conflicts" with New Zealand's 2024 Threat Classification System's (NZTCS") estimate of 48 Māui dolphins. PI Mot. at 35-36. The GNZ's examination of this assertion demonstrates the following: (1) there is no evidence

that the NZTCS conducted its own abundance estimate: (2) the estimate of 48 individuals in the NZTCS publication in Exhibit G to the PI Motion is the SC's recommended, but unadopted, revision to the IWC's published abundance estimate; (3) NZTCS used this estimate to determine whether Māui dolphins should remain on the list of "nationally critical" mammals, not to evaluate whether the IAICRS system used the best available abundance estimate to calculate PBR; and (4) Exhibit B to Ms. Slooten's own Declaration is a 2023 report by Constantine, *et al.*, which states (at 4) that the "latest abundance estimate" is 54 individuals, with a 95% Confidence Interval of 48-66. This Confidence Interval means that there is a 95% certainty that the actual number of Māui dolphins is somewhere between 48 and 66 individuals over one year of age.[16]

## VI.  NMFS RELIED ON REASONABLE PROOF THAT NEW ZEALAND'S FISHERIES ARE NOT EXCEEDING BYCATCH LIMITS

Having established that NMFS provided a reasoned explanation of the basis for its acceptance of the bycatch limits, including the abundance estimates used to calculate the PBRs for all marine mammals, we now address MHDD's assertion that NMFS did not rely on reasonable proof or use the best available evidence to conclude that New Zealand's fisheries are not exceeding the (properly calculated) bycatch limits. PI Mot. at 20-25. NMFS has fully addressed this issue. 2026 CF at 49-54.[17]

The GNZ has used the Spatially Explicit Fisheries Risk Assessment ("SEFRA") methodology to estimate bycatch for all marine mammals. Roberts, et al. 2019 described the species-specific model for Hector's and Māui dolphins in a report captioned "Spatial risk

---

[16] The estimate of 54 individuals with a 95% CI of 48-66 is consistent with the two prior abundance surveys that the GNZ conducted. The 2010-11 survey found a population of 55 with a 95% CI of 48-69. The 2015-16 survey found a population of 63 with a 95% CI of 57-75. *See* Exhibit B to Slooten Declaration at 4.

[17] *MHDD I* did not address the issue of whether any New Zealand commercial fishery exceeded the calculated bycatch limit for Māui dolphins.

assessment of threats to Hector's and Māui dolphins," upon which NMFS expressly relied. 2026 CF at 49-50. The 169-page Roberts report is available at:

https://fs.fish.govt.nz/Doc/24714/AEBR-2019-214-Spatial-risk-assessment-Maui-Hectors-dolphin.pdf.ashx.

Mackenzie, et al. 2022 described how the multi-species model works for all marine mammal in New Zealand's waters in a 2022 report captioned "Updated spatially explicit fisheries risk assessment for New Zealand marine mammal population," which is available at: https://fs.fish.govt.nz/Doc/25300/AEBR-290-Updated-Risk-Assessment-For-New-Zealand-Marine-Mammals-4286.pdf.ashx. The Mackenzie, et al. study had not yet been published when the GNZ submitted its comparability application in November 2021, but the GNZ did explain how it used the model to produce bycatch estimates in that application, as well as in its February 2026 supplemental information submission.

In summary, the SEFRA methodology estimates the risk to marine mammals posed by fishing or other threats. Risk is represented as a ratio between the estimated mortality of a species across all fisheries and an estimate of mortality that the species population can withstand while achieving a desired population outcome, which means a stable or increasing population. The method is especially useful where data on observed fishery mortality is low and thus cannot be used directly in risk management. The SEFRA method uses the spatial distribution and abundance of a species, combined with the distribution and intensity of fishing or other threats as a way of estimate their overlap. Where there is no overlap, there is no interaction. In overlap areas, the method can model the interactions, e.g., captures of species by fishing gear.[18]

---

[18] In addition to the Roberts, et al. 2019 study, NMFS obtained a further understanding of the SEFRA model in three subsequent GNZ submissions. 2026 CF at 50, fn. 249.

The probability that an interaction will result in a capture or death, termed "vulnerability," is estimated using fisheries observer data. Vulnerability is estimated separately for different types of fishing gear. Unobserved fatal interactions, termed "cryptic mortality," are also estimated in the 2019 SEFRA model.

The 2019 SEFRA model compared the estimated fatalities with the Population Sustainability Thresholds for Hector's and Māui dolphins to determine whether the total number of deaths posed a conservation risk to the populations. Population size, demography, growth rate, and natural (non-human caused) mortality are used to define how much mortality a population can withstand while still achieving a defined population outcome.

The IWC's Scientific Committee considered the 2019 SEFRA model in its May 2019 meeting and stated that:

> The Committee expressed support for the New Zealand government's use of a spatial risk assessment for Māui and Hector's dolphins and agreed with the principle of estimating encounters between dolphins and lethal threats as a function of their overlap in space. The Committee therefore recommends that the work be reviewed intersessionally, to assess if the model is sufficiently robust to inform management.

