**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |  |
|---|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Court No. 1:26-cv-02462-JCG |
| NATIONAL MARINE FISHERIES SERVICE, et al., | ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| NEW ZEALAND GOVERNMENT, | ) ) | |
| Defendant-Intervenor. | ) ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

OF COUNSEL:
MARK HODOR
Office of the General Counsel
National Oceanic & Atmospheric Administration

ANGELA CHERMAN
Office of the Chief Counsel
U.S. Customs and Border Protection

DANIEL PAISLEY
Office of the General Counsel
Department of the Treasury

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

AGATHA KOPROWSKI
OLIVER J. MCDONALD
Trial Attorneys
U.S. Department of Justice, Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 507-6081
Fax: (202) 353-0461
Email: agatha.koprowski@usdoj.gov

May 1, 2026

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Table of Contents.............................................................................................................ii

Table of Authorities ........................................................................................................iii

Introduction.................................................................................................................... 1

   I.   The Marine Mammal Protection Act................................................................... 1

   II.  Factual and Procedural Background.................................................................... 3

   III. Standard of Review ........................................................................................... 4

Summary of the Argument.............................................................................................. 6

Argument ....................................................................................................................... 7

   I.   MHDD Is Not Likely to Succeed On The Merits ............................................... 8

      A.  Absent Jurisdiction, There Can Be No Likelihood of Success.................... 8

      B.  Even If The Court Concludes It Has Jurisdiction, The Relief Sought By MHDD Is Not Available ............................................................................................. 9

      C.  The 2026 Comparability Findings Were Not Arbitrary and Capricious..................... 11

         1.  Overview of U.S. Fisheries Regulations............................................... 13

         2.  New Zealand Prohibits the Intentional Mortality and Serious Injury of Marine Mammals in the Course of Commercial Fishing Operations................................ 15

         3.  New Zealand Has Processes to Estimate Marine Mammal Abundance and Calculate a Bycatch Limit.................................................................................... 18

            a.  New Zealand Provided Reasonable Proof of Abundance Estimates .............. 20

            b.  A Zero Rate Mortality Goal Is Not a Required Consideration ...................... 23

         4.  New Zealand Requires Registration of Commercial Fishing Vessels .................. 28

         5.  New Zealand's Regulations Require Commercial Fishers to Report All Intentional and Incidental Mortality and Serious Injury of Marine Mammals..... 28

         6.  New Zealand Has Measures Designed to Reduce the Total Incidental Mortality and Serious Injury of Māui and Hector's Dolphins Below the Bycatch Limit..... 28

         7.  New Zealand Has Implemented Monitoring Designed to Estimate Incidental Mortality and Serious Injuryin Its Set Net and Trawl Fisheries .......................... 34

   II.  MHDD Cannot Show That It Will Be Immediately and Irreparably Injured  Absent Injunctive Relief.................................................................................................. 39

   III. The Public Interest Would Not Be Better Served By an Injunction and the Balance Of Hardships Favor the Government.................................................................... 41

   IV. MHDD Is Required To Pay Security Before Obtaining Injunctive Relief......................... 42

Conclusion ................................................................................................................... 44

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Alaska Dep't of Env't Conservation v. EPA*,
   540 U.S. 461 (2004).................................................................................................. 5

*Am. Inst. for Imported Steel, Inc. v. United States*,
   600 F. Supp. 204 (Ct. Int'l Trade 1984) ................................................................ 4, 5

*Axiom Res. Mgmt., Inc. v. United States*,
   564 F.3d 1374 (Fed. Cir. 2009)............................................................................... 5

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
   462 U.S. 87 (1983)................................................................................................... 5

*Camp v. Pitts*,
   411 U.S. 138 (1973)............................................................................................... 10

*Fed. Commc'ns Comm'n v. Prometheus Radio Proj.*,
   592 U.S. 414 (2021).......................................................................................... 5, 39

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985)............................................................................................... 10

*In re Volkswagen of Am., Inc.*,
   566 F.3d 1349 (Fed. Cir. 2009)............................................................................... 8

*Litton Sys., Inc. v. Sundstrand Corp.*,
   750 F.2d 952 (Fed. Cir. 1984)............................................................................. 7, 8

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989)...................................................................................... 5, 11, 39

*Māui & Hector's Dolphins Defs. NZ, Inc. v. Nat'l Marine Fisheries Servs.*,
   799 F. Supp. 3d 1327 (Ct. Int'l Trade 2025) .......................................................... 9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983)........................................................................................ 5, 11, 22

*NEXTEEL Co. v. United States*,
   28 F.4th 1226 (Fed. Cir. 2022) .......................................................................... 6, 10

*Nippon Steel Corp. v. Int'l Trade Comm'n*,
   345 F.3d 1379 (Fed. Cir. 2003).............................................................................. 10

*Nken v. Holder*,
  556 U.S. 418 (2009)........................................................................................... 41

*Sea Shepherd New Zealand v. United States*,
  606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) ............................................... 10

*Sofamor Danek Grp. v. DePuy-Motech, Inc.*,
  74 F.3d 1216 (Fed. Cir. 1996)........................................................................... 4

*U.S. Ass'n of Imps. of Textiles & Apparel v. U.S. Dep't of Com.*,
  413 F.3d 1344 (Fed. Cir. 2005)......................................................................... 9

*United States v. Texas*,
  599 U.S. 670 (2023)........................................................................................... 42

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981)............................................................................................. 8

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008)................................................................................................. 4

*Zenith Radio Corp. v. United States*,
  710 F.2d 806 (Fed. Cir. 1983)........................................................................... 4

**Statutes**

5 U.S.C. § 706.............................................................................................. 5, 9, 10

16 U.S.C. § 1362............................................................................................. 1, 24

16 U.S.C. § 1371.......................................................................................... *passim*

16 U.S.C. § 1378............................................................................................. 2, 41

16 U.S.C. § 1387............................................................................................. 1, 14

16 U.S.C. § 1533................................................................................................. 34

28 U.S.C. § 1581................................................................................................... 5

28 U.S.C. § 2640................................................................................................... 5

**Regulations**

50 C.F.R. § 216.3 ...................................................................................................... 1

50 C.F.R. § 216.24 .............................................................................................. *passim*

50 C.F.R. § 229.37 .................................................................................................. 29

**Other Authorities**

Dep't of Commerce, Nat'l Oceanic & Atmospheric Admin., *List of Fisheries Summary Table*,
 *available at* perma.cc/5FKV-KGHZ ..................................................................... 13

Exec. Order No. 13,526 (Dec. 29, 2009) ................................................................. 16

False Killer Whale Take Reduction Team and Plan FAQs,
 available at https://perma.cc/M5C5-MJ8E ............................................................ 29

*Fish and Fish Product Import Provisions of the Marine Mammal Protection Act*,
 81 Fed. Reg. 54,390, 54,406 (Dep't of Commerce Aug. 15, 2016)................................... *passim*

*Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection
 Act—Notification of Comparability Findings*,
 91 Fed. Reg. 11,962 (Dep't of Commerce Mar. 11, 2026)......................................................... 4

*List of Fisheries for 2024*,
 89 Fed. Reg. 12,257 (Dep't of Commerce Feb. 16, 2024) ........................................... 13, 14, 38

S. Rep. No. 92-863 (1972).......................................................................................... 2

*Taking of Marine Mammals Incidental to Commercial Fishing Operations; False Killer
 Whale Take Reduction Plan*,
 77 Fed. Reg. 71,260 (Dep't of Commerce Nov. 29, 2012)...................................................... 29

Defendants, the National Marine Fisheries Service (NMFS), the Assistant Administrator for NMFS, the Secretary of Commerce, the Secretary of the Treasury, and the Secretary of Homeland Security, respectfully file this opposition in response to the motion for preliminary injunction filed by plaintiff, Māui and Hector's Dolphin Defenders NZ Inc. (MHDD) (Apr. 3, 2026), ECF No. 13 (Motion). For the reasons below, the Motion should be denied.

## INTRODUCTION

I.  The Marine Mammal Protection Act

The Marine Mammal Protection Act (MMPA) regulates the take[1] of marine mammals, including those listed as threatened or endangered under the Endangered Species Act (ESA), incidental to a variety of human activities such as commercial fishing operations. *See, e.g.,* 16 U.S.C. §§ 1371(a)(5)(E), 1387.

The MMPA provides the Government with substantial discretion to address the effects of commercial fishing activities on marine mammals. *See generally*, 16 U.S.C. § 1387.  For example, the Government is required to establish a program to monitor incidental mortality and serious injury of marine mammals, require operators of commercial fishing vessels to report incidental mortality and injury of marine mammals, and develop "take reduction plans" (TRPs). *Id.* § 1387(d), (e), (f). The ultimate "goal" of these provisions is to reduce incidental mortality or serious injury of marine mammals "to insignificant levels approaching a zero mortality and serious injury rate," *id.* § 1371(a)(2), but in so doing, the Government is required to consider the economics of the fishery, the availability of existing technology, existing state or regional fishery management plans, and availability of funding, *id.* at § 1387(f)(2), (3).

---

[1] "Take" means to "harass, hunt, capture, kill, or attempt to harass, hunt, capture, or kill any marine mammal."  *See* 16 U.S.C. § 1362(13); 50 CFR § 216.3.

The MMPA has an ambitious goal and, given the scientific and practical challenges involved in this sophisticated effort, progress can be incremental. For example, NMFS developed a TRP in the 1990s for several large whales species in the Atlantic Ocean, and despite a three-decade effort, the regulated fisheries continue to take marine mammals in excess of the TRP's goals. In response, NMFS has implemented a variety of additional measures and continues to evaluate the adequacy of the TRP. *See* https://perma.cc/638E-PMJR.

In passing the MMPA, Congress recognized that "unilateral action by the United States affecting any species or subspecies of marine mammal could be fruitless unless other nations involved" also act, so it included provisions authorizing the Executive Branch to "work with" other countries "to preserve and protect these creatures." S. Rep. No. 92-863 at 10 (1972). For example, the MMPA authorizes negotiations for international agreements to further the protection of marine mammals, *see* 16 U.S.C. § 1378, and NMFS has duly taken on that foreign policy role by providing technical assistance, promoting research cooperation, and transferring technology to further the MMPA's goal of protecting marine mammals worldwide, *see* 50 C.F.R. § 216.24(h)(11).

