**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |  |
|---|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| NATIONAL MARINE FISHERIES SERVICE, et al., | ) ) ) | Court No. 26-02462 |
| Defendants, and | ) ) | |
| NEW ZEALAND GOVERNMENT, | ) ) | |
| Defendant-Intervenor. | ) ) ) | |

**REPLY OF THE GOVERNMENT OF NEW ZEALAND TO THE PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Submitted by:

Warren E. Connelly
Robert G. Gosselink
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
Phone: 202-223-3760

wconnelly@tradepacificlaw.com

Date: June 4, 2026

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES.................................................................................................. ii

I.      INTRODUCTION ...................................................................................................1

II.     THE "LIKELIHOOD" TEST REQUIRES THE COURT TO FIND A HIGH
        PROBABILITY THAT THE GNZ OR FISHERMEN WILL TAKE STEPS TO
        REDUCE FISHING ACTIVITY ...............................................................................1

III.    THE GNZ'S RESPONSE TO THE IMPORT BAN IN *SEA SHEPHERD*
        CONSTITUTES THE BEST EVIDENCE CONCERNING HOW THE GNZ AND
        FISHERMEN ARE LIKELY TO RESPOND TO A NEW IMPORT BAN ......................2

IV.     NEW ZEALAND LAW DOES NOT PERMIT THE GNZ TO MODIFY ITS CURRENT
        FISHING RESTRICTIONS OR MONITORING MEASURES IN RESPONSE TO AN
        IMPORT BAN ........................................................................................................3

        A.  The Fisheries Act 1996 ..................................................................................3

        B.  The Marine Mammals Protection Act 1978..................................................6

V.      THE EVIDENCE DOES NOT SUPPORT MHDD'S ALLEGATION THAT
        FISHERMEN ARE LIKELY TO RESPOND TO AN IMPORT BAN BY REDUCING
        THEIR FISHING EFFORT .......................................................................................7

        A.  MHDD Has Not Accurately Described the Economic Impact of an Import Ban
            on Fishermen...................................................................................................7

        B.  Fishermen Have Significant Available Third Country Markets............................11

        C.  MHDD Has Misrepresented the Effect of the Previous Import Ban ......................15

VI.     MHDD HAS MISCHARACTERIZED THE ROLLOUT OF THE GNZ'S
        ELECTRONIC MONITORING PROGRAM ..............................................................18

VII.    THE GNZ'S EXPRESSIONS OF CONCERN IN 2019 ABOUT THE IMPACT OF AN
        IMPORT BAN ARE IRRELEVANT IN 2026..............................................................21

VIII.   CONCLUSION.....................................................................................................23

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page no.**

*Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co., Ltd.,*
138 S. Ct. 1865 (2018).................................................................................................................5

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)                                                        1

*Sea Shepherd New Zealand v. United States*, 606 F. Supp. 3d 1286
(Ct. Int'l Trade 2022) ............................................................................................ *passim*

*Sea Shepherd New Zealand v. United States,* 693 F. Supp. 3d 1364
(Ct. Int'l Trade 2024) .................................................................................................................2

## I.     INTRODUCTION

Māui and Hector's Dolphin Defenders NZ Inc. ("MHDD") does not possess the standing necessary to pursue the allegations in its Complaint or to seek an import ban on seafood imported from 15 of New Zealand's fisheries. Alternatively, this Court should reject the MHDD's allegation that the GNZ, as well as fishermen, "are reasonably likely to react to an import ban in predictable ways that reduce risk to Māui and Hector's dolphins." *See* Plaintiff's Opposition to Defendant's Motion to Dismiss ("Opp.") at 4. In fact, in response to the import ban issued in the *Sea Shepherd* litigation, the GNZ concluded that it was not required by either the MMPA or New Zealand law to institute additional measures beyond the fishing restrictions that it adopted in October 2020 and the enhanced electronic monitoring measures that it implemented on a phased schedule ending in 2025.

No information has come to light since those measures were adopted that has caused the GNZ to determine that the sustainability of the Māui or Hector's dolphin populations are now in jeopardy or that those dolphins now face an increased risk of mortality or serious injury from commercial fishing activity.

## II.     THE "LIKELIHOOD" TEST REQUIRES THE COURT TO FIND A HIGH PROBABILITY THAT THE GNZ OR FISHERMEN WILL TAKE STEPS TO REDUCE FISHING ACTIVITY

This Reply addresses the MHDD's allegations captioned as "MHDD Has Also Shown that an Import Ban is Likely to Redress Its Injuries as a Matter of Fact." Opp. at 19-32. MHDD acknowledges that it must convince this Court that it is "likely," as opposed to merely "speculative," that its alleged injury will be redressed by an import ban. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

The term "likely" means an event "having a high probability of occurring or being true." *See* https://www.merriam-webster.com/dictionary/likely. Thus, it is not sufficient for MHDD to assert, as its Opposition repeatedly does, that the action it seeks from the GNZ or fishermen is "plausible, "possible," "reasonably predictable," or compelled by "commonsense economic principles."

