**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |  |
|---|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Court No. 1:26-cv-02462-JCG |
| NATIONAL MARINE FISHERIES SERVICE, et al., | ) ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) | |
| NEW ZEALAND GOVERNMENT, | ) ) | |
| Defendant-Intervenor. | ) ) | |

**DEFENDANTS' REPLY IN SUPPORT OF ITS
MOTION TO DISMISS PURSUANT TO RULE 12(B)(1)**

<table>
<tr><td>

OF COUNSEL:<br>
MARK HODOR<br>
Office of the General Counsel<br>
National Oceanic & Atmospheric Administration<br>
<br>
ANGELA CHERMAN<br>
RAYMOND MAGORIEN<br>
Office of the Chief Counsel<br>
U.S. Customs and Border Protection<br>
<br>
DANIEL PAISLEY<br>
Office of Tax Policy<br>
Department of the Treasury<br>
<br>
June 4, 2026

</td><td>

BRETT A. SHUMATE<br>
Assistant Attorney General<br>
<br>
PATRICIA M. MCCARTHY<br>
Director<br>
<br>
AGATHA KOPROWSKI<br>
OLIVER J. MCDONALD<br>
Trial Attorneys<br>
U.S. Department of Justice, Civil Division<br>
P.O. Box 480, Ben Franklin Station<br>
Washington, D.C. 20044<br>
Tel: (202) 507-6081<br>
Fax: (202) 353-0461<br>
Email: agatha.koprowski@usdoj.gov<br>
<br>
*Attorneys for Defendants*

</td></tr>
</table>

**TABLE OF CONTENTS**

Table of Contents.................................................................................................................ii

Table of Authorities ............................................................................................................iii

Introduction......................................................................................................................... 1

Argument ............................................................................................................................. 4

    I.   MHDD Mischaracterizes The Government's Arguments....................................... 4

        A.   To Be Predictable, MHDD Must Predict Something Will Occur.......................... 4

        B.   MHDD Misunderstands Basic Economics ............................................................ 7

        C.   MHDD Misapprehends Its Obligation to Allege Facts to Support
            Its Conclusions.................................................................................................... 13

        D.   The Court Should Respect What Congress And NMFS Have Actually Said....... 15

    II.  MHDD Cannot Demonstrate Causation With Mere Encouragement ............................... 18

Conclusion ........................................................................................................................ 22

## TABLE OF AUTHORITIES

**Cases**                                                                                 **Page(s)**

*Am. Ass'n of Exporters & Importers-Textile & Apparal Grp. v. Untied States,*
  751 F.2d 1239 (Fed. Cir. 1985).................................................................................. 1

*Animal Welfare Institute v. Kreps,*
  561 F.2d 1002 (D.C. Cir. 1977)............................................................................... 16

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)................................................................................................ 13

*Competitive Enter. Inst. v. Fed. Commc'ns Comm'n,*
  970 F.3d 372 (D.C. Cir. 2020)............................................................................. 9, 12

*Corus Staal BV v. Dep't of Commerce,*
  395 F.3d 1343 (Fed. Cir. 2005)................................................................................. 1

*Dep't of Commerce v. New York,*
  588 U.S. 752 (2019)..................................................................................... 18, 19, 20

*Diamond Alternative Energy LLC v. Envtl. Prot. Agency,*
  606 U.S. 100 (2025)..................................................................................... 12, 18, 19

*Food & Drug Admin. v. Alliance for Hippocratic Medicine,*
  602 U.S. 367 (2024)..........................................................................................*passim*

*Kōloa Rum Co. v. Noem,*
  -- F. Supp. 3d --, Civil Action No. 25-554, 2026 WL 145882 (D.D.C. Jan. 20, 2026)........ 9, 12

*Larson v. Valente,*
  456 U.S. 228 (1982)................................................................................................. 8

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)...................................................................................... 3, 7, 16

*Massachusetts v. Envtl. Prot. Agency,*
  549 U.S. 497 (2007).......................................................................................... 8, 20

*Morrison v. Nat'l Australia Bank, Ltd.,*
  561 U.S. 247 (2010)...................................................................................... 13, 14

*Murthy v. Missouri,*
  603 U.S. 43 (2024)................................................................................................. 20

iii

*Novak v. United States*,
   795 F.3d 1012 (9th Cir. 2015) ................................................................................... 9

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) .................................................................................................. 16

*Trusted Integration, Inc. v. United States*,
   659 F.3d 1159 (Fed. Cir. 2011) ................................................................................ 13

*Uzuegbunam v. Preczewski*,
   592 U.S. 279 (2021) .................................................................................................... 8


**Statutes**

16 U.S.C. § 1361 ............................................................................................................. 16

16 U.S.C. § 1371 ....................................................................................................... 1, 4, 5

16 U.S.C. § 1387 ............................................................................................................. 14


**Rules**

USCIT R. 12 ............................................................................................................ 1, 13, 14


**Regulations**

50 C.F.R. § 216.3 ............................................................................................................ 14

50 C.F.R. § 216.24 .......................................................................................................... 15


**Other Authorities**

*Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection
   Act—Notification of Comparability Findings*,
   91 Fed. Reg. 11,962 (Dep't of Commerce March 11, 2026) .................................... 15

Agreement on the International Dolphin Conservation Program,
   May 21, 1998, TAIS 12956 ....................................................................................... 17

Dep't of State, AIDCP Status List, *available at* https://www.state.gov/wp-content/uploads/2019/03/214-Intl-Dolphin-Conservation.pdf (last visited Mar. 13, 2026) ..... 17

