Slip Op. 26-73

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ INC., <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION FISHERIES, UNITED STATES DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, AND UNITED STATES DEPARTMENT OF COMMERCE, <br><br> Defendants, <br><br> and <br><br> NEW ZEALAND GOVERNMENT, <br><br> Defendant-Intervenor. | Before: Jennifer Choe-Groves, Judge <br><br> Court No. 26-02462 |

## OPINION AND ORDER

[Denying Defendants' Motion to Dismiss; Denying Plaintiff's Motion for
Preliminary Injunction.]

Dated: July 13, 2026

Sabrina Devereaux and Christopher D. Eaton, Earthjustice, of Seattle, WA, Natalie
N. Barefoot, Earthjustice, of San Francisco, CA, and Brett Sommermeyer and
Catherine E. Pruett, Law of the Wild, of Seattle, WA, for Plaintiff Māui and
Hector's Dolphin Defenders NZ Inc.

Agatha Koprowski, Trial Attorney, Brett A. Shumate, Assistant Attorney General,
and Patricia M. McCarthy, Director, Commercial Litigation Branch, Civil
Division, U.S. Department of Justice, of Washington, D.C., for Defendants
National Marine Fisheries Service, National Oceanic and Atmospheric
Administration Fisheries, U.S. Department of the Treasury, U.S. Department of
Homeland Security, and U.S. Department of Commerce.  Of counsel on the brief
were Mark Hodor, Counsel, Office of the General Counsel, National Oceanic and
Atmospheric Administration, of Silver Spring, MD, Zachary S. Simmons,
Attorney, Angela Cherman, Attorney, Raymond Magorien, Attorney, Office of the
Chief Counsel, U.S. Customs and Border Protection, of Washington, D.C., and
Daniel Paisley, Counsel, Office of Tax Policy, U.S. Department of the Treasury, of
Washington, D.C.  Oliver J. McDonald, Trial Attorney, Commercial Litigation
Branch, Civil Division, U.S. Department of Justice, of Washington, D.C. also
appeared.

Warren E. Connelly, Robert G. Gosselink, and Kenneth N. Hammer, Trade Pacific
PLLC, of Washington, D.C., for Defendant-Intervenor New Zealand Government.

Choe-Groves, Judge: Before the Court is Plaintiff Māui and Hector's

Dolphin Defenders NZ Inc.'s ("Plaintiff") Motion for Preliminary Injunction to

enjoin the comparability findings issued by the National Marine Fisheries Service

("NMFS") on March 11, 2026, and implement an import ban on New Zealand

fisheries that result in incidental death and serious injury to marine mammals in

excess of United States standards.  Pl.'s Mot. Preliminary Injunction ("Pl.'s Br."),

Court No. 26-02462                                                                Page 3

ECF No. 13; see Implementation of Fish and Fish Product Import Provisions of the

Marine Mammal Protection Act—Notification of Comparability Findings ("2026

Comparability Findings"), 91 Fed Reg. 11,962 (Dep't of Commerce Mar. 11,

2026).  Defendants NMFS, National Oceanic and Atmospheric Administration

Fisheries ("NOAA"), U.S. Department of the Treasury, U.S. Department of

Homeland Security, and U.S. Department of Commerce (collectively,

"Defendants") filed a motion to dismiss Plaintiff's complaint for lack of subject-

matter jurisdiction.  Defs.' Mot. Dismiss Pursuant R. 12(B)(1) ("Mot. Dismiss" or

"Defs.' Br."), ECF No. 16.

       For the reasons discussed below, Defendants' Motion to Dismiss is denied

and Plaintiff's Motion for Preliminary Injunction is denied.

## BACKGROUND

       Plaintiff is a non-profit organization with its headquarters in Kumeu, New

Zealand, focused on improving environmental protections for dolphins in New

Zealand.  Compl. Declaratory and Injunctive Relief ("Compl.") at ¶ 11, ECF No. 4.

The organization's members reside near and visit regularly Māui and Hector's

dolphin habitats along the coasts of New Zealand's North and South Islands.  Id. at

¶ 12.  The ability of Plaintiff's members to enjoy and benefit from the continued

presence of Māui and Hector's dolphin populations for recreational, aesthetic,

spiritual, artistic, cultural, commercial, scientific, and environmental purposes

Court No. 26-02462                                                                          Page 4

hinges upon the wellbeing of the dolphins. Id. at ¶¶ 12, 14. Plaintiff alleges that

the United States imports seafood from New Zealand's trawl and set net fisheries

that catch, harm, and kill marine mammals in excess of United States standards.

Id. at ¶ 15. Plaintiff asserts that the Government of New Zealand has indicated

repeatedly that avoiding an import ban is an important factor in the decision-

making and management of fisheries in Māui and Hectors' dolphin habitats. Id.

Plaintiff challenged NMFS' 2024 Comparability Findings for the Government of

New Zealand's set net and trawl fisheries in a prior litigation, and this Court

granted in part judgment on the agency record and held that the 2024

Comparability Findings were not in accordance with law and unsupported by

substantial record evidence. Māui & Hector's Dolphin Defs. NZ Inc. v. Nat'l

Marine Fisheries Serv. ("Māui I"), 49 CIT, __, __, 799 F. Supp. 3d 1327, 1333,

1349–50 (2025). After NMFS published 2025 Comparability Findings, as required

by settlement in a separate litigation, the Court dismissed Plaintiff's case for

mootness given the expiration of the 2024 Comparability Findings. Māui &

Hector's Dolphin Defs. NZ Inc. v. Nat'l Marine Fisheries Serv. ("Māui II"), 50

CIT __, __, 2026 WL 925518, at *4 (2026). Plaintiff now challenges the 2026

Comparability Findings as arbitrary and capricious, and contrary to law, under 5

U.S.C. § 706(2)(A), and Defendants' failure to implement an import ban as agency

Court No. 26-02462                                                      Page 5

action unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1).

Compl. at ¶¶ 155, 160–61.

## JURISDICTION AND STANDARD OF REVIEW

The U.S. Court of International Trade has jurisdiction pursuant to 28 U.S.C.

§ 1581(i)(1)(C), which grants the Court with jurisdiction over "any civil action

commenced against the United States, its agencies, or its officers, that arises out of

any law of the United States providing for" "embargoes or other quantitative

restrictions on the importation of merchandise for reasons other than the protection

of the public health or safety[.]" 28 U.S.C. § 1581(i)(1)(C). The Court reviews

actions brought under § 1581(i) by applying the standards provided in 5 U.S.C.

§ 706. Id. at § 2640(e). Section 706(1) applies when a plaintiff seeks to "compel

agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

"Agency action" is defined as "an agency rule, order, license, sanction, relief, or

the equivalent or denial thereof, or failure to act." Id. at § 551(13). Due to the

discrete nature of the first five agency actions enumerated in Section 551(13) and a

court's power to compel action unlawfully withheld, a claim under § 706(1) "can

proceed only where a plaintiff asserts that an agency failed to take a discrete

agency action that it is required to take." Norton v. S. Utah Wilderness Alliance,

542 U.S. 55, 64 (2004) (emphasis omitted).

Court No. 26-02462                                                    Page 6

Under Section 706(2), the Court shall hold unlawful and set aside agency action, findings, and conclusions that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious when the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or the action "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co. ("State Farm"), 463 U.S. 29, 43 (1983).  An arbitrary and capricious review is a "narrow" inquiry that looks to whether the agency considered the relevant data and articulated a satisfactory explanation for its action.  F.C.C. v. Fox Tele. Stations, Inc., 556 U.S. 502, 513 (2009).  The agency must articulate a "rational connection between the facts found and the choice made."  Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962).

