**UNITED STATES COURT OF INTERNATIONAL TRADE**

MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ INC.,

*Plaintiff,*

v.

NATIONAL MARINE FISHERIES SERVICE, et al.,

*Defendants,*

GOVERNMENT OF NEW ZEALAND,

*Intervenor-Defendant.*

Case No. 1:26-cv-02462-JCG

Before: Honorable Jennifer Choe-Groves

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ........................................................................................................1

STATUTORY FRAMEWORK........................................................................................2

FACTUAL BACKGROUND...........................................................................................6

I. New Zealand Fisheries Pose an Existential Threat to Māui and Hector's Dolphins. ..........................................................................................6

II. NMFS Has Found New Zealand's Regulatory Framework "Inadequate." .............8

III. The CIT Has Repeatedly Found that NMFS Arbitrarily Assesses the Sufficiency of New Zealand's Regulatory Program in Its MMPA Comparability Findings. ...........................................................................11

IV. NMFS Issues New Comparability Findings for the New Zealand Fisheries.........12

STANDARD OF REVIEW ..........................................................................................13

ARGUMENT ..............................................................................................................14

I. The Decision Memorandum Is Arbitrary and Contrary to Law. ...........................15

A. NMFS's Finding that New Zealand Law Is Equivalent to the ZMRG Standard Is Irrational and Misinterprets the Law. .........................15

B. NMFS Is Incorrect that New Zealand Law Does Not Authorize Incidental Take in Excess of the Negligible Impact Standard. ..................20

C. NMFS Arbitrarily Disregarded Its Own Findings, the Best Available Evidence, and the MMPA's Statutory Mandate in Accepting GNZ's Bycatch Estimates. ....................................................23

D. NMFS Illogically Concluded that the Mere Calculation of a Nonregulatory Bycatch Metric Is Comparable in Effectiveness to Actually Implementing a Regulatory Bycatch Limit. ...............................27

E. NMFS's Conclusions Regarding New Zealand's Monitoring Program Are Contrary to Its Own Findings and Fail to Account for Critical Data Gaps. ..........................................................................29

II. Treasury Has Failed to Execute Its Nondiscretionary Duty to Implement an Import Ban that Is Required by Law. ...........................................................35

III. The Court Should Vacate the Decision Memorandum and Order Defendants to Implement the MMPA's Prohibition on Unlawful Imports. ..........37

A. The Court Should Vacate NMFS's Arbitrary and Unlawful Decision Memorandum. ..........37

B. The Court Should Compel Treasury to Ban Imports. ..........37

C. In the Alternative, the Court Should Enjoin Imports from the New Zealand Fisheries. ..........39

1. MHDD Has Suffered an Irreparable Injury. ..........40

2. The Balance of Hardships and the Public Interest Favors an Injunction. ..........43

CONCLUSION ..........45

CERTIFICATE OF COMPLIANCE ..........47

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
882 F.Supp.2d 1366 (Ct. Int'l Trade 2012) ....................19, 22

*Am. Rivers v. FERC*,
895 F.3d 32 (D.C. Cir. 2018) ....................25

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
271 F.Supp.2d 230 (D.D.C. 2003) ....................42

*Am. Signature, Inc. v. United States*,
598 F.3d 816 (Fed. Cir. 2010) ....................44

*AM/NS Calvert LLC v. United States*,
654 F.Supp.3d 1324 (Ct. Int'l Trade 2023) ....................39, 40

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) ....................42

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018) ....................33

*Auxin Solar, Inc. v. United States*,
798 F.Supp.3d 1331 (Ct. Int'l Trade 2025) ....................41

*Bennett v. Spear*,
520 U.S. 154 (1997) ....................18

*Butte Cnty. v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) ....................30

*Carlson v. Postal Regul. Comm'n*,
938 F.3d 337 (D.C. Cir. 2019) ....................19

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ....................13

*Conservation L. Found. v. Pritzker*,
37 F.Supp.3d 254 (D.D.C. 2014) ....................28

*Conservation L. Found. v. Ross* (*CLF*),
422 F.Supp.3d 12 (D.D.C. 2019) ....................41, 42

*Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) ....................41

*Ctr. for Biological Diversity v. Ross*,
480 F.Supp.3d 236 (D.D.C. 2020) ........................................................................37

*Ctr. for Biological Diversity v. Ross*,
613 F.Supp.3d 336 (D.D.C. 2020) ........................................................................20

*Defs. of Wildlife v. U.S. Dep't of Interior*,
931 F.3d 339 (4th Cir. 2019) ........................................................................24, 26, 30

*Defs. of Wildlife v. U.S. Forest Serv.*,
No. 1:24-CV-00118-MR-WCM, 2026 WL 914620 (W.D.N.C. Mar. 31, 2026)......................38

*Del. Dep't Nat. Res. & Env't Control v. EPA* (*Del. DNR*),
785 F.3d 1 (D.C. Cir. 2015) ........................................................................13, 33

*Earth Island Inst. v. Mosbacher*,
746 F.Supp.964 (N.D. Cal. 1990) ........................................................................42, 43

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)........................................................................40

*Env't Def. Fund v. Regan*,
No. CV 20-762, 2024 WL 3887383 (D.D.C. Aug. 20, 2024)..............................................38

*Env't Prot. Info. Ctr. v. Simpson Timber Co.*,
255 F.3d 1073 (9th Cir. 2001) ........................................................................38

*Humane Soc'y of U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010) ........................................................................24, 25, 30

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ........................................................................43

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)........................................................................44

*Mayor of Baltimore v. Azar*,
973 F.3d 258 (4th Cir. 2020) (en banc) ........................................................................14, 34

*MHDD v. NMFS* (*MHDD I*),
799 F.Supp.3d 1327 (Ct. Int'l Trade 2025) ........................................................................ *passim*

*MHDD v. NMFS* (*MHDD II*),
829 F.Supp.3d 1263 (Ct. Int'l Trade 2026) ........................................................................12

*Michigan v. EPA*,
576 U.S. 743 (2015)........................................................................13, 19, 45

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983)....................13, 31, 34

*Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality*,
990 F.3d 818 (4th Cir. 2021) ....................13

*Nat. Res. Def. Council, Inc. v. Rauch*,
244 F.Supp.3d 66 (D.D.C. 2017)....................22

*Nat. Res. Def. Council, Inc. v. Ross* (*NRDC*),
331 F.Supp.3d 1338 (Ct. Int'l Trade 2018) .................... *passim*

*Nat'l Wildlife Fed'n v. NMFS*,
886 F.3d 803 (9th Cir. 2018) ....................42

*New Orleans v. SEC*,
969 F.2d 1163 (D.C. Cir. 1992)....................26

*New York v. Trump*,
811 F.Supp.3d 215 (D. Mass. 2025) ....................38

*Ninestar Corp. v. United States*,
687 F.Supp.3d 1308 (Ct. Int'l Trade 2024) ....................37

*Nken v. Holder*,
556 U.S. 418 (2009)....................43

*Norton Const. Co. v. U.S. Army Corps of Eng'rs*,
No. 1:03-CV-02257, 2006 WL 3526789 (N.D. Ohio Dec. 6, 2006) ....................38

*Nw. Coal. for Alts. to Pesticides v. U.S. EPA*,
544 F.3d 1043 (9th Cir. 2008) ....................13, 15, 17

*Oregon v. United States*,
835 F.Supp.3d 1307 (Ct. Int'l Trade 2026) ....................42

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) ....................23, 30

*Sea Shepherd N.Z. v. United States*,
723 F.Supp.3d 1374 (Ct. Int'l Trade 2024) ....................11

*Sea Shepherd N.Z. v. United States* (*Sea Shepherd I*),
606 F.Supp.3d 1286 (Ct. Int'l Trade 2022) .................... *passim*

*Sierra Club v. NMFS*,
797 F.Supp.3d 440 (D. Md. 2024)....................38, 39

*Yaak Valley Forest Council v. Vilsack*,
563 F.Supp.3d 1105 (D. Mont. 2021) ........................................................ 36, 39

**Statutes**

5 U.S.C. 706 ........................................................ *passim*

6 U.S.C. § 203 ........................................................ 3

6 U.S.C. § 212 ........................................................ 3

16 U.S.C. § 1361 ........................................................ 2, 41, 44

16 U.S.C. § 1362 ........................................................ 3, 4, 6

16 U.S.C. § 1371 ........................................................ *passim*

16 U.S.C. § 1372 ........................................................ 20

16 U.S.C. § 1374 ........................................................ 20

16 U.S.C. § 1375 ........................................................ 20

16 U.S.C. § 1386 ........................................................ 3, 4

16 U.S.C. § 1387 ........................................................ *passim*

16 U.S.C. § 1536 ........................................................ 38

16 U.S.C. § 1538 ........................................................ 20

16 U.S.C. § 1539 ........................................................ 20

16 U.S.C. § 1540 ........................................................ 38

**Regulations**

50 C.F.R. § 216.24 ........................................................ *passim*

50 C.F.R. § 216.103 ........................................................ 20

50 C.F.R. § 229.2 ........................................................ 4, 16

50 C.F.R. § 424.11 ........................................................ 10

50 C.F.R. § 424.21 ........................................................ 10

**Federal Register**

69 Fed. Reg. 23477 (Apr. 29, 2004) ........................................................ 16

69 Fed. Reg. 43338 (July 20, 2004) .......... 6, 16

90 Fed. Reg. 42395 (Sept. 2, 2025) .......... 12

91 Fed. Reg. 11962 (Mar. 11, 2026) .......... 12

**Rules**

USCIT R. 56 .......... 13

USCIT R. 56.1 .......... 13

## INTRODUCTION

At issue is the National Marine Fisheries Service's (NMFS) fourth attempt to produce a lawful comparability required for New Zealand's set net and trawl fisheries to export to the United States under the Marine Mammal Protection Act (MMPA). While NMFS has put more words on paper this time, those words only attempt to conceal the inadequacy of New Zealand's bycatch management program. To reach its end result, NMFS had to engage in logical gymnastics and ignore its own scientific findings. Nowhere is this clearer than when one looks at NMFS's status review of Māui and Hector's dolphins under the Endangered Species Act (ESA), where NMFS exercised its independent scientific expertise and found New Zealand's regulatory mechanisms "inadequate" to protect the dolphin populations from bycatch in set net and trawl fisheries. But when the Government of New Zealand (GNZ) asked NMFS for permission to export seafood from those same fisheries, NMFS inexplicably about-faced and gave the fisheries its seal of approval in the challenged Decision Memorandum. While NMFS rolls out the red carpet to New Zealand's exports—despite the science-based concerns of its own experts—Māui and Hector's dolphin populations continue to decline due to New Zealand's failure to sufficiently protect them from bycatch. The Māui dolphin in particular is staring down the barrel of the gun of extinction while NMFS continues reshuffling paper. The MMPA would not tolerate this result in the United States. And the MMPA's Import Provision does not allow Defendants to tolerate this result in fisheries that export to the United States. No matter how many words NMFS puts on paper, New Zealand's management is not "comparable" to the MMPA's standards.

At their base, U.S. standards require: 1) enforceable bycatch limits; 2) accurate bycatch estimates; and 3) effective regulatory response. Accurate bycatch estimates are needed to ensure that biologically relevant bycatch limits are not exceeded. Those estimates are only as good as the data from monitoring bycatch in the fisheries. And without effective regulatory response,

there can be no guarantee that bycatch will not diminish the species beyond recovery. GNZ's bycatch program fails every one of these standards. It lacks clearly defined, enforceable bycatch limits comparable to U.S. limits. GNZ's bycatch estimates are, by NMFS's own review, underestimates that are undermined by inadequacies in GNZ's monitoring program. And GNZ's regulations leave Māui and Hector's dolphins unprotected in much of their habitats and, even within their habitats, do not require the responsive action needed to sustain or recover their populations.