Report of the IWC Scientific Committee, Nairobi, Kenya 10-23 May 2019, available at: https://archive.iwc.int/pages/view.php?ref=9570#. *See also* April 2023 Report of the IWC Workshop on Hector's and Māui Dolphins in New Zealand: Consideration of Spatial Risk Assessment of Threats: available at: https://archive.iwc.int/pages/download.php?ref=21680&ext=pdf&alternative=6668&noattach=true&k=ca03da335d. This report reached the following conclusions:

> SEFRA provides a way to integrate data in a probabilistic manner and capture parameter uncertainty using probability distributions. Although information for some critical inputs to the model is limited, the ability to identify risks spatially is a strength of the approach, allowing it to be used to assess spatial management strategies.

The pre-meeting did not identify obvious flaws in the SEFRA and its application that would preclude its application to support management. However, considerable additional work should be conducted to better explore uncertainty and understand which parameters are both uncertain and consequential in terms of management-related outcomes.[19]

NMFS has described the results of the SEFRA model for Māui dolphins. 2026 CF at 52-53.

There, NMFS approves the SEFRA model's finding that the annual estimated bycatch of Māui

dolphins is 0.056 individuals, which equates to an estimate of one Māui dolphin death every 17.8

years. Moreover, the estimated bycatch rate is shown to be well below the PBR of 0.10.

MHDD objects to the use of the SEFRA model, as well as its results, on the ground that

"NMFS relied on outdated and unsupported bycatch estimates" to conclude that "no bycatch

limits were exceeded or even came close to being exceeded for any marine mammal species or

stock in New Zealand." PI Mot. at 20.  MHDD asserts that NMFS accepted the GNZ's "bycatch

estimates with no evidence of the data, methods, or assumptions on which they were based. PI

Mot. at 21. This assertion has no factual basis for the following reasons:

First, the 2026 CF, in Appendix A, lists the Roberts, et al. SEFRA model as part of the

"Timeline" of the measures that the GNZ adopted to measure bycatch for both the North and

South Islands. MHDD has deliberately ignored the extensive data inputs that the SEFRA model

relies upon and that Roberts, et al., fully discussed.

Second, the 2026 CF contains over 25 citations to the GNZ's two previous Comparability

Applications and supplemental information submissions in support of those applications. Many

of those documents describe the SEFRA model and the data that was input into the model to

derive the estimated bycatch figures. *See, e.g.,* 2020 Comp. Applic. at 15-19, as well as

---

[19] NMFS has expressly recognized the IWC's endorsement of the SEFRA model in 2019 and 2023. *See* 2026 CF at 53.

Appendixes F and G thereto. *See also* the GNZ's October 2025 Supplemental Information in Support of Revised Decision Memorandum and the Revised Comparability Finding to Be Issued upon Remand at 38-39 and 57-65.[20] Thus, it is only by willfully ignoring the evidence that MHDD is able to conclude that "the values {used to derive the bycatch estimates} are not found in any other publicly available document." PI Mot. at 21.

In addition, the administrative records in Court Nos. 20-00112 (*Sea Shepherd v. United States*) and 24-00218 (*MHDD I*) contain the evidence that MHDD erroneously claims is missing, so there is no question that MHDD has long been fully aware of the inputs into the SEFRA model. MHDD has failed to identify any input that it considers erroneous, much less establish, contrary to the IWC's Scientific Committee finding, that the SEFRA model is not a useful tool for estimating bycatch. The IWC, in contrast, expressed support for the SEFRA model, and MHDD has yet to suggest that U.S. standards require a different bycatch estimation model.

Third, MHDD claims that the estimated annual bycatch of 8.8 Hector's dolphins is "likely a significant understatement." PI Mot. at 21. However, this is the best available information on the combined mean estimate of injury and mortality (excluding cryptic mortality) for the six South Island fisheries that pose a risk to Hector's dolphins. Moreover, MHDD's reliance on the 5-Year Review (at 52) is unpersuasive because it is not the finding of NMFS. Rather, it is the opinion of the Declarant, Ms. Slooten, which she expressed in a non-peer

---

[20] *See also*: (1) Hector's dolphin Summary Information in 2021 Comparability Application; (2) Bycatch estimation using a spatial model in 2021 Comparability Application; (3) monitoring program description in December 2022 supplemental information submission; (4) March 3, 2023 supplemental information submission; (5) October 2023 supplemental information submission; (6) November 2025 supplemental information submission; and (7) February 2026 supplemental information submission.

reviewed 2024 article. A speculative "likelihood" or "possibility" is not evidence of undercounting of Hector's dolphin mortality.