While the MMPA does not and cannot endow the Executive Branch with global policing powers regarding marine mammals, it harnesses the economic power of the American seafood market to prompt exporting countries to adopt measures to address marine mammal bycatch in their fisheries. To that end, the MMPA restricts the import of commercial fish or fish products where harvesting results in the incidental killing or serious injury of marine mammals "in excess of United States standards." *See* 16 U.S.C. § 1371(a)(2).

Relevant to this litigation, a country seeking to export fish or fish products to the United States must submit an application for a finding that its regulatory program to protect marine

mammals is "comparable in effectiveness" to the American regulatory program. 50 C.F.R. § 216.24(h)(6)(iii)(B). To receive such a finding, the exporting country should regulate the incidental taking of marine mammals in a manner that "effectively achieves comparable results" as one that includes, among other things, a monitoring program, reporting requirement, and measures to reduce marine mammal bycatch in commercial fisheries. *Id.* § 216.24(h)(6)(iii)(C). NMFS may make a comparability finding if the harvesting nation submits "reasonable proof" that its program is meeting U.S. standards for marine mammal bycatch. *See* 16 U.S.C. § 1371(a)(2)(A); *Fish and Fish Product Import Provisions of the Marine Mammal Protection Act*, 81 Fed. Reg. 54,390, 54,406 (Dep't of Commerce Aug. 15, 2016). If a harvesting nation's fishery has been determined to utilize fishing technology that results the incidental mortality or incidental serious injury of marine mammals in excess of U.S. standards, then its fish and fish products may not be imported. 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h)(1)(ii).

II.     Factual and Procedural Background[2]

This case arises out of several years of repetitive and overlapping actions brought by MHDD regarding the Government of New Zealand's (GNZ) 2021 application for a comparability finding. *See Māui and Hector's Dolphin's Defenders NZ, Inc. v. Nat'l Marine Fisheries Serv.*, No. 24-cv-00218 (Ct. Int'l Trade) (*MHDD I* Proceedings) and *Māui and Hector's Dolphin's Defenders NZ, Inc. v. Nat'l Marine Fisheries Serv.*, No. 26-cv-00060 (Ct. Int'l Trade) (*MHDD II* Proceedings). Ultimately, on March 11, 2026, NMFS issued the comparability findings challenged here, concerning 15 set-net and trawl fisheries.

*Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection*

---

[2] As the Court is familiar with the factual and procedural background of this matter, the Government provides only a brief summary here. Additional information, as well as defined terms not defined herein, are incorporated by reference from the Government's motion to dismiss filed on April 9, 2026, ECF No. 16.

*Act—Notification of Comparability Findings*, 91 Fed. Reg. 11,962 (Dep't of Commerce

Mar. 11, 2026) (2026 Comparability Findings). NMFS explained its determinations in a decision

memorandum dated March 2, 2026. *See* ECF No. 16-1 (Decision Memorandum). The Court

subsequently dismissed as moot *MHDD I*, *see* Opinion and Order, *MHDD I* Proceedings (Apr. 6,

2026), ECF No. 90, and *MHDD II* was dismissed by stipulation, *see MHDD II* Proceedings

(Mar. 18, 2026), ECF No. 55.

On March 24, 2026, MHDD filed suit to challenge the 2026 Comparability Findings,

ECF No. 4, and on April 3, 2026, it moved for an order to immediately ban the importation of

fish from 15 of New Zealand's fisheries, *see* Motion. On April 9, 2026, the Government moved

to dismiss for lack of jurisdiction on the ground that MHDD has not shown that a ban would

likely redress its claimed injuries. ECF No. 16. The Government files this response opposing

the Motion.

III.    Standard of Review

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter

v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). To prevail on a motion for a preliminary

injunction, the movant must demonstrate four things: (1) that there is a likelihood of success on

the merits; (2) that it will be immediately and irreparably injured absent an injunction; (3) that

the public interest would be better served by the relief requested; and (4) that the balance of

hardship on all the parties favors the movant. *Zenith Radio Corp. v. United States*, 710 F.2d 806,

809 (Fed. Cir. 1983). "Central to the movant's burden are the likelihood of success and

irreparable harm factors." *Sofamor Danek Grp. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1219 (Fed.

Cir. 1996) (citation omitted).

Preliminary injunctive relief should be granted only upon a clear showing by the moving

party that it is entitled to the relief requested. *Am. Inst. for Imported Steel, Inc. v. United States*,

4

600 F. Supp. 204, 208 (Ct. Int'l Trade 1984). At all times, the Court must be cautious to avoid "undue judicial interference with the lawful discretion given to agencies." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1384 (Fed. Cir. 2009).

This Court reviews actions brought pursuant to 28 U.S.C. § 1581(i) as provided in the Administrative Procedure Act (APA), *id.* § 2640(e); 5 U.S.C. § 706. This Court may "hold unlawful and set aside agency action, findings, and conclusions" that are, among other things, "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.* § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Rather, an action is only arbitrary and capricious if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before it, or is so implausible that it cannot be attributed to a difference in view. *Id.* In short, the Court is limited to assessing whether an agency's action was "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021).

When it comes to complex scientific assessments, an agency entrusted by Congress with that "special expertise" is entitled to particularly heightened deference. *See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts" even if a court might "find contrary views more persuasive." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Even if an agency's decision is of "less than ideal clarity," the court must still uphold it if "the agency's path may be reasonably discerned." *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004).

5

## SUMMARY OF THE ARGUMENT

The Court should deny the Motion.

Assuming that this Court could exercise jurisdiction, MHDD has not established that it is entitled to the extraordinary relief it seeks. The injunction requested by MHDD is not available because NMFS has not determined that the fish harvested in the challenged fisheries "have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards," the statutory prerequisite for an import embargo. 16 U.S.C. § 1371(a)(2). The Court cannot direct NMFS to reach a pre-determined decision or prohibit imports without an *agency* determination that U.S. standards are exceeded. *E.g.*, *NEXTEEL Co. v. United States*, 28 F.4th 1226, 1238 (Fed. Cir. 2022). MHDD also cannot demonstrate that the alleged injuries to its members' aesthetic and other interests would be any worse if preliminary relief were denied. And the potential harm to the public—including tens, if not hundreds, of millions of dollars in affected trade and significant administrative costs borne by the taxpayers—weighs in favor of denying extraordinary relief.

In reaching its decision, NMFS considered each of the relevant factors required under the MMPA Import Rule and exercised reasonable judgment in concluding that each of the challenged fisheries should be issued comparability findings. MHDD's arguments on the likelihood of success misunderstand and misconstrue U.S. regulation of domestic fisheries in fundamental ways and rely on application of the import provision that is inconsistent with the MMPA Import Rule.

MHDD tellingly reveals its fundamental confusion by suggesting that the challenged fisheries cannot be considered comparable unless New Zealand can demonstrate that it imposes the same mathematical formulae for determining bycatch levels or that it requires the same (or even more stringent) management measures for its fisheries than the U.S. would require of its

6

domestic commercial fisheries. This rigid reading is not compelled or supported by the slim statutory text, "in excess of United States standards." Further, it conflicts with the MMPA Import Rule, which expressly acknowledges that programs "completely different" from the U.S. program could be comparable and also requires harvesting nations to account for "scientific uncertainty." MMPA Import Rule, 81 Fed. Reg. at 54,401.

Contrary to MHDD's assertions, NMFS's ultimate task is not to demand that harvesting nations maintain an identical program to the U.S. regulatory program. Rather, it is to determine whether a harvesting nation's efforts are comparable in effectiveness to the U.S. regulatory program, taking into account the harvesting nations' laws, regulations, policies and programs, consistency with international law, and the practical challenges that harvesting nations face in addressing marine mammal bycatch. *Id.*; *see also* Decision Memorandum at 10-12. NMFS reasonably determined that the GNZ manages the challenged fisheries and their impacts to marine mammals in ways that are comparable in effectiveness to the U.S. regulatory program, and MHDD can point to no clear error in that determination. MHDD may prefer that NMFS had interpreted the import provisions differently and reached a different conclusion, but its preferred interpretation and desired outcome cannot supersede a validly issued and binding regulation and a robust and well-reasoned decision, let alone entitle it to the extraordinary relief it seeks.

## ARGUMENT

At the outset, MHDD seeks a form of relief to which it is not entitled. Its motion is best construed as a petition for a writ of mandamus. A party may seek a preliminary injunction "to preserve the status quo pending a determination of the action on the merits." *Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir. 1984). "The status quo to be preserved is that state of affairs existing immediately before the filing of the litigation." *Id.* MHDD does not seek to *preserve* the prelitigation status quo, but to radically change it by imposing an indefinite ban

7

on imports that, according to MHDD, could exceed $100 million. *See* ECF No. 13-24 ¶ 57. The order MHDD seeks would compel the Government not to withdraw an action but would force the Government to take the dramatic *new* step of imposing an import ban—to the detriment of countless third parties not before the Court—despite the absence of any agency determination that the statutory prerequisite for an import ban has been met.

Since MHDD seeks an order that would "compel performance of a particular act by a . . . governmental officer of body," it seeks a writ of mandamus. *See* "Mandamus," Black's Law Dictionary (12th ed. 2024). A writ of mandamus is an extraordinary remedy and is generally limited to instances in which there has been a clear abuse of power and a litigant has demonstrated it has "no other means of obtaining the relief desires" and its right to the writ is "clear and indisputable." *In re Volkswagen of Am., Inc.*, 566 F.3d 1349, 1351 (Fed. Cir. 2009).

MHDD does not even attempt to meet the demanding standard for issuance of a writ, so its motion could be denied on that ground alone. Further, granting mandamus in the form of an injunction is not an appropriate consideration at this preliminary stage of the litigation because it would effectively provide complete relief on the merits of MHDD's claims. *See, e.g.*, *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Litton Sys.*, 750 F.2d at 951.

Whether viewed as a petition for a writ of mandamus or as a request for preliminary injunction, MHDD cannot establish its clear entitlement to the requested extraordinary relief and the Motion should be denied.

I.    MHDD Is Not Likely to Succeed On The Merits

    A.  Absent Jurisdiction, There Can Be No Likelihood of Success

For the reasons provided in the Government's motion to dismiss dated April 9, 2026, ECF No. 16, which are incorporated by reference, this Court lacks jurisdiction over MHDD's claims. Accordingly, MHDD cannot obtain injunctive relief. *U.S. Ass'n of Imps. of Textiles &*

*Apparel v. U.S. Dep't of Com.*, 413 F.3d 1344, 1349-50 (Fed. Cir. 2005) ("[T]he government's arguments as to jurisdiction demonstrate that the Association is not likely to succeed in this litigation.").