**III.     THE GNZ'S RESPONSE TO THE IMPORT BAN IN *SEA SHEPHERD* CONSTITUTES THE BEST EVIDENCE CONCERNING HOW THE GNZ AND FISHERMEN ARE LIKELY TO RESPOND TO A NEW IMPORT BAN**

In *Sea Shepherd*, the court issued a preliminary injunction on November 28, 2022 that directed the United States to ban the importation of nine species of finfish harvested from New Zealand's West Coast North Island multi-species set net and trawl fisheries. 606 F. Supp. 3d 1286, 1331. The import ban remained in effect until the court dissolved its preliminary injunction on April 1, 2024. 693 F. Supp. 3d 1364, 1368. During this 16-month period, the GNZ did not implement any additional measures because, as the GNZ's Declarant, Emma Taylor explained:

> a review or modification to the current fisheries' measures would need to meet NZG's statutory requirements (i.e., a risk to the sustainability of the Hector's and Māui dolphin populations) but not because of an import ban or change in export market access requirements.

*See* March 9, 2026 Declaration of Emma Taylor in Support of the New Zealand Government's Opposition to the Plaintiff's Motion for Preliminary Injunction in Ct. No. 26-00060 at para. 20, also submitted as Exhibit C to the Defendants' Motion to Dismiss, ECF No. 16-3. ("Taylor Decl."). The GNZ's laws have not changed in the three months since Ms. Taylor provided her Declaration.

Nevertheless, MHDD asserts that the circumstances are different now because, in *Sea Shepherd*, the plaintiffs challenged the GNZ's 2020 Comparability Finding as to just the two set net and trawl fisheries off the West Coast of the North Island, whereas MHDD here

2

challenges the GNZ's 2026 Comparability Finding with respect to 15 fisheries in order to include the South Island trawl and set net fisheries which allegedly constitute the habitat of Hector's dolphins.

MHDD asserts that, when the GNZ and fishermen are confronted with the greater scope of a new import ban, they will respond much differently: "The broader ban sought here would likely have a more significant impact on exports of those fish." Opp. at 20. Moreover, "it is 'commonsense' that such a significant reduction in market demand and export quantities would cause fishers to change their behavior in response." *Id.*

Thus, the standing issue boils down to whether this allegedly "commonsense" prediction is "likely" to come true in some (admittedly unknown) way that causes less intense fishing pressure in the 15 fisheries subject to MHDD's lawsuit.

IV.    **NEW ZEALAND LAW DOES NOT PERMIT THE GNZ TO MODIFY ITS CURRENT FISHING RESTRICTIONS OR MONITORING MEASURES IN RESPONSE TO AN IMPORT BAN**

   A.  **The Fisheries Act 1996**

MHDD asserts that New Zealand's Fisheries Act 1996 would not preclude the GNZ "from making regulatory changes in response to an import ban." Opp. at 31. Specifically, Sections 15(2) and 16 of that Act allegedly "authorize the Minister to take action on a much

3

quicker timeframe and with less process than regulatory revisions." *Id.*[1]  However, neither

Section 15(2) nor Section 16 applies in the circumstances presented here.[2]

Section 15(2) provides that:

> In the absence of a population management plan, the Minister may, after consultation with the Minister of Conservation, take such measures as he or she considers are necessary to avoid, remedy, or mitigate the effect of fishing-related mortality on any protected species, and such measures may include setting a limit on fishing-related mortality.

However, the GNZ has already concluded that no additional measures are "necessary to avoid,

remedy, or mitigate the effect of fishing-related mortality" on Māui or Hector's dolphins:

"Section 15(2) of the Fisheries Act was used to implement the fisheries measures in 2020."

Taylor Decl. at 3, para. 9. Ms. Taylor also explained that use of Section 15(2) requires

compliance with Section 12 of the Act, captioned "Consultation," which provides under

Subsection (1) that before acting under Section 15(2) the Minister shall:

> (a) consult with such persons or organisations as the Minister considers are representative of those classes of persons having an interest in the stock or the effects of fishing on the aquatic environment in the area concerned, including Maori, environmental, commercial, and recreational interests; and
>
> (b) provide for the input and participation of *tangata whenua* having—
>
> > (i) a non-commercial interest in the stock concerned; or

---

[1] Speculative, but unknown changes that MHDD envisions include "incremental protections" that could "at least partially redress MHDD's alleged injury," such as "prohibiting bycatch in excess of the negligible impact threshold"; implementing bycatch limits comparable to the Potential Biological Removal Level"; or "improving bycatch monitoring." Opp. at 29. However, the GNZ has not exceeded the PBR level, and it has already implemented enhanced monitoring measures. Moreover, the "negligible impact standard" does not apply to the GNZ's regulatory regime, as the GNZ explained in its Opposition to MHDD's motion for a preliminary injunction. *See* ECF No. 25 at 13-16. Moreover, both the Defendants and the GNZ have explained in their respective oppositions to MHDD's PI Motion that, on the merits, none of these three speculative changes are required by the MMPA or its implementing regulations. As such, the Court should not consider them as relevant to whether MHDD has standing.

[2] The Fisheries Act 1996 is available in ECF No. 25, Att. 7 in Court No. 24-00218.

4

(ii) an interest in the effects of fishing on the aquatic environment   in the area concerned.[3]

Declarant Taylor went on to explain that the "Consultation" requirements before making any decision under section 15(2) took over one year to complete. Taylor Decl. at 3-5, paras. 7-17. This is in significant part due to the statutory requirement that the GNZ engage with indigenous Māori interests. Failing to respect those rights would have violated the Treaty of Waitangi. Notably, Māori interests owned about 12% of the allowable fish quotas in the affected North and South Island fisheries at that time.