Kenneth J. Arrow, *Economic Theory and the Hypothesis of Rationality* 198, 201, *in* The New Palgrave The World of Economics (John Eatwell, et al. eds., 1991) ....................................... 10

Nat'l Oceanic & Atmospheric Admin.,
2020 Final List of Foreign Fisheries .................................................................................. 10, 11

Nigar Hashimzade, Gareth Myles, and John Black, Law of Demand, *Elasticity of Supply*, A Dictionary of Economics (online edition Oxford Univ. Press 5th ed. 2017), https://www.oxfordreference.com/view/10.1093/acref/9780198759430.001.0001/acref-9780198759430-e-972 ....................................................................................................... 9, 10

Partha Dasgupta, *Markets*, Economics: A Very Short Introduction (online ed. Oxford Academic 2013), https://doi.org/10.1093/actrade/9780192853455.003.0005 ...................... 9, 10

H.R. Rep. No. 92-707 (1971)........................................................................................................ 16

H.R. Rep. No. 92-1488 (1972)...................................................................................................... 16

H.R. Rep. No. 100-970 (1998)........................................................................................... 16, 17, 18

Sen. Rep. No. 92-863 (1972) ........................................................................................................ 16

Defendants respectfully file this reply in support of their motion to dismiss pursuant to Rule 12(b)(1). ECF No. 16 (Apr. 9, 2026) (MTD).[1]

**INTRODUCTION**

MHDD misreads most of the Government's arguments in the MTD. To be clear, the Government's position is not that this Court "lacks jurisdiction to hear *any* case that involves the Executive Branch's international trade decisions because they involve foreign policy." ECF No. 30 at 17 (May 14, 2026) (Response). *But see Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1349 (Fed. Cir. 2005) (giving deference to an agency's trade decision "because of [its] foreign policy implications"); *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. Untied States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (explaining that relief that would hinder foreign policy "should not be countenanced absent the clearest of indications from Congress"). The Government routinely appears before this Court without contesting jurisdiction. The Government does not even contest that this Court could exercise jurisdiction to adjudicate some claims involving the § 1371(a)(2) import ban, despite the potential implications on foreign affairs. The plaintiffs who would likely have standing to bring such claims would demonstrate that they are harmed by the Government's determination to impose, or not to impose, an import ban, such as U.S. importers of the affected products or U.S. fishers who compete with those products.

The premise of the Government's motion is simple: MHDD must connect the dots (1) between the Government's regulation of *importation* and the alleged injuries to its members arising from actions taken by fishers who are not regulated by, or under the jurisdiction of, the

---

[1] The Government adopts and incorporates by reference terms defined in the MTD to the extent not defined herein.

United States Government and (2) between an order from this Court and redress of MHDD's alleged injuries caused by third party actors not regulated by the Government or within the Court's control. Instead of providing a discernable path, MHDD appears to believe that if it simply repeats the words "effective," "basic," "commonsense," or "gross[] misinterpretation" enough, a path will manifest. MHDD cannot meet its burden with smoke and mirrors, and the Complaint must be dismissed.

MHDD has seemingly abandoned the theory in the Complaint that its injuries cannot be redressed without eliminating set net and trawl fishing in all New Zealand commercial fisheries. MHDD had alleged that "[e]xtinction is inevitable" unless New Zealand meets MHDD's interpretation of the standards set out by the MMPA. Complaint ¶ 5. It now argues that although "expanded closures likely are necessary to sufficiently reduce bycatch risk to satisfy the Import Provision's standards, they are not necessary to establish redressability." Response at 5. Rather, MHDD contends it has standing because "[a]ny response to an import ban that partially redresses bycatch risk is sufficient" to remedy its alleged aesthetic and other injuries. *Id.* But if extinction is "inevitable" unless MHDD is satisfied that the MMPA standards are met, then how can anything less than closing the challenged fisheries in their entirety redress the aesthetic injuries to MHDD's members? How is an aesthetic injury partially redressed? If bycatch has not been verified for more than a decade (as is the case with the Māui dolphin), how can risk be further diminished? How would "prohibiting bycatch" (which is already prohibited), "implementing bycatch limits" (which are already implemented), or "improving bycatch monitoring" (which is already at least as extensive as in the United States) "partially" redress these aesthetic injuries? Response at 29. MHDD does not provide the answers that are necessary for it to meet its burden.

2

MHDD provides nothing more than conjecture, and it has not carried its burden to establish this Court's jurisdiction.

Even assuming that its injuries are susceptible to partial redress through a reduction in bycatch risk, no matter how small, MHDD wholly fails to carry its burden to demonstrate how a favorable order issued by this Court would *likely* and *predictably* reduce bycatch on the other side of the planet in waters regulated by an independent sovereign state. MHDD's theory of causation apparently starts with (1) this Court's order imposing an import ban, which (2) MHDD hopes would decrease overall demand for fish caught in the challenged fisheries such that (3) the price for those fish falls, in turn (4) reducing the incentive to continue fishing efforts with challenged equipment, so (5) fishers leave the trade, invest in new fishing gear, or take other unidentified actions and (6) bycatch of Māui and Hector's Dolphins is thereby reduced and (7) it is consequently more likely that MHDD's members will be able to view and enjoy the animals.