## DISCUSSION

### I.     Motion to Dismiss

Article III of the Constitution limits federal courts to hearing actual, ongoing controversies.  Davis v. Fed. Election Comm'n, 554 U.S. 724, 732 (2008).  An actual case or controversy must be extant at all stages of review, not merely at the

time the complaint is filed.  Id. at 732–33; see DaimlerChrysler Corp. v. United

States, 442 F.3d 1313, 1318 (Fed. Cir. 2006) (noting that the Court is "presumed to

be 'without jurisdiction' unless 'the contrary appears affirmatively from the

record.'") (citation omitted).  "Though justiciability has no precise definition or

scope, doctrines of standing, mootness, ripeness, and political question are within

its ambit."  Fisher v. United States, 402 F.3d 1167, 1176 (Fed. Cir. 2005).  The

party invoking jurisdiction bears the burden of establishing it.  Hutchinson Quality

Furniture Inc. v. United States, 827 F.3d 1355, 1359 (Fed. Cir. 2016).  A plaintiff

must allege sufficient facts to state each claim alleged in the complaint.

DaimlerChrysler Corp., 442 F.3d at 1318 (citing, among other cases, McNutt v.

Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936)); USCIT R.

12(h)(3) ("If the court determines at any time that it lacks subject-matter

jurisdiction, the court must dismiss the action.").

Article III standing is a necessary component of the Court's subject matter

jurisdiction.  Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).  The

"irreducible constitutional minimum of standing contains three elements."  Id.  A

party must demonstrate: (1) that it has suffered "an injury in fact," that is "an

invasion of a legally protected interest which is (a) concrete and particularized,"

and "(b) actual or imminent, not conjectural or hypothetical;" (2) a "causal

connection between the injury and the conduct complained of;" and (3) "it must be

likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. at 560–61 (internal quotations and citations omitted). "[A]t the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element" to establish standing. Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (quoting Warth v. Seldin, 422 U.S. 490, 518 (1975)). If a plaintiff derives an injury from "the government's allegedly unlawful regulation (or lack of regulation)" of a third party, the plaintiff bears the burden to show that the third party's reaction to the government's choices will likely redress the injury. Lujan, 504 U.S. at 562. Plaintiffs in this circumstance cannot rely on mere speculation to show causation and must show that the "'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs." Food & Drug Admin. v. All. for Hippocratic Med. ("All. for Hippocratic Med."), 602 U.S. 367, 383 (2024) (internal quotations and citations omitted).

Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) "denies or controverts" Plaintiff's allegations of jurisdiction, meaning that the Court shall only accept the uncontroverted allegations pled as true for purposes of this motion. Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583–84 (Fed. Cir. 1993). "All other facts underlying the controverted jurisdictional allegations are in dispute and are subject to fact-finding by the [Court]." Id. at 1584. To determine the jurisdictional facts, the Court may review beyond the face of the

pleadings and consider extrinsic evidence such as affidavits and deposition testimony.  Id.  Defendants contest Plaintiff's standing on causation and redressability grounds.  Defs.' Br. at 14.

### a.    Causation

Defendants contend that because the United States does not regulate commercial fishing in New Zealand, Plaintiff's theory of causation is too attenuated.  Id. at 23.  According to Defendants, Plaintiff's failure to show causation of marine mammal bycatch in excess of United States standards on a fishery-by-fishery basis is also fatal to Plaintiff's standing.  Id. at 27.  Plaintiff argues that an import ban would eliminate the United States demand for fish from New Zealand's trawl and set net fisheries, and that basic economic principles support the theory that this reduction in demand and export quantities typically results in a reduction in supply that would cause third parties to change their behavior in response.  Pl.'s Opp'n Defs.' Mot. Dismiss ("Pl.'s Resp. Br.") at 19–20, ECF No. 30.  Plaintiff emphasizes that the impact of an import ban is more than solely restricting market access because the ban would serve as a significant public statement that New Zealand's fisheries are unsustainable and operate in a manner that cause excessive bycatch.  Id. at 30.  Regarding Defendants' fishery-by-fishery argument, Plaintiff claims that Defendants attempt to incorrectly transform the standing inquiry from a claim-based standard to an argument-based

standard and that Plaintiff has demonstrated standing for the two claims for relief

pled in the Complaint.  Id. at 33.

The element of causation requires a party to show that "the injury must be

fairly traceable to the challenged action."  Animal Legal Def. Fund v. Quigg, 932

F.2d 920, 932 (Fed. Cir. 1991) (internal quotation and citation omitted).  Plaintiff

presents a causation theory based on the economic impact and reputational

repercussions of an import ban on New Zealand fisheries and fishery policy.  See

Compl. at ¶ 15; Pl.'s Resp. Br. at 24–27.  Halting the United States' importation of

seafood from New Zealand's trawl and set net fisheries that harm marine mammals

above United States standards can impact the Government of New Zealand and

fishers' decision-making because the United States is a significant market for these

fisheries according to Plaintiff.  Compl. at ¶ 15.  Although Defendants question the

accuracy of the statistical evidence used to support this theory, Plaintiff cites data

published by the Government of New Zealand.  Defs.' Br. at 24; see Pl.'s Mot.

Preliminary Injunction, Ex. 8 ("Rose Dec.") at ¶ 77, ECF No. 13-8.  In December

2024, the Economic Intelligence Unit of New Zealand's Ministry for Primary

Industries reported on the decline of revenue for inshore fisheries amidst volume

reduction and market shifts and stated:

> Export revenue for inshore fisheries declined 3 percent to $610 million
> in the year to 30 June 2024 primarily due to a 13 percent reduction in
> export volumes that more than offset the 12 percent increase in export
> prices.  Reduced demand from Australia and a temporary US ban on

> New Zealand fish imports contributed to export volume declines across some species, with snapper down 8 percent, kahawai down 20 percent, dogfish down 8 percent, and trevally down 45 percent.  The US ban has now been lifted and an increase to commercial catch limits for snapper of around 1,000 tonnes from October 2024 has been implemented.[1]

Rose Dec., Ex. H at 54, ECF No. 13-16.  Defendants attached a declaration from the Director of Fisheries Management for New Zealand's Ministry for Primary Industries as an exhibit to the motion to dismiss.  Mot. Dismiss, Ex. C ("Taylor Dec."), ECF No. 16-3.[2]  Director Emma Taylor valued New Zealand's global seafood exports at $2.2 billion from 2024 to 2025, attributing $1.1 billion to wild capture finfish fisheries.  Id. at ¶ 26.  Taylor stated that China and Australia are New Zealand's largest markets for wild capture finfish species and were responsible for 33% of the export market combined in 2025, while the United States comprised "an important but smaller market share of around 8%."  Id.

"When third party behavior is predictable, commonsense inferences may be drawn[,]" and commonsense economic realities can support an argument for standing.  Diamond Alternative Energy, LLC v. Env't Prot. Agency ("Diamond"), 606 U.S. 100, 116 (2025).  Plaintiff's causation theory recites a predictable economic model of supply and demand.  An import ban would halt the demand

---

[1] The Ministry for Primary Industries reported currency figures in New Zealand dollars.  See Rose Dec., Ex. H.