The Court should not be distracted by NMFS's lengthy response. When one looks to the logic, the evidence, and NMFS's own prior findings, it is clear that NMFS's mountain of words cannot hide the core truth: New Zealand's set net and trawl fisheries catch Māui and Hector's dolphins in excess of U.S. standards. The Court should hold unlawful and vacate NMFS's illogical Decision Memorandum, and compel the Secretaries of the Treasury and Homeland Security to fulfill their statutory obligation to ban imports from these fisheries.

## STATUTORY FRAMEWORK

Congress enacted the MMPA to protect and restore marine mammal populations that "are, or may be, in danger of extinction or depletion as a result of man's activities," and to ensure that these populations do not become "diminish[ed] beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part." 16 U.S.C. § 1361(1), (2). To protect not just marine mammals within the United States, but also those abroad, the MMPA includes a provision designed to leverage the United States' position as a major seafood importer. Section 1371(a)(2) of the MMPA [hereinafter the Import Provision] requires the

Secretary of the Treasury[1] to ban the import of fish and fish products from foreign commercial fisheries that result "in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." *Id.* § 1371(a)(2). This provision holds foreign fisheries accountable to standards comparable to those for U.S. fisheries. Exporting nations bear the burden to show that they meet these standards: the MMPA requires the Secretary of Commerce (i.e., NMFS) to "insist on reasonable proof from the government of any [exporting] nation … of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products." *Id.* § 1371(a)(2)(A).

The term "United States standards" encompasses, at a minimum, the provisions of the MMPA that are relevant to managing incidental mortality and serious harm to marine mammals from commercial fisheries (known as bycatch). *Sea Shepherd N.Z. v. United States* (*Sea Shepherd I*), 606 F.Supp.3d 1286, 1294-95 (Ct. Int'l Trade 2022) (identifying "statutory markers of 'United States standards'" with reference to MMPA requirements). As relevant here, the MMPA requires implementing: 1) a mandate to reduce bycatch to insignificant levels approaching zero [hereinafter Zero Mortality Rate Goal or ZMRG]; 2) regulatory bycatch limits based on scientifically established thresholds, with stricter limits for imperiled marine mammals; 3) take reduction plans; 4) bycatch monitoring programs; and 5) stock assessments. 16 U.S.C. §§ 1371(a)(5)(E)(i), 1386(a), 1387(b), (d), (f).

The MMPA's key metric for establishing bycatch limits and guiding mitigation is the Potential Biological Removal (PBR) level. *See, e.g.*, *id.* §§ 1362(19), (20), 1387(f). The MMPA

[1] The Homeland Security Act imposes a responsibility on the Department of Homeland Security to implement import bans. 6 U.S.C. §§ 203(1), 212(a)(1). This brief will refer to obligations of "Treasury" for simplicity, but the duty to implement an MMPA import ban applies to the Secretaries of both Treasury and Homeland Security.

defines PBR as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." *Id.* § 1362(20). PBR is a numerical value calculated as: the minimum population estimate of the stock, times one-half the maximum theoretical or estimated net productivity rate of the stock at a small population size, times a recovery factor of between 0.1 and 1.0. *Id*. The PBR value effectively represents the tolerance the United States has for human-caused harm to marine mammal populations. When harm exceeds the PBR level, it indicates that corrective action is necessary to reduce the harm back to a sustainable level. *E.g.*, *id.* § 1387(f) (requiring implementation of take reduction plan to reduce bycatch below PBR level within six months). Thus, under the MMPA, NMFS uses the PBR value to evaluate risk factors, establish management goals such as ZMRG, and guide management efforts like assessing stock status, setting regulatory bycatch limits, and monitoring bycatch levels.

The ZMRG requires commercial fisheries to reduce marine mammal bycatch to "insignificant levels approaching a zero mortality and serious injury rate." *Id.* § 1387(b)(1), (f)(2); *accord id.* § 1371(a)(2). NMFS defines this goal numerically as 10% of the PBR. 50 C.F.R. § 229.2. If bycatch exceeds that value, NMFS is required to develop and implement appropriate actions to reduce bycatch to insignificant levels within five years. 16 U.S.C. § 1387(b), (f).

The MMPA imposes even stricter standards for the management of marine mammals that are listed under the ESA. *Id.* § 1386(a)(4); *see id.* § 1362(19) (defining "strategic stock" to include ESA-listed species). Fisheries that pose a risk to these vulnerable stocks must abide by lower bycatch limits and stricter monitoring requirements. *Id.* §§ 1371(a)(5)(E)(i), 1387(d)(4). For example, the MMPA only allows fisheries to incidentally take ESA-listed marine mammals

if NMFS determines that such incidental mortality "will have a negligible impact" on the stock. *Id.* § 1371(a)(5)(E)(i). Bycatch of these marine mammals cannot exceed 13% of PBR for endangered species and 2.6% of PBR for threatened species. NMFS_014681. If it does, NMFS must take immediate protective action. 16 U.S.C. § 1371(a)(5)(E)(iii).

The Import Provision's plain text requires Treasury to ban imports if an export fishery's bycatch rate is objectively "in excess of" what the bycatch limit would be under U.S. standards. *Id.* § 1371(a)(2). The regulations implementing that provision [hereinafter Import Regulations] also stipulate that an export fishery is operating in excess of U.S. standards—and thus its products must be banned—if it lacks regulatory measures comparable in effectiveness to those in the United States. 50 C.F.R. § 216.24(h).

NMFS promulgated the Import Regulations to assist in determining whether these conditions are met, based on consideration of several mandatory factors. NMFS_013723-53. NMFS reviews each export fishery that may incidentally catch marine mammals and publishes a "comparability finding" if it finds the fishery is in compliance with the Import Provision and Regulations. NMFS_013725-27. Imports must be prohibited from any fishery without a "valid" comparability finding "in effect." 50 C.F.R. § 216.24(h)(1)(i)-(ii), (h)(9); *see Sea Shepherd I*, 606 F.Supp.3d at 1324 (explaining such fisheries are "per se in excess of U.S. standards"). Nations apply for a comparability finding by submitting "reasonable proof" of the effects that their export fisheries have on marine mammals and documentary evidence demonstrating compliance with the Import Provision's standards. 16 U.S.C. § 1371(a)(2)(A); 50 C.F.R. § 216.24(h)(6)(i)-(ii). To issue a comparability finding, NMFS must rationally find that the exporting nation "maintains a regulatory program with respect to the fishery that is comparable in effectiveness to the U.S. regulatory program with respect to incidental mortality and serious

injury of marine mammals in the course of commercial fishing operations." 50 C.F.R. § 216.24(h)(6)(iii)(B). NMFS must make certain specified findings and consider mandatory factors before making such a finding. *Id.* § 216.24(h)(6)(iii), (h)(7). A comparability finding is operative for four years from its publication, unless otherwise indicated. *Id.* § 216.24(h)(8)(iv).

## FACTUAL BACKGROUND

### I. New Zealand Fisheries Pose an Existential Threat to Māui and Hector's Dolphins.

New Zealand's Māui and Hector's dolphins are two of the most imperiled dolphins in the world. Entanglement in New Zealand's set net and trawl fisheries has caused their precipitous decline, and those same fisheries continue to place them at impending risk of extinction.

The Māui dolphin is the world's most endangered marine dolphin, with less than 50 living individuals over one year old. NMFS_015943. It is found primarily along the west coast of New Zealand's North Island, in harbors and coastal waters out to 100 meters deep. NMFS_000398. Recognizing its imperiled status, NMFS has listed the Māui dolphin as endangered under the ESA. NMFS_009315-24. Accordingly, the Māui dolphin is considered a "strategic stock," which requires additional protections under the MMPA. *See* 16 U.S.C. § 1362(19)(C); NMFS_008552.

The closely related Hector's dolphin inhabits coastal waters primarily around New Zealand's South Island. NMFS_015984-87. Its population has declined from approximately 50,000 dolphins in 1975 to less than 15,000 dolphins by 2015. NMFS_015993. Bycatch has extirpated several subpopulations and is pushing others to the brink of extinction. NMFS_016040. NMFS has listed the Hector's dolphin as threatened under the ESA, 82 Fed. Reg. at 43701, so it is also a strategic stock under the MMPA, 16 U.S.C. § 1362(19)(C).

Capture and drowning in commercial fishing gear has been and continues to be the primary cause of decline for Māui and Hector's dolphins. NMFS_015979, NMFS_016010.

Indeed, NMFS has called bycatch "the most pressing threat" for Māui dolphins. NMFS_015979. The dolphins are at risk every day because set net and trawl boats fish in their habitat year-round. Because "much of [Māui dolphin] predicted range falls well outside of the current protection zones," NMFS recently found in a status review that "Māui's dolphins continue to be exposed to potential entanglement risk despite the fishing prohibition zones" implemented in 2020. NMFS_015980; *see also* NMFS_015982 ("[T]here is still a large area of potential Māui's dolphin habitat that is currently unprotected, including the east coast of the North Island."). Similarly, despite trawling being a major source of mortality for Hector's dolphins, NMFS concluded "there is very little in the way of mitigation or protection," and in fact "a very high level of trawl fishing effort" is allowed "within high density areas" of the Hector's dolphin's distribution. NMFS_016040.

There is widespread agreement—including from NMFS—that the risk from these fisheries must be eliminated for Māui and Hector's dolphins to avoid extinction, let alone to recover. *See, e.g.*, NMFS_015984 ("International bodies such as the IUCN, IWC, and the Society for Marine Mammalogy have all recommended a ban on gillnet and trawl net fishing throughout Maui's dolphin habitat to prevent further mortalities."). For instance, NMFS has concluded that for the Māui dolphin, "fishing-related mortality [in set nets alone] needs to decrease by a minimum additional 50% in order to stop the population decline and avert extinction." NMFS_015969; *see also* NMFS_009322 ("[I]t is considered unlikely that [the Māui dolphin] will recover unless sources of anthropogenic mortality are eliminated."), NMFS_016038 ("[A]ny mortality at all, whether anthropogenic or natural, could quickly bring [the Māui dolphin] closer to extinction."). And NMFS concluded that "[b]y allowing a level of bycatch that is sometimes an order of magnitude higher than the PBR it is unlikely that the [South Island] Hector's dolphin

will recover sufficiently to be delisted from the ESA in the near future." NMFS_016040. Yet, GNZ has failed to implement a regulatory program that sufficiently eliminates bycatch risk. Outside of the courtroom, NMFS has identified "concerns that the New Zealand Government's regulations and conservation measures are inadequate to protect Māui's dolphin from the risk of bycatch due to: fishing restrictions not covering their entire range; a lack of comprehensive bycatch data; and the potential underestimation of bycatch risk." NMFS_016038 (citations omitted). NMFS identified similar "major concerns" about the inadequacy of protections for the Hector's dolphin. NMFS_016039-40.

## II. NMFS Has Found New Zealand's Regulatory Framework "Inadequate."

GNZ manages Māui and Hector's dolphins through a "non-statutory" framework of goals and objectives known as a Threat Management Plan (TMP). NMFS_10790, NMFS_014394.[2] Under the TMP, GNZ employs three mechanisms to manage bycatch risk: 1) spatial closures; 2) fishing-related mortality limits; and 3) an electronic monitoring program. NMFS_003942-44. These mechanisms provide only partial, insufficient protection for Māui and Hector's dolphins.