Fourth, MHDD asserts that "the 8.8 bycatch estimate also does not incorporate cryptic mortality and that this could be "a third of all bycatches." PI Mot. at 21. The GNZ acknowledged in its comparability application, as well as in its February 2026 supplemental information submission, that the bycatch estimate of 8.8 (which is the mean estimate across six fisheries) did not include cryptic mortality. However, the GNZ also provided NMFS with additional bycatch estimates (derived from the 2019 SEFRA model) that do incorporate cryptic mortality, which were calculated for each Hector's dolphin subpopulation following implementation of the 2020 protection measures. *See* February 2026 supplemental information submission at 14-16. Estimating bycatch from set net or trawl methods for each subpopulation is how the GNZ monitors and manages bycatch domestically, rather than estimating bycatch from a defined fishery listed in the List of Foreign Fisheries ("LOFF").[21]

---

[21] Estimated bycatch from set net or trawl methods for each subpopulation during the review and implementation of further protection measures for Hector's and Māui dolphins is publicly available. This information has been provided to NMFS in the following documents:

Fisheries New Zealand (2019). Hector's and Māui dolphin Threat Management Plan: Technical advice. https://www.mpi.govt.nz/dmsdocument/41103-Hectors-and-Maui-Dolphin-Threat-Management-Plan-Advice-on-options-and-next-steps-18-October-2019-Appendices-Briefing-B19-0533

Fisheries New Zealand (2021) Supporting Information: Further consultation on fisheries measures for South Island Hector's dolphins. https://www.mpi.govt.nz/dmsdocument/47944-Protecting-South-Island-Hectors-dolphins-Supporting-Information-Further-consultation-on-fisheries-measures;

Fisheries New Zealand (2022) Technical advice on further fisheries measures to protect South Island Hector's dolphins. https://www.mpi.govt.nz/dmsdocument/57415-Appendix-one-Technical-advice-on-further-fisheries-measures-to-protect-South-Island-Hectors-dolphins/sitemap.

Moreover, the source of the "one-third of all bycatches" estimate is a 2017 article by Abraham, et al. 5-Year Review at 104. This estimate is irrelevant since it was proposed long before the GNZ fully implemented its enhanced fishing restrictions in 2020 and 2022 and its comprehensive electronic monitoring program in May 2025.

Fifth, MHDD asserts that the "GNZ's bycatch estimates conflicts with the agency's own findings that the GNZ's methodology significantly underestimates bycatch." PI Mot. at 22. In support of this claim, MHDD alleges that the SEFRA model estimated Māui dolphin bycatch at 0.10 dolphins per year. PI Mot. at 22. The 2019 report does provide this estimate, *but it represents the risk prior to the implementation of additional protection measures in October 2020.* The SEFRA model outputs, with the new protection measures applied, estimates Māui dolphin bycatch at 0.056 individuals per year as submitted in New Zealand's 2021comparability application.

The same applies to MHDD's error in asserting that the 2019 report provides the best available estimates for Hector's dolphin bycatch. Here again, the 2019 report does not apply the effect of the 2020 and 2022 protection measures. The Table on page 54 of the 2026 CF shows that the estimated bycatch (excluding cryptic mortality) is 8.8 dolphins per year and notes in footnote 274 that, when considering subpopulation bycatch estimates (which are derived from the 2019 SEFRA model with the recent protection measures applied and cryptic mortality included) the combined mean estimate of annual commercial fishing deaths is approximately 23, which is well below the PBR estimate of 66.5.

Sixth, MHDD asserts that NMFS scientists "concluded that the bycatch rate reported in the [SEFRA] assessment is 'likely understated.'" PI Mot. at 22. However, the report cited in support of this statement was issued in March 2019, i.e., before the final Roberts, et al. 2019

report was published and well before the GNZ's enhanced fishing restrictions and comprehensive monitoring requirements were fully implemented, so any conclusions pertaining to 2019 are irrelevant to the issue of bycatch estimates beginning on October 1, 2020. Moreover, the use of the qualifying term "likely understated" does not constitute substantial evidence of the actual understatement of bycatch.

Seventh, similarly irrelevant is MHDD's reliance on the 5-Year Review where NMFS allegedly expressed "notable concerns" about the SEFRA methodology. MHDD's citation to page 107 of the Review reveals that the "notable concerns" were expressed in Section 2.4.2.5.3.1, Section 2.4.2.5.3.2, and Section 2.4.2.5.3.3 of the Review. In those three sections, the Review identifies Declarant Slooten at least 28 times as the source of those concerns. Thus, none of those sections contain the findings of NMFS. Rather, they are the opinions of Ms. Slooten and a few others, which MHDD tries to palm off as the findings of NMFS. Thus, they are by no means the "contradictory findings by {NFMS'} own scientists," as MHDD claims. PI Mot. at 23.

Eighth, MHDD claims that NMFS "fails to rationally account for more recent, much higher bycatch rate estimates." PI Mot. at 23. The first such estimate allegedly appears in the so-called "MacKenzie report." However, NMFS did not ignore the MacKenzie report. Rather, as MHDD has acknowledged, NMFS found that the MacKenzie report, as published, did not consider the effect of fishing restrictions implemented in 2020 or 2022 in estimating Māui or Hector's dolphin bycatch. 2026 CF at 53, fn. 266 and 54, fn. 275. Rather, MacKenzie based his analysis on fishing effort data from 2016-17 to 2018-2019. PI Mot. at 24. This is supposedly "irrational" because the Roberts SEFRA model supposedly relied on the same "older" data. *Id.*

However, there is no inconsistency because, as the GNZ explained in its 2020 Comparability Application, for Māui dolphins its estimates (which the GNZ derived from the

2019 SEFRA model) took into account the changes to fishing effort after October 1, 2020 that were caused by the new fishing restrictions. *See* 2020 Comp. Applic. at 17, which states that:

> Estimates of fisheries bycatch have been calculated using a two-year average of fishing effort (from the 2015-16 to the 2016-17 October fishing year) to represent current (status quo) fishing effort. The fisheries bycatch efforts for Māui dolphins are shown for commercial set net fisheries, commercial trawl fisheries, and combined, *under the pre- and post-1 October fisheries measures in Figure 4 and Table 1.*

***

> Adoption of new measures under the Threat Management Plan represents an approximate reduction in mean annual deaths of 42% from commercial set net, 52% from commercial trawl, and 44% cumulative based on pre-1 October bycatch reduction management measures.