> B. Even If The Court Concludes It Has Jurisdiction, The Relief Sought By MHDD Is Not Available

Additionally, and in the alternative, MHDD cannot demonstrate likelihood of success on the merits because the relief it seeks—an import prohibition on fish and fish products harvested in 15 New Zealand fisheries—is not a remedy available in a challenge to a final agency action.

In its *MHDD I* remand order, the Court correctly explained that MHDD's challenge to the 2024 Comparability Findings "concern[ed] the sufficiency of an agency's action, rather than whether the agency unlawfully withheld or unreasonably delayed action in the first instance" and was thus governed by 5 U.S.C. § 706(2), so the Court could not conclude that it was simultaneously an agency action "unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1). *Māui & Hector's Dolphins Defs. NZ, Inc. v. Nat'l Marine Fisheries Servs.*, 799 F. Supp. 3d 1327, 1348-49 (Ct. Int'l Trade 2025) (*MHDD I*).

In dicta, the Court suggested that circumstances "may merit the implementation of an import ban going forward, if the agency continues to rely on an arbitrary and unlawful Decision Memorandum that could be regarded as equivalent to denying a comparability finding." *MHDD I*, 799 F. Supp. 3d at 1349. The Court's suggestion that reliance on a determination alleged to be arbitrary or capricious can amount to a denial of a comparability finding is not supported because the vacatur of a comparability finding is not tantamount to an agency finding that incidental taking in the challenged fisheries exceeds U.S. standards—the statutory prerequisite for an embargo.

9

Even were this statement supported, the Court currently lacks the information to determine whether the 2026 Comparability Findings were arbitrary or capricious because it does not have the administrative record before it at this early stage of litigation. *Cf.* 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973).[3]

To impose a judicial embargo would usurp the express statutory role of the agency to determine whether United States standards have been exceeded and replace the agency's deliberative determination with an *ultra vires* analysis by the Court. "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). This Court's role is limited to *review* of that determination, and it "is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Id.*; *accord Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381 (Fed. Cir. 2003) (holding that this Court exceeded its authority because "[u]nder the statute, only the [agency] may find the facts and determine causation and ultimately material injury").

Enjoining the importation of such products notwithstanding the agency's determination *directly to the contrary* would be equivalent to ordering NMFS to reach a predetermined result, an action not within this Court's authority to take. *See, e.g.*, *NEXTEEL*, 28 F.4th at 1238 (this

---

[3] Although the Government respectfully disagrees with the reasoning of *Sea Shepherd*, we note that the Court had the benefit of a complete administrative record at the time it ruled on the preliminary injunction. *See Sea Shepherd New Zealand v. United States*, 606 F. Supp. 3d 1286, 1296 n.13 (Ct. Int'l Trade 2022).

Court "exceeded its authority by directing Commerce to reach a particular outcome"). MHDD asks the Court to exceed its authority by replacing NMFS's view with that of the Court. Doing so, particularly without having even received a record, would be error.

C. The 2026 Comparability Findings Were Not Arbitrary and Capricious

After examining New Zealand's overarching fisheries management program, including its laws, regulations, and policies, and by weighing complex scientific evidence within the ambit of its special expertise, NMFS concluded that GNZ's regulatory program is comparable in effectiveness to U.S. marine mammal bycatch protections and thus none of the challenged fisheries employ commercial fishing technology that results in the incidental killing or serious injury of Māui or Hector's dolphins in excess of United States standards. MHDD provides no evidence that bycatch of either species in any of the challenged fisheries has ever exceeded applicable bycatch limits during the relevant period or that the GNZ responds to incidental marine mammal bycatch in a manner that is not comparable to conditions imposed on U.S. commercial fisheries.

To succeed on the merits of its claims that the 2026 Comparability Findings are arbitrary and capricious, MHDD must make a clear showing that NMFS failed to consider relevant factors or exercised a clear error of judgment. *E.g.*, *State Farm*, 463 U.S. at 43. Even if MHDD marshals purported "specialists" who express "conflicting views"—and even if the Court finds those views "persuasive"—the Court must defer to the agency's own qualified experts when it resolves questions delegated to it under the operative statute, particularly on matters within its scientific and technical expertise. *Marsh*, 490 U.S. at 378. MHDD has not demonstrated that the 2026 Comparability Findings failed to consider each of the relevant factors under the MMPA Import Rule or that it was a clear error of judgment, so MHDD cannot show a likelihood of success on the merits.

11

To obtain a comparability finding, a harvesting nation must "demonstrate that it has adopted and implemented, with respect to an export fishery, a regulatory program governing the incidental mortality and serious injury of marine mammals in the course of commercial fishing operations in its export fishery that is comparable in effectiveness to the U.S. regulatory program." MMPA Import Rule, 81 Fed. Reg. at 54,391. As applicable here, NMFS must consider whether: (1) the harvesting nation prohibits the intentional mortality or serious injury of marine mammals; (2) whether the foreign regulatory program includes assessments of population abundance for marine mammals, a register of fishing vessels, an obligation to report intentional or incidental mortality and serious injury of marine mammals, and calculation of a bycatch limit, along with measures to reduce total mortality and injury of marine mammal stock below such limits, or whether the foreign regulatory program achieves comparable results; and (3) whether the harvesting nation has monitoring procedures designed to estimate incidental mortality and serious injury of marine mammals during commercial fishing activities. 50 C.F.R. § 216.24(h)(6)(iii).

In addition to these threshold considerations, NMFS must consider additional conditions, including, among other things, how the United States implements its regulatory regime with respect to similar marine mammal stocks and similar fisheries, the extent that measures implemented by the harvesting nation have been successful in reducing incidental marine mammal mortality and serious injury in the fishery below the bycatch limit, whether other measures adopted by the harvesting nation are likely to reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit, and factors like the population size and trend of affected marine mammal stocks. *Id.* § 216.24(h)(7).

12

1.  Overview of U.S. Fisheries Regulations

NMFS classifies U.S. domestic commercial fisheries into three categories according to

their levels of incidental marine mammal mortality and serious injury: Category I (frequent);

Category II (occasional); and Category III (remote likelihood)). Decision Memorandum at 4 &

n.19. The latest classification of U.S. domestic fisheries was published in 2024. *See List of*

*Fisheries for 2024*, 89 Fed. Reg. 12,257 (Dep't of Commerce Feb. 16, 2024); Dep't of

Commerce, Nat'l Oceanic & Atmospheric Admin., *List of Fisheries Summary Table*, *available at*

perma.cc/5FKV-KGHZ. The classification determination is made in reference to annual

mortality and serious injury of a marine mammal stock in a particular fishery, relative to that

stock's potential biological removal (PBR) level, which represents the maximum number of

animals that may be removed while allowing the stock to reach or maintain its optimum

sustainable population. Decision Memorandum at 4 n.19.

To calculate the stock's PBR, scientists multiply the minimum estimate of its population

by its "recovery factor" and one half of the estimated rate of reproduction. *Id.* at 3 n.13. For

endangered species, the recovery factor is typically designated as "0.1," but determining each of

these variables requires applying technical scientific judgment based on the quality of data

available on each species. As NMFS explained, it has "modeled a range of scenarios representing

different scientific uncertainties to solve for" these variables. *Id.* at 49 (citing NMFS, Guidelines

for Preparing Stock Assessment Reports Pursuant to the Marine Mammal Protection Act (Feb. 7,

2023) (SAR Guidelines), *available at* https://perma.cc/7KY6-XT3U). For each fishery in which

the annual mortality and serious injury of any marine mammal stock is equal to or exceeding

50 percent of PBR, it is classified as Category I. Decision Memorandum at 4 n.19. For each

fishery in which the annual mortality and serious injury of any marine mammal stock is greater

than one percent but less than 50 percent of PBR, it is classified as Category II. *Id.* Finally, for

13

each fishery in which the annual mortality and serious injury of any marine mammal stock is less than or equal to one percent of PBR, regardless of the cumulative mortality and serious injury caused by all fisheries of that stock, it is classified as Category III. *Id.*

Pursuant to 16 U.S.C. § 1387(f), NMFS is required to develop and implement a TRP for each marine mammal stock that interacts with a Category I or Category II fishery and for which "the level of direct human-caused mortality exceeds the potential biological removal level" or for which the species is considered, or likely to be considered, threatened with extinction under other authorities. Decision Memorandum at 5 & n.23. These marine mammal stocks are known as a "strategic stock." *Id.*

TRPs include a variety of regulatory and non-regulatory measures designed to reduce the incidental mortality and serious injury of certain marine mammal stocks incidental to the fishery or fisheries subject to the TRP. *Id.* at 6. In addition, TRPs may also include specific levels of monitoring for a fishery to account for any incidental mortality and serious injury of marine mammals during the course of commercial fishing. *Id.* Examples include at-sea monitoring through observers, electronic monitoring using onboard video cameras, and self-reporting of any incidental mortality and serious injury of marine mammals. *Id.* Today, among the hundreds of fisheries operating in the United States, there are currently six TRPs that cover just 22 Category II fisheries and five Category I fisheries. *Id.* at 9; *List of Fisheries*, 89 Fed. Reg. at 12,281. The progress that has been made under the MMPA for domestic fisheries management has not happened overnight. Decision Memorandum at 9. The regulation of U.S. commercial fisheries varies considerably and is based on the specifics of the fishery, status of the affected marine mammal stocks or species, availability of funding, data availability, the impact of the regulations on the economics of the fishery, and other factors prescribed by the MMPA. *Id.*

14

As NMFS explained, it undertook a highly interactive process with harvesting nations to determine whether, in comparison to these domestic regulations, foreign fisheries had incidental mortality and serious injury of marine mammals in excess of United States standards. *Id.* at 12-13. Ultimately, the agency's approach "takes into account the practical realities of issuing comparability findings to various foreign sovereign nations, each of which has its own regulatory scheme governing marine mammal interactions with its commercial fisheries." *Id.* at 13. "[C]omparability in effectiveness does not require NMFS to find that the harvesting nations' laws, regulations, individual bycatch reduction, reporting, and monitoring measures, scientific programs, etc. are exactly the same as those employed in the United States or produce the exact same results." *Id.*

2. New Zealand Prohibits the Intentional Mortality and Serious Injury of Marine Mammals in the Course of Commercial Fishing Operations

NMFS reasonably concluded that New Zealand prohibits the intentional mortality and serious injury of marine mammals in the course of commercial fishing operations, as required under 50 C.F.R. § 216.24(h)(6)(iii)(A)(1). Decision Memorandum at 18. As NMFS explained, Section 4(1) of the New Zealand's Marine Mammals Protection Act 1978 (NZ MMPA),[4] prohibits any person from "tak[ing] any marine mammal, whether alive or dead, in or from its natural habitat or in or from any other place - without first obtaining a permit to do so from the Minister," which is comparable to the general prohibition on the take of marine mammals under § 1371 of the MMPA. *Id.* at 18 & n.97. *See also* NZ MMPA § 2 (defining take to include "(a) to take, catch, kill, injure, attract, poison, tranquillise, herd, harass, disturb, or possess: (b) to brand, tag, mark, or do any similar thing: (c) to flense, render down, or separate any part from a carcass: (d) to attempt to do any act specified in paragraph (a) or paragraph (b) or paragraph (c)");

---

[4] A copy of the NZ MMPA is available at https://perma.cc/V6KZ-9629.