Accordingly, the MHDD's assertion that Section 15(2) provides the GNZ with authority to act "on a much quicker timeframe" than so-called "regulatory revisions" has no basis in the GNZ's law or its previous implementation, even assuming, as MHDD (erroneously) claims, that an import ban would implicate the sustainability purpose of the Fisheries Act 1996."[4]

Moreover, to reach the conclusion that MHDD seeks, this Court would have to interpret the provisions of New Zealand's Fisheries Act 1996 upon which MHDD relies. However, under the Supreme Court's holding in *Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co., Ltd.*, 138 S. Ct. 1865, at 1869 (2018), a federal court "should accord respectful consideration to a foreign government's submission, but the court is not bound to

---

[3] "*Tangata whenua*," in relation to a particular area, means the *hapu* or *iwi* that is Māori and holds "*mana whenua*" over that area. "*Iwi*" refers to a Māori community or people. "*Hapu*" means a division of a Māori people or community. "*Mana whenua*" means customary authority exercised by an *iwi* or *hapu* in an identified area.

[4] MHDD contends that an import ban would fall within the Fisheries Act's sustainability purpose. Opp. at 31. However, banning imports from New Zealand fisheries will not affect whether those fisheries continue to achieve the sustainability objective. In other words, since the GNZ has no obligation under the Fisheries Act to reconsider whether its current measures are comparable to those required by the MMPA, action under the Fisheries Act is not implicated or compelled by an import ban.

accord conclusive effect to the foreign government's statements." Respectful consideration here compels the conclusion that Section 15(2) of the Fisheries Act does not require immediate action by the GNZ to institute additional measures to reduce fishing pressure in any of the 15 fisheries.

Equally irrelevant is Section 16 of the Fisheries Act 1996 ("Emergency measures"), which provides that:

> If satisfied that there is or has been—
>
> (a) an outbreak of disease; or
>
> (b) a *serious decline* in the abundance or reproductive potential of 1 or more stocks or species;[5] or
>
> (c) a significant adverse change in the aquatic environment, —
>
> the Minister may, by notice, impose such emergency measures in respect of any stocks or areas affected, or both, as the Minister considers necessary or expedient in the circumstances.

(Emphasis added.) However, MHDD has not provided evidence that any of the three pre-conditions for implementing emergency measures applies here, particularly with respect to the effect of an import ban.

**B.  The Marine Mammals Protection Act 1978**

MHDD also asserts that the NZ MMPA "allows for the protection, conservation of marine mammals." Opp. at 32.  However, the GNZ has already taken the steps that are necessary to achieve those goals through its October 2020 and December 2022 measures.

The only example that MHDD provides as to how the NZ MMPA could be used to respond to a new import ban is for the GNZ "*within a month's time* [to] vary existing marine

---

[5] MHDD deliberately misquotes the law when it alleges that emergency measures are required if there has been "*a decline* in the abundance or reproductive potential" of a species. Opp. at 31. The law requires, not just "a decline," but rather, *"a serious decline."*

mammal sanctuaries to prohibit some or all fishing activities." Opp. at 32. This is a gross mischaracterization of the steps and time needed to implement or revise the boundaries of, or restrictions within, a marine mammal sanctuary.

Marine mammal sanctuaries in New Zealand are established or varied through a Ministerial notice under section 22 of the MMPA. The process typically includes issuing a notice of intention, establishment of a 28-day public submission period, provision of analysis and advice to the Minister of Conservation, consent from other Ministers as required, and publication of the final notice. Recent variations to existing sanctuaries entailed issuing a notice of intention, a final declaration, and entry into force over a 3–5-month period.

However, this timeframe does not reflect the earlier policy development and consultation steps, including engagement with Māori and stakeholders. For example, sanctuary variations for Hector's and Māui dolphins as part of the review of the Threat Management Plan were notified on June 23, 2020 and were implemented on November 5, 2020, following extensive consultations in July-August 2019. *See* https://www.mpi.govt.nz/dmsdocument/34971-2019-Hectors-Maui-Dolphin-Consultation

V.    **THE EVIDENCE DOES NOT SUPPORT MHDD'S ALLEGATION THAT FISHERMEN ARE LIKELY TO RESPOND TO AN IMPORT BAN BY REDUCING THEIR FISHING EFFORT**

A.  **MHDD Has Not Accurately Described the Economic Impact of an Import Ban on Fishermen**

MHDD asserts that "commonsense economic principles" will "predictably" cause fishermen to "reduce fishing effort in response to reduced market demand following an import ban" and that such a reduction in fishing effort would provide at least partial relief from MHDD's alleged injury. Opp. at 19. This is simply not accurate for the following reasons.

7

First, MHDD asserts that "the requested injunction could potentially impact approximately $22 million [in New Zealand dollars, ("NZD")] in exports per year." Opp. at 20. That estimate ignores the significance of the export statistics compiled by Seafood New Zealand. *See* "New Zealand Seafood Exports by Country and by Species" for calendar year 2025 (at 191-197), which is available at: https://www.seafood.co.nz/fileadmin/Export_Statistics/2025-12-Country-Final.pdf. A second, highly relevant report compiled by Seafood New Zealand, entitled "New Zealand Seafood Exports Summary Report" for calendar year 2025, is available. at: https://www.seafood.co.nz/fileadmin/Export_Statistics/2025-12-Summary-Final.pdf. These two reports demonstrate the following:

- The total FOB Sales value for New Zealand's fresh, frozen, and processed finfish exports to all countries in 2025 was $1.243 billion NZD.