MHDD's theory of standing is significantly more uncertain than the circumstances in which the Supreme Court has acknowledged it is "substantially more difficult," if not impossible, to establish standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (internal quotation marks omitted). Redress of its alleged injuries does not even "hinge on the response of the regulated (or regulable) third party to the government action or inaction," but on parties far outside the reach of U.S. Executive or Judicial Branch authorities. *Id.* And the causal chain on which MHDD relies is much further removed than that of a firefighter who might sue to object to relaxed building codes, a police officer who might challenge legalization of certain activities associated with crime, or a teacher in a border state suing over allegedly lax immigration policies purportedly leading to overcrowded classrooms—each of which is "too

3

attenuated" to establish standing and "flatly inconsistent with Article III." *Food & Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 391-92 (2024) (*AHM*).

MHDD's avenue for relief lies with political actors in New Zealand, not with this Court. *See, e.g.*, *id.* MHDD's highly attenuated, multi-step chain of causation is riddled with basic errors and, at every step, simply waves away complex questions about how the global trade in seafood might react (or not) to an American import ban.

Nothing about MHDD's theory of standing is predictable, much less logical, and it does not pass constitutional muster. Accordingly, the action must be dismissed.

## ARGUMENT

### I.  MHDD Mischaracterizes The Government's Arguments

#### A.  To Be Predictable, MHDD Must Predict Something Will Occur

MHDD misconstrues and misunderstands the Government's arguments on causation and redressability, repeatedly asserting that the Government argues that import bans are "ineffective." Response at 1, 6, 12, 14-15. The Government does not argue anywhere in the MTD that import bans are a wholesale ineffective policy tool. Rather, the MTD uses the term "ineffectiveness" once to explain that "*Court-ordered* import bans" have historically failed to *close* foreign fisheries, in part because a judicial injunction forcing an embargo can undermine the efficacy of additional diplomatic and foreign policy tools that could otherwise be leveraged against the threat of a ban (or offer to lift one). MTD at 17. That a judicially imposed import ban under § 1371(a)(2) has never resulted in the closure of a foreign fishery is a historical fact not in dispute.

The question is not whether import bans are "effective" or "ineffective," Response at 1, 6, 7, 8, 12, 13, 14, 15, 16, 19, but whether the effects of an import ban would redress the injuries alleged in the Complaint. MHDD asserts that it need not predict how its injuries will be

4

redressed with any certainty or precision. Response at 5. But MHDD does not explain how a decision from this Court might redress its alleged injuries *at all*. The correct standard requires MHDD to demonstrate that the causal links between the allegedly unlawful Government action and the injurious actions are not "too speculative or too attenuated," and that third parties would react in "predictable" ways in response to an order from this Court. *AHM*, 602 U.S. at 383; *see also* MTD at 13; Response at 2.

MHDD can cite no evidence that a § 1371(a)(2) import ban (whether resulting from an agency action or a court order) has ever led to the *closure* of a single commercial fishery. The recent reconsideration of comparability for certain fisheries following initial denials in September 2025 does not change this fact. *Compare* Response at 14-15 *with* Response Exhibit C (stating that Grenada prohibited intentional taking of marine mammals without indicating that Grenada closed any commercial fisheries); Response Exhibit D (same for Ireland); *and* Response Exhibit E (noting that Vietnam increased its data collection efforts and provided additional information allowing NMFS to determine the effectiveness of mitigation measures without indicating that Vietnam closed a commercial fishery). MHDD's focus on a small handful of jurisdictions that promptly reacted to the threat of an import embargo masks the reality that 38 additional countries have not taken such steps and that roughly 250 additional fisheries remain subject to an import embargo under § 1371(a)(2). MHDD's best evidence is that approximately eight out of nine foreign jurisdictions have *not* taken concrete steps to avoid an import ban in the year since NMFS issued preliminary denials. No common understanding of "likely" or "predictable" encompasses a one-in-nine chance.

To the extent that remedying the alleged injury relies on closing fisheries or a foreign sovereign taking other concrete action, it is neither *predictable* nor *likely* that such an event

would flow from an import prohibition, so MHDD cannot rely on this theory to support standing. MTD at 16-17.

The Government does not agree with the premise, posited by MHDD, Response at 5, that *any* partial reduction in bycatch risk, no matter how minuscule, could satisfy MHDD's burden to establish standing. MHDD has certainly not explained what partial redress to its alleged aesthetic injuries looks like. But even accepting MHDD's theory, it has not established that an import embargo would *predictably* lead to such results in the challenged New Zealand fisheries. Rather, "the government action"—prohibiting certain imports—"is so far removed from [any] distant (even if predictable) ripple effects" on New Zealand policy that MHDD cannot establish standing. *AHM*, 602 U.S. at 383.

MHDD accuses the Government of "ignoring" relevant New Zealand statutory authorities because, it maintains, the Fisheries Act and NZ MMPA purportedly authorize the NZG to take all types of actions to manage fisheries and promote conservation of marine mammals. Response at 30-31. The Government does not purport to independently characterize New Zealand's statutory scheme but, rather, credits the NZG's explanation to this Court (in direct contradiction of MHDD's interpretation of New Zealand law, *id.* at 31) that it has *no* statutory authorization to take such action *in response to an importation embargo* imposed by the United States or a U.S. Court, Taylor Decl. ¶¶ 3-4. If an embargo is not a statutory basis permitting modification of fisheries management in New Zealand, then it is clearly speculative to assume that a ban would nonetheless prompt such action by a foreign sovereign as no current legal authority appears to expressly authorize, much less require, it.

Even if MHDD's unsupported interpretation of New Zealand law were correct, it might demonstrate that New Zealand has an abstract legal authority to take some action that MHDD

6

contends would reduce bycatch. But MHDD does not allege, much less demonstrate, that New Zealand would be obligated to exercise its authority. And why would New Zealand adopt tenuous legal theory it has expressly disavowed in a sworn declaration to undertake a discretionary fisheries management action? MHDD's urges this Court to disbelieve its own lying eyes about what the NZG says about its legal authorities and sovereign policy priorities and accept instead MHDD's own ahistorical conjecture about what a foreign sovereign will do.