[2] Defendant-Intervenor filed the Taylor Declaration previously in opposition to Plaintiff's preliminary injunction motion in Case No. 1:26-cv-00060.  See Taylor Dec.

from the United States for seafood from the contested fisheries in New Zealand,

directly impacting the economic demand from these fisheries and thus the fishing

practices alleged to harm Māui and Hector's dolphins.  The Government of New

Zealand's economic reporting demonstrates that the import ban ordered by the

Court in Sea Shepherd New Zealand v. United States ("Sea Shepherd I"), 46 CIT

__, 606 F. Supp. 3d 1286 (2022), contributed to a decrease in export demands from

inshore fisheries, indicating that the United States market is not an insignificant

driver of New Zealand's seafood export economy.  See Rose Dec., Ex. H at 54.

Plaintiff's injury is "fairly . . . trace[able]" to this action and the economic

principles of supply and demand support the causal connection between Plaintiff's

injury and the relief that it seeks.  Lujan, 504 U.S. at 560 (citation omitted).

Nevertheless, the standing requirements of causation and redressability are often

intertwined and the factors that demonstrate the redressability of Plaintiff's injury

also inform the Court's conclusion on causation.  See All. for Hippocratic Med.,

602 U.S. at 380–81.

### b.    Redressability

Defendants contend that Plaintiff has failed to identify any specific action

that could redress the injury alleged to Plaintiff's aesthetic and other interests and

that a favorable judicial decision is not one of them. Defs.' Br. at 15, 25.  Plaintiff

identifies that the United States' legislature itself has determined that import bans

under the Marine Mammal Protection Act ("MMPA") are an effective remedy and argues that both fishers and the Government of New Zealand will respond to an import ban. Pl.'s Resp. Br. at 6, 19–32. Defendants state that an import embargo under the MMPA has never led to the closure of a foreign commercial fishery and refer to the results of the proceedings in Sea Shepherd I and Nat. Res. Def. Council, Inc. v. Ross, 42 CIT __, 331 F. Supp. 3d 1338 (2018). Defs.' Br. at 15–21. Plaintiff presents the same expert used by the plaintiffs in Sea Shepherd I, Dr. Glenn Simmons, and Defendants fault Plaintiff's reliance on his opinion given that Dr. Simmons' previous prediction that a ban on imports would cause New Zealand to close the challenged set net and trawl fisheries did not come to fruition and note Plaintiff's concession that New Zealand "has not amended its regulations relating to the Māui dolphin since 2020." Defs.' Br. at 16–17; Pl.'s Mot. Preliminary Injunction, Ex. 28 ("Slooten Dec.") at ¶ 44, ECF No. 13-28. Director Taylor also commented on the repercussions of the preliminary injunction ordered previously by the Court in Sea Shepherd I, stating that the Government of New Zealand did not modify any aspect of the West Coast North Island fishing-related measures within the 17-month period between the issuance of the preliminary injunction and the Court's dissolution of the preliminary injunction due to the issuance of new superseding comparability findings in 2024. Taylor Dec. at ¶ 19; Sea Shepherd, 48 CIT __, __, 693 F. Supp. 3d 1364, 1367 (2024). Taylor estimated that any

reconsideration of New Zealand's regulatory measures concerning the dolphins would require a review, pursuant to statutory requirements, that has taken approximately two and a half years in the past.  Taylor Dec. at ¶ 8.

In response, Plaintiff contends that the Government of New Zealand has taken some action previously in response to import bans, such as expediting the Threat Management Plan review process for Māui and Hector's Dolphins after Sea Shepherd petitioned for an import ban.  Pl.'s Resp. Br. at 27.  Plaintiff suggests that the Government of New Zealand has delayed taking further protective actions for the dolphins due to a cycle of anticipating that new comparability findings will moot challenged comparability findings and dissolve the import bans ordered by the Court.  See id. at 27–28.  Plaintiff urges the Court to not feed this strategic misuse of the MMPA and comparability finding process by allowing Defendants to use their repeated failure to comply with the MMPA "to shield themselves from judicial review of that very failure on redressability grounds."  Id. at 28.  Plaintiff also contends that the Government of New Zealand fears losing access to the United States' seafood market.  Id. at 24.  The Court notes that the Government of New Zealand's presence in this action[3] as Defendant-Intervenor, and its previous

---

[3] Upon consideration of Plaintiff's Motion For Leave to File a Sur-Reply to Defendant-Intervenor's Reply ("Motion to File Sur-Reply") (ECF No. 35) and Defendant-Intervenor's Opposition of the Government of New Zealand to the Plaintiff's Allegation That the GNZ "Has No Right to File a Reply Brief" (ECF

intervention in <u>Sea Shepherd I</u>, <u>Māui I</u>, and <u>Māui II</u>, is indicative of its level of

interest in the effect of an import ban and supports Plaintiff's redressability

arguments.

Defendants' argument that because neither the Court nor the United States

Government can direct foreign regulation of commercial fisheries means that there

is no redressability for Plaintiff's injury neglects the declarations and objectives

made by the Legislative Branch on marine mammal protection.  The United States

Congress has declared that:

> [M]arine mammals have proven themselves to be resources of great
> international significance, esthetic and recreational as well as
> economic, and it is the sense of the Congress that they should be
> protected and encouraged to develop to the greatest extent feasible
> commensurate with sound policies of resource management and that
> the primary objective of their management should be to maintain the
> health and stability of the marine ecosystem.

16 U.S.C. § 1361(6).  The MMPA requires the Secretary of the Treasury to "ban

the importation of commercial fish or products from fish which have been caught

with commercial fishing technology which results in the incidental kill or

incidental serious injury of ocean mammals in excess of United States standards."

<u>Id.</u> at § 1371(a)(2).  It is relevant, if not elucidative, to the standing inquiry that

"Congress chose embargoes as the most effective remedy for foreign threats to

---

No. 36), the Court grants Plaintiff's Motion to File Sur-Reply and Plaintiff's sur-reply shall be deemed filed.

marine mammals." Nat. Res. Def. Council, Inc., 42 CIT at __, 331 F. Supp. 3d at 1360 (citing Animal Welfare Inst. v. Kreps, 561 F.2d 1002, 1010 (D.C. Cir. 1977) ("Congress, in enacting the MMPA, established as a matter of law the requisite causal relationship between American importing practices and [foreign harvesting] practices.") (alteration in original).  Defendants raise the various foreign policy tools that the MMPA grants the Executive Branch to argue that Plaintiff is seeking a form of redress beyond what the statute provides.  Defs.' Br. at 1–5.  However, "[t]he MMPA addresses not only the killing of marine mammals by Americans but also the importation of them."  Animal Welfare Inst., 561 F.2d at 1010.  "This reflects a congressional decision that denial of import privileges is an effective method of protecting marine mammals in other parts of the world[,]" and "[t]his conclusion is supported by the legislative history."  Id.

Defendants emphasize that the statement "we don't know," made by Plaintiff's counsel during a status conference in the Māui I & II proceedings, defines summarily the issue with Plaintiff's standing in this case.  See Defs.' Br. at 11, 23, 26, 29.  The Court examines the context of the quoted statement in full.  In a status conference before the Court on March 12, 2026, upon a question from the Court about what impact an import ban would have, Plaintiff's counsel stated the following:

> Well, Your Honor, Ms. Koprowski keeps talking about the fisheries would keep operating, whatnot.  There are a lot of things that can

happen short of shutting down a fishery that protect Māui dolphins.  We can close certain areas off, restrict, you know, times that fisheries are in certain areas.  You know, monitoring is a big issue.  So there are a lot of things that the New Zealand government could do, and *we don't know* what that would be.