First, GNZ has closed just a fraction of Māui and Hector's dolphin habitats to set net and trawl fishing. NMFS_003947-48. The closures do not include harbors or deeper waters where the dolphins have been found, or other large portions of the dolphins' ranges. *See* NMFS_004633-

---

[2] *See* Nicola Wheen, *The United States Marine Mammal Protection Act: Improving State Law to Reduce Fishing-Related Mortalities of Marine Mammals – The New Zealand/Māui Dolphin Experience*, 19 INT'L J. MARINE & COASTAL LAW 11 (2026) (quoting New Zealand High Court ruling in explaining that TMP's "non-statutory nature means it is 'a voluntary process, not provided for by any specific legislation' and not subject to specific enforceable statutory controls" (quoting *The Environmental Law Initiative v. Director-General of the Ministry for Primary Industries* [2024] NZHC 3824, para 391)), https://brill.com/view/journals/estu/aop/article-10.1163-15718085-20261035/article-10.1163-15718085-20261035.xml, attached as Exhibit 1.

38, NMFS_000016, NMFS_016025-28, NMFS_016038. This is troubling because set netting is intensive in the Māui dolphin's harbor habitat. NMFS_015979-80.

Second, New Zealand regulations provide for "fishing-related mortality limits" (FRMLs). The only FRML in the North Island is a limit of one Hector's or Māui dolphin within a defined "Māui dolphin habitat zone" (MDHZ). NMFS_000260-61, NMFS_003966. The delineated habitat zone covers only the northern two-thirds of the west coast of the North Island out to 12 nautical miles, omitting large areas where Māui dolphins are found. NMFS_010722, NMFS_015967. Dolphin deaths that occur outside of the MDHZ do not count against the FRML. NMFS_013976. Additionally, the regulations do not identify a temporal metric for the limit (i.e., how often can the FRML be exceeded) or any consequences if the limit is exceeded or if a non-fatal capture occurs. NMFS_003966; *see also* Wheen, *supra* note 2, at 19 (explaining "response to a breach of the FRML is, as a matter of law, discretionary" and constrained by Fisheries Act). GNZ describes FRMLs as only a "backstop." NMFS_013940.

Third, GNZ requires a fraction of set net and trawl vessels fishing in the Māui and Hector's dolphin habitats to install cameras that record video of fishing effort and ostensibly bycatch. Set net vessels less than 8 meters in length and trawl vessels greater than 32 meters in length are exempt—they are not "in-scope." NMFS_001255, NMFS_013964. What this practically means is that only 14% of set net vessels (24 of 176) and 70% of trawl vessels (96 of 137) in New Zealand waters have cameras. NMFS_013977 (¶ 18 & n.5). On the west coast of the North Island, only 6% of set net vessels (5 of 89)—the type of fishing GNZ says "pose[s] the greatest risk of fishing-related deaths," NMFS_017732—have cameras. NMFS_013978. GNZ then takes another slice out of the portion of fishing that is monitored by only reviewing a subset of camera footage from this subset of vessels with cameras. NMFS_014423.

NMFS recently found in its 2024 ESA 5-Year Review of Māui and Hector's dolphins that GNZ's bycatch management is inadequate. *E.g.*, NMFS_015979-84, NMFS_016022-37, NMFS_016038-40. In a 5-Year Review, NMFS collects and analyzes the best available scientific and commercial data. 50 C.F.R. §§ 424.11, 424.21. The Review provides not only NMFS's expert scientific assessments, but also management recommendations. In the case of dolphins found only in New Zealand, those recommendations are directed solely at GNZ. In its Review, NMFS concluded that Māui dolphins remain endangered and Hector's dolphins threatened largely because GNZ's "existing regulatory mechanisms" are "inadequate." *See* NMFS_016038-40. NMFS found regulatory mechanisms for the Māui dolphin inadequate, because, among other things:

- Much of the predicted range of Māui dolphins "falls well outside of the current protection zones," and fisheries continue to expose Māui's dolphins to entanglement risk, NMFS_015980-82;
- New Zealand lacks comprehensive bycatch data, NMFS_015982:
- Bycatch risk is potentially underestimated, NMFS_015982-83;
- Camera monitoring is insufficient, NMFS_015984; and
- More information on Māui dolphin distribution is required, *id*.

NMFS found regulatory mechanisms for the Hector's dolphin inadequate because, among other things:

- Fishing exclusion zones are insufficient and need to be revised and extended, NMFS_016025-28, NMFS_016037;
- Bycatch limits are too high and unsustainable, NMFS_016034-37;

- Management responses are insufficient once bycatch limits are reached, NMFS 016036; and
- Bycatch is potentially and dangerously underestimated, NMFS_016028-34.

Because it found GNZ's management inadequate, NMFS made recommendations to GNZ, including:

- Extending fishing prohibitions to the 100 m depth contour;
- Implementing fishing restrictions in harbors;
- Increasing monitoring in both set net and trawl fisheries;
- Improving the accuracy of calculated bycatch limits; and
- Improving population assessments by expanding their geographic scope to the entirety of the dolphins' habitats and increasing their frequency.

NMFS_016042.

## III. The CIT Has Repeatedly Found that NMFS Arbitrarily Assesses the Sufficiency of New Zealand's Regulatory Program in Its MMPA Comparability Findings.

NMFS issued comparability findings in 2020 and 2024 concluding that New Zealand's regulatory program for fisheries that catch Māui dolphins is comparable in effectiveness to U.S. standards. Both times, the CIT found NMFS's determinations fatally flawed.

In *Sea Shepherd I*, the CIT preliminarily enjoined imports from set net and trawl fisheries on the North Island's west coast because NMFS's 2020 comparability finding was likely arbitrary and capricious. 606 F.Supp.3d at 1310-23. The court also found "given the undisputed instances of Māui dolphin bycatch and the continued threat[,] there exists a likelihood of irreparable harm absent injunctive relief." *Id.* at 1328. After NMFS issued a new comparability finding in January 2024, the CIT lifted the injunction but observed that the "disposition ... is far from [a] bill of health for a species teetering on the brink of extinction." *Sea Shepherd N.Z. v.*

*United States*, 723 F.Supp.3d 1374, 1381 (Ct. Int'l Trade 2024).

Māui and Hector's Dolphin Defenders (MHDD) challenged the 2024 comparability finding, which this Court held to be arbitrary and unlawful in multiple respects. *MHDD v. NMFS* (*MHDD I*), 799 F.Supp.3d 1327 (Ct. Int'l Trade 2025). The Court vacated the Decision Memorandum for the finding but declined to compel Defendants to implement an import ban at that time. *Id.* at 1348-49.

**IV. NMFS Issues New Comparability Findings for the New Zealand Fisheries.**

Just three days after the ruling in *MHDD I*, NMFS published comparability finding determinations for approximately 2,500 fisheries from 135 nations, including a comparability finding for all of New Zealand's export fisheries—including set net and trawl fisheries on the west coast of the North Island and the entirety of the South Island [hereinafter the New Zealand Fisheries]. *See* 90 Fed. Reg. 42395 (Sept. 2, 2025). MHDD challenged the findings for these New Zealand Fisheries on January 5, 2026. *See MHDD v. NMFS* (*MHDD II*), 829 F.Supp.3d 1263, 1266 (Ct. Int'l Trade 2026).

While that case was pending, NMFS published a new comparability finding for the New Zealand Fisheries on March 11, 2026, that superseded the 2025 findings. 91 Fed. Reg. 11962, 11963 (Mar. 11, 2026). MHDD filed this challenge to the new finding on March 24. ECF No. 4. MHDD moved for a preliminary injunction, ECF No. 13, and Defendants moved to dismiss the case for lack of standing, ECF No. 16. On July 13, 2026, the Court denied both motions. ECF No. 37. It held "Plaintiff has established standing to challenge both Defendants' comparability findings as arbitrary and capricious and contrary to law and Defendants' failure to ban the import of fish from the New Zealand fisheries." *Id.* at 18. And it found MHDD had "not demonstrated sufficiently a clear likelihood to succeed on the merits" of its claims "at th[e] preliminary stage." *Id.* at 37.

## STANDARD OF REVIEW

A party is entitled to summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56. "[I]n any action in which a party believes that the determination of the court is to be made solely on the basis of the record made before an agency, that party may move for judgment in its favor on all or any part of the agency determination." USCIT R. 56.1.

Courts review challenges to a final agency action under the Administrative Procedure Act (APA) to determine whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). A reviewing court must perform a "thorough, probing, in-depth review" of the action. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). A court reviewing even the most technical matter "must not reduce itself to a 'rubber-stamp' of agency action." *Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality*, 990 F.3d 818, 826 (4th Cir. 2021) (citation omitted). "To prevail, an agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Del. Dep't Nat. Res. & Env't Control v. EPA* (*Del. DNR*), 785 F.3d 1, 11 (D.C. Cir. 2015) (cleaned up). "[W]here the agency's reasoning is irrational, unclear, or not supported by the data it purports to interpret, [a court] must disapprove the agency's action." *Nw. Coal. for Alts. to Pesticides v. U.S. EPA*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008); *see also Michigan v. EPA*, 576 U.S. 743, 750 (2015) ("[T]he

process by which [an agency] reaches [its] result must be logical and rational." (citation omitted)).

Separately under the APA, a court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The reviewing court asks whether "an agency failed to take a discrete agency action that it is required to take." *Nat. Res. Def. Council, Inc. v. Ross* (*NRDC*), 331 F.Supp.3d 1338, 1353 (Ct. Int'l Trade 2018) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004)).

**ARGUMENT**

The crux of APA review is that the agency's explanation must be reasonable and supported by the facts. The Import Provision adds an additional obligation that NMFS must "insist on reasonable proof" from exporting nations to support its findings. 16 U.S.C. § 1371(a)(2)(A). "[J]ust because an agency puts words to a page does not mean it has provided a 'sufficiently reasoned basis.'" *Mayor of Baltimore v. Azar*, 973 F.3d 258, 277 n.8 (4th Cir. 2020) (en banc). But that is what NMFS has done here: it has put words to a page in a Decision Memorandum that is rife with illogical conclusions and findings that are unsupported or directly contrary to the evidence. The Decision Memorandum's "'analysis' is nothing but a long-winded 'because we said so.'" *Id.* The Decision Memorandum is precisely the sort of arbitrary and capricious explanation that the APA requires must be held unlawful and set aside.

Treasury has failed in its statutory duties, too. The Import Provision leaves Treasury with no discretion but to ban imports from the New Zealand Fisheries if they catch marine mammals in excess of U.S. standards. Bycatch rates of Māui and Hector's dolphins objectively, quantitatively exceed applicable U.S. standards. That alone requires a ban. Separately, Treasury is required to ban imports if this Court finds the Decision Memorandum is unlawful and/or

vacates it, because that means the New Zealand Fisheries per se do not satisfy U.S. standards without a "valid" comparability finding "in effect."

The appropriate remedies under the APA for these violations by NMFS and by Treasury are vacatur of NMFS's Decision Memorandum and an order compelling Treasury to ban imports, respectively. In the alternative, the Court can and should use its equitable authority to enjoin imports from the New Zealand Fisheries unless and until they come into compliance with the Import Provision.

## I. The Decision Memorandum Is Arbitrary and Contrary to Law.

Although the 2026 Decision Memorandum may be lengthier than the three that preceded it, it is no less arbitrary or unlawful. NMFS made five fundamental errors: 1) it employed logical fallacies in finding New Zealand meets the ZMRG standard; 2) it incorrectly assumed New Zealand does not allow incidental take when finding the negligible impact standard is inapplicable; 3) it arbitrarily disregarded its own findings, the best available science, and the MMPA's statutory mandate when unquestioningly accepting GNZ's bycatch estimates; 4) it illogically concluded that New Zealand implements a PBR-based bycatch limit that New Zealand does not in reality implement; and 5) it arbitrarily found the New Zealand Fisheries meet U.S. standards for monitoring despite evidence to the contrary, including NMFS's own findings. While the Decision Memorandum contains *an* explanation, its "reasoning is irrational, unclear, [and] not supported by the data it purports to interpret," so the Court "must disapprove the agency's action." *Nw. Coal.*, 544 F.3d at 1052 n.7.