(Emphasis added.) *See also* Figure 4 (at 18), which shows annual Māui dolphin captures and deaths by fishing method both before and after the new spatial closures that took effect on October 1, 2020. And, as the GNZ further explained in its February 2026 supplemental information submission (at 15) with respect to Hector's dolphins:

> For Hector's dolphins, the effect of the 2020 fishing restrictions was manually applied to the model inputs from MacKenzie et al. (2022) for the purpose of the 2021 Comparability Application.

***

> The information as submitted in 2021 remains our best estimates of bycatch for the respective LOFF fisheries, however, as noted in our 2021 Comparability Application these numbers do not include cryptic mortality.

Accordingly, there is no inconsistency or irrationality between the MacKenzie methodology and the GNZ's methodology.

Ninth, MHDD asserts that the 8.8 Hector's dolphin bycatch estimate "was not even the best uncorrected estimate available." PI Mot. at 25. Instead, GNZ should have relied on the 15 Hector's dolphin deaths reported during the single 2023/2024 fishing year. Moreover, NMFS

33

failed to explain why it ignored this more recent figure. However, the NMFS Comparability

Application User Guide requested that nations "Please enter the annual mortality rate of marine

mammals interacting with this fishery. It is recommended to enter at least the last five years of

data (if known)." *See* NMFS_004693 in ECF No. 25, Att.2.pdf. *See also* NMFS Instruction No.

02-204-01, February 2023 (at 11), available at: https://www.fisheries.noaa.gov/s3/2023-02/02-

204-01-Final%20GAMMS%20IV%20Revisions%20clean_kdr.pdf. ("Generally, human-caused

M/SI estimates in the SARs [i.e., stock assessment reports] will include the most recent five

years for which data have been analyzed, as this can account for inter-annual variability.")

Finally, MHDD asserts that NMFS ignored "numerous other published bycatch estimates

for Māui and Hector's dolphins that are significantly higher than those in the 2026 Comparability

Finding." PI Mot. at 25. In support, it cites the estimates appearing on pages 52-53 of the 5-Year

Review. However, review of the cited reports indicates that: (1) they did not take into account the

significant reduction in fishing effort caused by the expanded fishing restrictions on October 1,

2020 and December 2022; (2) were not peer reviewed; and/or (3) were deemed implausible by

the author.

Specifically, Curry, et al. 2012 (not 1995) was superseded by the 2019 SEFRA model.

Cooke, et al. 2019 noted that one of their model estimates of bycatch was implausible given that

there is no evidence to suggest that an encounter between a Māui dolphin and a set net is more

likely to result in a dolphin death than if a Hector's dolphin encountered a set net. The paper also

did not take into account the 2020 measures. De Jager, et al. 2019 was also published before the

2020 measures. And, Slooten and Dawson 2021b was not peer-reviewed.

**VII. THE GNZ MAINTAINS A MONITORING PROGRAM THAT IS COMPARABLE TO U.S. STANDARDS**

NMFS provided an extensive description of the nature and extent of the GNZ's monitoring program and concluded that it is comparable to U.S. monitoring standards. In support, it expressly referenced the GNZ's supplemental information submissions in October 2025, November 2025, and February 2026. 2026 CF at 37-48. These three submissions contain extensive descriptions of all aspects of the GNZ's monitoring programs, which NMFS relied upon. Therefore, the GNZ need not repeat or summarize here NMFS' findings, and we instead respond to each MHDD allegation that the GNZ's monitoring program is deficient under U.S. standards.

First, although MHDD never says what would, in its opinion, constitute an adequate monitoring program, its position is that compliance with U.S. monitoring standards would require the use of human observers and/or cameras on all commercial fishing vessels, regardless of the size of those vessels, their fishing methods, or the areas in which they fished. Those observers must be on duty 24/7 during every fishing trip. Moreover, observer coverage must include stationing observers or cameras on all vessels operating in harbors, as well as stationing observers or cameras on those vessels operating in deepwater offshore out to the 100-meter depth contour, as well as out to 20 nautical miles.[22] However, MHDD cannot identify any U.S. fishery where NMFS has imposed this type of monitoring program because none exists.

---

[22] *See* Exhibit G to Slooten Declaration (at 5): "Certainty would require perfect coverage by observers and performance by observers or cameras, 100% footage review, and no dropouts before the net comes into view." Moreover, "banning gillnet and trawl fisheries in waters less than 100 meters deep is the only management option likely to reduce the risk of extinction to acceptable levels." *Id.* at 6. *See also* MHDD's Motion for Summary Judgment on Agency Record in Court No. 24-00218 (at 24): "100% of fishing effort must be monitored," including adoption of a prior NMFS proposal that 100% monitoring be extended out to 20 nautical miles.