15

Supplemental Information Supplied in Support of New Zealand Comparability Application § 2.2

(Oct. Supplement, attached as Exhibit A[5]) (explaining that "[t]he NZ MMPA prohibits the taking

of marine mammals without a permit").

MHDD does not contest that this factor is met. Rather, MHDD presses an irrelevant and

extra-regulatory argument that New Zealand fisheries fail to meet the so-called negligible impact

standard. The negligible impact standard appears nowhere in the MMPA Imports Rule and is not

one of the factors required to be considered before issuing a comparability finding. In fact,

NMFS explicitly rejected the suggestion to reference negligible impact in the final rule. MMPA

Import Rule, 81 Fed. Reg. at 54,398 (explaining that the negligible impact standard in

§ 1371(a)(5)(E) is addressed through the requirement to "comply with monitoring and take

reduction plans"). As demonstrated further below, New Zealand has comprehensive monitoring

and take reduction programs.

Besides, MHDD mischaracterizes, Motion at 17-20, the purpose of the negligible impact

standard. The MMPA instructs the Secretary of Commerce to "*allow* the incidental, but not

intentional, taking by persons" with a valid fishing permit of "marine mammals from a species or

stock designated as depleted because of its listing as an endangered species or threatened species

under the Endangered Species Act of 1973," but only after a determination that, among other

---

[5] Certain information was supplied to NMFS by the GNZ in confidence. The applicable Executive Order regarding classified national security information defines "foreign government information" to include "information provided to the United States Government by a foreign government . . . with the expectation that the information, the source of the information, or both, are to be held in confidence." Exec. Order No. 13,526 § 6.1(s)(1) (Dec. 29, 2009). The unauthorized disclosure of foreign government information "is presumed to cause damage to the national security." *Id.* § 1.1(d). As the Government does not have authorization to disclose the information deemed confidential by the GNZ, the Government is attaching redacted copies of the Oct. Supplement and certain other documents containing information requested to be held in confidence by the GNZ.  In the current filing, the Government does not rely on any information provided to it in confidence by the GNZ.

16

things, "the incidental mortality and serious injury from commercial fisheries will have a negligible impact on such species or stock." 16 U.S.C. § 1371(a)(5)(E)(i) (emphasis added). In other words, it is an *affirmative license* to incidentally take marine mammals in connection with commercial fishing activities. Decision Memorandum at 64.

MHDD materially misinterprets foreign law by insisting that New Zealand "[f]ishers are allowed to incidentally catch and kill marine mammals" and that "New Zealand authorizes *all* incidental take of marine mammals." Motion at 18-19. These statements are simply wrong.

The GNZ explained that "section 4(1) of the NZ MMPA prohibits any take of a marine mammal unless with a permit. This prohibition includes the entanglement, injury or mortality of marine mammals in commercial fishing operations." Oct. Supplement § 2.3. Unlike in the United States, where incidental take by commercial fishers may be authorized under certain circumstances, GNZ "authorities have never issued a permit that authorized the incidental take of a marine mammal during commercial fishing operations since the law prohibits it." *Id.*; *see also* Supplemental Information New Zealand Comparability Application at 29 (Feb. 2026) (Feb. Supplement, attached as Exhibit B) ("New Zealand's statutory framework does not authorise or permit commercial fishers to incidentally take any marine mammals (irrespective of their threatened or endangered status). Rather, the taking of marine mammals without a permit is prohibited and to do so is an offence."); NZ MMPA §§ 5, 7 (application and conditions for permit do not include any reference to commercial fishing activities).

Accordingly, NMFS was unquestionably correct in concluding that the "negligible impact standard is not applicable to [its] comparability findings for New Zealand commercial fisheries." Decision Memorandum at 64. Whether an individual fisher might successfully present an affirmative defense to a criminal prosecution by demonstrating that the taking of a marine

17

mammal was incidental to commercial fishing activities and properly reported, *e.g. id.* at 18, is an enforcement issue not relevant to whether incidental mortality or serious injury is authorized in the first instance—and it indisputably is not authorized.

3. New Zealand Has Processes to Estimate Marine Mammal Abundance and Calculate a Bycatch Limit

NMFS reasonably concluded that New Zealand has processes for determining marine mammal population abundance and to calculate bycatch limits for marine mammal stocks that are incidentally killed or seriously injured in its commercial fisheries, as required under 50 C.F.R. § 216.24(h)(6)(iii)(C)(1) and (5). Decision Memorandum at 19-24, 58.

The information provided to NMFS demonstrates that New Zealand uses various techniques, similar to the U.S., to collect data to inform its estimates of marine mammal stock abundance. *Id.* at 19. These include, among other things, "government-led programs, academic research, observer-based data collection, use of acoustic devices, land-based sightings, [and] drones," as well as various spatial distribution and habitat models, "aerial surveys, genetic census, [and] satellite tagging." *Id.* at 19-20. *See also* Oct. Supplement § 10.1; Feb. Supplement § 2.1.1. Collectively, these "methodologies . . . are comparable to how the United States estimates marine mammal stock/species abundance and determines the stock's or species' distribution" and that "these data represent the best scientific information available regarding marine mammal abundance, distribution, and the effects of fishing on the environment, marine biodiversity and aquatic environments." Decision Memorandum at 19. In implementing the MMPA import provision, NMFS explained that the "reasonable proof" requirement under the statute would be satisfied when harvesting nations supplied the "best scientific information available." MMPA Import Rule, 81 Fed. Reg. at 54,406. Importantly, this does not mean that a harvesting nation must provide evidence that it uses a method representing scientific consensus,

18

but simply that NMFS must be satisfied that the evidence is of "sufficient detail, quality and reliability for NMFS to fully evaluate the regulatory program for a given export fishery." *Id.* This standard was easily met here. *See, e.g.*, Decision Memorandum at 23 ("[T]he processes used by the GNZ and other researchers are a reliable and credible method of data collection and population estimation.").

For its domestic regulatory efforts, the GNZ uses its abundance estimates to calculate a Population Sustainability Threshold (PST), which represents "the maximum number of marine mammal deaths per year that can occur while still allowing the population outcome to be achieved and is used to assess whether human-caused mortality (especially from fisheries bycatch) is sustainable for the long-term viability of protected species populations." Decision Memorandum at 50. Like the NMFS's PBR calculation, PST uses a maximum growth rate variable and a risk factor variable. *Id.* at 51. The GNZ's variable for population estimate "uses a statistical method called Bayesian analysis" rather than the method used in PBR. *Id.* at 50. The GNZ references PST to determine the effectiveness of the management of its fisheries to meet its long-term sustainability goal of increasing the population of Māui dolphins to 95 percent of the total population that can be supported by the environment and Hector's dolphins to 90 percent of the total population that can be supported, as well as whether additional action should be taken. Decision Memorandum at 50, 62; *see also id.* at 56 (explaining that "Fisheries New Zealand would assess the impact of those mortalities against the bycatch limit (e.g., PBR or PST) for the species and advise the Minister of Fisheries on what action should be taken" following specific trigger events); Oct. Supplement § 11.2.1. In its comparability application, the GNZ ultimately adopted PBR to estimate marine mammal bycatch limits for its fisheries and to demonstrate that those limits were not being exceeded. Decision Memorandum at 51-52.

19

MHDD's arguments that these conditions are not satisfied for Māui and Hector's dolphins are unpersuasive and do not account for the latitude provided under the regulations codified in the MMPA Import Rule.

a.  New Zealand Provided Reasonable Proof of Abundance Estimates

To meet the statutory standard of "reasonable proof," harvesting nations must provide the "best scientific information available," meaning evidence of "sufficient detail, quality and reliability for NMFS to fully evaluate the regulatory program for a given export fishery." MMPA Import Rule, 81 Fed. Reg. at 54,406. Contrary to MHDD's arguments, Motion at 20-25, NMFS, in an exercise of its specialized scientific judgment, found that GNZ had provided reasonable proof of its estimates.

MHDD first maintains that the bycatch estimates provided by the GNZ using its Spatially Explicit Fisheries Risk Assessment (SEFRA) model were unreliable. Motion at 20-22. The SEFRA model "estimates the likelihood of protected species encountering fishing events based on their spatio-temporal overlap," to approximate the annual incidental catpures for marine mammals in its fisheries. Decision Memorandum at 49-50. The GNZ employed species-specific modeling for Māui and Hector's dolphins and the modeling used to estimate other marine mammal species varied based on the amount and quality of evidence. *Id.* at 50.

MHDD insists, without support, that NMFS should have required New Zealand to provide the "data, methods or assumptions" on which the SEFRA estimates were based. Motion at 21. NMFS is not required to undertake an academic peer review of a harvesting nation's modeling—a task that would be virtually impossible for some 2,500 fisheries across the globe. Besides, as NMFS explained, the GNZ provided sufficient information in support of its SEFRA model. *E.g.*, Decision Memorandum at 19 & n.100.