- Excluding Antarctic toothfish, Patagonian toothfish, orange roughy, southern blue whiting, and salmon, which are not commercially targeted within the 15 fisheries subject to MHDD's lawsuit, just eight species of finfish equaled or exceeded 1.00% of the total FOB value in 2025 of all of New Zealand's finfish exports in all product forms.

- These eight species were barracouta, hake, hoki, ling, blue mackerel, jack mackerel, snapper, and silver warehou.

- Collectively, these eight species constituted about 43% of the total FOB value of finfish exports in 2025.

Therefore, it is reasonable to conclude that these eight species would be the most desirable finfish in the U.S. market.

Set forth below are their FOB export values in NZD to the U.S. in 2025:

| | |
|---|---|
| Barracouta | None |
| Hake | $103,509 |
| Hoki | $4,423,359 |
| Ling | $3,264,860 |
| Blue Mackerel | None |
| Jack Mackerel | $728,701 |
| Snapper | $8,728,031 |
| Silver Warehou | None |
| Total | $17,248,460 |

At the current exchange rate of $1.0 NZD = $0.60 USD, the total equals $10.3 million USD.

Four of the five species that were exported to the U.S. in 2025 are primarily caught in New Zealand's deepwater trawl fisheries, which are hake; hoki; ling; and jack mackerel. New Zealand has fourteen deepwater fisheries in its List of Foreign Fisheries (LOFF). These fisheries are primarily located between 12 and 200 nautical miles from the coast. MHDD's lawsuit includes three of these fourteen fisheries: LOFF ID 2067 (hoki, hake, ling trawl fishery); LOFF 1883 (alfonsino trawl fishery); and LOFF 2041 (deepwater pelagic fishery).[6]

The following information appears on the Ministry of Primary Industries ("MPI") Fisheries Infosite, which is available at: https://fs.fish.govt.nz/Page.aspx?pk=91.

Hake are widely distributed throughout the middle depths of the New Zealand EEZ, mostly south of 40°S. Adult hake *are mainly distributed from 250–800 m depth*, but some have been found as deep as 1200 m, while juveniles are found in inshore regions shallower than 250 m

Hoki is widely distributed throughout New Zealand waters in *depths of 200m to 600m.*

Ling are *widely distributed through the middle depths (200–800 m)* of the New Zealand EEZ, particularly south of latitude 40° S.

---

[6] The GNZ's 11 other deepwater fisheries bear LOFF ID nos. 2039, 2050, 2074, 2075, 2083, 2084, 2085, 2093, 2099, 10581, and 12480. Six of these fisheries target orange roughy, southern blue whiting, and ling.

In addition, the deepwater pelagic trawl fishery is an important source of jack mackerel in central and southern waters at depths of around 130-220 meters.

Thus, four of the five most popular types of finfish exported both to the U.S. and globally are rarely, if ever, caught in the 100 meters or less depth where the MHDD sees a danger to dolphins from commercial fishing:

> Scientific consensus, including from NMFS, IWC, and IUCN, recommends that fishing with set nets and trawl nets must be banned in the entirety of the Māui and Hector's dolphins' range, and therefore, within harbours and out to the 100-metre depth contour at a minimum (approximately 20 nautical miles from the coastline).

Declaration of Elizabeth Slooten, ECF No. 13-28, at 14, para. 43. For that reason, U.S. exports of these four finfish species are virtually irrelevant to MHDD's claim that fishermen will reduce their fishing efforts once an import ban is imposed.

Arguably, the only one of these eight finfish species that could be affected by an import ban would be snapper, where the FOB value of U.S. exports in 2025 was $8,728,031 NZD. However, snapper does not exclusively come from the 15 fisheries subject to MHDD's lawsuit. Specifically, snapper is fished by other methods in non-subject LOFF ID 2095 (snapper bottom longline fishery).[7] Accordingly, the total export volume of snapper exported to the U.S. that is harvested in one of the 15 subject fisheries is less than $8.7 million NZD.[8]

In summary, Māui and Hector's dolphins are not threatened by commercial fishing in any deepwater fishery, as the most recent publicly available report from Fisheries New Zealand,

---

[7] In addition, jack mackerel (and blue mackerel) is harvested by purse seine in LOFF ID 1881. Ling is harvested by bottom longline in LOFF ID 2075 and by potting in LOFF ID 12480.

[8] In no other instance did the total FOB value of U.S. exports of other finfish species exceed $100,000 USD. Here again, fishermen are unlikely to reduce their fishing effort when their speculative loss of revenue (not profit) from an import ban is so small.

entitled "Deepwater Annual Review Report 2022/23" demonstrates. This report is available at:

https://www.mpi.govt.nz/dmsdocument/68307/direct. This report estimates total marine mammal

interactions and "alive" and "dead" captures in deepwater fisheries for the period from 2018

through 2023. *There was no observed alive or dead capture for either a Māui dolphin or a*

*Hector's dolphin in this five-year period in any deepwater fishery*. *Id.* at 47.[9] This evidence

constitutes further proof that fishermen would have no incentive to reduce fishing effort in

deepwater fisheries, which account for a significant proportion of four of the five most

significant finfish species exported to the U.S.

### B.  Fishermen Have Significant Available Third Country Markets

Fishermen need not reduce their fishing effort in response to an import ban because the

United States market is just one of a number of significant markets for New Zealand seafood,

including, but not limited to, France, Germany, Denmark, the UK, Poland, Japan, Sweden,

Australia, and China, as well as New Zealand's domestic market. All these markets will remain

available to fishermen even if an import ban completely closes the U.S. market, which is not

"likely" to happen for the reasons explained above.