Whether the NZG will take any action, assuming it even has the authority to do so, "depends on the unfettered choices made by [an] independent [foreign nation] . . . whose exercise of broad and legitimate discretion [this Court] cannot presume either to control or to predict." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). MHDD does not, and cannot, meaningfully argue otherwise.

B.  MHDD Misunderstands Basic Economics

The Government has never argued that, as a matter of law, MHDD must demonstrate that its redress must be "complete[]" to establish standing. Response at 3, 4, 29. As the MTD reflects, MHDD has repeatedly *alleged* that its injuries cannot be redressed so long as commercial fishing continues in the challenged fisheries. *Compare* MTD at 11 ("Based on the Complaint, the *alleged* injury . . . can only be redressed by eliminating set net and trawl fishing in all New Zealand commercial fisheries."); *id.* at 14 ("MHDD *Asserts* That Its Injury May Only Be Redressed by Closure of All Set Net and Trawl Fisheries."); *id.* ("MHDD has repeatedly *argued* that the only solution for MHDD and its members to avoid injury is to eliminate the use of set net and trawl fisheries.") (emphases added) *with* Response at 5 (asserting that "expanded closures likely are necessary to sufficiently reduce bycatch risk").

While MHDD now insists it need not demonstrate that an import ban would lead to the closure of the challenged fisheries because it need only demonstrate some "small reduction of

7

injury," Response at 4, the cases on which MHDD relies are largely inapposite and its theory of partial relief is unclear. MHDD has arguably alleged distinct injuries insofar as, for example, an aesthetic injury is distinct from an artistic one. Complaint ¶ 12. But its alleged injuries rise and fall together. MHDD has not articulated any basis on which this Court could fashion a remedy to redress, for example, its alleged scientific injuries but not its recreational ones, so it cannot rely on a theory that one of its alleged *discrete* injuries will be redressed by a judicial action. *Cf. Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself."). Likewise, MHDD does not seek compensatory damages, so caselaw establishing the effectiveness of nominal damages paid directly to a plaintiff does not support its theory of redress. *Cf. Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) ("Because nominal damages are in fact damages paid to the plaintiff, they . . . independently provide redress."). And MHDD is not asserting a fundamental procedural right conferred by Congress and necessary to protect its "quasi-sovereign interests" as a state, so it cannot claim any "special solicitude" from this Court. *Massachusetts v. Envtl. Prot. Agency*, 549 U.S. 497, 520 (2007). The Government will not guess what MHDD means by a "small reduction" in an aesthetic or recreational injury in the face of what MHDD alleges is an existential threat to the existence of these two species, and neither should this Court.

In any event, the Government did address MHDD's oblique suggestion (not alleged in the Complaint) that its injuries could be redressed through a reduction in fishing efforts in the challenged fisheries. *See* MTD at 23-24.

Assuming for the sake of argument that any reduction in fishing efforts, no matter how insignificant, is adequate to establish redressability—despite MHDD's own repeated allegations

that its injuries *cannot* be remedied so long as any fishing continues in the challenged fisheries—MHDD has failed to meet its burden. MHDD relies almost entirely on what it characterizes as "basic laws of economics" to argue that a fishing embargo would reduce fishing efforts in the challenged fisheries. Response at 6, 19. But this—the premise of MHDD's entire standing argument—is incorrect.

Although MHDD does not adequately explain the basis for its assertion that "a reduction in demand typically results in a reduction in supply," Response at 19,[2] it appears to be alluding to the supply and demand curves commonly taught in introductory economics courses. These curves are often represented on a graph, with quantity measured on the x-axis and price measured on the y-axis. The line representing demand slopes down, peaking where price is high and quantity is low, while the line for supply slopes up, peaking where price and quantity are both high. As first-year economics students learn, in an ideal, unitary market, price is considered at an equilibrium at the single point at which the two curves meet because the demand meets the available supply. *See, e.g.*, Partha Dasgupta, *Markets*, Economics: A Very Short Introduction (online ed. Oxford Academic 2013), https://doi.org/10.1093/actrade/9780192853455.003.0005. In this hypothetical market, the suppliers are price-takers, meaning the market sets the price and suppliers meet it. *Id.*; *see also* Nigar Hashimzade, Gareth Myles, and John Black, Law of Demand, *Elasticity of Supply*, A Dictionary of Economics (online edition Oxford Univ. Press

---

[2] MHDD cites to two out-of-circuit cases, neither of which purport to define the "laws" of supply and demand as MHDD states. *See Competitive Enter. Inst. v. Fed. Commc'ns Comm'n*, 970 F.3d 372, 383 (D.C. Cir. 2020) ("Without the condition [prohibiting certain fees], New Charter 'would find it profitable to reduce its subscriber charges somewhat to attract more subscribers and thus greater revenues from interconnection fees.'") *Kōloa Rum Co. v. Noem*, -- F. Supp. 3d --, Civil Action No. 25-554, 2026 WL 145882, at *7 (D.D.C. Jan. 20, 2026) ("[T]he law of supply and demand tells us that, when demand for a good remains constant, a decrease in the supply of that good will cause an increase in price.") (quoting *Novak v. United States*, 795 F.3d 1012, 1024 (9th Cir. 2015) (Friedland, J., concurring)).