But I would venture to guess that, you know, Mr. Connelly's presence in this case suggests that the New Zealand government is concerned about an import ban and would be interested in, if one were imposed, taking responsive action to get that ban lifted.  And again, it may not be a fishery closure, but it may be other sorts of protective measures.  And if there were a ban put in place, as soon as PI briefing is done, the Government may immediately implement some emergency measures to get that ban lifted.  *We don't know* necessarily what those are.

Case No. 1:24-cv-00218, Am. Tr. In-Person Status Conf. at 57:15–25, 58:1–7,

ECF. No. 85 (emphasis added).  In full context, Plaintiff's counsel opined on the

various actions that the Government of New Zealand could take in response to an

import ban, rather than expressing doubt as to whether the Government of New

Zealand would respond at all.  "[A] plaintiff need not 'negate every speculative

and hypothetical possibilit(y) . . . in order to demonstrate the likely effectiveness of

judicial relief.'"  Earth Island Inst. v. Christopher, 19 CIT 1461, 1474, 913 F.

Supp. 559, 571 (1995) (quoting Nat'l Wildlife Fed'n v. Hodel, 839 F.2d 694, 705–

06 (D.C. Cir. 1988)).  Although the Government of New Zealand could take an

array of actions in response to an import ban, Plaintiff has and continues to argue

that Defendants' unlawful comparability findings further perpetuate imports from

New Zealand fisheries that harm and kill marine mammals in excess of United

Court No. 26-02462                                                                                      Page 18

States standards and that an import ban will redress the harm to the dolphins.

Compl. at ¶ 8.

For the foregoing reasons, the Court concludes that Plaintiff has established

standing to challenge both Defendants' comparability findings as arbitrary and

capricious and contrary to law and Defendants' failure to ban the import of fish

from the New Zealand fisheries as required allegedly by the MMPA.  See Compl.

at ¶¶ 142–61.[4]

## II.    Preliminary Injunction

USCIT Rule 65 permits the Court to grant injunctive relief when

appropriate.  USCIT R. 65; 28 U.S.C. § 2643(c)(1).  A preliminary injunction "is

an extraordinary remedy never awarded as of right."  Winter v. Nat. Res. Def.

Council, Inc., 555 U.S. 7, 24 (2008) (citing Munaf v. Geren, 553 U.S. 674, 689–90

(2008)).  The Court considers the following four factors when evaluating whether

to grant a preliminary injunction: (1) whether the party is likely to succeed on the

merits of the action; (2) whether the party will incur irreparable harm in the

absence of such injunction; (3) whether the balance of hardships favors the

imposition of the injunction; and (4) whether the injunction is in the public interest.

---

[4] "We need not decide whether every piece of record evidence described above is necessary to establish standing here.  The totality of record evidence, along with commonsense inferences about market realities, readily suffices to demonstrate standing."  Diamond, 606 U.S. at 120 n.5.

See id. at 20; see also Wind Tower Trade Coal. v. United States ("Wind Tower"), 741 F.3d 89, 95 (Fed. Cir. 2014). A preliminary injunction may only be awarded upon a clear showing that the plaintiff is entitled to such relief. Winter, 555 U.S. at 22. The Court of Appeals for the Federal Circuit ("CAFC") has held that "the party seeking the injunction must be able to 'demonstrate that it has at least a fair chance of success on the merits for a preliminary injunction to be appropriate.'" Silfab Solar, Inc. v. United States, 892 F.3d 1340, 1345 (Fed. Cir. 2018) (quoting Wind Tower, 741 F.3d at 96).

Plaintiff moves for a preliminary injunction enjoining imports from the New Zealand set net and trawl fisheries that harm Māui and Hector's dolphins in excess of United States standards. Pl.'s Br. at 2. This action concerns the Comparability Findings for New Zealand's North and South Island Multi-Species Commercial Set Net and Trawl Fisheries. Pl.'s Mot. Preliminary Injunction, Ex. B (March 2, 2026) ("Decision Memorandum"), ECF No. 13-2; see 2026 Comparability Findings. Plaintiff challenges the comparability findings under the Administrative Procedure Act ("APA") as arbitrary and capricious and contrary to law, and seeks to compel an import ban of seafood products caught by New Zealand fisheries that result in the incidental killing or serious injury to Māui and Hector's dolphins in excess of United States standards. 5 U.S.C. § 706(1)–(2)(a); Compl. at ¶¶ 145–47, 158–61. An agency action must be reasonable and reasonably explained under the arbitrary

and capricious standard.  Fed. Commc'ns Comm'n v. Prometheus Radio Project,

592 U.S. 414, 423 (2021).  The Court considers whether the agency "has acted

within a zone of reasonableness and, in particular, has reasonably considered the

relevant issues and reasonably explained the decision."  Id. (citing FCC, 556 U.S.

at 513–514; State Farm, 463 U.S. at 43).

      a.      **Likelihood of Success on the Merits**

The MMPA instructs that the incidental killing or serious injury of marine

animals allowed in the course of commercial fishing should be reduced to

insignificant levels approaching a zero mortality and serious injury rate.  16 U.S.C.

§ 1371(a)(2).  The statute requires banning the importation of commercial fish or

products from fish that have been caught in commercial fishing technology that

results in the incidental killing or serious injury of ocean mammals in excess of

United States standards to achieve this goal.  Id.  A harvesting nation must show

adoption and implementation of "a regulatory program governing the incidental

mortality and serious injury of marine mammals in the course of commercial

fishing operations in its export fishery that is comparable in effectiveness to the

U.S. regulatory program."  Fish and Fish Product Import Provisions of the Marine

Mammal Protection Act, 81 Fed. Reg. 54,390, 54,391 (Dep't of Commerce Aug.

15, 2016) ("Final Rule").  The conditions and criteria for comparability findings

are enumerated in 50 C.F.R. § 216.24(h)(6) and (h)(7).

Plaintiff argues that it is likely to succeed on the merits of all its claims

regarding Defendants' 2026 Comparability Findings and the Court will consider

each argument in turn.

### i.    Arbitrary Determination of a Zero Mortality Rate Goal

Plaintiff claims that the 2026 Comparability Findings and its accompanying

Decision Memorandum failed to establish that the Government of New Zealand's

regulatory program met the Zero Mortality Rate Goal's required elements of a

target bycatch rate below 10% of the Potential Biological Removal ("PBR") level

and the implementation of regulatory measures that ensure the target is being met

or will be met within five years.  Pl.'s Br. at 14–15 (citing 16 U.S.C. §§ 1387(b),

(f)(2)).  Plaintiff notes that the Decision Memorandum relied on non-binding

environmental principles, nonexistent language in New Zealand's 2020

Biodiversity Strategy and Conservation General Policy, and population objectives

in New Zealand's Threat Management Plan only for Māui and Hector's dolphins.

Id. at 15–17.  Defendant-Intervenor argues that a comparable Zero Mortality Rate

Goal does not require the numerical metrics Plaintiff demands and rather the

implementing regulations of the MMPA only require that a harvesting nation have

goals intended to reduce bycatch to "sustainable levels."  Opp'n Gov't New

Zealand Pl.'s Mot. Preliminary Injunction ("Def-Interv.'s Resp. Br.") at 8–9, ECF

No. 25.  Defendants identify fishing area closures as the primary mitigation

measure employed by New Zealand to ensure that the total incidental mortality and serious injury rate of the dolphins remains below its Population Sustainability Threshold ("PST") metric. Defs.' Resp. Opp'n Pl.'s Mot. Preliminary Injunction ("Defs.' Resp. Br.") at 28–29, ECF No. 26.