### A. NMFS's Finding that New Zealand Law Is Equivalent to the ZMRG Standard Is Irrational and Misinterprets the Law.

The MMPA's ZMRG standard requires managing U.S. fisheries to reduce marine mammal bycatch to "insignificant levels approaching a zero mortality and serious injury rate."

16 U.S.C. § 1387(b), (f)(2). This standard requires both a target *and* a mechanism to achieve that target. *See* 69 Fed. Reg. 43338, 43338 (July 20, 2004). United States law defines the target as 10% of the PBR level. 50 C.F.R. § 229.2. And U.S. law requires the implementation of regulatory measures to ensure that bycatch is actually reduced to that target. 16 U.S.C. § 1387(b), (f). New Zealand's bycatch targets are an order of magnitude higher than the U.S. ZMRG targets. And New Zealand law does not require regulatory action to achieve even those lax objectives. The Decision Memorandum's conclusion that the two countries' standards are nonetheless comparable is wholly irrational and disregards the MMPA's distinct ZMRG requirements. In addition, the Decision Memorandum does not even address that bycatch in the New Zealand Fisheries quantitatively exceeds the ZMRG standard.

U.S. law sets the ZMRG at 10% of PBR to achieve a "biologically insignificant" rate of bycatch. 69 Fed. Reg. 23477, 23486 (Apr. 29, 2004); *see also* 69 Fed. Reg. at 43339 (describing metric as "biologically relevant"). Accordingly, a comparable standard for Māui and Hector's dolphins cannot simply be some nebulous aspiration to try one's best to reduce bycatch. Rather, it must be a concrete, biologically relevant bycatch target: no more than approximately 1 Māui dolphin per 100 years (0.01) and 6.65 Hector's dolphins per year.[3] New Zealand has no bycatch targets anywhere near as rigorous as those levels. Having a comparable metric is crucial because when bycatch surpasses that threshold, the MMPA requires that mitigating action be taken.

The Decision Memorandum concludes that New Zealand's TMP objectives provide the equivalent to the ZMRG for Māui and Hector's dolphins. NMFS_014439-40. Specifically, it references the TMP's Māui dolphin objective of "95% of the maximum number of dolphins the

---

[3] These numbers represent 10% of the PBR for Māui dolphins (0.10) and Hector's dolphins (66.5). *See* NMFS_014432 (listing PBR values).

environment can support" and Hector's dolphin objective to "allow the population to increase to a level at or above 90% of the maximum number of dolphins the environment can support." NMFS_014439. GNZ states those objectives are equivalent to "the population sustainability threshold (PST)." NMFS_013937; *see* NMFS_000258 (n.8). New Zealand's PST targets are 0.14 Māui dolphins per year and 74 Hector's dolphins per year. NMFS_010679, NMFS_016036. That means that the TMP's objectives are more than an order of magnitude higher than the U.S. standards for the ZMRG: 0.14 vs. 0.01 for Māui dolphins and 74 vs. 6.65 for Hector's dolphins. It is patently "irrational" for the Decision Memorandum to conclude that such disparate objectives are comparable. *See Nw. Coal.*, 544 F.3d at 1052 n.7.

NMFS's reliance on PST to satisfy the ZMRG standard is unlawful for two additional reasons. For one, GNZ states that PST is "comparable" to PBR. NMFS_013937. *But see* NMFS_016036 ("The key issue is that PST estimates are substantially larger than PBR values."). But in its ZMRG rulemaking, NMFS expressly rejected that PBR can be "an acceptable long-term goal for reducing mortality and serious injury" to insignificant levels. NMFS_016143. NMFS may not rationally now conclude that New Zealand's PBR-equivalent *is* an acceptable long-term goal to reach insignificant levels. Second, by accepting PST as "metrics/measures comparable in effectiveness to ZMRG," NMFS_014438, NMFS is effectively double-counting PST as being comparable to both ZMRG *and* PBR, *see* NMFS_014427-28 (discussing why PST and PBR are similar), NMFS_014433 (describing New Zealand's "bycatch limit" as "PBR or PST"). The MMPA establishes ZMRG and PBR as two separate standards, the former stricter than the latter. By treating them the same in finding PST is comparable to both, the Decision Memorandum effectively renders the ZMRG standard a nullity, ignoring the explicit statutory mandate reaffirmed thrice by this Court. *See MHDD I*, 799 F.Supp.3d at 1337; *Sea Shepherd I*,

606 F.Supp.3d at 1295; *NRDC*, 331 F.Supp.3d at 1355. While the Import Regulations may not mandate "like for like" regulations, they certainly do not allow for NMFS to equate a dime to a dollar and gut applicable U.S. standards of ZMRG. *See Bennett v. Spear*, 520 U.S. 154, 173 (1997) ("It is the cardinal principle of statutory construction that it is our duty to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section." (cleaned up)).

Even if New Zealand's quantitative objectives were in the same ballpark as a ZMRG threshold—and they are not—the TMP lacks any legal requirement comparable to the U.S. standard to take action to ensure that its targets are met. The Import Regulations require an exporting nation to implement "[r]egulatory requirements" to achieve bycatch limits like ZMRG. 50 C.F.R. § 216.24(h)(6)(iii)(C)*(3)*. Neither the TMP, nor New Zealand's Biodiversity Strategy 2020 or Conservation General Policy cited in the Decision Memorandum (NMFS_014439), are "regulatory requirements"; they are nonbinding, "non-statutory" documents. NMFS_014394. Moreover, it is arbitrary for NMFS to conclude a TMP that "does not require New Zealand to do anything on any particular timeframe following a fishery-related interaction," *Sea Shepherd I*, 606 F.Supp.3d at 1318, is comparable to the U.S. statutory and regulatory requirements that *do* require the U.S. to take action on a particular timeframe to achieve ZMRG targets, *see* 16 U.S.C. § 1387(b), (f). And while the Decision Memorandum also references vague "[e]nvironmental principles and sustainability [that] are incorporated in [New Zealand] laws," NMFS_014439, it never explains what those principles are or how they set or achieve a biologically relevant bycatch target comparable to ZMRG. *Cf.* NMFS_008721 (GNZ stating Fisheries Act "does not oblige [the Minister] to reduce the risk of fishing-related mortalities to zero").

In sum, the U.S. standard sets strict biologically significant targets and requires action to achieve those targets, while the New Zealand standard allows mortality to be ten to twenty times higher and does not require action to meet even those levels. Yet NMFS concluded the standards are comparable. In no sense is that conclusion "logical and rational." *Michigan*, 576 U.S. at 750 (citation omitted).

Separately, NMFS ignores evidence that New Zealand is *not*, in fact, "achieving comparable results as the U.S. regulatory program." *Contra* NMFS_014440. The estimated bycatch rates in the Decision Memorandum are far higher than the 0.01 and 6.65 ZMRG bycatch levels for Māui and Hector's dolphins, respectively. *See* NMFS_014434 (citing 15 observed fishing-related Hector's dolphin mortalities in the 2023/2024 fishing year), NMFS_014440 (citing Māui dolphin mortality rate of 0.056 dolphins per year). *But see infra* Section I.C. (explaining why these estimates are arbitrarily low). The Decision Memorandum does not even address this critical fact that bycatch is quantitatively "in excess of" the ZMRG U.S. standard. 16 U.S.C. § 1371(a)(2); *see Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019) (holding agency violated APA "[b]y failing to consider relevant statutory objectives and factors"). And despite bycatch exceeding the ZMRG metric, GNZ has not taken any action over the last three years to try to actually reduce serious injury and mortality of Māui or Hector's dolphins to insignificant levels. *See* NMFS_014048-51 (demonstrating no take reduction measures implemented since 2020 for Māui dolphins and 2022 for Hector's dolphins). The Decision Memorandum's conclusion that New Zealand "achieve[s] comparable results" to what the MMPA requires, NMFS_014440, "does not comport with a reasonable reading of the record," *Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F.Supp.2d 1366, 1376 (Ct. Int'l Trade 2012).

### B. NMFS Is Incorrect that New Zealand Law Does Not Authorize Incidental Take in Excess of the Negligible Impact Standard.

As an additional safeguard to protect imperiled species, the MMPA prohibits commercial fisheries from incidentally catching endangered or threatened marine mammals at levels that have more than a numerically defined negligible impact on their population. 16 U.S.C. § 1371(a)(5)(E)(i); 50 C.F.R. § 216.103. New Zealand law allows its commercial fisheries to incidentally catch endangered Māui dolphins and threatened Hector's dolphins without *any* legal limits. Moreover, the estimated bycatch of these dolphins far exceeds the negligible impact threshold that would apply under U.S. standards. Yet the Decision Memorandum incomprehensibly concludes that bycatch in the New Zealand Fisheries is *not* in excess of this standard.

By default, U.S. law does not allow *any* incidental capture of ESA-listed marine mammals by commercial fisheries. The MMPA makes it unlawful for commercial fisheries to "take" a marine mammal. 16 U.S.C. §§ 1372(a), 1387(c). And the ESA makes it unlawful for any person to "take" an endangered species. *Id.* § 1538(a)(1)(B), (C). The term "take" under both laws includes incidental capture in fisheries. *See Ctr. for Biological Diversity v. Ross*, 613 F.Supp.3d 336, 340-41 (D.D.C. 2020). Both laws allow for limited and circumspect exceptions through authorizations. 16 U.S.C. §§ 1374, 1387(c), 1539. Fishers who incidentally catch ESA-listed marine mammals without authorization are subject to criminal and civil penalties. *Id.* §§ 1375, 1540(a), (b). The MMPA incorporates the enhanced ESA protections for imperiled species by allowing NMFS to partially lift the prohibitions and authorize the incidental take of ESA-listed marine mammals by commercial fisheries *only* if such take will have no more than a negligible impact on the stock. *See id.* §§ 1371(a)(5)(E), 1387(a)(2). The MMPA further requires NMFS to take "emergency" corrective action if at any point incidental take exceeds the

negligible impact level. *Id.* § 1371(a)(5)(E)(iii). At its heart, then, the MMPA imposes a "negligible impact" bycatch limit for ESA-listed species that NMFS must enforce both *before* allowing commercial fisheries to operate and *while* they are in operation.

The negligible impact standard is a U.S. standard under the MMPA's plain language. *See MHDD I*, 799 F.Supp.3d at 1339. For the Māui dolphin, the negligible impact threshold is 13% of PBR: 0.013, or one dolphin every 77 years. NMFS_014681. For the threatened Hector's dolphin, the negligible impact threshold is 2.6% of PBR, or 1.729 dolphins per year. *Id.* The Decision Memorandum reports bycatch rates that far exceed these limits: 0.56 Māui dolphins per year and 15 Hector's dolphins in the 2023/2024 fishing year. NMFS_014434, NMFS_014440. Accordingly, the rate of bycatch is objectively, quantitatively "in excess of" the U.S. negligible impact standard. 16 U.S.C. § 1371(a)(2).

NMFS attempts to circumvent this inconvenient fact by asserting that the "negligible impact standard is not applicable … because New Zealand's statutory framework does not authorize or permit its commercial fisheries to incidentally take any marine mammals." NMFS_014441. This justification is both irrelevant and factually incorrect.