Second, MHDD relies on monitoring deficiencies identified in the 5-Year Review, including the allegation that "only 4% of the vessels from the most problematic fishery [set nets] have cameras and several areas with intense fishing effort (such as harbors) have no monitoring." PI Mot. at 29. Moreover, "there has been little monitoring of inshore [trawl] fisheries." *Id.* In addition, there are "low levels of observer coverage and gaps in fisheries data." *Id*. The review of video data is also low, and around the Banks Peninsula, on the east coast of the South Island, it is "very unlikely that bycatch would be detected." *Id.* In conclusion, MHDD asserts that the 2026 CF "does not even acknowledge these findings, much less provide a reasoned explanation for discarding them." *Id.* at 30.

The defect in these allegations is that they are not the findings of NMFS. Rather, they are the opinions of various individuals that MHDD erroneously characterizes as the agency's findings. More important, although monitoring is discussed throughout the 5-Year Review, every time it is discussed *the Review references an article that was published or submitted before the GNZ completed its rollout of its onboard camera monitoring program in May 2025*. *See* the GNZ's February 2026 supplemental information submission (at 64-67), which contains chronologies of the measures that the GNZ has implemented, including monitoring measures, to protect Māui and Hector's dolphins on the North and South Islands. Thus, the alleged NMFS "findings," which are not official agency findings, do not consider the most up to date information concerning the extent of the GNZ's monitoring program. As such, MHDD's reliance upon these so-called (non-existent) findings is irrelevant.

Third, MHDD claims that there is "effectively no monitoring of fishing effort" in an "extensive portion of the Māui dolphin habitat." PI Mot. at 30. MHDD focuses specifically on the fact that neither observers nor cameras are required within harbors on the west coast of the

36

North Island even though harbors are part of the Māui dolphin's "range." *Id.* This, in turn, means that there is "zero" percent monitoring of 95-99% of the set net fishing effort in the MDHZ. *Id.* at 30-31. However, MHDD neglects to point out that only about 2.7% (summer) and 1.2% (winter) of the Māui dolphin distribution falls within the harbors, and the estimated distribution is concentrated near the mouths of the harbors, where commercial fishing is banned. 2026 CF at 76, fn. 352.

Thus, MHDD's allegation is highly misleading, and it also ignores the NMFS discussion of a key aspect of U.S. standards, which is that vessels that are equal to or less than 8 meters (26 feet) in length are not required under U.S. standards to carry observers or cameras under 50 C.F.R. § 600.746 when to do so would jeopardize observer health or safety or interfere with the vessel's operations. Therefore, NMFS found that the GNZ's program complies with this regulation and, therefore, is comparable to U.S. standards. 2026 CF at 41, 43-44.[23]

Fourth, MHDD greatly exaggerates the threat to Māui dolphins in harbors. A July GNZ 2025 report, captioned "Harbour use by Māui/Hector's dolphin and commercial net fisheries," concludes (at 1) that:

> opportunistic sightings of Māui/Hector's dolphins were almost entirely from the coastal domain of the WCNI. By comparison, sightings in harbour areas were much more infrequent and, with a very small number of exceptions, occurred in set-net (SN) prohibition areas in harbour mouths. This is despite relatively high levels of activity in harbours where observations could be made of Māui/Hector's dolphins and other marine mammals.

Trawling is not permitted in any harbor, and the "vessels that fish within harbors (small dories) are usually between 12 and 20 feet (four to six meters) in length and are unable to carry an

---

[23] Nevertheless, the GNZ's bycatch estimates include the risk associated with small vessels, which is substantially less than the PBR. 2026 CF at 46, fn. 234.

observer or an on-board camera due to concerns for both human health and safety and safe vessel operations." 2026 CF at 46. Fisheries New Zealand monitors the entire MDHZ, which is estimated to cover approximately 96.3% (summer) and 87.8% (winter) of the Māui dolphin distribution (if including harbors) and approximately 93.7% (summer) and 86% (winter) of the Māui dolphin distribution (if excluding harbors). 2026 CF at 43, fn. 210. *See also* extensive discussion of harbors in the 2026 CF at 44-45, 76.[24] In addition, the GNZ's "proof of concept" testing of onboard cameras "observed a large percentage of the set net and trawl fisheries in the West Coast North Island between 2020-2023 and no interactions with Hector's or Māui dolphins were recorded." 2026 CF at 45, fn. 225. *See also* 2026 CF at 42, fn. 204, which identifies those submissions where the GNZ explained in detail its monitoring program.

Fifth, MHDD insists that monitoring coverage is required by U.S. standards "across the dolphin's entire *distribution*, not just a subset." PI Mot. at 31. Then, at another point, it insists that monitoring must be evaluated in the "entirety of the Māui dolphin's *range*." PI Mot. at 31. Then, it asserts that NMFS ignores "the extensive portion of Māui dolphin *habitat* where there is effectively no monitoring of fishing effort." PI Mot. at 32. However, MHDD erroneously conflates these three terms and uses them interchangeably even though they represent very different concepts.