20

That the SEFRA model is producing evidence of "sufficient detail, quality and reliability" for Māui and Hector's dolphins is evident because it produced estimates largely in line with observed data. For example, MHDD faults the SEFRA annual estimate of 8.8 Hector's dolphins because it relied on data from the 2020-21 fishing season, before electronic monitoring had been implemented. Motion at 21. But since the rollout of cameras in 2023, the observed data of bycatch continues to fall within the SEFRA estimates—below the mean, and well below the bycatch limit. *E.g.*, Feb. Supplement § 3.2.2 (table demonstrating SEFRA mean annual estimate of approximately 24 animals incidentally killed in the South Island fisheries and observed captures in 2022-23, 2023-24, 2024-25 fishing seasons of 6, 15, and 8, respectively); Decision Memorandum at 54 ("The bycatch limit of 66.5 Hector's dolphins has not been exceeded by any South Island set net or trawl fishery.").

MHDD next speculates, Motion at 22, that the SEFRA model employed by the GNZ was the same model published in the 2019 Roberts report. MHDD's conjecture is misplaced. The GNZ explained that it estimated the annual mortality and serious injury of Hector's dolphins based on a 2022 SEFRA multi-species model with specific manual modifications to meet the nature of NMFS's requests, including species-specific inputs, and to account for the effects of restrictions imposed after the fishing data on which the model relied was collected. Feb. Supplement § 2.3.1; Decision Memorandum at 54. This is the same model MHDD argues the GNZ should have employed. *Compare id.* ¶ 56 *with* Motion at 23-24. For the Māui dolphin, New Zealand estimated annual bycatch using a species-specific model encompassing the entire area in which the fisheries challenged in the *MHDD I* Proceedings operate, which "cover a much broader area than where Māui dolphins are found." Oct. Supplement § 10.4; 2026 Decision Memorandum at 52.

21

MHDD provides no basis to conclude that the SEFRA model—using the same methodology it promotes—was not of "sufficient detail, quality and reliability for NMFS to fully evaluate the regulatory program for a given export fishery," MMPA Import Rule, 81 Fed. Reg. at 54,406, much less that NMFS exercised a "clear error of judgment" by relying on them, *State Farm*, 463 U.S. at 43.

MHDD argues, Motion at 34-36, that NMFS relied on outdated or incorrect population estimates to calculate PBR of Māui dolphins. MHDD is incorrect. NMFS relied on the GNZ's 2021 estimate of 54 Māui dolphins to inform the bycatch limits, Decision Memorandum at 22, but MHDD prefers an estimate of 48, which was produced in 2021 by the International Whaling Commission's Scientific Committee (IWC SC), Motion at 24-25. This is a clear example of a situation in which a Court should defer to the reasoned judgment of an agency exercising its specialized expertise in its scientific field.

MHDD falsely accuses NMFS, Motion at 34, of not explaining why it chose to rely on the GNZ's estimate rather than the estimate produced by the IWC SC. NMFS, in fact, provided a detailed explanation demonstrating that it considered the lower estimate produced by the IWC SC. Decision Memorandum at 24-25. NMFS explained that the IWC SC itself characterized its estimate as not suitable for implementation of management procedures, *id.* at 25, and that the same organization's review of the SEFRA model endorsed its use, *id.* at 53.

MHDD also misrepresents NMFS's population estimate in the five-year report. Motion at 36 ("NMFS's 5-Year Review concludes that the Māui dolphin population was 'an estimated 48 in 2021.'"). In the review, NMFS states "Māui's dolphin has declined from several hundred individuals in the 1980s (Constantine 2023) to an estimated 48 in 2021." ECF No. 13-1 at 13. This is the only reference to that estimate. But NMFS repeatedly characterizes the estimate of 54

provided by the GNZ and used in the 2026 Comparability Findings as the "most recent" estimate available. *Id.* at 16, 17, 108. Nowhere does NMFS state that the IWC SC's estimate of 48 dolphins "*is* the best available estimate," as MHDD incorrectly purports. Motion at 35. MHDD simply disagrees with the agency's judgment, but that is not a basis for rejecting an action under an arbitrary and capricious standard of review.

Besides, MHDD does not explain how the use of a population estimate of 48 would affect NMFS's analysis. MHDD states that "[i]f the PBR bycatch limit is any lower than 0.10, NMFS could not have lawfully concluded that Māui dolphin bycatch does not exceed PBR." Motion at 36. But the estimated bycatch rate based on the SEFRA model is 0.056, Decision Memorandum at 52, and "[t]here has been no reported or observed bycatch of a Hector's or Māui dolphin off the West Coast North Island since 2012," *id.* at 58. At most, even were MHDD correct—and it is not—this alleged error appears harmless as MHDD does not suggest that the observed bycatch rate of *zero* exceeds whatever value less than 0.1 it believes should have constituted the bycatch limit. Such a harmless error could not conceivably entitle MHDD to the extraordinary relief it seeks.

### b.  A Zero Rate Mortality Goal Is Not a Required Consideration

MHDD erroneously argues, Motion at 14-17, that NMFS did not correctly evaluate whether the GNZ's fisheries management program is comparable in effectiveness to the MMPA's aim to reduce the incidental mortality and serious injury of marine mammals to insignificant levels approaching a zero mortality and serious injury rate goal (ZMRG).

ZMRG does not appear in the MMPA Imports Rule and is not one of the factors required to be considered before issuing a comparability finding. When promulgating the final rule, NMFS explicitly *rejected* the recommendation to "adopt a bycatch standard that fully mirrors" ZMRG. MMPA Import Rule, 81 Fed. Reg. at 54,398. NMFS explained that it "is not ignoring

the ZMRG standard," but that it "will consider the application of the ZMRG, *or metrics/measures comparable in effectiveness to ZMRG*, to foreign fisheries providing the same flexibility to foreign fisheries as it has applied to analogous U.S. fisheries that have not met ZMRG." *Id.* (emphasis added). Accordingly, MHDD's argument that NMFS was required to insist on proof that the challenged fisheries maintained bycatch levels meeting the specific percentage used to define the ZMRG target is unfounded.

Even if ZMRG were a required consideration—and it is not—this is another circumstance where MHDD attempts to require, without legal support, that another sovereign nation institute exactly the same marine mammal program as the U.S. However, NMFS reasonably concluded that the laws, regulations, and policies governing the challenged fisheries are comparable. *E.g.*, Decision Memorandum at 61. NMFS explained that when Congress set the ZMRG, it was realistic that this goal might not ever be reached. *Id.* at 59 (citing Congressional report stating that "[i]t may never be possible to achieve this goal, human fallibility being what it is" and noting that NMFS must consider practical realities, like economic conditions in regulating domestic fisheries). NMFS also provided the context for the regulatory definition of ZMRG: "The rationale for 10% of a stock's PBR is that this small amount of mortality and serious injury will not significantly delay the time to recovery for most stocks and therefore still allows for the MMPA's overarching goal of recovering all stocks to their optimum sustainable population levels to be met." *Id.* at 5-6. The term "optimum sustainable population level" is defined in the MMPA as "the number of animals which will result in the maximum productivity of the population or the species," 16 U.S.C. § 1362(9), and "is thought to occur between 50 and 85 percent of carrying capacity for marine mammals," Decision Memorandum at 49.

24

New Zealand's target for the Māui and Hector's dolphins is similar and, if anything, more aggressive than ZMRG. Under the New Zealand system, the GNZ calculates PST to determine "the maximum number of marine mammal deaths per year that can occur while still allowing the population outcome to be achieved and is used to assess whether human-caused mortality (especially from fisheries bycatch) is sustainable for the long-term viability of protected species populations." *Id.* at 50. The population outcome target for Māui dolphins is 95 percent of the maximum number that the environment can support, and the target for Hector's dolphins is 90 percent. *Id.* at 50. It defies credulity that long-term goals of 90 to 95 percent somehow fail to meet the U.S. target of optimum sustainable population, which typically spans 50 to 85 percent of the population that can be supported by the environment.

MHDD continually conflates bycatch limits and the ZMRG, *e.g.*, Motion at 16, but they are not the same thing. PBR is a "biological reference point" that NMFS utilizes "as a mechanism to respond to the uncertainty associated with assessing and reducing human-caused mortality and serious injury of marine mammals, including from incidental bycatch in fisheries." Decision Memorandum at 48-49. In the U.S. context, PBR constitutes the bycatch limit. When PBR for a marine mammal stock is exceeded within a given fishery (or when certain percentages of PBR is exceeded for a strategic stock), NMFS relies on the TRP process to reduce incidental bycatch of the stock. Decision Memorandum at 5. The long-term objective of the TRP process is ZMRG. *Id.* However, "[t]o date, no U.S. commercial fishery has been closed in its entirety while regulatory measures have been modified to reduce bycatch below the PBR level pursuant to the MMPA." *Id.*

In New Zealand, the GNZ references a similar metric, PST, to set bycatch limits for its domestic fisheries. *Id.* at 50. Contrary to MHDD's unsupported accusation, Motion at 26, this

25

bycatch limit has been implemented by the GNZ. "New Zealand law requires commercial fishing regulators to reduce bycatch below the bycatch limit [*i.e.*, PST] and secondarily to keep it as low as possible as soon as practicable or within 20 years." Decision Memorandum at 52. For the challenged fisheries, the GNZ has developed a Threat Management Plan (TMP) to reduce bycatch of Māui and Hector's dolphins. *E.g.*, *id.* at 17. Like TRPs, TMPs follow an iterative process to manage risk and regulate fisheries. *Id.* Among other things, the goals of these plans are to achieve certain population outcomes by reducing human-induced deaths to be as near as practicable to zero, to reduce the risk of localized depletion, to ensure that there are no substantial barriers to dispersal or connectivity between subpopulations, and to ensure populations are stable or increasing within 20 years and to ultimately achieve a non-threatened status. *Id.* at 17, 63. As noted above, the targeted population outcome under the TMP for the Māui and Hector's dolphins is 95 and 90 percent of the maximum number of dolphins the environment can support, respectively. *Id.* at 50 & n.250. This long-term threshold target is comparable to the aim to reach a stock's optimum sustainable population level. Decision Memorandum at 60.

While MHDD has repeatedly attempted to characterize TMPs as ineffective, characterizing them as a "framework of goals and objectives" offering "only partial, insufficient protection," Motion at 8, 16, nothing could be further from the truth. A TMP is a "comprehensive, science-driven framework that assesses risks and implements mitigation measures for marine mammals most at risk from fishing" and are "implemented via a range of legislative and regulatory mechanisms, and voluntary measures." Decision Memorandum at 17. The TMP is designed as a dynamic plan to reduce fishing-related mortality to near zero and support recovery of marine mammals to non-threatened status. Oct. Supplement § 3.3.3. NMFS

26

thus reasonably concluded that the TMP process, including the measures contained therein, are comparable in effectiveness to the TRP process.  Decision Memorandum at 28, 37, 62, 65.