In calendar year 2025, New Zealand's export revenue from wild capture (not

aquaculture) finfish products totaled $1.1 billion NZD in all product forms. *See* "New Zealand

Seafood Exports Summary Report," *supra*, at 1. Thus, even a complete loss of the allegedly $22

million U.S. market would constitute a maximum loss of just 2% of the global market for New

Zealand's wild caught finfish.

---

[9] Limited numbers of captures were reported for fur seals and sea lions, but these species are not included in MHDD's Complaint. Nor has PBR has been exceeded for these two marine mammal species.

New Zealand's fishermen may offset MHDD's speculated loss by expanding sales in other markets, as well as by adjusting which fisheries will be used to supply those markets. New Zealand enjoys almost 100% duty free access for fish exports to other key markets (China, Australia, European Union, UK, Singapore) and exports significant amounts of finfish to these markets.

For example, the GNZ concluded a free trade agreement with the European Union that became effective on May 1, 2024. On that day, 99.5% of New Zealand finfish imported into the EU became duty free. The previous finfish duties ranged up to 22%. *See* https://www.mfat.govt.nz/assets/Trade-agreements/EU-NZ-FTA/Annexes/Appendix-2-A-1-Tariff-Schedule-of-the-European-Union.pdf.

In the period from July 1, 2024 through June 30, 2025, the EU accounted for 7% of New Zealand's inshore finfish exports.[10] Economic "commonsense" compels the conclusion that duty free treatment provides expanded sales opportunities. That is the primary purpose of a free trade agreement.

Equally important, Australia is New Zealand's largest export market for New Zealand's inshore finfish, accounting for 61% of total finfish exports in the 12-month period ending June 30, 2025. These products enter Australia tariff free. *See* Outlook 2025 at 59. In the 12-month period ending June 30, 2024, Australia accounted for an even greater 65% of inshore finfish exports. Thus, increased sales to just the EU and Australian markets could offset the estimated

---

[10] *See* Ministry for Primary Industries, Situations and Outlook for Primary Industries, dated December 2025 ("Outlook 2025") at 59, available at: https://www.mpi.govt.nz/dmsdocument/70984-Situation-and-Outlook-for-Primary-Industries-SOPI-December-2025.

loss of the $22 million in sales to the U.S. Shipping to Australia is obviously much cheaper than shipping to the U.S. given the greater distance involved.

The example of hoki exports, caught in deepwater fisheries, further establishes the availability of alternative markets for New Zealand's most popular finfish.[11] Hoki is New Zealand's largest fishery, and its exports constituted 26.19% by value of New Zealand's total exports of live, chilled, and frozen finfish in 2025.

New Zealand exported about 30,000 metric tons of hoki in 2025 in all product forms, but it exported only 440 metric tons to the United States, which constituted just 1.4% of total hoki exports. Thus, the loss of the U.S market, even after accepting MHDD's incorrect assumption that all hoki are caught in the 15 fisheries subject to MHDD's lawsuit, rather than in other deepwater fisheries, would have, at most, a minor effect on fishermen.

Third country pricing information supports this conclusion. The most popular product form for hoki is frozen fillets. In 2025, New Zealand exported over 18,000 metric tons of this product form. The FOB price for the 440 metric tons exported to the U.S. was $10.03 NZD per kg. However, *hoki FOB prices in 15 other third country markets either exceeded or were comparable to the FOB price charged in U.S. sales.*[12]

Accordingly, there is no basis to accept MHDD's speculation that fishermen have a financial incentive to reduce their fishing activity with respect to one of the most significant fish species found in New Zealand given the large number of sales opportunities in numerous other countries, including Australia, Denmark, France, Japan, and Poland, all of which imported a

---

[11] As noted above, hoki is primarily fished by trawlers at depths of 200 to 600 meters.

[12] *See* Seafood New Zealand's "New Zealand Seafood Exports by Product Type," available at: https://www.seafood.co.nz/fileadmin/Export_Statistics/2025-12-Product-Final.pdf.

13

greater volume than the U.S. in 2025. A total of 32 countries, excluding the U.S., imported hoki from New Zealand in 2025. Thus, it beggars belief for MHDD to allege that hoki fishermen would reduce their fishing efforts considering the widespread availability of alternative markets.

The attractiveness of third country markets is, of course, heightened by the Trump Administration's imposition of a 10% import tariff on all New Zealand exports under the International Emergency Economic Powers Act, effective on April 5, 2025, and, subsequently extended under Section 122 of the Trade Act of 1974, effective February 24, 2026. The latter 10% duty remains in effect today. Additional trade restrictions are also now being considered under Section 301 of the Trade Act of 1974.[13]

Considering these additional tariffs, economic "commonsense" compels fishermen to consider alternative markets where additional tariff barriers have not been newly erected. MHDD has no answer to the fact that the currently effective Section 122 tariff and the newly proposed Section 301 forced labor tariff has encouraged, and will continue to encourage, New Zealand's fishermen to increase their reliance on markets other than the U.S. market.

The Table below demonstrates that the reduction in volume and value of U.S. finfish imports from New Zealand following the imposition of the Section 122 tariff was more than offset by the increase in the volume and value of finfish exports to third countries. This information is compiled from monthly export statistics published by Seafood New Zealand available at: https://www.seafood.co.nz/publications/export-stats.