5th ed. 2017), https://www.oxfordreference.com/view/10.1093/acref/9780198759430.001.0001/acref-9780198759430-e-972.

This theoretical world, however, is not a reliable predictor of outcomes in the world in which we actually live. *Cf. Markets* ("Marshall's famous demand and supply curves mislead in one important way."). Real world markets are interdependent, meaning that there may be more than one set of prices at which demand may equal supply. *Id.* And they are subject to various so-called failures, including unideal allocation of resources, monopolies, and various macroeconomic forces. *Id.* Ultimately, it is difficult to infer anything useful about rational supply changes in response to changes in demand because the agents acting "are different in unspecifiable ways." Kenneth J. Arrow, *Economic Theory and the Hypothesis of Rationality* 198, 201, *in* The New Palgrave The World of Economics (John Eatwell, et al. eds., 1991). An informed analysis would, at a minimum, consider the elasticity of markets for these fisheries, the extent with which their sales rely on domestic demand, the costs of modifying or abandoning commercial practices, and the availability of other alternative markets, not to mention the psychological impediments to change, such as the sunk costs of expensive equipment in which fishers have already invested.

The fault with MHDD's self-serving economic theory is further illustrated by considering one rational response to an import prohibition—investing in new gear that does not present the same alleged risk to marine mammals. Each of the challenged fisheries target numerous species, many of which are harvested in unchallenged fisheries as well. For example, among the species harvested using set nets or trawls in Fishery IDs 1968, 1969, 1977, 2041, 2051, 2052, 2053, 2054, and 2064 is snapper (*Pagrus auratus*). *See* Nat'l Oceanic & Atmospheric Admin., 2020 Final List of Foreign Fisheries. Snapper is also harvested in New Zealand fisheries using Danish

10

seines (Fishery IDs 2035, 1897), ring nets (Fishery ID 1895), handlines (Fishery ID 1887), longlines (Fishery IDs 1882, 2075, 2095), fish pots (Fishery ID 2043), lobster traps (Fishery ID 2089), and purse seines (Fishery ID 1881), none of which are challenged in this litigation. *Id.* If exports of snapper harvested with set nets and trawls to the United States are prohibited, one rational response by fishers would be to change the type of gear they use and begin harvesting with lines, pots, seines or ring nets. But MHDD's position is that a "properly implemented" import prohibition would cover all products of any species harvested in a challenged fishery, *even if the fish had been harvested in an unchallenged fishery.*[3] Simmons 2026 Decl. ¶ 30. If fishers cannot guarantee regaining access to the U.S. market by adopting unchallenged gear, the entire economic incentive to purchase new gear and modify other equipment is eliminated.

MHDD cannot have it both ways. If MHDD's theory is that the economic injury will be so inflated (and thus motivating) to fishers because a "properly implemented ban" would be immensely broad and impactful, *id.*, then it follows that an overly broad prohibition would serve as a *barrier* to gear modification if fishers' economic investment would not result in U.S. market access. Why would a fisher take the time and expense to invest in new gear in exchange for no apparent economic benefit? MHDD does not explain.

MHDD accuses the Government of placing too high a burden on it by asking that it supply basic economic facts to support its "basic" economic argument. *E.g.*, Response at 5, 21.

---

[3] MHDD did not respond to this characterization of its position. MTD at 17. Accordingly, MHDD appears to agree that it seeks an injunction that would effectively bar the importation of products that have *not even been alleged* to have been harvested in a manner that poses a risk to any marine mammal species. It is unclear on what legal basis MHDD believes that products harvested outside of the challenged fisheries could or should be subject to an import embargo.

But MHDD bears the burden to demonstrate this Court's jurisdiction, which it cannot avoid by insisting that the Government prove a negative.

MHDD asserts, Response at 19, 20, 21, 23, 26, 28, that it is mere "commonsense" to conclude that fishers would change behaviors in response to the closure of an important export market. MHDD does not explain why, if it were merely common sense, fishers in the previously embargoed fisheries apparently did *not* exit the market in significant numbers in response to the *Sea Shepherd* ban. Its own hearsay evidence demonstrates that commercial fishers in New Zealand have responded to changes in New Zealand policies, *not* "the threat of or an actual import ban." Response at 20-21 (citing Rose Decl. ¶ 78, 80; Simmons 2026 Decl. ¶ 26).

In an attempt to support its unsupportable economic theory, Response at 19-20, MHDD relies on cases presenting entirely distinguishable scenarios—direct business relationships between plaintiffs and regulated parties, *Diamond Alternative Energy, LLC v. Envtl. Prot. Agency*, 606 U.S. 100, 116 (2025) ("As the Court has explained, when the government regulates (or under-regulates) a business, the regulation (or lack thereof) may cause downstream or upstream economic injuries to others in the chain, such as certain manufacturers, retailers, suppliers, competitors, or customers.") (internal quotation marks omitted); *Kōloa Rum*, 2026 WL 145882, at *7 (same), and direct consumer relationships between plaintiffs and regulated parties, *Competitive Enter.*, 970 F.3d at 383 (concluding that legal prohibition on broadband providers from extracting payments from service providers, like Netflix, logically led broadband providers to raise prices on consumers to maintain profits).

Even accepting MHDD's flawed premise that an order from this Court would prompt fishers outside of any regulatory power of the United States to modify their behavior, the fundamental question that MHDD again fails to address is *how* fishers would change their

12

behaviors. Would the fishers reduce fishing efforts? Maybe. Would they leave the fishing industry altogether? Maybe. Would the fishers adopt new gear and methods? Maybe. Would the fishers focus on other foreign or domestic markets? Maybe. Would the fishers advocate for retaliatory measures in response to what they view as U.S. overreach? Maybe. Or would they not react at all? Maybe.