Regulatory programs must include a comparable requirement to implement measures in export fisheries designed to reduce the total incidental morality and serious injury of a marine mammal stock below the bycatch limit. 50 C.F.R. § 216.24(h)(6)(iii)(C)(3)(ii). The "Zero Mortality Rate Goal" is a United States standard enshrined in the MMPA. See Māui I, 49 CIT at __, 799 F. Supp. 3d at 1337 (citing Sea Shepherd I, 46 CIT at __, 66 F. Supp. 3d at 1295; Nat. Res. Def. Council, Inc., 42 CIT at __, 331 F. Supp. 3d at 1355). To meet the goal of reducing incidental killing or serious injury to marine mammals during commercial fishing to insignificant levels, federal regulations define an "insignificance threshold" as "the upper limit of annual incidental mortality and serious injury of marine mammal stocks by commercial fisheries that can be considered insignificant levels approaching a zero mortality and serious injury rate[,]" and estimate such a threshold "as 10 percent of the Potential Biological Removal level for a stock of marine mammals." 50 C.F.R. § 229.2. The Potential Biological Removal level is "the maximum number of animals, not including natural

mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." Id.

NMFS determined that the Government of New Zealand calculates a Population Sustainability Threshold instead of a Potential Biological Removal level; this is a working calculation that is being refined. Decision Memorandum at 50–51. This threshold is the maximum number of annual marine mammal deaths that can occur while still achieving population outcome. Id. at 50. The Decision Memorandum reported that New Zealand's bycatch limit, the maximum number of dolphins that can be removed from the stock annually while maintaining a sustainable population, is equivalent to a Potential Biological Removal level of 0.10 Māui dolphins per year and 66.5 South Island Hector's dolphins per year. Id. at 55–56. The actual bycatch rates were estimated as 0.056 Māui dolphins and 8.8 Hector's dolphins. Id. at 52–54. The Decision Memorandum framed New Zealand's Threat Management Plan objectives as equivalent to the Zero Mortality Rate Goal and explained that for Māui dolphins, "the objectives require fisheries impacts to be managed to a level at or above 95% unimpacted status, not 80%[,]" and for Hector's dolphins the population outcome allows the population to increase to a level at or above 90% of the maximum number of dolphins sustainable in the environment. Id. at 62 n.321. The Decision Memorandum reported that a population outcome of 95% means that human-induced deaths need to be as near

as practicable to zero.  Id.  NMFS determined that because New Zealand law requires commercial fishing regulators to reduce bycatch below the bycatch limit and keep it as low as possible as soon as practicable or within 20 years, this is comparable in effectiveness to the MMPA's Zero Mortality Rate Goal.  Id. at 63.

The Threat Management Plans are non-statutory policies used to guide the government's decision-making.  Id. at 17.  Plaintiff argues that neither the Threat Management Plan's objectives nor the Population Sustainability Threshold are comparable to the Zero Mortality Rate, and that New Zealand is failing to achieve any results comparable to the Zero Mortality Rate Goal standards.  Pl.'s Br. at 16–17.  Defendant-Intervenor argues that the current bycatch estimates for Māui and Hector's dolphins are significantly reduced from historical estimates and are moving towards zero.  Def.-Interv.'s Resp. Br. at 13.  NMFS determined that population outcome targets of 95% and 90% are comparable to Zero Mortality Rate Goals but also provided data showing that in practice these goals are resulting in bycatch rates of 0.056 Māui dolphins and 8.8 Hector's dolphins.  Decision Memorandum at 52–54.  NMFS explained this difference by stating that the Final Rule does not mandate a "like for like" standard and New Zealand provided sufficient documentary evidence that it is capable of achieving comparable results as the United States' regulatory program.  Decision Memorandum at 63.

Plaintiff faults the Decision Memorandum for relying on non-binding principles and objectives that are incorporated into New Zealand's Marine Mammal Protection Act but not mandatory requirements.  Pl.'s Br. at 15.  New Zealand's MMPA and the Fisheries Act of 1996 are the operative laws to address fishing-related mortality on marine mammals and the Decision Memorandum stated that through both laws "the [Government of New Zealand] possesses authority to impose measures to prevent or minimize marine mammal bycatch." Decision Memorandum at 16.  The Decision Memorandum's description of New Zealand's goals, policies, and permissive authorities on marine mammal protection differs facially from the imperative "[r]egulatory requirements" that require harvesting nations to maintain and demonstrate a comparable regulatory program. See 50 C.F.R. § 216.24(h)(6)(iii)(C)(3); Sea Shepherd I, 46 CIT at __, 606 F. Supp. 3d at 1318–19 (explaining how a discretionary approach contrasts with the MMPA's mandatory directive that where commercial fishing causes marine mammal mortality and/or serious injury in excess of United States standards, the government must develop and implement Take Reduction Plans with measures to reduce such mortality and/or serious injury to levels below the Potential Biological Removal levels within six months of implementing the plan); see also 16 U.S.C. §§ 1387(f)(1), (5).  The Decision Memorandum cites the Aotearoa New Zealand Biodiversity Strategy 2020, which states that a goal for 2025 was "[t]he number of

Court No. 26-02462                                                    Page 26

fishing-related deaths of protected marine species [] decreasing towards zero for all

species."  Decision Memorandum at 17 n.91, 62; see Te Mana O Te Taiao

Aotearoa New Zealand Biodiversity Strategy 2020 (August 2020)

https://www.doc.govt.nz/nature/biodiversity/te-mana-o-te-taiao-aotearoa-new-

zealand-biodiversity-strategy-2020/aotearoa-newzealand-

biodiversity-strategy/ (last visited July 13, 2026).[5]  These are policy goals and

instructions that provide frameworks for protecting marine species.  The Decision

Memorandum stated that the Threat Management Plan and Take Reduction Plan

processes are comparable; New Zealand primarily uses fishery closures to mitigate

bycatch risk whereas the United States emphasizes technological modifications.

Decision Memorandum at 37.  Considering New Zealand's marine mammal

protection legal authorities, and NMFS' explanation of the systems put in place in

New Zealand and the bycatch rates produced, the Court concludes that NMFS'

determination on the Zero Mortality Rate Goal is rationally connected to the facts

presented.  See State Farm, 463 U.S. at 43.  The Court concludes that, at this

preliminary stage, Plaintiff has not shown a clear likelihood that NMFS'

---

[5] The strategy includes "[t]he direct effects of fishing do not threaten protected marine species populations or their recovery" as a 2030 goal, and "the mortality of non-target species from marine fisheries has been reduced to zero" as a 2050 goal. Te Mana O Te Taiao Aotearoa New Zealand Biodiversity Strategy 2020 (August 2020) at 54.

determination on the Zero Mortality Rate Goal was arbitrary and capricious or contrary to law.