It is irrelevant because the question under the Import Provision is *not* whether New Zealand employs an identical permitting mechanism as the United States (i.e., a "like for like"), *see* NMFS_014443, but whether "the incidental kill or incidental serious injury of [Māui or Hector's dolphins is] in excess of" the negligible impact standard, 16 U.S.C. § 1371(a)(2). There can be no dispute that bycatch is exceeding the negligible impact values.

The justification is factually incorrect because New Zealand law expressly *does* allow its commercial fisheries to incidentally take marine mammals without limitation or penalty, so long as fishers report the bycatch. NMFS_001671, NMFS_001677-78; *see* NMFS_014184 ("It is not

illegal to accidentally capture a marine mammal, but it is illegal to fail to report the capture."); *accord* NMFS_001083, NMFS_014238, NMFS_014281. "Suffice it to say, it is arbitrary and capricious for an agency to base its decision on a factual premise that the record plainly showed to be wrong." *Nat. Res. Def. Council, Inc. v. Rauch*, 244 F.Supp.3d 66, 96 (D.D.C. 2017) (citing *State Farm*, 463 U.S. at 43).

Recall that under U.S. law, incidentally taking ESA-listed marine mammals is *illegal* by default unless authorized. Under New Zealand law, incidentally taking marine mammals is *legal* by default. Accordingly, New Zealand law authorizes unlimited incidental take of ESA-listed marine mammals, while U.S. law authorizes only incidental take that is below a negligible impact threshold. In no rational sense are those measures comparable.

In addition, unlike under the MMPA, *see* 16 U.S.C. § 1371(a)(5)(E)(iii), New Zealand lacks any requirement to take immediate responsive action if incidental take exceeds a negligible impact threshold. The Decision Memorandum does not even address that issue. Any way you slice it, New Zealand has *no* measures to keep bycatch of threatened and endangered marine mammals below a negligible impact.

It cannot be disputed that bycatch of both Māui and Hector's dolphins is *far* in excess of negligible impact levels.[4] The fact that New Zealand does not have a "like-for-like" permitting program for take does not absolve it of achieving comparable effectiveness to the U.S. negligible impact standard. *Cf.* NMFS_014440, NMFS_014443; ECF. No. 37, at 24. In fact, the complete

[4] This objective fact belies the Decision Memorandum's claim that the suite of management measures somehow achieves the same effect as meeting a numeric negligible impact threshold. *See Ad Hoc Shrimp*, 882 F.Supp.2d at 1376 (holding agency's reasoning arbitrary if it "does not comport with a reasonable reading of the record"). *Contra* NMFS_014441-42. Moreover, the referenced "bycatch limits" from the TMP are not actual limits, those "limits" are exceeded, and the TMP does not mandate action to maintain a negligible impact threshold. *See, infra* Sections I.C., I.D.

absence of any "[r]egulatory requirements" to ensure negligible take levels is an independent basis for why bycatch in the New Zealand fisheries is in excess of U.S. standards, apart from the quantitative exceedance. *See* 50 C.F.R. § 216.24(h)(6)(iii)(C)*(3)*. NMFS's conclusion that this U.S. standard is not applicable disregards the plain requirements of the MMPA and is arbitrary and capricious. 16 U.S.C. § 1371(a)(5)(E); *see MHDD I*, 799 F.Supp.3d at 1339 ("Absent a prohibition on incidental takings by the Government of New Zealand, NMFS was required to evaluate whether New Zealand applied the negligible impact standard or an effective equivalent.").

### C. NMFS Arbitrarily Disregarded Its Own Findings, the Best Available Evidence, and the MMPA's Statutory Mandate in Accepting GNZ's Bycatch Estimates.

In the Decision Memorandum, NMFS relied on bycatch estimates provided by GNZ to conclude that "no bycatch limits were exceeded or even came close to being exceeded for any marine mammal species or stock" in New Zealand. NMFS_014413. However, not long before accepting GNZ's estimates, NMFS concluded in its 5-Year Review that based on the best available science, GNZ's bycatch estimates are critically flawed and likely underestimate bycatch. The APA prohibits an agency from "discard[ing] prior factual findings without a reasoned explanation." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015). NMFS did not justify its flip flop on GNZ's estimates. Nor did NMFS reasonably explain its choice of GNZ's estimates over the best available, more recent estimates. Further, despite having many reasons to doubt the accuracy of GNZ's estimates, NMFS failed to "insist on reasonable proof" from GNZ for its estimates as the MMPA requires. 16 U.S.C. § 1371(a)(2)(A). Any one of these errors renders its use of GNZ's estimates arbitrary.

In its Decision Memorandum, NMFS compared GNZ's estimated bycatch rate of 0.056 mean annual Māui dolphin deaths to a PBR of 0.10. NMFS_014429-30 (tbl.1). And it compared

GNZ's estimated Hector's dolphin bycatch mortality and injury rate of 8.8 dolphins per year to a PBR of 66.5. NMFS_014431. The Decision Memorandum indicates that the bycatch estimates were derived from the SEFRA model, based on data provided in GNZ's 2021 comparability finding application. NMFS_014429-31.

However, in its 5-Year Review, NMFS concluded that GNZ's SEFRA-derived estimates are flawed and unreliable. The SEFRA model was first published in a report by Roberts et al. in 2019. NMFS_004456-629. In its Review, NMFS described many "notable concerns about the methodology of [Roberts'] analysis," NMFS_016037, and noted that "if a different set of assumptions was used … the mortality rate could be 15-20 times higher," NMFS_015983. Ultimately, NMFS concluded that "due to low levels of observer coverage and gaps in fisheries data … and several assumptions made in the SEFRA model, the estimates of the impacts of fisheries on Māui's dolphins are likely to be underestimated." *Id.* NMFS also concluded that the model "underestimated the potential risk that fisheries bycatch poses to [South Island] Hectors dolphins." NMFS_016037. These findings directly contradict the agency's unquestioning reliance on the SEFRA model's apparent outputs for purposes of the Decision Memorandum.

Such "[d]ivergent factual findings with respect to seemingly comparable [issues] raise questions as to whether the agency is fulfilling its statutory mandates impartially and competently." *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1049 (9th Cir. 2010). The Decision Memorandum does not even acknowledge the contradictory findings by its own scientists. "NMFS cannot avoid its duty to confront these inconsistencies by blinding itself to them." *Id.* at 1051. NMFS's reliance on bycatch estimates that the agency itself found are flawed renders NMFS's conclusions arbitrary and capricious. *E.g.*, *Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 352-53 (4th Cir. 2019) ("Absent a reasoned discussion of the agency's

apparently contradictory positions about the species, we can only conclude that FWS acted arbitrarily … .”); *Humane Soc'y*, 626 F.3d at 1049-51.

Moreover, in accepting GNZ's estimates, NMFS failed to use the best available science in two respects. First, the Decision Memorandum's 8.8 Hector's dolphin-per-year bycatch mortality estimate is based on stale data from the 2020-2021 fishing season, before New Zealand implemented its electronic monitoring program on South Island vessels. *See* NMFS_014431, NMFS_014446 (showing on-board cameras became mandatory in October 2023). NMFS recognized in its 5-Year Review that the “[r]ecent camera monitoring (Slooten *et al*. 2024) suggests that bycatch of [South Island] Hector's dolphins may be higher than [earlier] estimates.” NMFS_015982. In addition, the 8.8-dolphin estimate does not incorporate cryptic mortality—dolphins that are captured and killed but not observed. *See* NMFS_014431. Cryptic mortality “could be a third of all bycatches.” NMFS_016034. Accordingly, NMFS's own guidelines require correcting for cryptic mortality when possible “using the best scientific information available.” NMFS_013845. NMFS did not follow its own guidelines here, instead adopting GNZ's uncorrected, negatively biased bycatch estimate. *See Am. Rivers v. FERC*, 895 F.3d 32, 46 (D.C. Cir. 2018) (holding action arbitrary where agency “discard[ed] the methodology set forth in its own handbook”).

Second, NMFS arbitrarily dismissed GNZ's most recent, publicly available bycatch estimate: a 2022 GNZ report from MacKenzie et al. NMFS_017481-704. That report used a method “consistent with” the Roberts 2019 SEFRA report, but applied updated dolphin distributions to estimate a mortality rate of 0.38 Māui dolphins per year. NMFS_017504-05, NMFS_017573. That bycatch rate far exceeds *every* applicable U.S. standard: the PBR limit (0.10), the negligible impact limit (0.013), and the ZMRG limit (0.010). The Decision

Memorandum states NMFS disregarded the MacKenzie report because it "is based on fishing effort data from 2016-17 to 2018-19 and … did not include the effect of" the 2020 or 2022 set net fishing restrictions. NMFS_014430 (n.266). However, the Māui dolphin bycatch estimate that the Decision Memorandum used instead was based on even *older* data, from "up to the end of the 2016-17 October fishing year." NMFS_000005-06. NMFS's explanation for dismissing the MacKenzie estimates is irrational. *See Defs.*, 931 F.3d at 351-52 (finding agency failed to rationally explain why it chose one estimate over others).

In addition to arbitrarily disregarding its own findings and the best available science, NMFS violated the Import Provision by passively accepting GNZ's bycatch estimates without "insist[ing] on reasonable proof" to support those estimates. 16 U.S.C. § 1371(a)(2)(A). While the Decision Memorandum indicates generally that the estimates were derived from the SEFRA model using data from GNZ's 2021 application, NMFS_014429-31, the record contains nothing resembling "reasonable proof" of what the data are, how they were collected, or what methods and assumptions GNZ used to produce the estimates.[5] The minimal account from GNZ—that it "recalculated" Māui dolphin estimates, NMFS_013978, and "manually applied" adjustments to Hector's dolphin model outputs, NMFS_013999—begs the question of whether its treatment of the data was reasonable or scientifically sound. The MMPA's reasonable proof requirement demands answers to those questions. NMFS abdicated that duty. *See also, e.g.*, *New Orleans v. SEC*, 969 F.2d 1163, 1167 (D.C. Cir. 1992) (explaining "an agency's reliance on a report or study without ascertaining the accuracy of the data contained in the study or the methodology used to collect the data 'is arbitrary'" (citation omitted)).

[5] NMFS had further good reason to question these estimates, given that Hector's dolphin bycatch self-reported by fishers in 2023/2024 was almost twice GNZ's estimate. NMFS_014434.

NMFS ignored both its own findings that GNZ's estimates are unreliable and the best available information indicating that bycatch rates are higher, and it accepted GNZ's estimates without requiring reasonable proof. NMFS's approach effectively allows exporting nations to cherry-pick the most favorable data to claim their bycatch rates are within U.S. standards and avoid all scrutiny. The Import Provision does not permit such an approach.

### D. NMFS Illogically Concluded that the Mere Calculation of a Nonregulatory Bycatch Metric Is Comparable in Effectiveness to Actually Implementing a Regulatory Bycatch Limit.

The Import Provision and Import Regulations require exporting nations to implement marine mammal bycatch limits. And they require that the bycatch limits be comparable to PBR levels. While GNZ adopted NMFS's calculated PBR *values* for purposes of its comparability finding application, it does not *implement* a PBR-based bycatch limit. Nor does New Zealand implement *any* comparable regulatory limit. NMFS's conclusion that the performative computation of a metric in the application is comparable in effectiveness to a regulatory bycatch limit is illogical.