The term "distribution" is a term of art when referring to the spatial areas where dolphins may be found. It is far more extensive than a dolphin's "range" (which means the alongshore distance inhabited by any particular dolphin during its lifetime), which is in turn less extensive

---

[24] MHDD claims that "there is almost no monitoring in a large portion of the area where Māui dolphins are at risk of being caught." However, this "area" is the harbors on the west coast of the North Island, where NMFS expressly found that, under the particular circumstances, onboard observers or electronic monitoring are not required.

than the term "habitat" (which means a suitable living space for a dolphin, represented by physical or biological features, such as the availability of prey, which may exist without the presence of dolphins.). By asserting that U.S. standards require monitoring throughout the entire distribution, range, and habitat, MHDD implicitly asserts that the *GNZ must eliminate all risk* of commercial fishing in New Zealand's waters. MHDD confirms this conclusion when it asserts that "100% of bycatch needs to be detected." *Id.* However, U.S. standards have never required the elimination of all risk.[25] Nor do U.S. standards require 100% monitoring in every area of residual risk.

In essence, MHDD misdirects the inquiry from the U.S. monitoring standard, which is to obtain statistically reliable estimates of incidental mortality and serious injury. In contrast, NMFS describes how monitoring information is used to estimate fisheries-related risk in the SEFRA model and concludes that this monitoring "will provide the information necessary for the SEFRA model to estimate bycatch with sufficient levels of confidence." 2026 CF at 47.

Sixth, MHDD finds fault with the GNZ's limitation of monitoring requirements to "in-scope" vessels. PI Mot. at 32. The term "in-scope" means all trawl vessels 32 meters or less in length, excluding those that exclusively target scampi, and all set net vessels that are 8 meters or more in length.[26] 2026 CF at 43. The GNZ's rationale for excluding larger trawl vessels is that they fish in deeper waters that dolphins do not inhabit. 2026 CF at 15, fn. 81.[27] Smaller set net

---

[25] MHDD cites a 2019 GNZ document stating that there must be "100% monitoring of vessels using trawl or set nets *in areas of risk*." PI Mot. at 31-32. But, that is precisely what the GNZ's monitoring program accomplishes, i.e., there is 100% monitoring in "areas of risk."

[26] Even though these smaller vessels are not required to carry cameras, they are still subject to mandatory reporting requirements and real-time geospatial positioning reporting. 2026 CF at 44.

[27] Deepwater trawl vessels do carry observers. 2026 CF at 43, fn. 208.

vessels primarily fish within harbors: "95-99% of set net fishing effort across the entire MDHZ occurs within the harbors primarily by vessels less than 8 meters in overall length." 2026 CF at 44. In contrast, by law, *all "in-scope" vessels must carry cameras* because, as NMFS found, "they pose the most risk to protected species, are practically able to operate the equipment, and responsible for high inshore catch volumes and fish bycatch." 2026 CF at 43.

Seventh, MHDD alleges that monitoring of Hector's dolphins is inadequate due to the exclusion of "out-of-scope" vessels, which "still pose a bycatch risk to Hector's dolphins when fishing within their range." PI Mot. at 32. However, MHDD does not define where this risk exists, much less what this risk consists of. In contrast, the GNZ South Island monitoring program achieves "nearly 100% monitoring by all in-scope vessels." 2026 CF at 45. MHDD fails to explain what else is required in order to maintain a program that is comparable to U.S. standards.

Eighth, MHDD takes issue with the very use of onboard cameras, claiming that they have "multiple shortcomings," including that they "may not be as effective during night time hauling."[28] PI Mot. at 33. It is unclear from this (erroneous) criticism whether MHDD asserts that the U.S. standard requires human observers or that the use of cameras is deficient in some way that MHDD fails to identify. However, NMFS has approved fourteen electronic monitoring programs in U.S. fisheries. *See* https://www.fisheries.noaa.gov/national/fisheries-observers/electronic-monitoring. Accordingly, MHDD's objection to the GNZ's use of cameras is has no basis in U.S. standards. *See also* NMFS' identification of the advantages of cameras over observers. 2026 CF at 6, 39, 44-47.

---

[28] The article that MHDD relies upon concerning nighttime fishing does not describe any difference in the effectiveness of cameras in the daytime compared to nighttime.

Finally, MHDD finds fault with the extent to which the GNZ reviews the footage captured by onboard cameras and asserts that U.S. standards require that 100% of video footage be reviewed. PI Mot. at 33-34. This is the same as saying that 100% of vessels operating in U.S. fisheries must carry observers 100% of the time. But that is not how the U.S. standard works, as documented in the 2022 NOAA Fisheries "National Observers Program FY 2022 Annual Report, which is available at: https://repository.library.noaa.gov/view/noaa/66191.

Appendix A to that Report lists the "target coverage" and "actual coverage" of observers on all NMFS Fisheries Observer Programs. The actual observer coverage ranges to as low as 5%. Accordingly, U.S. standards do not require 100% review of video footage, nor has MHDD identified where they do so.