Many U.S. fisheries continue to operate despite not reaching ZMRG, even long after the statutory timeframes have lapsed. For example, several U.S. fisheries are subject to the Atlantic Large Whale Take Reduction Plan (ALWTRP), which was developed in the late 1990s to address the incidental take of several species, including the North Atlantic right whale. Decision Memorandum at 9. Even with this TRP in place for nearly three decades, mortality and serious injury of North Atlantic right whales from these fisheries continue to be above the PBR level and ZMRG has *never* been achieved. *Id.* NMFS has responded by repeatedly amending the TRP and implementing a variety of measures aimed to mitigate marine mammal bycatch and continues to re-assess and evaluate the ALWTRP to better protect this stock, "while meeting the needs of fishermen and conditions and circumstances related to the fishery itself." *Id.*

Contrary to MHDD's unsupported assertions, Motion at 17, New Zealand follows a similar iterative fisheries management process. For example, New Zealand has steadily ramped up its regulatory program by adopting numerous fisheries bycatch reduction measures for the challenged fisheries over the past four decades, many of which have been in direct response to new science, instances of marine mammal bycatch, and other catalysts. Decision Memorandum at 68-71. For example, in the 2023-24 fishing season, 15 Hector's dolphins were incidentally caught in commercial fisheries. Decision Memorandum at 57. Although 15 dolphins is a concern, it is far below PBR (66.5 dolphins), the bycatch limit that would apply in a comparable U.S. fishery. *Id.* at 54. Still, the GNZ promptly responded. As NMFS explained: "the GNZ initiated a series of management actions in response to the captures" that "are comparable to the types of measures that the United States could require of its domestic commercial fishing fleet." *Id.* at 57.

27

Even if the ZMRG were relevant, the GNZ maintains a regulatory program with a comparable target of a sustainable population and engages in an iterative and reactive process to reach that goal which is comparable to the TRP process.

4.  New Zealand Requires Registration of Commercial Fishing Vessels

NMFS reasonably concluded that New Zealand requires registration of the fishing vessels that participate in the challenged fisheries, as required under 50 C.F.R. § 216.24(h)(6)(iii)(C)(2). Decision Memorandum at 26. As NMFS explained, the Fisheries Act 1996 requires that all vessels used in fishing operations must be registered as a New Zealand ship and are subdivided into various categories. *Id.* MHDD does not dispute that this factor has been met.

5.  New Zealand's Regulations Require Commercial Fishers to Report All Intentional and Incidental Mortality and Serious Injury of Marine Mammals

NMFS reasonably concluded that New Zealand requires commercial fishers to report intentional and incidental mortality and serious injuries or marine mammals, as required under 50 C.F.R. § 216.24(h)(6)(iii)(C)(3)(i). Decision Memorandum at 27. As NMFS explained, the NZ MMPA requires that permitted vessel operators "report all incidental injuries and mortalities of marine mammals that have occurred as a result of fishing operations within 48 hours." *Id.* In addition, the Fisheries (Geospatial Position Reporting) Regulations 2017 requires electronic reports of target and non-target catch, including marine mammals, on the same day. Decision Memorandum at 27. MHDD does not dispute that this factor has been met.

6.  New Zealand Has Measures Designed to Reduce the Total Incidental Mortality and Serious Injury of Māui and Hector's Dolphins Below the Bycatch Limit

NMFS reasonably concluded that New Zealand has implemented measures designed to reduce the total incidental mortality and serious injury of Māui and Hector's dolphins below the applicable bycatch limit, as required under 50 C.F.R. § 216.24(h)(6)(iii)(C)(3)(ii) and (6).

Decision Memorandum at 37, 58. The primary mitigation measure employed by New Zealand to ensure that total incidental mortality and serious injury of Māui and Hector's dolphins remains below PST is fishing area closures. *Id.* at 28. Based on its scientific analysis, the GNZ prohibits commercial set net and trawl fishing across the majority of the Māui dolphin's range. *Id.* Depending on the season, set net fishing is prohibited in 83.8 to 92.6 percent of its spatial distribution and trawl fishing is prohibited in 50 to 73.3 percent of its spatial distribution. *Id.* Similar prohibitions cover substantial portions of the Hector's dolphins' distribution, ranging in the winter from 16.7 to 74.1 percent for set net and 12.3 to 26 percent for trawl. *Id.* at 29.

MHDD views these percentages as insignificant, Motion at 8, but they are comparable to the take reduction plan the U.S. put in place for the False Killer Whale. *See Taking of Marine Mammals Incidental to Commercial Fishing Operations; False Killer Whale Take Reduction Plan*, 77 Fed. Reg. 71,260, 71,265 (Dep't of Commerce Nov. 29, 2012) (Figure 1); 50 C.F.R. § 229.37(d); False Killer Whale Take Reduction Team and Plan FAQs, available at https://perma.cc/M5C5-MJ8E. And MHDD fails to acknowledge that there have only been "rare sightings or acoustic detections in harbours [and where they have occurred], they were mainly near harbour mouths within fishing prohibition zones." Oct. Supplement § 10.2.3; *see also* Decision Memorandum, at 29-30 n.153, 32. Additional measures to mitigate bycatch are used to varying degrees in the challenged fisheries and include requiring particular fishing practices, safe handling and release practices, marine mammal ID guides, avoidance of high marine mammal activity areas, good offal management, gear operational procedures, and deterrent devices. Decision Memorandum at 16-17, 33, Appendix C.

As NMFS explained, these measures are comparable to those used in the U.S. fisheries management "because both New Zealand and the United States have processes to establish

29

bycatch limits, identify and implement bycatch mitigation measures such as gear modifications or area closures to reduce bycatch, and have a review process if the bycatch limit is exceeded to reduce bycatch levels below the bycatch limit." *Id.* at 37. New Zealand has not updated its PST calculation for Māui dolphins following the most recent population estimate. Oct. Supplement § 10.3 n.47. For purposes of its comparability finding application, therefore, the GNZ adopted PBR to demonstrate that its measures were effective in ensuring mortality and serious injury of Māui and Hector's dolphins do not exceed applicable limits. Decision Memorandum at 50-51. NMFS gave all harvesting nations the choice to demonstrate this factor in this manner. *Id.* at 52.

MHDD reveals its own confusion by insisting that NMFS relied on "three conflicting metrics" to demonstrate bycatch limits. Motion at 26 (referencing PBR, PST, and Fishing-Related Mortality Limit (FRML)). Unsurprisingly, MHDD cannot provide a citation to support its mischaracterization. The Decision Memorandum is clear. The bycatch limit used in U.S. fisheries is PBR, which is a biological reference point to determine whether a species is reaching its optimum sustainable population level. Decision Memorandum at 48-49. New Zealand uses a slightly different formula, PST, as a metric that serves a similar purpose under its domestic regime. *Id.* at 50. However, for purposes of comparability, New Zealand chose to demonstrate that its program achieves comparable *results* in reducing bycatch below applicable limits by referencing PBR, rather than PST. *Id.* at 52.

There has been no observed bycatch of Māui dolphins in New Zealand's commercial fisheries for more than a decade. *See id.* at 58 ("There has been no reported or observed bycatch of a Hector's or Māui dolphin off the West Coast North Island since 2012."). The GNZ employed a species-specific SEFRA model to estimate annual bycatch of Māui dolphins in the set net fisheries at 0.048 and in the trawl fisheries at 0.08. *Id.* at 52. Individually or cumulatively,

30

this estimated annual bycatch is significantly less than PBR, which is 0.10. *Id.* at 52-53.

Moreover, this SEFRA model estimate might be overly conservative as the fishing data used to

calculate it includes cryptic mortality and also pre-dates the imposition of many of the measures

summarized above. *Id.*

For Hector's dolphins, the GNZ presented evidence that observed bycatch has remained

below PBR since the 2020 regulations have begun to be implemented. Feb. Supplement § 3.2.2.

Specifically, it provided evidence that in the 2022-23, 2023-24, and 2024-25 fishing seasons,

bycatch of Hector's dolphins was 6, 15, and 8 animals, respectively. *Id.* It also demonstrated that

the SEFRA model, using data from the 2020-21 fishing season, estimated total annual mortality

and injury for the six challenged fisheries likely to impact Hector's dolphins at 1.08, 3.63, 0.86,

0.31, 1.17, and 1.75 (or cumulatively 8.8). Decision Memorandum at 54.

Based on both the observed and estimated data demonstrating that at all relevant times

that PBR has not been exceeded for either Māui or Hector's dolphins, it was reasonable to

conclude that New Zealand has implemented, and continues to implement, successful measures

to ensure that incidental mortality and serious injury of Māui and Hector's dolphins from its

commercial fisheries remains below the applicable bycatch limit. MHDD can present no record

evidence to demonstrate that either observed or estimated annual bycatch exceeds PBR or any

other comparable bycatch limit, let alone that NMFS's conclusion to that effect was arbitrary and

capricious.

NMFS was also correct in concluding that the "goals and objectives of New Zealand's

regulatory program are comparable in effectiveness because they are designed to limit fishing-

related impacts to low enough levels to achieve the same conservation purposes as the negligible

impact process." *Id.* at 65. MHDD again mischaracterizes the U.S. regulatory program as

31

requiring fisheries to limit bycatch within the negligible impact standard or cease to operate. Motion at 19. Under 16 U.S.C. § 1371(a)(5)(E), NMFS will authorize incidental take of a marine mammal species in a commercial fishery when, among other things, it has a negligible impact on the stock of that species. But U.S. fisheries lawfully operate despite causing incidental bycatch of marine mammals far exceeding the negligible impact standard. *See, e.g.*, Decision Memorandum at 4 & n.19 (annual mortality and serious injury in a Category I fishery is greater than or equal to 50 percent of PBR); *id.* at 5 (no U.S. fishery has ever been closed in its entirety while provisions are put into place to reduce bycatch below PBR). That these Category I fisheries operate does not render their incidental mortality and serious injury of marine mammals *permitted* pursuant to § 1371(a)(5)(E); whatever enforcement steps are taken, if any, in response to such unpermitted bycatch is fundamentally a question of prosecutorial discretion that is not relevant to the comparability findings at issue here.