---

[13] Two days ago, on June 2, 2026, the Trump Administration found that "the acts, policies and practices of New Zealand related to the failure to impose and effectively enforce a forced labor import prohibition are unreasonable and burden or restrict U.S. commerce." For this reason, the Administration is considering an additional tariff up to 12.5%. *See* https://ustr.gov/sites/default/files/files/Press/Releases/2026/USTR%20Report%20Sec%20301%20FL%20301%206-2-26%20FINAL%20for%20upload.pdf

| | April 2024-March 2025 U.S. | April 2025-March 2026 U.S. | Change U.S. | April 2024-March 2025 non-U.S. | April 2025-March 2026 non-U.S. | Change non-U.S. |
|---|---|---|---|---|---|---|
| Export volume | 8,811,844 | 6,758,051 | -2,053,793 | 174,920,871 | 177,988,677 | 3,067,806 |
| Export value | $222,108,742 | $183,642,055 | -$38,466,687 | $936,751,478 | $1,019,154,805 | $82,403,327 |

## C. MHDD Has Misrepresented the Effect of the Previous Import Ban

MHDD claims that the "prior more limited ban resulted in decreased exports for many of the fish caught in the affected fisheries, 'with snapper down 8 percent, kahawai down 20 percent, dogfish down 8 percent, and trevally down 45 percent.'" Opp. at 20. The information concerning export declines comes from Exhibit H to the Rose Declaration, which is the December 2024 MPI report entitled "Situation and Outlook for Primary Industries." This report contains data for the period July 1, 2023 through June 30, 2024. However, MHDD misleadingly truncates what the report says because the MPI also attributed those declines to "reduced demand from Australia." Thus, the percentage declines do not specify the extent to which the decline in Australian demand or the import ban contributed to the overall demand decline.

More important is the fact that the four finfish products that the report identifies as having declined are not significant in the U.S. market. Exports of dogfish (aka spotted rig) and kahawai constituted just 0.49% and 0.34%, respectively, of total finfish exports from New Zealand in 2025. Export data back to 2019 shows no kahawai was exported to the U.S., while just 11 kilograms (24 lbs.) of dogfish were exported to the U.S. in 2022. A mere 3.5 metric tons of trevally were exported to the U.S. in 2025 with an FOB value of just $47,574 NZD. And, while snapper exports declined about 5% in 2025 compared to 2024, this was due to a reduction in unit value, not volume, which increased from 588 metric tons in 2024 to over 600 metric tons in 2025.

15

Moreover, the most widely sold forms of snapper are: (1) chilled fillets, which New Zealand fishermen sold to 9 countries besides the U.S.; (2) chilled whole fish, which fishermen sold to 13 countries besides the U.S.; (3) frozen fillets, which fishermen sold to 23 countries besides the U.S.; and (4) frozen whole fish, which fishermen sold to 14 countries besides the U.S. Thus, it defies both the laws of economics and "commonsense" for MHDD to contend that it is likely that fishermen will reduce their fishing efforts because they lack alternative markets, especially where importers in those markets have frequently paid higher FOB prices than U.S. importers.[14]

Despite the availability of numerous third country markets for the relatively small volume of finfish that could theoretically be displaced from the U.S. market due to the requested import ban, MHDD asserts that "Defendants have not provided evidence that the Australian and Chinese seafood markets would expand *at all* in response to an import ban, much less by a big enough extent to absorb imports from the 15 fisheries at issue in this case." Opp. at 22. (Emphasis in original.) Of course, it is MHDD that is doing the speculating by saying that these markets would not expand "*at all*," while simultaneously ignoring New Zealand's numerous significant export markets beside China and Australia.

Seafood New Zealand's "New Zealand Seafood Exports Report" for calendar year 2025 shows that total finfish export revenue increased from $1.147 billion NZD in 2024 to $1.243

---

[14] MHDD asserts that the Australian and Chinese markets are not interchangeable with the U.S. market because "Australia and China import different products for different prices than the U.S. market." Opp. at 23. This statement is false as the export data repeatedly show. MHDD cites para. 22 of the Simmons Declaration, ECF No. 13-23, but Mr. Simmons is merely stating his opinion, without citing the specific type of evidence upon which the GNZ relies that demonstrates that *numerous third country markets purchase the identical product forms that are sold to the U.S.* Also, to be clear, Australia and China are far from the only third country markets available to New Zealand fishermen despite MHDD's contrary suggestion. Opp. at 22.

16

billion NZD in 2025, or by 8.33%. Total export volume similarly increased from 185,549 metric tons in 2024 to 193,515 metric tons in 2025, or by 4.29%. Thus, MHDD's speculation that global markets will not expand *at all* is contradicted by the facts.

Instead, economics and "commonsense" compel the conclusion that, when sellers are unable to sell to a particular market, they will seek out sales opportunities in other markets, especially where customers in those markets already exist. With respect to the notable examples of hoki and snapper, the export statistics irrefutably demonstrate the existence of those markets, which reflect existing customer relationships.

Speculation is not required to conclude that existing markets and existing customers could absorb the small incremental amount of displaced U.S. sales that originate in the 15 subject fisheries, especially because New Zealand fishermen could offer price or other types of incentives, if necessary, to gain additional sales. This is yet another "commonsense" response to the closure of a market. Moreover, the plethora of case citations in the MHDD's Opposition do not discuss the situation where dozens of alternative markets are available and where comparable prices are charged.