Whether or not MHDD believes it has the answers to these questions, *cf.* Response at 30 n.15, the problem is that the Government and this Court do not know and cannot predict which, if any, of these actions are likely to occur.

     C.  <u>MHDD Misapprehends Its Obligation to Allege Facts to Support Its Conclusions</u>

MHDD accuses the Government of demanding the Court adjudicate merits arguments at the standing stage and claims that the Court "must assume" that "all of the challenged fisheries *are* catching Māui and Hector's dolphins in excess of U.S. standards for purposes of this inquiry." Response at 35. Not so.

The Government's motion merely seeks to hold MHDD to *its* burden to establish this Court's jurisdiction. In doing so, MHDD may *not* rely on legal conclusions, such as the bare assertion that marine mammal bycatch in the challenged fisheries is "in excess of United States standards." *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Furthermore, on a motion to dismiss for lack of jurisdiction, a plaintiff must provide evidence to establish *facts* in support of any challenged assertion. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).[4]

---

[4] While the Government framed this deficiency in terms of jurisdiction, it could also be construed as a failure to state a claim under USCIT R. 12(b)(6). *See Morrison v. Nat'l Australia*

MHDD fails on *alleging*, must less demonstrating, that each of the particular fisheries that it chose to challenge—and not some other fishery—catches marine mammal species in excess of U.S. standards. It alleges broadly that "[w]e know that each of the fifteen challenged fisheries catches Māui or Hector's dolphins." Response at 36.[5] But even if the Court accepts this unsupported and disputed factual allegation, it is not enough to reach the required *legal* determination that any one of these particular fisheries contributes independently to bycatch in excess of United States standards. Collective blame is insufficient. *See, e.g.*, 50 C.F.R. § 216.3 ("A commercial fishing operation that has a remote likelihood of causing incidental mortality and serious injury of marine mammals is one that *collectively* with other foreign fisheries . . . causes the annual removal of . . . [m]ore than 10 percent of any marine mammal stock's bycatch limit, yet that fishery *by itself* removes 1 percent or less of that stock's bycatch limit annually.") (emphasis added); 16 U.S.C. § 1387(b)(2) ("Fisheries which maintain insignificant serious injury and mortality levels approaching a zero rate shall not be required to further reduce their mortality and serious injury rates.").

MHDD conflates, Response at 34, the *analysis* of New Zealand's fisheries management program and NMFS's statutory and regulatory obligations to reach fishery-by-fishery *determinations*. NMFS considered the management program holistically because, as it explained, "the GNZ's overarching regulatory framework applies equally to the North and South Island set net and trawl fisheries, with certain specific differences based on where the fishery is prosecuted and its potential to interact with marine mammals." Decision Memorandum at 15 n.81. "Based

---

*Bank, Ltd.*, 561 U.S. 247, 254 (2010) (declining to remand when identified error "would only require a new Rule 12(b)(6) label for the same Rule 12(b)(1) conclusion").

[5] This assertion contradicts NMFS's conclusions. *See* Decision Memorandum at 15-16 n.81.

on the record currently before the agency, NMFS does not have any reason to believe that any one fishery or set of fisheries is resulting in a disproportionate impact such that an individual fishery-by-fishery analysis is warranted in this case." *Id.*; *see also* 50 C.F.R. § 216.24(h)(1)(i). Although the *decision memorandum* provides a mostly consolidated analysis, the final determinations are discrete. MHDD, therefore, does not challenge a single comparability finding, Response at 33, but a set of findings for 15 individual fisheries, 2026 Comparability Findings, 91 Fed. Reg. at 11,963 ("As a result of these *findings*, NMFS announces the issuance of *comparability findings* that will allow the continued importation into the United States of fish and fish products harvested by New Zealand's set net and trawl fisheries . . . operating off the North Island and South Island. A more detailed analysis of NMFS' *comparability findings* . . . is contained in NMFS's Decision Memorandum dated March 2, 2026.") (emphasis added); *see also* Decision Memorandum at 15-16 n.81, 43, 44-45, 52, 54-55, 73-74 (separately analyzing fisheries, as appropriate).

Because applicable law requires, and NMFS in fact made, fishery-by-fishery determinations, MHDD must also at least *allege* (and demonstrate) some *facts* to support a conclusion, on a fishery-by-fishery basis, that the particular fisheries here have caused the alleged aesthetic and other injuries to its members and that the injurious actions are fairly traceable to the challenged agency action. It has not made any particularized factual allegations—much less demonstrated that those disputed facts are true—and thus it cannot meet its burden to demonstrate standing.

D.   <u>The Court Should Respect What Congress And NMFS Have Actually Said</u>

MHDD places significant emphasis on what it purports to be Congress's policy choices in the MMPA. *E.g.*, Response at 7-10. But MHDD fails to identify a single instance in which Congress has stated that "an import ban under the MMPA is an effective remedy for addressing

15

unsustainable marine mammal bycatch in foreign fisheries." *Id.* at 8. Rather, as we demonstrated, Congress has repeatedly emphasized the importance of international negotiation and cooperation—in other words, foreign diplomacy—as an effective means of promoting the MMPA's conservation goals. MTD at 3 (citing 16 U.S.C. § 1361(4); Sen. Rep. No. 92-863, at 10-11 (1972); H.R. Rep. No. 92-707, at 14, 16 (1971); H.R. Rep. No. 100-970, at 30 (1998); H.R. Rep. No. 92-1488, at 25 (1972) (Conf. Rep.)).