### ii.    Negligible Impact Standard

The Decision Memorandum determined that the negligible impact standard is not applicable to comparability findings for New Zealand's commercial fisheries because New Zealand's statutory framework does not authorize or permit commercial fisheries to take any marine mammals incidental to commercial fishing operations. Decision Memorandum at 63–64. A similar argument was raised in Māui I and this Court found that the Decision Memorandum failed to address the negligible impact standard or identify record evidence that supported NMFS' determination. 49 CIT at __, 799 F. Supp. 3d at 1340. The Court concluded that "[a]bsent a prohibition on incidental takings by the Government of New Zealand, NMFS was required to evaluate whether New Zealand applied the negligible impact standard or an effective equivalent." Id., 49 CIT at __, 799 F. Supp. 3d at 1339. Plaintiff identifies that New Zealand's MMPA prohibits taking of marine mammals unless that take is incidental. Pl.'s Br. at 18; see Decision Memorandum at 18. The Decision Memorandum stated that "all marine mammal species are designated as protected species under Section 2 of the Fisheries Act and Section 26(4) of the [New Zealand] MMPA provides a defense for commercial fishing operations if the death of, or injury to, the marine mammal was accidental, or

Court No. 26-02462                                                    Page 28

incidental (not intentional), provided that the reporting requirements set out in section 16 of the [New Zealand] MMPA were complied with." Decision Memorandum at 18. The Decision Memorandum indicated that this provision of the New Zealand MMPA is comparable to Section 1371 of the MMPA, which provides only limited exceptions to "a general moratorium on taking marine mammals[.]" Id. at 18 n.97.

Plaintiff argues that New Zealand law allows the incidental catch and kill of marine mammals if it is reported, while Defendant-Intervenor claims this mischaracterizes the permitting process described in Section 4(1)(b) of New Zealand's MMPA and that the penalty provisions for unreported incidental take are comparable to the penalty provision in the MMPA. Pl.'s Br. at 18; Def.-Interv.'s Resp. Br. at 14–15. The Decision Memorandum mentions that Section 26(4) provides a defense for incidental death or injury to marine mammals. Decision Memorandum at 18. NMFS stated that New Zealand's statutory framework does not authorize or permit commercial fisheries to incidentally take any marine mammals, making any comparable negligible impact standard irrelevant. Id. at 64.[6] NMFS explained that a permitting scheme is established and the Government of New Zealand "has no intention of issuing any permit that would allow the

---

[6] "Under the NZ MMPA, government authorities have never issued a permit that authorized the incidental take of a marine mammal during commercial fishing operations since the law prohibits it." Decision Memorandum at 64 n.332.

incidental take of a Maui dolphin."  Id.  For endangered or threatened species,

federal regulations permit the incidental taking of such species if the negligible

impact is established, a recovery plan is developed, and a monitoring program is

established.  See 16 U.S.C. §§ 1371(a)(5)(E)(i)(I)–(III).  The Court finds that the

Decision Memorandum articulates a plausible connection between the record

evidence and the determination regarding the applicability of the negligible impact

standard, or lack thereof.  See State Farm 463 U.S. at 43.  The Court concludes

that, at this preliminary stage, Plaintiff has failed to demonstrate a likelihood to

succeed on the claim that NMFS' finding on the negligible impact standard was

arbitrary and capricious or contrary to law.

### iii.    No Insistence on Reasonable Proof or Use of Best Evidence

In weighing whether commercial fishing in a harvesting nation results in

incidental death or serious injury to ocean mammals in excess of United States

standards, warranting an import ban, NMFS must "insist on reasonable proof"

from the nation's government "of the effects on ocean mammals of the commercial

fishing technology in use for such fish or fish products exported from such nation

to the United States[.]"  16 U.S.C. § 1371(a)(2)(A).  For comparability findings,

the regulations instruct that NMFS "shall consider documentary evidence provided

by the harvesting nation and relevant information readily available from other

sources."  50 C.F.R. § 216.24(h)(6)(ii).  An agency action is arbitrary and

capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." State Farm, 463 U.S. at 43.

Plaintiff asserts that NMFS failed to insist on reasonable proof to support New Zealand's bycatch estimates and to address evidence from its own 5-Year Review that indicated that these estimates were low. Pl.'s Br. at 20–21. Defendants argue that Plaintiff simply disagrees with the agency's judgment regarding the evidence used for the population estimates and Defendant-Intervenor contends that the NMFS 5-Year Review does not make determinations on comparability to United States standards and instead is a general collection of information that does not constitute an agency finding. Defs.' Resp. Br. at 23; Def.-Interv.'s Resp. Br. at 4–7. The Government of New Zealand chose to rely on information in the International Affairs Information Capture and Reporting System to calculate bycatch limits for marine mammals in its 2021 Comparability Finding application. Decision Memorandum at 52. NMFS compared the bycatch estimates reported by the Government of New Zealand in 2021 to determine if the limit had been exceeded for marine mammals caught in a fishery. Id. Information from the 2021 Comparability Finding application was used to estimate annual injury and

Court No. 26-02462                                                    Page 31

deaths for dolphins in New Zealand's Spatially Explicit Fisheries Risk Assessment

("SEFRA") model.  Id. at 52–54.  Plaintiff contends that the 2026 Comparability

Findings lack evidentiary support for relying on the validity of New Zealand's

asserted estimates and that the Hector's dolphin estimate is likely underestimated

because the estimate was based on outdated data from the 2020–21 fishing season.

Pl.'s Br. at 21.  Defendant-Intervenors argue that the SEFRA model uses many

data points to derive the estimated bycatch figures.  Def.-Interv.'s Resp. Br. at 28.

The Decision Memorandum details the SEFRA model and the critiques the

model received upon review by the International Whaling Commission.  Decision

Memorandum at 53.  Supplemental information filed by the Government of New

Zealand is mentioned in the Decision Memorandum, but the bycatch estimates are

based on reporting from 2021.  Id. at 36, 47 n.240, 51.  Defendants note that

meeting the statutory standard of "reasonable proof" means that harvesting nations

must provide the "best scientific information available," meaning evidence of

"sufficient detail, quality, and reliability for NMFS to fully evaluate the regulatory

program for a given export fishery."  Defs.' Resp. Br. at 20; see Final Rule, 81

Fed. Reg. at 54,406.

The SEFRA model was partially updated in 2023 according to NMFS, and

the Government of New Zealand continues to fully update the model based upon

recommendations, previous modeling efforts, and fishery and non-fishery threats.

Decision Memorandum at 53.  Plaintiff poses the question of why NMFS did not insist on more up-to-date information for calculating the bycatch estimates than the information reported in the 2021 comparability finding application.  The Decision Memorandum identified the data sourced for calculating the bycatch estimates and elaborated on the sufficiency of that data.  The Decision Memorandum reasonably explained why NMFS relied on the data used to calculate the bycatch estimates. See Fed. Commc'ns Comm'n, 592 U.S. at 423.  The Court concludes, at this preliminary stage, that Plaintiff has not demonstrated a likelihood to succeed on the claim that NMFS' determination regarding the evidence used to calculate bycatch limits was arbitrary and capricious or contrary to law.

### iv.    Arbitrary Determination on Bycatch Limits

Plaintiff argues that NMFS relied inconsistently on three conflicting metrics as bycatch limits–Potential Biological Removal limits, Fishing Related Mortality Limits, and the Population Sustainability Threshold.  Pl.'s Br. at 26.  Plaintiff contends that New Zealand does not actually implement Potential Biological Removal limits for marine mammals and that the regulations require that harvesting nations not only calculate comparable bycatch limits but implement them.  Id.  A "bycatch limit" is "the calculation of a potential biological removal level for a particular marine mammal stock . . . or comparable scientific metric established by the harvesting nation or applicable regional fishery management

organization or intergovernmental agreement." 50 C.F.R. § 216.3. Fisheries need

bycatch limits and to implement measures that "reduce the total incidental

mortality and seriously injury" of a marine mammal stock below the bycatch limit.