NMFS concluded that the New Zealand Fisheries meet U.S. standards for bycatch limits because GNZ "adopted" the PBR values calculated in NMFS's application platform (IAICRS) "for purposes of its 2021 Comparability Finding Application." NMFS_014429, NMFS_014431. As the Decision Memorandum explains, IAICRS "calculate[d] bycatch limits for GNZ's marine mammals" using NMFS's PBR equation. NMFS_014429. However, the Import Regulations expressly require exporting nations to "*implement*"—not just calculate—comparable bycatch limits. *Compare* 50 C.F.R. § 216.24(h)(6)(iii)(C)*(3)(ii)* (requiring nation to "implement measures in the export fishery" to reduce bycatch "below the bycatch limit"), *with id.* § 216.24(h)(6)(iii)(C)*(5)* (separately requiring "[c]alculation of bycatch limits"). And GNZ does not actually implement PBR as a bycatch limit for Māui or Hector's dolphins. It defies common

sense for NMFS to conclude that a PBR calculation that exists only within NMFS's IAICRS platform functions as a "limit" on bycatch in New Zealand waters. *Cf. Conservation L. Found. v. Pritzker*, 37 F.Supp.3d 254, 265-67 (D.D.C. 2014) (holding NMFS's use of an upper bound on fish catch that exceeded the statutory "catch limit" contrary to the plain meaning of "catch limit"). A number that does not, when reached, prohibit additional bycatch is not a "limit." *See id.* at 267 ("The Oxford English Dictionary defines a 'limit' as 'a bound which may not be passed, or beyond which something ceases to be possible or allowable.'" (citation omitted)). PBR does not function as a limit in New Zealand.

A regulatory bycatch limit is critical because it serves to ensure that, even if bycatch rates today do not exceed PBR, they will not be permitted to exceed PBR in the future. That is why the Import Regulations require a nation to implement a "[r]egulatory" bycatch limit, 50 C.F.R. § 216.24(h)(6)(iii)(C)*(3)(ii)*, *in addition to* showing that current rates of mortality and serious injury "[d]o not exceed the bycatch limit," *id.* § 216.24(h)(6)(iii)(C)*(6)*. And while the MMPA requires corrective action if PBR is exceeded, New Zealand law does not require any such response tied to PBR. New Zealand's regulatory program does nothing to actually limit bycatch from exceeding PBR today, tomorrow, or at any other point in the future.[6]

[6] New Zealand's regulatory program allegedly manages bycatch to PST, with FRML as a "backstop." NMFS_014432. NMFS has conceded that PST and FRML are not "bycatch limits" for purposes of 50 C.F.R. § 216.24(h)(6)(iii)(C). ECF No. 26, at 30; *see also* NMFS_014433-34 (stating FRMLs do "not function as a bycatch limit"). And rightly so. PST is not a regulatory limit, but rather New Zealand's non-regulatory estimate for the maximum number of dolphin deaths that can occur while still allowing GNZ's population outcome objective for the stock to be achieved. NMFS_000258. Even if it were a limit, it is not comparable to PBR: as NMFS explained in its 5-Year Review, "[t]he key issue is that PST estimates are substantially larger than PBR values … . Therefore, the New Zealand Government is likely to be allowing a level of bycatch that is unsustainable." NMFS_016036. Indeed, the PST for Māui dolphins is 40% higher than the PBR value, and the PST for Hector's dolphins is six to eleven *times* the PBR value. *Id.* (tbl. 13); NMFS_010679.

### E. NMFS's Conclusions Regarding New Zealand's Monitoring Program Are Contrary to Its Own Findings and Fail to Account for Critical Data Gaps.

The MMPA requires NMFS to implement monitoring programs for threatened and endangered marine mammals that are sufficient to produce "statistically reliable estimates of incidental mortality and serious injury." 16 U.S.C. § 1387(d)(1)(A); *see also id.* § 1387(d)(3)(A). For highly imperiled marine mammals, a monitoring program needs to be capable of "reliably detect[ing] any non-zero capture rate." *Sea Shepherd I*, 606 F.Supp.3d at 1328 n.64; *see also* NMFS_015984 (indicating monitoring must be sufficient to "detect all bycatch"). There are three main problems with NMFS's conclusion that New Zealand meets these standards: 1) it is contradicted by NMFS's own findings in its 5-Year Review; 2) it fails to address a critical reliability problem with the geographic scope of monitoring; and 3) it does not address detection gaps in the video review process.

**First**, NMFS determined in its 5-Year Review that "[a]ccurate information on bycatch ... is [a] data gap" in the New Zealand Fisheries. NMFS_016042. For both the Māui dolphin and Hector's dolphin, NMFS found that the "[i]nadequacy of existing regulatory mechanisms" includes deficiencies in monitoring. NMFS_015982-83, NMFS_016028-34. For the Māui dolphin, NMFS explained: "Any entanglements of Māui's dolphins in fishing gear could endanger the survival of the subspecies and it is essential that *any* instances are reported so that emergency conservation actions can be taken." NMFS_015979 (emphasis added). Accordingly, NMFS expressed concern that only a small percentage of vessels "from the most problematic fishery [set nets] have cameras, and several areas with intense fishing effort (such as harbors) have no monitoring." *Id.*; *see also* NMFS_015969 (stating "there has been little monitoring of inshore [trawl] fisheries"). NMFS warned that "monitoring of fisheries interactions is insufficient to detect all bycatch" under GNZ's current monitoring program. NMFS_015984. It concluded

that "due to low levels of observer coverage and gaps in fisheries data … the estimates of the impacts of fisheries on Māui's dolphins are likely to be underestimated." NMFS_015983. For the Hector's dolphin, NMFS explained that "despite the intended camera coverage, the probability of bycatch being detected will still likely be low as the New Zealand Government's targets for viewing collected video data in many areas is only about a third, or less, of the video collected." NMFS_016029. Around the Banks Peninsula—a core of the Hector's dolphin east coast population—NMFS determined "it is very unlikely that bycatches would be detected." *Id.* Ultimately, to decrease GNZ's bycatch "data gap," NMFS determined that "[m]onitoring of set gillnet and trawl fisheries should be increased in areas where Māui's and [South Island] Hector's dolphins occur." NMFS_016042.

NMFS's Decision Memorandum does not even acknowledge those findings, much less provide the "reasoned explanation" that the APA requires if NMFS is to discard them. *Vill. of Kake*, 795 F.3d at 968; *see also Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706."). This failure alone is a quintessential APA violation. *See, e.g.*, *Defs.*, 931 F.3d at 352-53; *Humane Soc'y*, 626 F.3d at 1048-52.

**Second**, NMFS failed to rationally address how critical gaps in monitoring coverage in portions of the Māui and Hector's dolphins ranges undermine the statistical reliability of results. For the Māui dolphin, the Decision Memorandum concludes that GNZ has statistically reliable monitoring results based on its finding that GNZ "has been able to attain at least 90% monitoring coverage … within the coastal portion of the MDHZ (excluding harbors)." NMFS_014424. That ignores that there is effectively *no* monitoring in most of the rest of Māui dolphin habitat. *See* NMFS_015972 ("At present, approximately 21%-27% of fishing vessels in Māui's dolphin

habitat have onboard cameras for monitoring."). While the Decision Memorandum does not define what the "coastal portion of the MDHZ" means, the Memorandum explicitly excludes harbors. *See also* NMFS_013949. And harbors are certainly "part of the Māui's dolphin range." NMFS_015980; *see also* NMFS_014421, NMFS_014459 (describing evidence of harbor use). Indeed, GNZ included harbors within its designated MDHZ, and a Māui dolphin mother and calf were sighted interacting with fishing nets within the Waikato River harbor on multiple occasions in January 2025. NMFS_017553, NMFS_017734. But there is 0% monitoring of set netting in harbors, where 95-99% of set net fishing effort in the MDHZ occurs. NMFS_014421. This creates a critical gap in the program's ability to detect Māui dolphin bycatch. NMFS_015979. And it means monitoring coverage in the MDHZ as a whole is far lower than 90%. *See also infra* p. 33-34. It is also undisputed that Māui dolphins are found *outside* of the MDHZ, which the Decision Memorandum's 90% monitoring statistic does not touch. *See, e.g.*, NMFS_014421 (reporting that only a portion of the "Māui dolphin distribution is contained within the zone"), NMFS_014458, NMFS_015954 (discussing evidence "of Māui's dolphins from the east coast of the North Island"). The Decision Memorandum does not address low monitoring levels in Māui dolphin habitat outside the MDHZ.

Māui dolphins may be caught and killed by trawls and set nets anywhere in their range, whether in the "coastal portion of the MDHZ," harbors, or other areas beyond the bureaucratically defined MDHZ. *See* NMFS_015980. NMFS's narrow focus on the monitoring percentage in just a portion of their range fails to address the "important aspect of the problem" of how an absence of monitoring in the rest of their range affects the reliability of the program to observe the full scope of captures. *State Farm*, 463 U.S. at 43. The geographic monitoring gap is important because, for the Māui dolphin, 100% of bycatch needs to be detected in order to ensure

that any bycatch limit is not exceeded and to take "emergency conservation actions" if there is a death. NMFS_015979; *see also* NMFS_015984 (stating "there are concerns that monitoring of fisheries interactions is insufficient to detect all bycatch" and "observers or cameras are needed on all fishing vessels"). Both NMFS and GNZ have recognized the need for 100% monitoring. *See* NMFS_015972 (recognizing recommendation for "100 per cent observer coverage of any gill net or trawling vessels allowed to operate in any part of the range of Hector's and Maui's Dolphins"), NMFS_016183 (stating there must be "100% monitoring of vessels fishing using trawl or set net in areas of risk" to determine if a bycatch limit is exceeded); *Sea Shepherd I*, 606 F.Supp.3d at 1328 & n.64 ("Defendants themselves recognize that 'the level of monitoring coverage must be high enough to reliably detect any non-zero capture rate' of Māui dolphins."). Without evaluating monitoring in the entirety of the Māui dolphin's range—as opposed to just the "coastal portion of the MDHZ"—NMFS could not rationally establish that New Zealand's monitoring program is sufficient to produce statistically reliable estimates of Māui dolphin bycatch or detect non-zero bycatch as necessary to protect such an imperiled species. *See* NMFS_015983 (finding "the estimates of the impacts of fisheries on Māui's dolphins are likely to be underestimated" due in part to inadequate monitoring).

Similarly, for the Hector's dolphin, NMFS based its monitoring determination on a finding that "there is nearly 100% monitoring coverage across all *in-scope* vessels." NMFS_014422 (emphasis added). "In-scope" just means the vessels that fish in Hector's dolphin habitat on which GNZ has chosen to require cameras, based on vessel size. *See* NMFS_014420. So once again, NMFS arbitrarily considered monitoring coverage for only part of the risk, this time arbitrarily excluding "out-of-scope" vessels that fish in Hector's dolphin habitat. Out-of-scope vessels fishing with set nets or trawl nets still pose a bycatch risk because the risk comes

from the nets, not from the size of the vessel. Ultimately, for both Māui and Hector's dolphins, NMFS failed to make a "rational connection" between its findings that a *subset* of fishing in each dolphins' habitat is monitored and its conclusion that monitoring throughout each dolphin's *entire* range produces statistically significant results. *See Del. DNR*, 785 F.3d at 11.

**Third**, NMFS failed to consider important reliability problems with the electronic monitoring that GNZ uses. For one, the Decision Memorandum acknowledges that "reliability" of electronic monitoring in the U.S. "is still developing and depends on the fishery characteristics (e.g., [electronic monitoring] may not be as effective for night time hauling …)." NMFS_014416. But then it disregards these limitations to conclude that New Zealand's electronic monitoring "is capable of observing marine mammal bycatch 100% of the time." NMFS_014424. That conclusion makes no sense, given that set netting and trawl fishing in New Zealand are both permitted to occur at night. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018) (stating agency's "reasoning cannot be internally inconsistent"). If electronic monitoring is not effective for nighttime fishing, it cannot possibly observe bycatch "100% of the [night]time."