The GNZ's February 2026 supplemental information submission (at 31-34 and 38-45) provided confidential levels of footage review for the South Island set net and inshore trawl fisheries, the deepwater fisheries, and the east and north coast North Island set net and trawl fisheries. The GNZ's October 2025 supplemental information submission (at 72-78_) provided footage review levels for the west coast North Island set net and trawl fisheries. The GNZ now achieves at least 90% monitoring coverage within the coastal portion of the MDHZ, which is the area of the greatest residual risk to Māui dolphins. Cameras are capable of observing marine mammal bycatch 100% of the time, and 100% of camera footage is reviewed. This degree of coverage amply satisfies the U.S. standard.

## VIII.  MHDD HAS FAILED TO DEMONSTRATE THAT IT WILL SUFFER IRREPARABLE INJURY WITHOUT A PRELIMINARY INJUNCTION

MHDD's effort to demonstrate irreparable injury consists of a series of inaccurate and unreliable statements that fail to satisfy the irreparable injury standard. MHDD first asserts that "the existential threat to Māui dolphins has worsened" and there is "ongoing mortality" of

Hector's dolphins in the South Island fisheries. PI Mot. at 36. However, to demonstrate that irreparable harm is "likely," MHDD would need to demonstrate that substantial evidence shows that the PBRs for Māui dolphins and Hector's dolphins have been, or are imminently expected to be, exceeded. The evidence does not support either conclusion.

First, MHDD asserts that set net and trawl fisheries "continue to pose a daily threat of bycatch" and that a "continued threat" of bycatch is enough." PI Mot. at 38. In support of this allegation, MHDD alleges that, "in February of this year, a Māui dolphin was found dead." *Id.* at 40. However, the necropsy report, attached as Exhibit E to the Slooten Declaration, does not find that the cause of death was entanglement in a fishing net. *See* Exhibit E to Slooten Declaration, which states (at 1) that, "Overall, the skin lesions were assessed as not typical of bycatch, particularly the irregular distances between the lacerations and an absence of knot marks (which are usually obvious) at the angles where the lacerations intersect." A review of the entire report demonstrates that MHDD has grossly mischaracterized its findings.

Second, MHDD asserts that the Māui dolphin "population is only continuing to decline." Specifically, the 5-Year Review purportedly shows that there was a 14% decline between the two most recent population estimates in 2020-21 and 2015-16. *Id.* To derive this percentage, Declarant Rose subtracted 54 from 63, and the difference of 9 divided by 63 equals 14%.

This calculation is misleading because the 2015-16 survey estimated the population as 63 with 95% confidence that the *actual population* of individuals over 1 year of age was between 57 and 75. The 2020-21 survey estimated the population of individuals over 1 year of age as 54 with 95% confidence that the *actual population* was between 48 and 66. *See* 5-Year Review at 108. Thus, it is possible, if not likely, that the actual population was the same or similar during both periods, or it may even have increased in 2020-21 compared to 2015-16. In any event, given the

42

overlapping confidence intervals of the abundance estimates in each period, it is simplistic and, therefore, erroneous to assert that a 14% population decline has occurred.

Third, MHDD asserts that "Māui dolphin bycatch rates are exceeding NMFS's calculated PBR limit by as much as three times." In support, MHDD relies once again on the 5-Year Review (at 24). PI Mot. at 40. However, we cannot find the "three times" figure in either the 5-Year Review or in the Declarations of Ms. Slooten or Ms. Rose. Regardless, MHDD identifies no reliable or confirmed evidence that, beginning on October 1, 2020, when the enhanced fishing restrictions took effect as well as in August 2023 when the rollout of the nationally expanded monitoring program for in-scope set net and trawl vessels was completed off the west coast of the North Island, and in May 2025 when the rollout of the expanded monitoring program was completed, that Māui dolphin deaths attributable to commercial fishing are three times greater than the PBR limit.

Fourth, MHDD asserts that west coast North Island fisheries "have caused the deaths of Māui dolphins. That is accurate as to the distant past, but the last confirmed death of a Māui or Hector's dolphin (subspecies unknown) attributable to commercial fishing off the west coast of the North Island occurred in 2012. Thus, MHDD is compelled to rely on speculation, mainly by Declarant Slooten, that deaths in excess of PBR are bound to occur. In this regard, MHDD seeks to have this Court find that irreparable harm occurs when a fishery fails to eliminate 100% of the commercial fishing risk. However, that is not the U.S. standard.

Fifth, MHDD flatly asserts that "the current bycatch rate exceeds PBR." PI Mot. at 40. This claim is undocumented and, therefore, wrong.

Sixth, MHDD alleges that NMFS has concluded that "the estimates of the impacts of fisheries on Māui dolphins are likely to be underestimated." In support, MHDD cites the 5-Year

Review (at 53). However, NMFS made no such finding. Instead, the Review repeatedly relies upon articles authored by Declarant Slooten contained in three other sections of the Review.

## IX.    CONCLUSION

For all these reasons, this Court should deny MHDD's Motion for a Preliminary Injunction.