Contrary to MHDD's suggestion, Motion at 26, NMFS explicitly explained that FRML is *not* a bycatch limit and serves a different purpose, *see* Decision Memorandum at 55-56 (discussion under the heading "The Purpose and Function of New Zealand's Fishing-Related Mortality Limits and Bycatch Limits Differ"). FRML does not have a precise corollary in U.S. law. New Zealand has set FRMLs for both Māui and Hector's dolphins. *Id.* If incidental take exceeds the applicable FRML, then the Minister of Fisheries is authorized to take certain actions, including prohibiting all fishing in a particular area. *Id.* at 55. MHDD also misrepresents the FRML when it asserts that "[d]olphin deaths that occur outside of the [Māui Dolphin Habitat Zone] do not count against" it. Motion at 9.  As NMFS explained, the Minister is authorized to take action regardless of where the dolphin deaths occur. Decision Memorandum at 56 & n.286. "The establishment of a [FRML] provides greater certainty that PBR is not exceeded"—and it

therefore supports the conclusion that New Zealand's fisheries management achieves results comparable to that of the United States—but it is not itself a bycatch limit. *Id.*

MHDD's other arguments on bycatch limits, *e.g.* Motion at 27-28, are equally unavailing. MHDD tries to attack the calculation of PBR for Māui and Hector's dolphins by cherry-picking data concerning the common dolphin. *Id.* at 27. Even assuming that PBR should have been calculated using New Zealand-specific metrics for a species like the common dolphin that is found abundantly around the world (an assertion for which MHDD again offers no support, *id.*), MHDD does not meaningfully contest the calculation of PBR as 0.1 and 66.5 for Māui and Hector's dolphins, respectively. Nor does MHDD provide any evidence that a lower PBR for either species has, in fact, ever been exceeded over the last 20 years, much less since the more stringent fishing restrictions were issued in 2020. Besides, as previously discussed, "no U.S. commercial fishery has been closed in its entirety while regulatory measures have been modified to reduce bycatch below the PBR level," so even fisheries operating when approaching PBR would not exceed the flexible standards NMFS employs in regulating domestic fisheries. Decision Memorandum at 5.

Likewise, MHDD cannot demonstrate that it was arbitrary and capricious to consider New Zealand's use of PST as an applicable bycatch limit simply because it produces higher results than PBR. Motion at 28. The MMPA Import Rule "does not require that nations calculate PBR," but that it should establish a "*comparable scientific metric*" that "incorporate[s] scientific uncertainty about the population estimate and trend results in sustainable levels of incidental mortality and serious injury while still allowing the marine mammal stock to grow or recover." Decision Memorandum at 51-52. MHDD primarily relies on NMFS's five-year review of the Māui and Hector's dolphins, which criticized New Zealand's use of PST as a regulatory metric.

33

Motion at 28. The five-year review is a document required by § 4(c) of the Endangered Species

Act (ESA), which obligates NMFS to periodically review threatened or endangered species and

determine whether they should be remain on the applicable list. 16 U.S.C. § 1533(c)(2). This

exercise under a separate statutory regime serves an entirely different purpose from a

comparability finding under the MMPA. A status review is required to be performed at least

once every five years to ensure that a listed species has the appropriate level of protection under

the ESA and to determine whether its status has changed since the time of listing or its last status

review, and whether it should be classified differently or delisted. 16 U.S.C. § 1533(c)(2)(A). In

contrast to its obligations in determining whether to issue a comparability finding, NMFS is not

required to consult with specific trading partners during status review, as it did extensively and

was required to do before making the 2026 Comparability Findings.[6] Although NMFS was

critical in its ESA status review report of the GNZ's efforts to protect Māui and Hector's

dolphins, the 2026 Comparability Findings are based on additional information provided by the

GNZ and a detailed analysis of the elements of New Zealand's fisheries management program

that did not inform the November 2024 status review.

       7.  New Zealand Has Implemented Monitoring Designed to Estimate Incidental
           Mortality and Serious Injury in Its Set Net and Trawl Fisheries

     Finally, NMFS reasonably concluded that New Zealand implements monitoring

procedures designed to estimate incidental mortality and serious injury of marine mammals of

Māui and Hector's dolphins resulting from commercial set net and trawl fisheries interacting

---

[6] Although a status review has no direct bearing on NMFS's consideration of whether a
harvesting nation's regulatory program is comparable in effectiveness to the U.S. regulatory
program, NMFS did consider and address various aspects of the five-year Status Review in its
Decision Memorandum. *E.g.*, Decision Memorandum at 22-23, 75-76, Appendix D.

with those stocks and that such procedures are capable of producing statistically reliable estimates, as required by 50 C.F.R. § 216.24(h)(6)(C)(4). Decision Memorandum at 41, 47-48.

As NMFS explained, New Zealand maintains an extensive monitoring program governed by several laws and regulations that relies on "self-reporting through vessel logbooks, electronic catch and geospatial position reporting, and at-sea monitoring achieved through human observers and electronic monitoring." *Id.* at 41. For the West Coast North Island fisheries—that is, those most likely to interact with Māui dolphins—at-sea monitoring "is now predominantly undertaken using electronic monitoring (on-board cameras) and the level of monitoring coverage applicable to the fisheries varies depending on fishing location, size of vessel, type of gear, etc." *Id.* at 42. Certain vessels are exempted from electronic monitoring due to size, location or method of operation, or other criteria. New Zealand explained that the vessels subject to these electronic monitoring requirements (in-scope vessels) "are responsible for a large proportion of New Zealand's inshore fish catch (approximately 85 percent), tend to take significant amounts of bycatch, and pose the greatest risk to at-risk protected species due to fishing area and fishing method." Supplemental Information in Support of New Zealand Comparability Application § 1.3 (Nov. 2025) (Nov. Supplement, attached as Exhibit C).

The GNZ explained that it reviews the footage from these electronic monitoring efforts and that it adjusts the rates of review "based on analysis of risk, fisher misreporting rates, and additional monitoring objectives." Decision Memorandum at 45. NMFS explained that this "electronic monitoring program acts as a strong incentive for commercial fishers to report any marine mammal interactions accurately and in a timely fashion," especially in high-risk areas where the GNZ targets 100 percent of footage for review. *Id.* at 47.

35

NMFS concluded that the GNZ has been able to attain high levels of monitoring coverage in the challenged fisheries through a mix of its electronic monitoring program and human observers. *Id.* at 47. The coverage achieved by the GNZ generally surpasses the extent of monitoring undertaken under the U.S. fisheries management program and thus it was reasonable for NMFS to conclude that it produces statistically reliable results. *Id.*

Contrary to MHDD's assertion, Motion at 31-32, NMFS evaluated monitoring across the distribution of both species because it was not only concerned with onboard camera monitoring, as MHDD appears to suggest. All 15 of the fisheries challenged in the Motion are subject to monitoring. Decision Memorandum at 43-45. This includes multiple fisheries that NMFS concluded pose no or negligible risk to dolphin populations. Decision Memorandum at 15 n.81.

MHDD again points to NMFS's five-year report to suggest that monitoring efforts in New Zealand fisheries are inadequate. Motion at 29. But—even if the report were relevant—the source material makes clear that NMFS was primarily relying on reports produced with evidence that predated full implementation of the current monitoring program rolled out in 2023. *See, e.g.*, ECF No. 13-1 at 52-53 (relying on reports published between 1995 and 2021); *id.* at 39 (relying on 2021 report). And the report certainly could not evaluate information provided to NMFS more than a year later. *See generally* Oct. Supplement; Nov. Supplement; Feb. Supplement.

MHDD incorrectly asserts that the GNZ engages in no monitoring in harbors where 95 to 99 percent of the set net fishing effort occurs within the Māui Dolphin Habitat Zone. Motion at 31. NMFS explained the monitoring program for these fisheries: "GNZ relies on mandatory fisher reporting and real-time geospatial position reporting to monitor these small vessels" and "Fisheries Compliance also regulatory patrol the harbours and inspect these operators." Decision

Memorandum at 44. Further, "Māui dolphin sightings within the harbors have occurred mainly near harbor mouths where set net fishing is already prohibited." *Id.*

MHDD also erroneously relies on the five-year review to assert that camera monitoring has been implemented on "less than 27% of fishing vessels in Māui dolphin habitat." Motion at 9. Any such statements in the five-year review did not account for more recent information supplied by the GNZ after its publication and are contradicted by NMFS's conclusion on this record. *See* Decision Memorandum at 43-45 (electronic monitoring for in-scope vessels near 100 percent as of June 2025); Nov. Supplement § 1.3 (explaining that nearly all in-scope vessels have electronic monitoring and most out-of-scope vessels operate in harbors—but not in harbor mouths—and so interaction with Māui dolphins is unlikely or use methods unlikely to result in bycatch).

These efforts are comparable to the U.S. regulatory program. As NMFS explained, the applicable U.S. monitoring program "primarily relies on mandatory self-reporting and human observers to track marine mammal mortality and injury incidental to commercial fisheries." Decision Memorandum at 38. MHDD's fundamental misunderstanding of the U.S. monitoring program—and many other aspects of the U.S. regulatory program—has injected confusion into this series of overlapping and repetitive actions before this Court as it seeks to undermine NMFS's reasoned conclusion that the GNZ's use of electronic monitoring is comparable in effectiveness to the U.S. program. Motion at 33. The U.S. monitoring program, unlike the New Zealand program, does not rely heavily on onboard cameras. Decision Memorandum at 38. Through the extensive use of onboard cameras, which are required to remain active, electronic monitoring in the New Zealand program is generally more effective and certainly covers more

37

fishing efforts than the human observers and self-reports that NMFS primarily relies upon in its fisheries management. *Id.* at 38, 43-46.

It is also not accurate to conclude that monitoring is ineffective unless it is reviewed 100 percent of the time. Motion at 33-34. Fishers do not know when or whether review of camera footage will occur. This uncertainty logically means that fishers have an incentive to remain compliant with regulatory requirements, including reporting obligations, whenever onboard cameras are present. *E.g.*, Feb. Supplement § 4.1 ("The on-board camera programme operates in a way that all in-scope vessels have cameras operating and footage is recorded during all fishing events, but fishers are not aware at what point they are being monitored. This acts as a deterrent to fishers and strongly incentivises fishers to accurately report."). Besides, most U.S. fisheries are Category III, which are not required to have either human or electronic observers. Decision Memorandum at 9 n.49; *List of Fisheries*, 89 Fed. Reg. at 12,258.