Finally, MHDD contends that, if the GNZ is correct that its fishermen can "simply shift to other markets to avoid the economic impacts of an import ban, then it is unclear why GNZ would even be interested in defending the 2026 Comparability Finding." Opp. at 23. However, economic "commonsense" always requires a seller to consider how best to develop and expand available markets to the maximum extent. For that reason, it is no surprise that the GNZ and fishermen would want to continue to export seafood to the U.S. by defending the Comparability Finding. In other words, why would New Zealand give up the U.S. market when it firmly believes that it has fully complied with the requirements of the MMPA and its implementing

17

regulations and that the MHDD has erroneously and unfairly criticized the measures that it has implemented.

This is not to say that an import ban would have "zero impact," but any such impact would be relatively small considering the vast alternative sales opportunities around the world that the comprehensive statistics concerning third country export volumes and FOB prices described above amply establish. MHDD complains that Defendants have engaged in "questionable economic speculation" about the likely response of the GNZ and fishermen to an import ban. However, the "commonsense economic principles" upon which MHDD repeatedly relies do not compel the conclusion that the only possible response of fishermen is to reduce fishing effort or change to "less harmful gear" when significant alternative export markets and comparable or higher prices are widely available. Opp. at 20.

Similarly, there is no basis to conclude that the only possible response of the GNZ to an import ban is to improve its management program "to incrementally protect Māui and Hector's dolphins" in one of the three ways that MHDD suggests the GNZ could adopt. That is because the GNZ is firmly convinced that its current measures satisfy all requirements of the MMPA and its implementing regulations. Opp. at 29.

## VI.    MHDD HAS MISCHARACTERIZED THE ROLLOUT OF THE GNZ'S ELECTRONIC MONITORING PROGRAM

MHDD speculates that the GNZ might increase aspects of its monitoring program in response to an import ban and, as evidence that this is "likely," claims that "on-board camera installation was reduced from an expected 300 to 255 vessels because 45 vessels chose to switch from harmful fishing methods in order to avoid on-board camera monitoring." Opp. at 20. We refer the Court to the following GNZ website captioned "On-board cameras for commercial fishing vessels," which is available at: https://www.mpi.govt.nz/fishing-aquaculture/commercial-

18

fishing/digital-monitoring-of-commercial-fishing/on-board-cameras-for-commercial-fishing-vessels.

This website explains that all in-scope inshore vessels must operate cameras during fishing, as well as during related activities such as setting, hauling, sorting, processing and returning fish to the sea, and while transiting to and from fishing locations. All trawling vessels 8 meters to 32 meters in length, except those targeting scampi, are in-scope and must operate cameras. All set net vessels greater than or equal to 8 meters are also in-scope and must operate cameras (except when using one or more tenders to haul the nets).

These camera requirements have been subject to a phased rollout since August 1, 2023. The rollout was completed by May 28, 2025. MHDD speculates that the GNZ delayed implementing electronic monitoring measures "until the *Sea Shepherd* case produced an import ban; at which point 'New Zealand sped up and largely completed the rollout of electronic monitoring in the WCNI and other fisheries.'" Opp. at 27. MHDD cites para. 25 of the Simmons Declaration in support of this allegation, which supposedly establishes that the GNZ will once again take some type of action in response to a new import ban.

However, para. 25 of the Simmons Declaration *contains his opinion* of how the GNZ responded to the *Sea Shepherd* import ban, but *Simmons cites no evidence to support that opinion*.[15] In fact, the GNZ engaged in an orderly and phased rollout. *See* Second Declaration of Emma Taylor, attached hereto as Exhibit 1.[16] Thus, Mr. Simmons has failed to establish what he

---

[15] Mr. Simmons acknowledges that he is providing an opinion, not evidence: "In my opinion, these observations indicate that external trade measures, when combined with domestic regulatory settings, can influence fishing practices and reduced fishing pressure in Māui and Hector's dolphin habitat. *Id.* at para. 26.

[16] See also Cabinet paper captioned "Rollout of On-Board Cameras on Commercial Fishing Vessels – Updated timeframes," available at:

calls the GNZ's "regulatory escalation and increased oversight during the *Sea Shepherd* litigation." *Id.*

Similarly speculative is MHDD's claim that "It is likely GNZ would have taken even further protective action had NMFS not indicated that it would soon issue a new comparability finding to lift the [*Sea Shepherd*] import ban." Opp. at 28. This claim has no factual basis, and MHDD cites none. Thus, it constitutes wishful thinking that does not satisfy the likelihood test. It also represents MHDD's argument on the merits: "Defendants *may not use their historical failure to comply with the law* to shield themselves from judicial review of that very failure on redressability grounds." Opp. at 28.[17] However, elsewhere, MHDD concedes that the merits are irrelevant to the standing inquiry. Opp. at 5.

Equally lacking in merit is MHDD's effort to convince the Court that the phased implementation of the on-board camera installation requirement caused 45 out of an expected 300 vessels to "switch from harmful fishing methods in order to avoid on-board camera monitoring." Opp. at 20. In support of this contention, MHDD once again relies on Declarant Simmons. We refer the Court to the February 9, 2024 GNZ document captioned "Overview of the rollout of on-board cameras on commercial fishing vessels," upon which Simmons relies, which is available at: https://www.mpi.govt.nz/dmsdocument/61636-Overview-of-the-rollout-of-on-board-cameras-on-commercial-fishing-vessels-briefing-B24-0023. That document states (at 3) that:

> Originally the rollout was expected to be closer to 300 vessels. This reduction has primarily been due to some vessels choosing to no longer undertake fishing

---

https://www.mpi.govt.nz/dmsdocument/58843/direct. This paper explains (at para. 9) that delays in achieving the originally scheduled rollout dates were "due to a range of technical challenges, including aspects related to ensuring the system meets all security and privacy requirements."
[17] *See also* Opp. at 30 ("an import ban . . . [is] a public statement that *the fisheries are unsustainable and operating in a manner that causes excessive bycatch*."

methods requiring on-board cameras, for example, *vessels that undertake both rock lobster potting and setnet* choosing to stop using setnet.[18]

Emphasis added. MHDD has misleadingly failed to provide the full quotation along with additional context in that document (at 14), which shows a decrease in the number of *all* commercial vessels regardless of whether cameras were required on those vessels.