In advancing this argument, MHDD primarily relies on *Animal Welfare Institute v. Kreps*, 561 F.2d 1002 (D.C. Cir. 1977). Response at 7-8. In *dicta* in connection with an alternative holding and addressing an argument that had not been raised by the parties, the *Kreps* court stated that "we believe that Congress, in enacting the MMPA, established as a matter of law the requisite causal relationship between American importing practices and South African sealing practices." 561 F.2d at 1010. Even assuming this advisory discussion related to an alternative holding in a non-binding 50-year-old decision construing a different provision of the MMPA were relevant, this Court has an independent obligation to determine jurisdictional prerequisites as subsequent precedent makes clear. *Lujan*, 504 U.S. at 573 (rejecting the view that a standing requirement "had been satisfied by congressional conferral upon all persons of an abstract, self-contained, noninstrumental 'right' to have the Executive observe the procedures required by law"); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) ("Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III.").

MHDD incorrectly asserts that "Congress made explicit reference to the effectiveness of denying U.S. markets as a means of forcing changes in destructive fishing practices abroad."

16

Response at 8 (citing H.R. 100-970, at 15). MHDD's claim—that Congress asserted a power to "forc[e]" sovereign nations to change how they regulate commercial fishing—is unbelievable, and for good reason: neither the House report it cites nor the MMPA itself says any such thing. The House report discusses a requirement to determine whether yellowfin tuna purse seine fishers in the eastern tropical Pacific Ocean (ETP) "are using techniques and equipment that prevents mortalities of marine mammals in excess of U.S. standards." H.R. Rep. No. 100-970, at 15. The report summarizes that, of the 18 other nations that engage or engaged in such fishing, eight had met the required standards, while the other ten had left the market or were subject to an import ban. *Id.*

The report does not state that any of these eight countries were ever subject to a prohibition, or even threatened with one, so the denial of the U.S. market as an effective means to "forc[e]" change by a foreign sovereign is not implicit, much less "explicit." Perhaps more persuasively, of the eight countries that were allowed to export to the United States and discussed in the report, all but one was an original signatory to the Agreement on the International Dolphin Conservation Program, May 21, 1998, TAIS 12956 (AIDCP), which expanded on a similar 1992 multilateral treaty. *See* Dep't of State, AIDCP Status List, https://www.state.gov/wp-content/uploads/2019/03/214-Intl-Dolphin-Conservation.pdf. Both the AIDCP and its predecessor treaty had an explicit objective to "progressively reduce incidental dolphin mortalities in the tuna purse-seine fishery in the Agreement Area to levels approaching zero." AIDCP, art. II.1. It is much more plausible that the series of negotiated treaties with binding commitments, and not the illusory threat of embargoes, led to positive results. The actual impact of an import prohibition, as demonstrated by the report, is decidedly mixed. H.R. Rep. 100-970, at 15 (of the eleven countries operating in the ETP that were not party to the AIDCP,

17

the majority continued to operate fisheries in excess of U.S. standards despite an ongoing import prohibition).

Also contrary to MHDD's assertions, Response at 12-16, the Government has never "determined that MMPA import bans are effective at improving marine mammal protections in foreign fisheries" *id.* at 12. Rather, it has been the Government's consistent position that the MMPA import embargo, *in combination with appropriate diplomatic engagement and foreign policy tools*, can be (but is not always) an effective method for improving marine mammal conservation in foreign fisheries. MHDD's incomplete quotations from Government documents do not change this. *Compare* Response at 12-16 *with* Exhibit A.[6]

II.    MHDD Cannot Demonstrate Causation With Mere Encouragement

Under binding Federal Circuit precedent, causation cannot be established by mere "encouragement" of third-party actions. MTD at 22-23. MHDD attempts to diminish this argument by insisting in a footnote that more recent Supreme Court precedent abrogates Federal Circuit law. Response at 3 n.1. (citing *Diamond Alternative Energy, LLC v. Envtl. Prot. Agency*, 606 U.S. 100, 112 (2025), and *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019)). Neither of these decisions use the word "encourage" or "encouragement" anywhere in the discussion of standing, so it is unclear how they upset the holdings cited in the MTD. *See generally Diamond*, 606 U.S. at 100-26; *Commerce*, 588 U.S. at 752-85. Besides, each is readily distinguishable.

In *Diamond*, certain fuel producers challenged a California regulation that *mandated* car manufacturers to "manufacture a certain percentage of electric vehicles as part of their vehicle

---

[6] Nearly every one of the purported quotations from Government materials omits key words that contextualize the points and emphasize the importance of coordination between NMFS and its foreign counterparts. For readability, these are summarized in the table attached as Exhibit A.

fleets." 606 U.S. at 106-07. The fuel producers argued that, because the regulations "require[d]" third parties on which the plaintiffs' business models relied to produce proportionally fewer gas-powered vehicles, the producers would sell less fuel than they otherwise would have. *Id.* at 114. Although the policy underlying the California regulations was certainly to encourage electric vehicle production, the regulations did so by *requiring* automakers to take certain actions that had a direct and foreseeable downstream economic effect on the plaintiffs. *Id.* No comparable business relationship exists between MHDD and the third parties causing the alleged injuries to its members. Indeed, no comparable regulatory relationship exists between the Government and either the NZG or New Zealand's commercial fishers. The United States cannot require these commercial fishers to take any specific actions because the United States does not—and cannot—regulate foreign commercial fisheries; it only has the power, at most, to attempt to sway third parties (including other sovereign nations through diplomacy and negotiations) to adopt policies or practices.