50 C.F.R. §§ 216.24(h)(6)(iii)(C)(3)(ii). The Decision Memorandum calculated a

Potential Biological Removal limit of 0.10 Māui dolphins and 66.5 Hector's

dolphins per year. Decision Memorandum at 55–56. Defendant-Intervenor

contends that the estimation of bycatch is entirely separate from the calculation of

the bycatch limit. Def.-Interv.'s Resp. Br. at 18. The Decision Memorandum

acknowledged that New Zealand calculates Population Sustainability Threshold

rather than Potential Biological Removal. Decision Memorandum at 50. NMFS

detailed New Zealand's approach to estimating bycatch, and attached explanatory

appendices and mentioned supplemental information submitted in New Zealand's

February 2026 Comparability Findings Application. Id. at 50 n.249. Because the

Population Sustainability Threshold calculations are being refined, New Zealand

adopted the Potential Biological Removal calculation for estimating marine

mammal bycatch limits for its 2021 comparability finding application. Id. at 51.

"Since the [Government of New Zealand] ultimately adopted NMFS' PBR

calculations for Māui dolphins (i.e., 0.1), NMFS [found] that the [Government of

New Zealand's] bycatch estimates [were] comparable to the U.S. PBR estimates."

Id. at 52. In Māui I, the Court found that the Decision Memorandum did not

Court No. 26-02462                                                        Page 34

address how New Zealand calculated the bycatch limit nor explain whether the

bycatch calculation involved a comparable scientific metric to the Potential

Biological Removal level.  49 CIT at __, 799 F. Supp. 3d at 1341.  The Decision

Memorandum in this case detailed New Zealand's calculation formula and

explained NMFS' reasoning for how the estimates compare to the Potential

Biological Removal calculations.  Decision Memorandum at 50–54.  The Court

concludes that Plaintiff has not shown a likelihood of success on a claim that

NMFS' determination of bycatch limits was arbitrary and capricious or contrary to

law at this early stage in the proceedings.

v.      <strong>Arbitrary Determination on Monitoring Program</strong>

The MMPA requires the establishment of "a program to monitor incidental

mortality and serious injury of marine mammals during the course of commercial

fishing operations." 16 U.S.C. § 1387(d)(1).  The program shall obtain reliable

statistics on incidental mortality and serious injury, determine the reliability of

such reported statistics, and identify changes in fishing methods or technology that

may increase or decrease incidental mortality and serious injury.  Id. at

§ 1387(d)(1)(A)–(C).  New Zealand has mandatory reporting requirements for

marine mammal bycatch that occurs within New Zealand's exclusive economic

zone.  Decision Memorandum at 41.  "These regulations provide a standardized

means for commercial fishers to meet the reporting obligations discussed above

Court No. 26-02462                                                    Page 35

and as required under the [New Zealand] MMPA." Id.  The Decision

Memorandum detailed New Zealand's monitoring program, established under

statute and regulation, that involves both human and electronic monitoring.  Id. at

41–48.  NMFS determined that New Zealand's requirements for reporting marine

mammal bycatch are comparable if not exceed the regulatory requirements in the

United States.  Id. at 47.

Plaintiff asserts that the Decision Memorandum's determinations contradict

NMFS' findings in the 5-Year Review that New Zealand's monitoring was

inadequate and underestimates bycatch.  Pl.'s Br. at 34.  Defendant-Intervenor

notes that NMFS provided an extensive description of the nature and extent of the

Government of New Zealand's monitoring program and that Plaintiff seeks a type

of monitoring program that does not exist in any United States fishery.  Def.-

Interv.'s Resp. Br. at 35.  Defendants also argue that NMFS reasonably concluded

that New Zealand has monitoring procedures designed to estimate incidental

mortality and serious injury to marine mammals as required by 50 C.F.R.

§ 216.24(h)(6)(iii)(C)(4).  Defs.' Resp. Br. at 34–35.  The Court agrees with

Defendants that the Decision Memorandum provides a plausible explanation of the

monitoring procedures implemented in New Zealand that likely satisfy the

MMPA's regulatory requirements, especially at this early stage of the proceedings.

The Court concludes that Plaintiff has not shown a likelihood of succeeding on the

merits of the claim that NMFS' monitoring program determination was arbitrary and capricious or contrary to law.

### vi.    Inexplicable Reliance on Outdated and Overly Optimistic Estimates

Plaintiff argues that the Decision Memorandum relies on outdated and overly optimistic population estimates for dolphins without explanation. Pl.'s Br. at 34. Plaintiff contends that contrary evidence from the International Whaling Commission shows that NMFS used an arbitrarily high minimum population estimate of 54 dolphins and that the Decision Memorandum gave an illogical rationale for rejecting the lower estimate. Id. at 34–35. The Decision Memorandum explains the type of documentary evidence that the Government of New Zealand provided and used in the process of conducting its marine mammal population abundance estimates. Decision Memorandum at 19–26. NMFS engaged with the disagreement from Plaintiff regarding the actual number of Māui dolphins in New Zealand's waters. Id. at 24 n.126. The Decision Memorandum explained that NMFS declined to use the International Whaling Commission's estimate of 48 Māui dolphins because it was deemed to not be the best data available given that it was derived from the International Whaling Commission's Scientific Committee's data that NMFS categorized as "adequate enough to provide a general indication of abundance *but* subject to various possible concerns that preclude a higher categorization." Id. at 25 (emphasis in original). NMFS

addressed contrary record evidence and further explained its position as the Court requested previously. Māui I, 49 CIT at __, 799 F. Supp. 3d at 1343. The Court concludes that Plaintiff has not demonstrated a likelihood to succeed on the merits of the claim that NMFS arbitrarily and capriciously relied on outdated and overly-optimistic population estimates without explanation, especially without the benefit of a more developed record at this early stage of the litigation.

For the foregoing reasons, the Court concludes that, at this preliminary stage, Plaintiff has not demonstrated sufficiently a clear likelihood to succeed on the merits of the claim that the 2026 Comparability Findings are arbitrary and capricious or contrary to law, in violation of the MMPA and APA because, at a minimum, NMFS provided a rational connection between certain record evidence and certain determinations made.[7] At the preliminary injunction stage, the Court makes these non-exhaustive conclusions that Plaintiff has not established a basis upon which the Court can find a likelihood to prevail on its claims.

---

[7] The Court observed in Māui I "that the 2024 Decision Memorandum [was] a cursory seven-page document that [was] replete with conclusory statements and [cited] minimal record evidence." 49 CIT at __, 799 F. Supp. 3d at 1336. The Court observes that the 2026 Decision Memorandum consists of a 67-page report with extensive citations to record evidence and explains, in much greater detail, NMFS' determinations. See Decision Memorandum.

### b. Irreparable Harm

A plaintiff seeking preliminary injunctive relief must demonstrate that irreparable injury is likely to occur in the absence of an injunction. Winter, 555 U.S. at 22. Harm is irreparable when it cannot be addressed by damages. See Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012). "'Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.'" Nat. Res. Def. Council, Inc., 42 CIT at __, 331 F. Supp. at 1368 (emphasis omitted) (citing Fed'n of Japan Salmon Fisheries Co-op. Ass'n v. Baldridge, 679 F.Supp. 37, 48 (D.D.C. 1987)). Additionally, a "determination of irreparable harm should be guided by reference to the purposes of the statute being enforced." Id., 42 CIT at __, 331 F. Supp. at 1369.