Moreover, electronic monitoring can only detect bycatch if footage is reviewed. As NMFS's 5-Year Review explains, "the probability of bycatch being detected will still likely be low as the New Zealand Government's targets for viewing collected video data in many areas is only about a third, or less, of the video collected." NMFS_016029. So even electronic monitoring coverage of 100% of fishing effort would not be capable of detecting all bycatch unless the footage review rate is also 100%. GNZ's review rate is not 100%. *See, e.g.*, *id.*, NMFS_014014 (stating "not all camera footage is reviewed"). [redacted]

[redacted]

The Decision Memorandum's discussion of footage review rates does not address whether the level of review from only in-scope vessels is sufficient to produce statistically reliably results or, critically, detect a non-zero bycatch rate for Māui dolphins. NMFS_014422-24. NMFS failed to consider the "important aspect of the problem" that, between limitations in camera monitoring and selective video review, simply putting cameras on some vessels does not mean GNZ is monitoring all bycatch on those vessels. *See State Farm*, 463 U.S. at 43; *cf. Sea Shepherd I*, 606 F.Supp.3d at 1321 ("[A] city cannot use evidence of a lack of speeding tickets issued as proof that people are not speeding if the police department is not monitoring the roadways … ." (cleaned up)).

Overall, NMFS's analysis of New Zealand's program disregards NMFS's own prior findings that the program is inadequate and fails to consider important geographic and methodological gaps in monitoring. The record reveals a reality far from the 100% monitoring rate that both GNZ and NMFS have said is required. Rather than grapple with these key issues, the Decision Memorandum's finding that New Zealand's monitoring program is comparable to U.S. standards "is nothing but a long-winded 'because we said so.'" *Mayor of Baltimore*, 973 F.3d at 277 n.8. That does not satisfy the APA's requirement for reasoned decision making.

**II. Treasury Has Failed to Execute Its Nondiscretionary Duty to Implement an Import Ban that Is Required by Law.**

While the Import Provision gives NMFS responsibility to "insist on reasonable proof" from governments wishing to export seafood to the United States, it imposes the ultimate duty to "ban the importation of commercial fish or products from" fisheries that catch "ocean mammals in excess of United States standards" on the Secretary of the Treasury. 16 U.S.C. § 1371(a)(2); *see supra* note 1 (discussing complementary role of Homeland Security). The MMPA is unambiguous: *if* incidental mortality or serious injury is in excess of U.S. standards, then Treasury "*shall* ban" imports. 16 U.S.C. § 1371(a)(2) (emphasis added). Bycatch in the New Zealand Fisheries is both quantitatively in excess of U.S. standards and, because they lack a valid comparability finding, per se in excess of U.S. standards. Either circumstance on its own requires Treasury to ban imports from the New Zealand Fisheries. Treasury has not done so.

Section 706(1) of the APA directs a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). This section applies when "an agency failed to take a discrete agency action that it is required to take." *NRDC*, 331 F.Supp.3d at 1353 (quoting *Norton*, 542 U.S. at 64). An import ban under the MMPA's Import Provision is "both discrete and mandatory for purposes of the APA." *Id.* at 1353-56. By the plain language of the statute, Treasury incurs a duty to ban imports at any point that marine mammal bycatch is in excess of U.S. standards. 16 U.S.C. § 1371(a)(2). There are two independent reasons why Treasury is required to ban imports here.

First, the plain statutory text of the MMPA itself requires a ban because the *rate* of the "incidental kill or incidental serious injury" of Māui and Hector's dolphins is objectively, quantitatively "in excess of U.S. standards." *Id.* As discussed above, it cannot be disputed that bycatch rates of both Māui and Hector's dolphins far exceed the negligible impact limits. *See*

*supra* Section I.B.[7] "[B]ecause the statutory duty to ban fish imports resulting in such excessive marine mammal bycatch is mandatory, the Government must comply with it." *NRDC*, 331 F.Supp.3d at 1354.

Second, and independently, Treasury is required to implement a ban if "a valid comparability finding is not in effect" because the regulations stipulate that a fishery "is in excess of U.S. standards" in that situation. 50 C.F.R. § 216.24(h)(1)(i); *Sea Shepherd I*, 606 F.Supp.3d at 1324-25 & nn.61-63 ("[I]f these fisheries do not have valid comparability findings in effect at the time of importation, imports of fish and/or fish products into the United States from them are per se in excess of U.S. standards under Paragraph (h)(1) of the Imports Regulation, and thereby prohibited under the MMPA's Import Provision."). Such a ban is required not "only where [NMFS] 'has denied or terminated a comparability finding for a fishery,'" but also if a court holds that the comparability finding that NMFS has issued is not "valid." *Id.* at 1325 & n.63 (citing 50 C.F.R. § 216.24(h)(9)(i)). If this Court holds that NMFS's Decision Memorandum is unlawful, that necessarily means that no "valid" comparability finding is "in effect" for the New Zealand Fisheries.[8] And Treasury has a nondiscretionary duty to ban imports in that situation.[9] Its failure to take that nondiscretionary action, even in apparent reliance on NMFS's legally insufficient determination, violates § 706(1). *See Yaak Valley Forest*

---

[7] The record also shows that bycatch is exceeding PBR for both Māui and Hector's dolphins. *E.g.*, NMFS_016040; *supra* pp. 25-26.

[8] Further, as discussed below, a ban will be required if the Court vacates the Decision Memorandum because then *no* comparability finding, whether valid or not, will be "in effect."

[9] Treasury and Homeland Security have not taken any agency action here, so MHDD's claim against those agencies is not governed by § 706(2). *Cf. MHDD I*, 799 F.Supp.3d at 1348 (finding § 706(2)(A) applied because challenge to NMFS's "Decision Memorandum concerns the sufficiency of an agency's action, rather than whether the agency unlawfully withheld or unreasonably delayed action in the first instance").

*Council v. Vilsack*, 563 F.Supp.3d 1105, 1117-18 (D. Mont. 2021) ("[T]he Court may consider whether the Forest Service's reliance on the Kootenai Plan violates § 706(1) because the reliance is part and parcel of the Forest Service's unreasonable delay.").

## III. The Court Should Vacate the Decision Memorandum and Order Defendants to Implement the MMPA's Prohibition on Unlawful Imports.

The Court should apply the APA's default remedy to vacate NMFS's unlawful Decision Memorandum. Separately, the APA requires an order compelling Treasury to execute its nondiscretionary statutory duty to ban imports from the New Zealand Fisheries. In the alternative, the Court can and should enjoin such imports under its equitable authority.

### A. The Court Should Vacate NMFS's Arbitrary and Unlawful Decision Memorandum.

Section 706(2) of the APA directs that a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Accordingly, vacatur is "the default remedy for unlawful agency action." *Ninestar Corp. v. United States*, 687 F.Supp.3d 1308, 1337 n.25 (Ct. Int'l Trade 2024). To the extent Defendants or GNZ may ask the Court to take the "rare" step of deviating from that remedy, *id.*, they "bear the burden to prove that vacatur is unnecessary," *Ctr. for Biological Diversity v. Ross*, 480 F.Supp.3d 236, 245 (D.D.C. 2020) (citation omitted). As in *MHDD I*, the "deficiencies in the Decision Memorandum are severe," and "this case does not merit a departure from the standard remedy." 799 F.Supp.3d at 1349. The Court should vacate the Decision Memorandum here, as well.

### B. The Court Should Compel Treasury to Ban Imports.

As discussed in Section II above, the MMPA imposes on Treasury its own legal obligation to ban imports from fisheries in excess of U.S. standards, which is separate from NMFS's responsibility to decide whether to issue a comparability finding. The APA directs that

a court "shall … compel agency action unlawfully withheld." 5 U.S.C. § 706(1). Because Treasury has unlawfully withheld the required import ban, the Court should compel it to take that nondiscretionary action.

MHDD's claim against Treasury is distinct from its claim against NMFS. The latter is that *NMFS's* action is arbitrary and unlawful, and the former is that *Treasury* has failed to act. *Compare* Compl. ¶¶ 142-155, *with id.* ¶¶ 156-61. The APA does not preclude a plaintiff from challenging one agency's inaction simply because a different agency did take final action. Claims under APA Section 706(1) and Section 706(2) are not "mutually exclusive." *Norton Const. Co. v. U.S. Army Corps of Eng'rs*, No. 1:03-CV-02257, 2006 WL 3526789, at *6 (N.D. Ohio Dec. 6, 2006); *see also New York v. Trump*, 811 F.Supp.3d 215, 243 (D. Mass. 2025); *Env't Def. Fund v. Regan*, No. CV 20-762, 2024 WL 3887383, at *9-12 (D.D.C. Aug. 20, 2024) (finding some claims against agency reviewable under Section 706(2) and another claim reviewable under Section 706(1)).

Insofar as Treasury is relying on NMFS's Decision Memorandum to decline to implement a ban, such reliance does not preclude an independent claim against Treasury for violation of its own statutory duty.[10] On the contrary, such reliance is, in fact, a legal basis for

[10] By analogy, the ESA requires each federal agency to ensure, "in consultation with" NMFS, that its action will not jeopardize the continued existence of any ESA-listed species. 16 U.S.C. § 1536(a)(2). While a plaintiff can challenge NMFS's "biological opinion" on the action (akin to NMFS's Decision Memorandum here) under 5 U.S.C. § 706(2), the plaintiff can also bring a claim under the ESA's cause of action (16 U.S.C. § 1540(g)(1)(A)) against the federal agency for violating the ESA's substantive requirement by relying on NMFS's arbitrary biological opinion. *See, e.g.*, *Env't Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1078-79 (9th Cir. 2001) (citing *Bennett*, 520 U.S. at 173). If a court vacates the biological opinion, that necessarily "voids authority for the proposed action" by the action agency. *Sierra Club v. NMFS*, 797 F.Supp.3d 440, 496 (D. Md. 2024); *accord Defs. of Wildlife v. U.S. Forest Serv.*, No. 1:24-CV-00118-MR-WCM, 2026 WL 914620, at *12 (W.D.N.C. Mar. 31, 2026). So too here, a Section 706(2) challenge to NMFS's Decision Memorandum does not preclude a challenge to Treasury's failure to act in apparent reliance on that Decision Memorandum.

compelling Treasury to act. *See, e.g.*, *Yaak Valley*, 563 F.Supp.3d at 1117 (holding agency unlawfully withheld action under 706(1) by relying on legally inadequate trails plan).

While Treasury already has a duty to ban imports, vacatur of the Decision Memorandum would make that duty unmistakable because vacatur would "void[] authority" for any reliance Treasury has placed on the Decision Memorandum when failing to ban imports. *See Sierra Club*, 797 F.Supp.3d at 496. As soon as the Decision Memorandum is vacated, then no valid comparability finding is "in effect," and Treasury has no discretion but to ban imports. 50 C.F.R. § 216.24(h)(1)(i); *see also id.* § 216.24(h)(1)(ii) (making it unlawful to import fish from any "fishery that does not have a valid comparability finding in effect"); *Sea Shepherd I*, 606 F.Supp.3d at 1325. APA Section 706(1) provides the Court authority to compel Treasury to take that nondiscretionary action.

### C. In the Alternative, the Court Should Enjoin Imports from the New Zealand Fisheries.

If the Court does not compel Treasury under 5 U.S.C. 706(1) to implement a ban on imports from the New Zealand Fisheries, the Court can and should use its equitable power to enjoin such imports. "In the APA context, … a district court is 'justified in fashioning equitable relief that would ensure the vindication of plaintiffs' rights.'" *AM/NS Calvert LLC v. United States*, 654 F.Supp.3d 1324, 1349 (Ct. Int'l Trade 2023) (citation omitted). "Rather than subjecting the party challenging the agency action to further abuse [on remand], [a court] may put an end to the matter by using its equitable powers to fashion an appropriate remedy." *Id.* n.28 (citation omitted); *cf. MHDD I*, 799 F.Supp.3d at 1349 (observing import ban may be merited "going forward, if the agency continues to rely on an arbitrary and unlawful Decision Memorandum"). Injunctive relief in an APA case "is subject to ordinary equitable principles."