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly (lead counsel)
Robert G. Gosselink
Kenneth N. Hammer

Trade Pacific PLLC
700 Pennsylvania Avenue, S.E.
Suite 500
Washington, D.C. 20003
Phone:  202-223-3760
wconnelly@tradepacificlaw.com

*Counsel for the New Zealand Government*

**APPENDIX OF EVIDENTIARY SOURCES THAT NMFS EXPRESSLY RELIED UPON IN ITS MARCH 2, 2026 COMPARABILITY FINDINGS**

**(The first footnote or page where NMFS identified a source is shown in parentheses)**

**(Citations to NMFS or GNZ statutory or regulatory provisions have been omitted.)**
**(Also omitted are NMFS' citations to NOAA websites)**

- All of the GNZ's comparability applications and supplemental information submissions beginning in 2020

- Hammond, et al. 2021, Estimating the Abundance of Marine Mammal Populations (fn.15)

- NMFS Guidelines for Assessing Marine Mammal Stocks (fn.16)

- House Conference Report (fn.31)

- NMFS National Observer Program FY 2022 Annual Report (fn.37)

- Criteria for Determining Negligible Impact under MMPA Section 101(a)(5)(E) (fn.40)

- Memorandum Addressing NMFS' Priorities for Convening Take Reduction Teams (fn.44)

- Wade, et al. 2021, Best Practices for Assessing and Managing Bycatch of Marine Mammals (fn.45)

- Atlantic large whale take reduction plan regulations (fns.50 and 51)

- IAICRS tool User Guide (fn.60)

- WTO Appellate Body Reports (fn.63)

- Administrative record filed in *MHDD v. NMFS I* litigation (fn.80)

- Administrative record for NMFS' September 2, 2025 Comparability Findings (fn.80)

- New Zealand Biodiversity Strategy 2020 (August 2020) (fn.91)

- Constantine, et al. 2021, Estimating the Abundance and Effective Size of Māui Dolphins in 2020-2021  (fn. 100)

- AEBAR Hector's and Māui dolphin – technical summary (2021) (fn.102)

- AEBAR 2025: Protected Species: Marine Mammals (fn.106)

- Baker, et al. 2002, Geographical variation in Hector's dolphin (fn.110)

- Taras, et al., Estimating Demographic Parameters for Bearded Seals in Alaska (fn.111)

- Parsons, 5-Year Review: Summary and Evaluation (2024) (fn.115)

- South Island Hector's Dolphin Bycatch Reduction Plan – Annual Report 2023/24 (March 2025) (fn.118)

- Bennington 2025, Investigating the Recovery Potential of Hector's Dolphin (May 2025) (fn.118)

- IWC Scientific Committee review of 2012-2015 aerial surveys (fn.121)

- NMFS IAICRS database (fn.123)

- Taylor and Wade assessment (2019) (fn.126)

- IWC Report of the Scientific Committee (2023) (fn.127)

- IWC Report of Scientific Committee's Standing Working Group on Abundance Estimates (2018) (fn.128)

- IWC Report of Scientific Committee (SC69A, 2023) (fn.129)

- IWC Table of Accepted Abundance Estimates (fn.132)

- New Zealand Conservation General Policy (fn.143)

- Hector's and Māui dolphin Threat Management Plan (fn.156)

- South Island Hector's Dolphin Bycatch Reduction Plan (November 2022) (fn.157)

- AEBAR New Zealand Fur Seal (fn.173)

- NMFS National Bycatch Report (fn.184)

- Final False Killer Whale TRP and implementing regulations (fn.186)

- Jannot, et al. 2022, Marine Mammal Bycatch in U.S. West Coast Groundfish Fisheries (fn.186)

- Somers, et al. 2024, Fisheries Observation Science Program Coverage Rates (fn.186)

- Chan, et al. 2024, Examining the Potential of Electronic Monitoring to Address Gaps in Protected Species Bycatch Data Collection (fn.187)

- Moore, et al. 2021, Estimating Bycatch Mortality for Marine Mammals (fn.188)

- GNZ Fisheries (Reporting) Regulations 2017 (fn.200)

- GNZ Fisheries (Geospatial Position Reporting) Regulations 2017 (fn.200)

- GNZ Fisheries (Electronic Monitoring on Vessels Regulations 2017 (fn.200)

- Meyer and Hickcox 2023, van Helmond, et al., 2019, Pierre 2018, re electronic monitoring (fn.225)

- MPI Accidental captures of seabirds and protected marine species by commercial fishers from 1 July to 30 September 2025 (fn.237)

- Brandon, et al. 2017, Toward a tier system approach for calculating limits on human-caused mortality of marine mammals (fn.243)

- MacKenzie, et al. 2022 (fn.266)

- Letter from GNZ (Dan Bolger) to NMFS (Alexa Cole) re U.S. MMPA Import Rule (fn.315)

- New Zealand Sea Lion/Rapoka Threat Management Plan (2017-2022) (fn.324)

- Roberts, et al. 2019, Spatially explicit fisheries risk assessment for Hector's and Māui dolphins (page 68)

- Proof of concept for onboard cameras (page 71)

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATION

This opposition brief contains 13,873 words and, therefore, complies with the 14,000-word limitation in Standard Chambers Procedures 2(B)(1).

/s/ Warren E. Connelly
Warren E. Connelly