Accordingly, MHDD has not demonstrated that NMFS exercised clear error by concluding that the monitoring program in New Zealand is comparable to that of the United States.

*    *    *

Congress directed that the Government determine whether harvesting of fish or fish products from foreign nations resulted in the incidental mortality or serious injury of marine mammals "in excess of United States standards" and, if so, to prohibit the importation of those goods. 16 U.S.C. § 1371(a)(2). Bringing its expertise to bear, NMFS concluded that GNZ's program achieved comparable results to the domestic program, and in some respects surpasses it.

MHDD advocates, largely without reference to the MMPA Import Rule or any understanding of how NMFS actually manages U.S. fisheries, for even more stringent policies.

38

But mere policy preferences, or even a disagreement with NMFS's expert scientific judgment, does not render the comparability finding arbitrary and capricious. *Marsh*, 490 U.S. at 378. At bottom, NMFS's decision is "reasonable and reasonably explained," *Prometheus Radio Proj.*, 592 U.S. at 423, and that is all that is required.

II.    MHDD Cannot Show That It Will Be Immediately and Irreparably Injured Absent Injunctive Relief

Assuming for the sake of argument that the aesthetic, recreational, and other interests of MHDD's members are injured by the 15 fisheries identified in its Motion despite *any* specific allegations to those fisheries, MHDD cannot show that it would *avoid* injury through preliminary injunctive relief, so it cannot demonstrate it will be harmed in its absence. This Court can only speculate about what, if anything the GNZ might do to regulate its fisheries to ameliorate harm to Māui and Hector's dolphins. Of course, we do know what MHDD alleges the GNZ did to further regulate fisheries in response to the *Sea Shepherd* injunction: nothing at all. ECF No. 13-28 ¶ 41; ECF No. 13-8 ¶ 65. MHDD's conclusory assertion that "[i]rreparable harm is happening," Motion at 40, fails to demonstrate that any of the challenged fisheries are causing bycatch of either Māui or Hector's dolphins. Indeed, the necropsy report cited by MHDD clearly states that, although bycatch could not be ruled out due to the decomposition of the body, "[o]verall, the skin lesions were assessed as *not typical of bycatch*." ECF No. 13-33 at 1 (emphasis added); *id.* at 2 ("[N]one of the observed lesions and defects are considered typical or diagnostic of entanglement . . . . While some defects may be interpreted as ligature wounds or entanglement lacerations, some of their characteristics are not consistent with the likely physics or typical presentation of lesions in known entanglements of small cetaceans.").

Further, even if the GNZ committed to taking certain steps beyond the current commercial fisheries management framework—and it has not—regulatory, policy, or other legal

39

change in New Zealand, like in the United States requires certain procedural steps to go into effect. *See* ECF No. 16-3 ¶¶ 5, 8-12. Any change must be consistent with internal New Zealand law and its international treaty obligations. *Id.* ¶¶ 2-3. "Reconsideration of regulatory measures . . . would require GNZ to meet several statutory requirements. These reviews involve a few phases – research and analysis, pre-engagement and development of consultation material, formal consultation, submission analysis and development of advice, Ministerial decision-making and Parliamentary legislative processes." *Id.* ¶ 8. The GNZ must engage in a public consultation process with interested parties, including those with fishing, environmental, commercial, and recreational interests, as well as specific groups from indigenous communities. *Id.* ¶¶ 10-11. These steps evidently take time. The *MHDD I* Proceedings were decided on the merits approximately nine months after the filing of the complaint. In contrast, it took the GNZ approximately two and a half years to finalize the TMP from the initial research and analysis stage through the various stages of pre-engagement, consultation, advice, decisionmaking, and legislative processes. *Id.* ¶ 8. Further, GNZ is restricted by law in what in can consider before modifying current fisheries management, which is explicitly limited to "ensuring fishing activity does not constitute a risk to sustainability and long-term viability of marine mammal populations." *Id.* ¶ 3. "An import ban or a change to the current level of export market access does not constitute a risk to sustainability." *Id.* ¶ 4.

MHDD has not, and cannot, demonstrate that these procedural steps would be completed before this case is decided on the merits, assuming a normal briefing schedule. If it is not legally feasible for the GNZ to pass and implement whatever additional regulations of the set net and trawl fisheries that MHDD maintains is required—something MHDD has never clearly

articulated—in the time it takes for the Court to resolve the merits in this action, then MHDD

would be no better or worse than it is now, irrespective of any injunctive relief.

III.    The Public Interest Would Not Be Better Served By an Injunction and the
        Balance Of Hardships Favor the Government

When the Government is a party, the last two factors of the test for injunction are merged.

*See Nken v. Holder*, 556 U.S. 418, 435 (2009). MHDD proposes that this Court disrupt tens, if

not hundreds, of millions of dollars in trade with no obvious benefit to the aesthetic and other

interests of its members. ECF No. 13-24 ¶ 57. Imposing an extensive ban would cause untold

damage to numerous third parties who are not before this Court, including commercial fishers,

U.S. importers, and other affected communities. There is also *zero* evidence that a preliminary

injunction would render *any* of the marine mammal species MHDD identifies better off because

nothing in New Zealand's fisheries management is likely to change during the pendency of

this litigation.

A Court-imposed import prohibition, on the other hand, would cause damage to the

Government as it would interfere with the Executive Branch's ability to engage in foreign

affairs, with likely negative ramifications for vulnerable marine mammal species. Among other

things, the MMPA Import Rule requires NMFS to consider both the established and *likely*

progress of a harvesting nation's regulatory efforts. 50 C.F.R. § 216.24(h)(7)(iii). The MMPA

and the Rule also authorize NMFS to provide technical assistance to assist harvesting nations to

develop fisheries management consistent with the MMPA and negotiate, through the Secretary

of State, agreements with harvesting nations to reduce marine mammal mortality and serious

injury caused by commercial fishing operations. *Id.* § 216.24(h)(11); 16 U.S.C. § 1378. Inherent

in these actions is the discretion to determine the types of commitments harvesting nations could

make to be consistent with the MMPA. Retaining that discretion over foreign policy objectives is

41

precisely why the type of lawsuit brought by MHDD is not thought to be traditionally redressable through the judicial process. *E.g.*, *United States v. Texas*, 599 U.S. 670, 679-81 (2023). As explained in the Government's motion to dismiss, the interference with foreign policy goals—and subsequent negative outcomes for endangered species—previously occurred in the MMPA context. *See* ECF No. 16 at 19-20. Additional judicial interference could dissuade harvesting nations from committing to terms that would benefit marine mammal species when those nations cannot rely on NMFS's assurance that implementing them would render a program comparable.

Accordingly, the public interest and balance of equities weigh against a Court-imposed embargo with the potential to disrupt hundreds of millions of dollars in trade and, as history has shown, to cause lasting damage to the foreign relations of the United States, including to achieve the objectives of the MMPA, when the Court can only speculate what, if any, benefit it may have on the aesthetic or other interests of MHDD's members.

Importantly, these considerations do not prevent the Court from performing a careful review of the agency's decision—assuming MHDD can establish standing—at the appropriate time and with the benefit of a full record before it, identifying error if it exists, and remanding the issue to the agency for corrective action. While the Government is confident that full consideration of this matter will not reveal any error, it respectfully submits that the appropriate remedy upon identification of one should be remand without vacatur, which further weighs against the preliminary injunction MHDD now seeks.

IV.   MHDD Is Required To Pay Security Before Obtaining Injunctive Relief

Finally, this Court's Rules require that a preliminary injunction may be issued "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

42

USCIT R. 65(c). In addition to the tens—if not hundreds—of millions of dollars of trade MHDD seeks to halt in favor of their member's aesthetic interests, enforcing an embargo under the MMPA places a significant burden on the United States to administer certificates of admissibility. Declaration of Virginia McPherson ¶ 4 (estimating costs to U.S. Customs and Border Protection to administer a 12-month import ban of the fish products exported by the challenged fisheries) (attached as Exhibit D). Further, MHDD's own self-proclaimed expert suggests that the GNZ would be forced to spend significant time and resources to ensure that products *not* covered by a Court-ordered embargo would be permitted to enter the United States. ECF No. 13-24 ¶ 57; *see also* ECF No. 16-3 ¶ 25 (estimating costs to the GNZ of $120,000 or more based on experience with *Sea Shepherd I* embargo). Absent security, these costs to the taxpayers cannot be recovered if the United States is found to have been wrongfully enjoined.

MHDD's assertion that the administrative cost to other parties is minimal, like much of its case, is based on nothing but its own conjecture. While MHDD invokes the Court's decisions in *Sea Shepherd* and *NRDC* as supporting a $1 bond, Motion at 45, the Court in those cases (unlike here) was not provided with an explanation of the Government's costs. And its suggestion that payment of a security would hinder MHDD's access to the courts is unsupported and immaterial. The purpose of security is to protect the *enjoined* party from incurring costs that cannot be recovered if the injunction is unlawful. In paying security, MHDD can be made whole by recovering the security if the injunction is warranted. Its access to the courts is thus not thwarted by protecting the taxpayers of two nations from the costs of a wrongful injunction.

43

## CONCLUSION

For these reasons, we respectfully request that the Court deny the Motion.

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

OF COUNSEL:
MARK HODOR
Office of the General Counsel
National Oceanic & Atmospheric Administration

PATRICIA M. MCCARTHY
Director

ANGELA CHERMAN
Office of the Chief Counsel
U.S. Customs and Border Protection

/s/Agatha Koprowski
AGATHA KOPROWSKI
OLIVER J. MCDONALD
Trial Attorneys
U.S. Department of Justice Civil Division

DANIEL PAISLEY
Office of the General Counsel
Department of the Treasury

P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 507-6081
Fax: (202) 353-0461
Email: agatha.koprowski@usdoj.gov

May 1, 2026

*Attorneys for Defendants*

44

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this Response in Opposition to Plaintiff's Motion for Preliminary Injunction and Motion to Dismiss Pursuant to Rule 12(b)(1)contains 13,579 words, excluding any materials excluded from those Procedures' requirements, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/Agatha Koprowski