## VII. THE GNZ'S EXPRESSIONS OF CONCERN IN 2019 ABOUT THE IMPACT OF AN IMPORT BAN ARE IRRELEVANT IN 2026

MHDD first asserts that the GNZ's responses to two Official Information Act ("OIA") requests in 2019 demonstrate that the GNZ "does not anticipate other markets being able to compensate for the lost U.S. market in the event of an import ban, at least in the near term." Opp. at 22. These responses are denominated as OIA24-0894 and OIA24-0699. *See* Opp. at 23 and 26. MHDD provided these two responses as Exhibits H and G, respectively, to its Opposition to the Defendants' Motion to Dismiss. Both responses were compiled in 2019, i.e., well before the GNZ implemented its enhanced fishing restrictions and monitoring measures in October 2020, and as such are irrelevant.[19]

Nevertheless, MHDD alleges that a new import ban: (1) would once again have a greater disruption on the market beyond the two WCNI fisheries (Opp. at 23); (2) could in the worst case scenario "initially impact all of New Zealand's fisheries exports to the US ($246 million of

---

[18] Needless to add, fishermen enter and exit fisheries all the time, so the expectation that cameras might be required on 300 vessels was necessarily a projection.

[19] MHDD also alleges that Sea Shephard's action in filing a petition for an emergency rulemaking on February 6, 2019 caused the GNZ to "urgently" expedite progress on its Threat Management Plan ("TMP"). Opp. at 27. However, no such expedition occurred since it was not until October 2020 that the GNZ implemented its additional measures pursuant to the TMP, which was only finalized in 2020. Nor has MHDD cited any evidence of a GNZ intent to "expedite" its required processes. Moreover, the fact that the GNZ may have considered its TMP as the basis to avoid U.S. trade measures in 2020 is irrelevant after the adoption of the enhanced measures in October 2020.

annual exports)" (Opp. at 25); and (3) would likely cause the GNZ to "adopt additional measures" due to its "deep fear" of an import ban (Opp. at 26). However, the information contained in these two OIA responses related to concerns that the GNZ expressed in 2019. Once the GNZ implemented the October 2020 measures, which were underway before Sea Shepherd commenced its litigation, these concerns no longer remained, as conclusively demonstrated by the GNZ's determination that it did not need to implement any additional measures after the import ban was imposed in *Sea Shepherd*. Thus, the information in the 2019 OIA responses is irrelevant to the situation today.

Equally irrelevant is the information in Exhibit F to MHDD's Opposition to the Motion to Dismiss. That document, dated March 28, 2019, expressed a GNZ concern that an import ban would: "necessitate a traceability and certification programme" and would "undermine the reputation of New Zealand's fisheries management regime and environmental credentials; and could encourage further such NGO-led actions in the US targeting New Zealand fisheries." Opp. at 25.

That is all water under the bridge because the GNZ's actions since it implemented its October 2020 measures demonstrate both that it has already developed a traceability and certification program in response to the *Sea Shepherd* import ban and has determined that any "reputational risk" (which MHDD has failed to document) is a minimal concern, at most. To put it another way, MHDD has provided no evidence that U.S. importers or third country importers stopped buying New Zealand seafood due to concerns about the GNZ's reputation.[20]

---

[20] Equally irrelevant is MHDD's reliance on the GNZ's motion for permissive intervention in Court No. 24-00218 where the GNZ stated that an import ban "would likely require the NZG to take additional actions and conduct additional analyses that would impose significant burdens." Opp. at 26. However, the GNZ never stated that any of those possible "actions" or "analyses" would include additional fishing restrictions or monitoring measures. Moreover, the unlikelihood

22

## VIII.  CONCLUSION

For all these reasons, the Court should dismiss the MHDD's lawsuit for its failure to satisfy the standing requirement.

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly (Lead counsel)
Robert G. Gosselink
Kenneth N. Hammer

Trade Pacific PLLC
700 Pennsylvania Avenue, S.E.
Suite 500
Washington, D.C. 20003
Phone: 202-223-3760
wconnelly@tradepacificlaw.com

*Counsel for the Government of New Zealand*

---

of such actions at this time has been further reduced by the 2026 Comparability Finding, which explains in far greater detail than the Comparability Finding at issue in Court No. 24-00218 why the GNZ's measures comply with the MMPA and its implementing regulations.

Also irrelevant is MHDD's reliance on the GNZ's statement in this case that an import ban "would upset the carefully considered commercial fishing restrictions and monitoring provisions that the NZG has adopted over time and that it continues to update and enhance." Opp. at 26. Here again, the GNZ did not say that an import ban would cause it to implement any additional measures.

23

<u>CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATION</u>

This Reply contains 6,839 words and, therefore, complies with the 7,000

word count limitation in Standard Chambers Procedures 2(B)(1).


<u>/s/ Warren E. Connelly</u>
Warren E. Connelly