In *Commerce*, several U.S. states, among other plaintiffs, challenged the Government's decision to add a citizenship question to the decennial census. 588 U.S. at 764. The lower court concluded that the addition of the citizenship question would, in fact, result in noncitizenship households responding to the census at a lower rate and thereby leading to undercounting of those households. *Id.* at 767. This undercounting would have a direct negative economic impact on the U.S. state plaintiffs. *Id.* The Supreme Court cited the historical evidence presented at trial that noncitizenship households previously have responded at lower rates than citizenship households and that "the discrepancy is likely attributable at least in part to noncitizens' reluctance to answer a citizenship question." *Id.* at 768. The Supreme Court concluded that the states thus had standing. *Id.* In this instance, MHDD does not rely on historical evidence of the

19

effect of an injunction on third parties in New Zealand. Unlike the 200-year history of census data collection developed at trial to inform the Supreme Court's analysis in *Commerce*, MHDD can cite to only one instance in which an import ban was put into effect with any of the challenged fisheries. That ban did *not* result in altered behavior by New Zealand fishers or prompt NZG to make changes to its fisheries management. Although MHDD argues that the previous ban was ineffective, it cannot escape the historical fact that there is no evidence that fishing practices changed *as a result of* the previous 18-month import embargo imposed by this Court in *Sea Shepherd* (even if the ban coincided with the implementation of previously promulgated fisheries management regulatory actions).

Even if *Commerce* could be construed as lowering the bar for redressability in some instances, *cf.* Response at 21 (accusing the Government as arguing "for a significantly higher bar"), it would not apply to MHDD. The plaintiffs determined to have standing in *Commerce* were limited to the U.S. state respondents. 588 U.S. at 767. The Supreme Court has repeatedly "recognized that [U.S.] States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts*, 549 U.S. at 518. Such U.S. "*state* plaintiffs are 'entitled to special solicitude' when it comes to standing" that does not apply to private persons, like MHDD. *Murthy v. Missouri*, 603 U.S. 43, 74 n.11 (2024).

The Supreme Court has also explained that, although the causation analysis is heavily fact-dependent, "the Court has identified a variety of familiar circumstances where government regulation of a third-party individual or business may be likely to cause injury in fact to an unregulated plaintiff." *AHM*, 602 U.S. at 384. The Court enumerated these circumstances, none of which apply to MHDD. *Id.*

20

MHDD has not alleged "the kinds of injuries . . . that unregulated parties sometimes can assert to demonstrate causation." *Id.* at 385. MHDD's members do not engage in commercial fishing activities that might suffer from allegedly unfair competition or other direct monetary injuries caused by continued importation of products from the challenged fisheries. *Cf. id.* at 385-86 ("Because the plaintiffs do not prescribe, manufacture, sell, or advertise mifepristone or sponsor a competing drug, the plaintiffs suffer no direct monetary injuries from FDA's actions relaxing regulation of mifepristone."). "Nor do [MHDD's members] suffer injuries to their property, or to the value of their property, from [the Government's] actions" *Cf. id.* at 385-86. And MHDD has not alleged that its members would suffer any direct injuries as a result of the Government's importation policies. *Cf. id.* at 385 ("Because the plaintiffs do not use mifepristone, they obviously can suffer no physical injuries from FDA's actions relaxing regulation of mifepristone.").

The Government does not dispute the sincerity of MHDD and its members in their opposition to commercial fishing practices in the waters of New Zealand or of their concern for marine mammals interacting with those fisheries. But "those general legal, moral, ideological, and policy concerns [about the regulations of others far outside the jurisdictional reach of the United States] do not suffice on their own to confer Article III standing to sue in federal court." *Id.* at 386.

Each of the causal chains that the Supreme Court characterized as "too attenuated" to establish standing in *AHM* is substantially *less* attenuated than MHDD's theories here because each involve the direct regulation of the third parties allegedly causing injury. *Id.* at 391-92 (rejecting theoretical claims brought by firefighters against building codes, police offices against legalization of certain activities, and teachers against immigration policies). MHDD cannot

21

establish "standing to sue simply because others are allowed to engage in certain activities—at least without [MHDD] demonstrating how [its members] would be injured by the *government's* alleged under-regulation of others," especially when the regulable parties here (importers) are not even alleged to be the cause of MHDD's injuries. *Id.* at 392-93 (emphasis added).

## CONCLUSION

The challenge here is premised on the regulation of *importation*. MHDD does not import and does not allege that it is injured by *importation*. It merely hopes that its desired domestic regulatory action will encourage its desired foreign policy outcome. This is too attenuated to establish causation or redressability. And the standing inquiry should end there.

For these reasons, we respectfully request that the Court grant the MTD and dismiss the action in its entirety.

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

OF COUNSEL:
MARK HODOR
Office of the General Counsel
National Oceanic & Atmospheric Administration

ANGELA CHERMAN
RAYMOND MAGORIEN
Office of the Chief Counsel
U.S. Customs and Border Protection

DANIEL PAISLEY
Office of Tax Policy
Department of the Treasury

PATRICIA M. MCCARTHY
Director

/s/Agatha Koprowski
AGATHA KOPROWSKI
OLIVER J. MCDONALD
Trial Attorneys
U.S. Department of Justice Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 507-6081
Fax: (202) 353-0461
Email: agatha.koprowski@usdoj.gov

June 4, 2026

*Attorneys for Defendants*

22

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this Reply in Support of Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1) contains 6,739 words, excluding any materials excluded from those Procedures' requirements, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/Agatha Koprowski