Plaintiff argues that irreparable harm is likely because this action involves fishing-induced deaths of Māui and Hector's dolphins and set net and trawl fisheries pose a daily threat of bycatch to both types of dolphins. Pl.'s Br. at 36–38. Plaintiff argues that any reduction in bycatch risk that reduces the harm is sufficient for an injunction. Id. at 39. Defendant-Intervenor disagrees with the argument that the existential threat to Māui dolphins has worsened and that there is "ongoing mortality" of Hector's dolphins in the South Island fisheries. Def.-Interv.'s Resp. Br. at 41–42. Defendant-Intervenor asserts that it is speculative that

deaths in excess of Potential Biological Removal limits are bound to occur and

notes that the last confirmed death of a Māui or Hector's dolphin attributable to

commercial fishing happened in 2012.  Id. at 43.  Defendants also emphasize that

the relief Plaintiff seeks, governmental intervention in New Zealand, is subject to

certain procedural and bureaucratic steps that take time.  Defs.' Resp. Br. at 39–40.

Plaintiff states that on February 26, 2026, a Māui dolphin was found dead

potentially due to bycatch because the necropsy report "was unable to exclude the

possibility of entanglement as a contributory factor."  Pl.'s Br. at 1, 40.  The

necropsy report found that given the extent of decomposition, neither disease nor

any other cause of death could be ruled out, and "the best diagnosis in this case is

'open', i.e. the cause of death could not be determined."  Slooten Dec., Ex. E at 2,

ECF No. 13-33.  The report also stated that:

> Assessing for death due to entanglement is an important component of
> any beachcast dolphin necropsy investigation.  This includes looking
> for evidence of net marks on the skin as well as ruling out other causes
> of death.  A range of tissues from this dolphin were examined
> histologically (under the microscope), but all were badly affected by
> decomposition.  This meant that it was difficult even to identify the
> organs, and impossible to interpret any lesions that may have been
> present.  Because of this, it is not possible to rule out other (non-
> bycatch) causes of death in this dolphin.
> […]
> Overall, the skin lesions were assessed as not typical of bycatch,
> particularly the irregular distances between the lacerations and an
> absence of knot marks (which are usually obvious) at the angles where
> the lacerations intersect.  An alternative explanation considered was
> that the lacerations occurred as the carcass washed back and forth over
> shellfish beds (oyster or mussel shells).

Id. at 1.  A preliminary injunction is an extraordinary and drastic remedy.  Munaf,

553 U.S. at 689–90.  Preliminary injunctions cannot be granted on simply a

possibility of irreparable harm as that is inconsistent with the "characterization of

injunctive relief as an extraordinary remedy that may only be awarded upon a clear

showing that the plaintiff is entitled to such relief."  Winter, 555 U.S. at 22 (citing

Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam).  The Court

concludes that Plaintiff has established a form of harm that is irreparable in nature.

However, the question remains whether this harm is likely to occur without a

preliminary injunction.  The Court refers to the principle and purpose of the

MMPA.  See 16 U.S.C. § 1361(6).  The importation of commercial fish or fish

products that have been caught in a way that results in the incidental death or

serious injury of ocean mammals in excess of United States standards shall be

banned under the MMPA.  16 U.S.C.A. § 1371(a)(2).  The contested comparability

findings in this action are what permit the continued importation of seafood from

New Zealand fisheries that are alleged to cause incidental death or serious injury to

endangered dolphins beyond what is allowed in the United States, but the Court

has determined that Plaintiff has failed to demonstrate clearly at this stage a

sufficient likelihood to succeed on the merits for its claims related to challenging

the comparability findings.

Court No. 26-02462                                                   Page 41

Given that preliminary injunctions cannot be granted on simply a possibility

of irreparable harm, the Court concludes that, at this preliminary stage, Plaintiff

has not sufficiently demonstrated a likelihood that rises to the level necessary to

grant the extraordinary and drastic remedy of a preliminary injunction.  See

Winter, 555 U.S. at 22.

### c.  Balance of Hardships

The Court considers the last preliminary injunction factors taking into

consideration the legal conclusions made above regarding Plaintiff's inability to

satisfy the first two factors.[8]

Courts must balance each party's competing claims of injury and consider

the effect on each party of either granting or denying the requested injunctive

relief.  Winter, 555. U.S. at 24.  Plaintiff argues that the impact on itself and the

broader public from the death and potential extinction of dolphins is immense.

Pl.'s Br. at 43.  Plaintiff asserts that Defendants face little harm or burden as the

---

[8] "While a district court must consider all four factors before granting a
preliminary injunction to determine whether the moving party has carried its
burden of establishing each of the four, we specifically decline today to require a
district court to articulate findings on the third and fourth factors when the court
denies a preliminary injunction because a party fails to establish either of the two
critical factors."  Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir.
1994) (emphasis omitted) (citing T.J. Smith and Nephew Ltd. v. Consolidated
Med. Equip., Inc., 821 F.2d 646 (Fed. Cir. 1987) (affirming denial of preliminary
injunction based on movant's failure to establish a reasonable likelihood of success
and irreparable harm, even though district court did not address the other two
factors)).

result of a preliminary injunction. Id. at 45. Defendants contend that an injunction would damage the Executive Branch's ability to engage in foreign affairs, which will likely have negative ramifications for vulnerable marine mammal species. Defs.' Resp. Br. at 41. Defendants also raise the damage that the requested relief would inflict on numerous third parties not party to this litigation, such as commercial fishers, United States importers, and others. Id. The Court has repeatedly recognized that the MMPA and enacted regulations permit import bans as an effective remedy to marine mammal survival and preservation. Nat. Res. Def. Council, Inc., 42 CIT at __, 331 F. Supp. 3d at 1370 ("No evidence submitted by the Government affirmatively shows that the institution of an embargo under the Imports Provision, as required by United States law, would undermine international negotiations, and any outcome to that effect is speculative."). The Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. Winter, 555 U.S. at 24. The Court considers the reasonableness of granting or denying Plaintiff's preliminary injunction request in light of the Court's conclusions made regarding Plaintiff's likelihood of succeeding on the merits of the claims and the possibility of irreparable harm. Given the legal conclusions made based on the arguments and evidence presented, the Court concludes that the balance of equities favors denying the requested injunctive relief.

Court No. 26-02462                                                          Page 43

### d. Public Interest

As Plaintiff has not prevailed on the other required factors for a preliminary

injunction, the public interest favors denying a grant of an extraordinary remedy of

a preliminary injunction.  See Winter, 555 U.S. at 20.

The Court concludes that, at this preliminary stage of the litigation, Plaintiff

has not demonstrated sufficiently the criteria required for the extraordinary remedy

of a preliminary injunction.

<strong>CONCLUSION</strong>

Accordingly, it is hereby

**ORDERED** that Defendants' Motion to Dismiss (ECF No. 16), is denied;

and it is further

**ORDERED** that Plaintiff's Motion for Preliminary Injunction (ECF No. 13)

is denied; and it is further

**ORDERED** that Plaintiff's Motion for Oral Argument (ECF No. 32) is

denied as moot; and it is further

**ORDERED** that the Parties shall meet and confer and file a Joint Proposed

Scheduling Order on or before July 27, 2026.

                                              /s/ Jennifer Choe-Groves

                                          Jennifer Choe-Groves, Judge

Dated:     July 13, 2026
            New York, New York