*AM/NS Calvert*, 654 F.Supp.3d at 1343. A plaintiff seeking permanent injunctive relief must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). As the CIT found previously, continuing to allow imports from the New Zealand Fisheries causes irreparable harm to the marine mammals they catch and, accordingly, a plaintiff's interests in them. *Sea Shepherd I*, 606 F.Supp.3d at 1328. Such environmental injuries cannot be compensated with monetary damages. And the balance of the hardships and the public interest favor an injunction that would help protect imperiled Māui and Hector's dolphins from extinction, with little to no burden on Defendants.

**1. MHDD Has Suffered an Irreparable Injury.**

The CIT previously held that "given the undisputed instances of Māui dolphin bycatch and the continued threat[,] there exists a likelihood of irreparable harm absent injunctive relief." *Id.*[11] The only difference now is that the existential threat to Māui dolphins has worsened. *See* 2d Decl. of Christine Rose ¶¶ 43-46, 57, 100; 2d Decl. of Elisabeth Slooten ¶¶ 15-21, 29-44; NMFS_016038. In fact, "[t]he number of Māui dolphins caught in fishing nets is now so uncertain, that it is possible—based on model runs submitted by New Zealand to the IWC

[11] In denying MHDD's motion for a preliminary injunction, this Court found MHDD had "not sufficiently demonstrated a likelihood" of irreparable harm at that point because "[t]he contested comparability findings in this action are what permit the continued importation of seafood from New Zealand fisheries that are alleged to cause incidental death or serious injury to endangered dolphins" and "the Court ha[d] determined that Plaintiff has failed to demonstrate clearly at [that] stage a sufficient likelihood to succeed on the merits." ECF 37, at 40-41. That reasoning will be inapplicable if the Court rules for MHDD on the merits at this stage and proceeds to determining remedy.

scientific committee—for the entire Māui dolphin population to be killed in fishing nets in a single year." 2d Slooten Decl. ¶ 37. There is also a likelihood of irreparable harm to Hector's dolphins given the documented, ongoing mortality of those dolphins in the South Island Fisheries. *See id.* ¶¶ 22-28, 45-49; 2d Rose Dec. ¶¶ 45-58; NMFS_016039-40. Every Hector's dolphin death shrinks the already imperiled population, hastening its current decline towards endangerment. *See* 2d Rose Decl. ¶¶ 45-56, 100; 2d Slooten Decl. ¶¶ 26-31, 45-49. These are the exact harms that Congress sought to prevent by requiring an MMPA import ban in a situation like this.

"A determination of irreparable harm should … be guided by reference to the purposes of the statute being enforced." *NRDC*, 331 F.Supp.3d at 1369. The core purpose of the MMPA is to conserve marine mammals and the ecosystems that support them. 16 U.S.C. § 1361. Given this conservation purpose, "establishing irreparable injury should not be an onerous task for plaintiffs." *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015) (citing 16 U.S.C. § 1531).

"An irreparable injury is a 'viable threat of serious harm which cannot be undone.'" *Auxin Solar, Inc. v. United States*, 798 F.Supp.3d 1331, 1349 (Ct. Int'l Trade 2025) (citation omitted). New Zealand's set net and trawl fisheries pose a viable threat of deadly bycatch to marine mammals every day they operate. *See* 2d Slooten Decl. ¶¶ 29-60; NMFS_016038-40. That is sufficient to establish "a likelihood of irreparable harm absent injunctive relief." *Sea Shepherd I*, 606 F.Supp.3d at 1328 (finding harm likely because "set net and trawl fishing are presently allowed to operate in at least portions of the Māui dolphin's range"); *Conservation L. Found. v. Ross* (*CLF*), 422 F.Supp.3d 12, 33 (D.D.C. 2019) (finding fishing in whale's habitat "is likely to cause irreparable injury to these whales and thus to [plaintiff] and its members").

"[T]he injury complained of need not have been inflicted when the application is made, or be certain to occur." *NRDC*, 331 F.Supp.3d at 1368 (citation omitted). A "continued threat" of bycatch is enough. *Sea Shepherd I*, 606 F.Supp.3d at 1328. "[S]howing an extinction-level threat to [a] species is not required" under this factor, either. *Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d 803, 819 (9th Cir. 2018). A likelihood of harm to individual members of a population is sufficient because "[o]nce a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult." *Id.* at 818 (alteration in original) (citation omitted); *see, e.g.*, *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F.Supp.2d 230, 258-59 (D.D.C. 2003) (finding potential loss of "relatively few" birds out of an at-risk population established likelihood of irreparable harm (citation omitted)); *Earth Island Inst. v. Mosbacher*, 746 F.Supp.964, 975 (N.D. Cal. 1990) (finding "risk of unnecessary dolphin deaths and injury to the dolphin population" in foreign fisheries sufficient to establish irreparable harm absent import ban). The loss of individual Māui or Hector's dolphins would result in fewer animals in fewer locations, making it less likely that MHDD's members will be able to observe and enjoy them. *See CLF*, 422 F.Supp.3d at 34 ("Even short of extinction, each death causes the declarant [plaintiff] members individualized personal and professional anguish that money damages would not redress."); 2d Rose Decl. ¶¶ 42, 44, 100-02; ECF No. 13-26. ¶¶ 7, 12-16; ECF No. 13-27 ¶¶ 5-10. And it is well-established that such environmental harm is "irreparable" because no monetary payment could remedy the harm. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *Sea Shepherd I*, 606 F.Supp.3d at 1326-27; *see Oregon v. United States*, 835 F.Supp.3d 1307, 1339 (Ct. Int'l Trade 2026) ("The court considers the first and second [injunction] factors together.").

This Court and others have repeatedly recognized that marine mammals face a legally significant risk of harm absent an import ban on the fisheries that catch them. *E.g.*, ECF 37, at 12-18 (holding MHDD established that an import ban will likely redress harm to dolphins); *Sea Shepherd I*, 606 F.Supp.3d at 1326-30; *NRDC*, 331 F.Supp.3d at 1368-69; *Mosbacher*, 746 F. Supp. at 975. The situation is no different here: "given the undisputed instances of Māui dolphin [and Hector's dolphin] bycatch and the continued threat[,] there exists a likelihood of irreparable harm absent injunctive relief." *Sea Shepherd I*, 606 F.Supp.3d at 1328. "[T]o hold otherwise would undermine the very purpose of the MMPA." *Id.*

**2. The Balance of Hardships and the Public Interest Favors an Injunction.**

The third and fourth injunction factors "merge when the Government is the opposing party," as here. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The impact to MHDD and the broader public from the death and possible extinction of imperiled dolphins is great. The risk to the Māui dolphin, in particular, cannot be overstated. In contrast, the administrative burden of an injunction on the U.S. government to implement an import ban is minimal. *See Sea Shepherd I*, 606 F.Supp.3d at 1329.

In considering the balance of hardships and public interest prongs, a court's inquiry must be "guided by reference to 'the underlying statutory purposes at issue.'" *Id.* at 1330 (citation omitted). The MMPA's "explicit" purpose is "to be administered for the benefit of the protected species rather than for the benefit of commercial exploitation." *Id.* (citation omitted). Banning imports from the fisheries that pose the highest bycatch risk to Māui and Hector's dolphins would serve the public interest by effectuating Congress's tool of choice under the MMPA for encouraging foreign fisheries to better protect their marine mammal populations. *See Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc) ("[P]reserving environmental

resources is certainly in the public's interest."), *abrogated on other grounds*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008).

In contrast, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Rather, "[t]he public interest is served by ensuring that governmental bodies comply with the law." *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). The unlawful Decision Memorandum for the New Zealand Fisheries challenged here is the *fourth* that NMFS has published in the past five years. This Court held two to be unlawful, *MHDD I*, 799 F.Supp.3d 1327; *Sea Shepherd I*, 606 F.Supp.3d 1286, and NMFS replaced the other in response to MHDD's litigation, *see* NMFS_017806-10. Yet Defendants perpetuate their failure to comply with the law with the publication of yet another unlawful Decision Memorandum and a refusal to ban imports from the New Zealand Fisheries. It is abundantly clear that the only way to prevent Defendants from continuing to allow imports in violation of the law is to enjoin them from doing so.

These imperiled dolphins face a threat of irreparable harm with every entangling net deployed in their habitats. As Judge Katzmann recognized, "extinction is likely should the Māui dolphin population decline much further." *Sea Shepherd I*, 606 F.Supp.3d at 1329; *see also* 2d Slooten Decl. ¶¶ 18-19. And while extinction may not be as imminent for the Hector's dolphin, the current mortality rate is sending the subspecies in that direction, a direction in direct opposition to the MMPA's mandate. *See* 16 U.S.C. § 1361(2); 2d Slooten Decl. ¶¶ 26-28; NMFS_016040. Any reduction in harmful fishing activities within Māui and Hector's dolphin habitat is in the interest of their survival, and thus in the interests of both MHDD and the broader public.

Conversely, there will be little to no harm or burden to the Defendants as a result of the requested injunction. This Court has held that "the administrative inconvenience of administering an embargo can be characterized as 'routine.'" *Sea Shepherd I*, 606 F.Supp.3d at 1329 (quoting *NRDC*, 331 F.Supp.3d at 1370). Defendants are currently implementing MMPA import bans for over 200 fisheries from approximately 42 nations,[12] and are well equipped to quickly implement an import ban on a handful of fisheries from one additional nation. The balance of the equities tips strongly in favor of an injunction.

**CONCLUSION**

The APA requires more than words on a page. It requires a "logical and rational" analysis. *Michigan*, 576 U.S. at 750. The Decision Memorandum perpetuates NMFS's practice of employing logical fallacies and ignoring the evidence before it—including its own findings—to continue giving the New Zealand Fisheries a free pass under the Import Provision. The Court should vacate NMFS's unlawful Decision Memorandum and order Treasury to ban imports from the Fisheries before the Māui and Hector's dolphins are pushed any closer to extinction.

Respectfully submitted this 28th day of September, 2026.

*/s/ Christopher Eaton*
Christopher Eaton
Sabrina Devereaux-Weemaes
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T: (206) 343-7340
ceaton@earthjustice.org
sdevereaux@earthjustice.org

[12] *See* NOAA Fisheries, *Marine Mammal Protection Act Comparability Finding Determinations for Harvesting Nations*, https://www.fisheries.noaa.gov/international-affairs/marine-mammal-protection-act-comparability-finding-determinations-harvesting-nations (last updated July 2026).

Natalie Barefoot
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
T: (415) 217-2000
nbarefoot@earthjustice.org

*/s/ Brett Sommermeyer*
Brett Sommermeyer
Catherine Pruett
Law of the Wild
7511 Greenwood Avenue North, #4214
Seattle, WA 98103
T: (206) 774-0048
brett@lawofthewild.org
catherine@lawofthewild.org

*Attorneys for Plaintiff Māui and Hector's Dolphin Defenders NZ Inc.*

**CERTIFICATE OF COMPLIANCE**

This document complies with the word count limitations as provided for in the Court's Standard Chambers Procedures 2(B) because it contains 13,993 words, excluding the parts of the brief exempted by Standard Chambers Procedures 2(B)(1)(c).

*/s/ Christopher Eaton*
Christopher Eaton