**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ, INC.,

Plaintiff,

v.

NATIONAL MARINE FISHERIES SERVICE, et al.,

Defendants,

and

NEW ZEALAND GOVERNMENT,

Defendant-Intervenor.

Court No. 1:26-cv-02462-JCG

**DEFENDANTS' RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION JUDGMENT ON THE AGENCY RECORD**

JONATHAN D. GUYNN
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

AGATHA KOPROWSKI
OLIVER J. MCDONALD
Trial Attorneys
U.S. Department of Justice, Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 507-6081
Fax: (202) 353-0461
Email: agatha.koprowski@usdoj.gov

*Attorneys for Defendants*

OF COUNSEL:
MARK HODOR
Office of the General Counsel
National Oceanic & Atmospheric Administration

EVA BOGDEWIC
GARY W. NEIMAN
ROBERT MATHAI
Office of the Chief Counsel
U.S. Customs and Border Protection

DANIEL PAISLEY
Office of the General Counsel
Department of the Treasury

November 20, 2026

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ vi

INTRODUCTION ........ 1

I. The Marine Mammal Protection Act ........ 1

II. Factual and Procedural Background ........ 3

III. Standard of Review ........ 4

SUMMARY OF THE ARGUMENT ........ 5

ARGUMENT ........ 6

I. The 2026 Comparability Findings Were Not Arbitrary and Capricious ........ 6

A. Overview of U.S. Fisheries Regulations ........ 8

B. New Zealand Prohibits the Intentional and Incidental Mortality and Serious Injury of Marine Mammals in the Course of Commercial Fishing Operations ........ 10

C. New Zealand Has Processes to Calculate Bycatch Limits ........ 13

1. New Zealand Calculates Bycatch Limits Using a Biological Reference Point . 13

2. ZMRG Is Not A Required Consideration ........ 14

D. New Zealand Has Comparably Effective Measures Designed to Reduce the Total Incidental Take of Māui and Hector's Dolphins Below the Bycatch Limit ........ 15

1. The TRP Process Does Not Guarantee ZMRG is Reached ........ 15

2. The TMP Process is Comparable in Effectiveness to a TRP ........ 16

3. The Mitigation Measures Employed by the GNZ Are Comparable in Effectiveness to U.S. Measures ........ 19

4. Neither Observed Nor Estimated Bycatch Exceeds Applicable Limits ........ 20

E. New Zealand Has Implemented Monitoring Designed to Estimate Incidental Mortality and Serious Injury in Its Set Net and Trawl Fisheries ........ 26

F. MHDD Misinterprets the Record and Confuses the Regulatory Considerations ....... 30

1. MHDD Misunderstands Bycatch Limit Comparison ........ 31

2. MHDD Mischaracterizes U.S. and New Zealand Law ........ 32

3. MHDD Misconstrues The Five-Year Review ........ 34

II. MHDD Seeks Unlawful Relief ........ 37

III. MHDD Cannot Show That It Will Be Irreparably Injured Absent Injunctive Relief ........ 38

IV. The Public Interest Would Not Be Better Served By an Injunction and the Balance Of Hardships Favor the Government ........ 43

CONCLUSION ........ 45

# TABLE OF AUTHORITIES

Cases

*Alaska Dep't of Env't Conservation v. EPA*,
540 U.S. 461 (2004) .......... 5

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
462 U.S. 87 (1983) .......... 5

*Camp v. Pitts*,
411 U.S. 138 (1973) .......... 33

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .......... 42

*Euromepa S.A. v. R. Esmerian, Inc.*,
51 F.3d 1095 (2d Cir. 1995) .......... 12

*Fed. Commc'ns Comm'n v. Prometheus Radio Proj.*,
592 U.S. 414 (2021) .......... 4, 37

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) .......... 38

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 40-41

*Gill v. Whitford*,
585 U.S. 48 (2018) .......... 42, 44

*Humane Soc'y v. Locke*,
626 F.3d 1040 (9th Cir. 2010) .......... 36

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 41, 42

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) .......... 5, 37

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) .......... 4, 5

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 42

*NEXTEEL Co. v. United States*,
28 F.4th 1226 (Fed. Cir. 2022) .......... 38

*Nippon Steel Corp. v. Int'l Trade Comm'n*,
345 F.3d 1379 (Fed. Cir. 2003) .......... 38

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 43

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......... 37, 38

*Phigenix, Inc. v. Immunogen, Inc.*,
845 F.3d 1168 (Fed. Cir. 2017) .......... 41

*Qingdao Sea-Line Trading Co. v. United States*,
766 F.3d 1378 (Fed. Cir. 2014) .......... 36

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 42

*United States v. Texas*,
599 U.S. 670 (2023) .......... 44

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) .......... 41

Statutes

5 U.S.C. § 706 .......... 4, 37

16 U.S.C. § 1362 .......... 1, 18

16 U.S.C. § 1371 .......... passim

16 U.S.C. § 1378 .......... 2, 43, 44

16 U.S.C. § 1387 .......... passim

16 U.S.C. § 1533 .......... 29, 34

28 U.S.C. § 1581 .......... 4

Rules

Fed. R. Evid. 806 .......... 43

USCIT R. 56 .......... 42

<u>Regulations</u>

50 C.F.R. § 216.24 .......... passim

50 C.F.R. § 216.3 .......... 1

50 C.F.R. § 229.37 .......... 20

<u>Other Authorities</u>

*Fish and Fish Product Import Provisions of the Marine Mammal Protection Act*, 81 Fed. Reg. 54,390 (Dep't of Commerce Aug. 15, 2016) .......... passim

*Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act—Notification of Comparability* Findings, 91 Fed. Reg. 11,962 (Dep't of Commerce Mar. 11, 2026) .......... 3

H.R. Rep. No. 92-707 .......... 43

H.R. Rep. No. 92-1488 .......... 43

H.R. Rep. No. 100-970 .......... 43

S. Rep. No. 92-863 .......... 2, 43

Defendants, the National Marine Fisheries Service (NMFS), the Assistant Administrator for NMFS, the Secretary of Commerce, the Secretary of the Treasury, and the Secretary of Homeland Security, respectfully file this opposition in response to the motion for judgment on the agency record (MJAR) filed by plaintiff, Māui and Hector's Dolphin Defenders NZ Inc. (MHDD), on April 3, 2026. ECF No. 50. For the reasons below, the MJAR should be denied.

## INTRODUCTION

I. The Marine Mammal Protection Act

The Marine Mammal Protection Act (MMPA) regulates the take[1] of marine mammals, incidental to a variety of human activities, including commercial fishing operations. *See, e.g.,* 16 U.S.C. §§ 1371(a)(5)(E), 1387.

The MMPA provides the Government with substantial discretion to address the effects of commercial fishing activities on marine mammals. *See generally*, 16 U.S.C. § 1387. For example, the Government must establish a program to monitor incidental mortality and serious injury of marine mammals, require operators of commercial fishing vessels to report incidental mortality and injury of marine mammals, and develop "take reduction plans" (TRPs). *Id.* § 1387(d), (e), (f). The ultimate "goal" of these provisions is to reduce incidental mortality or serious injury of marine mammals "to insignificant levels approaching a zero mortality and serious injury rate," *id.* § 1371(a)(2), but in so doing, the Government is required to consider the economics of the fishery, the availability of existing technology, existing state or regional fishery management plans, and the availability of funding, *id.* at § 1387(f)(2), (3).

[1] "Take" means to "harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *See* 16 U.S.C. § 1362(13); 50 C.F.R. § 216.3.

In passing the MMPA, Congress recognized that "unilateral action by the United States affecting any species or subspecies of marine mammal could be fruitless unless other nations involved" also act, so it included provisions authorizing the Executive Branch to "work with" other countries "to preserve and protect these creatures." S. Rep. No. 92-863 at 10 (1972). For example, the MMPA authorizes negotiations for international agreements to further the protection of marine mammals, *see* 16 U.S.C. § 1378, and NMFS has duly taken on that foreign policy role by providing technical assistance, promoting research cooperation, and transferring technology to further the MMPA's goal of protecting marine mammals worldwide, *see* 50 C.F.R. § 216.24(h)(11).

The MMPA restricts the importation of commercial fish or fish products where harvesting by foreign commercial fisheries results in the incidental killing or serious injury of marine mammals "in excess of United States standards." *See* 16 U.S.C. § 1371(a)(2).

A country seeking to export fish or fish products to the United States must submit an application for a finding that its regulatory program to protect marine mammals is "comparable in effectiveness" to the highly discretionary and flexible American regulatory program. 50 C.F.R. § 216.24(h)(6)(iii)(B). "Comparable in effectiveness" means that the exporting country should regulate the incidental taking of marine mammals in a manner that "effectively achieves comparable results" as the U.S. program. *Id.* § 216.24(h)(6)(iii)(C); *Fish and Fish Product Import Provisions of the Marine Mammal Protection Act*, 81 Fed. Reg. 54,390, 54,401 (Dep't of Commerce Aug. 15, 2016) (MMPA Import Rule). Effectively achieving comparable results means that "harvesting nations [have] flexibility to implement the same type of regulatory program as the United States or a program that is completely different but achieves the same results." *Id.*

NMFS may issue a comparability finding if the harvesting nation submits "reasonable proof" that its program is meeting U.S. standards for marine mammal bycatch. *See* 16 U.S.C. § 1371(a)(2)(A); MMPA Import Rule, 81 Fed. Reg. at 54,406. However, if NMFS determines that a harvesting nation's fishery utilizes fishing technology that results in the incidental mortality or incidental serious injury of marine mammals in excess of U.S. standards, then the Government is required to ban the import of fish or fish products from such fishery. 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h)(1)(ii).

## II. Factual and Procedural Background[2]

This case is one of several overlapping actions initiated by MHDD arising out of the application by the Government of New Zealand (GNZ) for a comparability finding, initially submitted in 2021. *See Māui and Hector's Dolphin's Defenders NZ, Inc. v. Nat'l Marine Fisheries Serv.*, No. 24-cv-00218 (Ct. Int'l Trade); *Māui and Hector's Dolphin's Defenders NZ, Inc. v. Nat'l Marine Fisheries Serv.*, No. 26-cv-00060 (Ct. Int'l Trade). On March 11, 2026, NMFS issued the comparability findings challenged here, which concern 15 set-net and trawl fisheries. *Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act—Notification of Comparability Findings*, 91 Fed. Reg. 11,962 (Dep't of Commerce Mar. 11, 2026) (2026 Comparability Findings). NMFS explained its determinations in a decision memorandum dated March 2, 2026. NMFS_014378-465 (Decision Memorandum).

[2] As the Court is familiar with the factual and procedural background of this matter, the Government provides only a brief summary here. Additional information and defined terms not defined herein are incorporated by reference from the Government's motion to dismiss filed on April 9, 2026, ECF No. 16, and its response to the motion for preliminary injunction filed on June 4, 2026, ECF No. 26. References to the Administrative Record filed on August 14, 2026, ECF Nos. 42-46, and completed on September 25, 2026, ECF Nos. 47-48, begin with the prefix "NMFS_0."

On March 24, 2026, MHDD filed this suit to challenge the 2026 Comparability Findings, ECF No. 4, and on April 3, 2026, it moved for an order to immediately ban the importation of fish from 15 of New Zealand's fisheries, *see* ECF No. 13. On April 9, 2026, the Government moved to dismiss for lack of jurisdiction on the ground that MHDD has not shown that U.S. imports were causing, or that an import prohibition would likely redress, its claimed injuries. ECF No. 16.

On July 13, 2026, the Court denied the Government's motion to dismiss and MHDD's motion for a preliminary injunction. ECF No. 37.

On September 28, 2026, following the filing of the administrative record, MHDD filed the MJAR, ECF No. 50, which we now oppose.

## III. Standard of Review

This Court reviews actions brought pursuant to 28 U.S.C. § 1581(i) as provided in the Administrative Procedure Act (APA), *id.* § 2640(e); 5 U.S.C. § 706. This Court may "hold unlawful and set aside agency action, findings, and conclusions" that are, among other things, "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.* § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Rather, an action is only arbitrary and capricious if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before it, or reached a conclusion that is so implausible that it cannot be attributed to a difference in view. *Id.* In short, the Court is limited to assessing whether an agency's action was "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021).

To succeed, MHDD must make a clear showing that NMFS failed to consider relevant factors or exercised a clear error of judgment. *E.g.*, *State Farm*, 463 U.S. at 43. Even if MHDD marshals purported "specialists" who express "conflicting views"—and even if the Court finds those views "persuasive"—the Court still must defer to the agency's own qualified experts when it resolves questions delegated to it under the operative statute, particularly on matters within its scientific and technical expertise. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

When it comes to complex scientific assessments, an agency entrusted by Congress with that "special expertise" is entitled to particularly heightened deference. *See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts" even if a court might "find contrary views more persuasive." *Marsh*, 490 U.S. at 378. The Court must still uphold an agency's decision of "less than ideal clarity" if "the agency's path may be reasonably discerned." *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004).

## SUMMARY OF THE ARGUMENT

In the thousands of pages that MHDD has filed with this Court, it has sought to complicate what is, at its essence, a simple question: whether the GNZ takes appropriate responsive actions to manage its commercial set net and trawl fisheries to prevent or minimize the incidental bycatch of marine mammals, particularly Māui and Hector's dolphins, while taking into account the economics of the industry. NMFS accurately found that, while the MMPA did not require the GNZ's program to be identical to that of the United States, the GNZ's program shares many of the same hallmarks as the U.S. fisheries management program. And it rightly found that the GNZ had submitted reasonable proof that its regulatory program

effectively achieves comparable results to the U.S. program. The MMPA's "comparability" test does not require more.

With understandable zeal for promoting marine mammal conservation, MHDD now seeks to move the MMPA's goalposts. Its fundamental objection is that the GNZ has not eliminated commercial set net and trawl fishing from any potential Māui or Hector's dolphin territory, but that is not the applicable standard for comparability. The Government does not dispute that the survival of both species is precarious. However, MHDD's opposition to the GNZ's policies regarding the management of its fisheries, and its disagreement with NMFS's expert scientific judgment, without regard to industry economics, do not render the comparability finding arbitrary and capricious. MHDD's confusing arguments are premised on its misreading of a previous NMFS report generated under a different statutory regime and for a different purpose, as well as irrelevant mathematical equations, which serve no ostensible purpose other than as distraction. They in no way aid or assist this Court's review of the agency's application of the lawfully promulgated regulations and reaching a reasonable determination. MHDD has not demonstrated that NMFS failed to consider any of the relevant conditions under the MMPA Import Rule or that it exercised a clear error of judgment, so the MJAR must be denied, and the Court should enter judgment in favor of the Government.

## ARGUMENT

### I. The 2026 Comparability Findings Were Not Arbitrary and Capricious

The Court should deny the MJAR. After examining New Zealand's overarching fisheries management program, including its laws, regulations, and policies, and by weighing complex scientific evidence within the ambit of its special expertise, NMFS concluded that the GNZ's regulatory program is comparable in effectiveness to U.S. marine mammal bycatch protections because it has mechanisms in place to identify when incidental bycatch occurs and because the

GNZ exercises its legal authority to take reasonable responsive actions restricting or otherwise modifying commercial fishing activities to limit incidental bycatch of Māui and Hector's dolphins to a sustainable level. NMFS thus determined that none of the challenged fisheries employ commercial fishing technology that results in the incidental killing or serious injury of Māui or Hector's dolphins in excess of United States standards. *Cf.* 16 U.S.C. § 1387(f)-(g) (describing the take reduction plan process and the ability to issue emergency regulations if incidental mortality or serious injury of marine mammals is "having, or is likely to have, an immediate and significant adverse impact on a stock or species" in managing U.S. commercial fisheries).

To obtain a comparability finding, a harvesting nation must "demonstrate that it has adopted and implemented, with respect to an export fishery, a regulatory program governing the incidental mortality and serious injury of marine mammals in the course of commercial fishing operations in its export fishery that is comparable in effectiveness to the U.S. regulatory program." MMPA Import Rule, 81 Fed. Reg. at 54,391.

As relevant here, NMFS must consider whether a foreign harvesting nation's regulatory program includes, or achieves effectively comparable results as a program that includes: (1) a prohibition against the intentional mortality or serious injury of marine mammals; (2) calculation of a bycatch limit; (3) measures to reduce total mortality and injury of marine mammal stock below such limits; and (4) monitoring procedures designed to estimate incidental mortality and serious injury of marine mammals during commercial fishing activities. 50 C.F.R. § 216.24(h)(6)(iii). The administrative record shows that NMFS considered these conditions and addressed each in detail in the Decision Memorandum. NMFS_014395-435.

To determine comparability, NMFS undertook a highly interactive process with the GNZ to determine whether, in comparison to the U.S. domestic legal framework, its fisheries had incidental mortality and serious injury of marine mammals in excess of United States standards. NMFS_014389-90. Ultimately, NMFS's approach "takes into account the practical realities of issuing comparability findings to various foreign sovereign nations, each of which has its own legal system and regulatory framework to govern marine mammal bycatch within its commercial fisheries." NMFS_014390.

While the scope of MHDD's argument is unclear, its essence appears to be that NMFS erroneously concluded that New Zealand has calculated bycatch limits for Māui and Hector's dolphin and that it implements measures designed to reduce the take of Māui and Hector's dolphin stock below the applicable limit, as required by 50 C.F.R. § 216.24(h)(6)(iii)(C)(3), (5), and (6). MJAR at 18, 23, 28. MHDD otherwise ignores the MMPA Imports Rule itself, arguing that NMFS failed to impose standards that were explicitly rejected when the rule was promulgated, such as the negligible impact standard and zero mortality rate goal. Any effort by MHDD to impose additional requirements on harvesting nations amounts to an effort to require NMFS to deny comparability findings in a manner contrary to law. Such a result cannot support an APA claim, and the MJAR must be denied.

A. Overview of U.S. Fisheries Regulations

NMFS classifies U.S. domestic commercial fisheries into three categories according to their levels of incidental marine mammal mortality and serious injury: Category I (frequent); Category II (occasional); and Category III (remote likelihood). NMFS_014381 & n.19. The latest classification of U.S. domestic fisheries was published in 2024. NMFS_ 014466-491. The classification determination is made in reference to annual mortality and serious injury of a marine mammal stock in a particular fishery, relative to that stock's potential biological removal

(PBR) level, which represents the maximum number of animals that may be removed while allowing the stock to reach or maintain its optimum sustainable population. NMFS_014381 n.19.

To calculate the stock's PBR, scientists multiply the minimum estimate of its population by its "recovery factor" and one half of the estimated rate of reproduction. NMFS_014380 n.13. For endangered species, the recovery factor is typically designated as "0.1," but determining each of these variables requires applying technical scientific judgment based on uncertainty and the quality of data available on each species. NMFS_014426. For each fishery in which the annual mortality and serious injury of any marine mammal stock is equal to or exceeding 50 percent of PBR, it is classified as Category I. NMFS_014381. For each fishery in which the annual mortality and serious injury of any marine mammal stock is greater than one percent but less than 50 percent of PBR, it is classified as Category II. *Id.* Finally, for each fishery in which the annual mortality and serious injury of any marine mammal stock is less than or equal to one percent of PBR, regardless of the cumulative mortality and serious injury caused by all fisheries of that stock, it is classified as Category III. *Id.*

Pursuant to 16 U.S.C. § 1387(f), NMFS is required to develop and implement a take reduction plan (TRP) for each marine mammal stock that interacts with a Category I or Category II fishery and for which "the level of direct human-caused mortality exceeds the potential biological removal level" or for which the species is considered, or likely to be considered, threatened with extinction under other authorities. NMFS_014382 & n.23.

TRPs include a variety of regulatory and non-regulatory measures designed to reduce the incidental mortality and serious injury of certain marine mammal stocks incidental to the fishery or fisheries subject to the TRP. NMFS_014383. In addition, TRPs may also include specific percentage levels and methods of observer coverage for a fishery to account for any incidental

mortality and serious injury of marine mammals during the course of commercial fishing. *Id.* at NMFS_014385. Examples include at-sea monitoring through observers and electronic monitoring using onboard video cameras. *Id.*

B. New Zealand Prohibits the Intentional and Incidental Mortality and Serious Injury of Marine Mammals in the Course of Commercial Fishing Operations

NMFS reasonably concluded that New Zealand prohibits the intentional mortality and serious injury of marine mammals in the course of commercial fishing operations, as required under 50 C.F.R. § 216.24(h)(6)(iii)(A)(1). NMFS_014395.

As NMFS explained, Section 4(1) of the New Zealand's Marine Mammals Protection Act 1978 (NZ MMPA), prohibits any person from "tak[ing] any marine mammal, whether alive or dead, in or from its natural habitat or in or from any other place - without first obtaining a permit to do so from the Minister," which is comparable to the general prohibition on the take of marine mammals under § 1371 of the MMPA. NMFS_014395 & n.97; *see also* NMFS_001656 (defining take under the NZ MMPA); NMFS_013881 (explaining that "[t]he NZ MMPA prohibits the taking of marine mammals without a permit").

MHDD does not contest that this factor is met. Rather, MHDD presses an irrelevant and extra-regulatory argument that New Zealand fisheries fail to meet the so-called negligible impact standard. The negligible impact standard appears nowhere in the MMPA Imports Rule and is not one of the specified conditions required to be considered when evaluating a harvesting nation's general prohibition against certain types of take. *See* MMPA Import Rule, 81 Fed. Reg. at 54,398 (explaining that the negligible impact standard in § 1371(a)(5)(E) is addressed through the condition to "comply with monitoring and take reduction plans"). As demonstrated further below, New Zealand has comprehensive monitoring and take reduction programs.

Even if it were a relevant consideration, MHDD mischaracterizes, MJAR at 20-23, the purpose of the negligible impact standard. The MMPA instructs the Secretary of Commerce to "*allow* the incidental, but not intentional, taking by persons" with a valid fishing permit of "marine mammals from a species or stock designated as depleted because of its listing as an endangered species or threatened species under the Endangered Species Act of 1973," but only after a determination that, among other things, "the incidental mortality and serious injury from commercial fisheries will have a negligible impact on such species or stock." 16 U.S.C. § 1371(a)(5)(E)(i) (emphasis added). In other words, the MMPA provides an *affirmative license* to incidentally take marine mammals in connection with commercial fishing activities when the impact is negligible. NMFS_014441. No such licensing regime exists under New Zealand law. NMFS_013881-82.

MHDD materially misinterprets foreign law by insisting that New Zealand "expressly does allow its commercial fisheries to incidentally take marine mammals without limitation or penalty, so long as fishers report the bycatch." MJAR at 21 (emphasis omitted). MHDD is wrong on New Zealand law and wrong on the record.

For example, it repeatedly cites the operating procedures of Deepwater Group Ltd., which appears to be a private entity that manages certain fishing activities in New Zealand. MJAR 21-22 (citing NMFS_014184, NMFS_014238, NMFS_014281). These operating procedures are irrelevant on their own terms as they explicitly state that they "do not replace or override any fisheries legislation or other regulations including Health & Safety and Maritime Safety. Vessel operators should ensure that officers and crew understand all regulations that are in place for the fisheries, areas and environment that they are operating in." NMFS_014174.

MHDD also cites a stray statement from a Fisheries New Zealand operating procedures document, MJAR at 22 (citing NMFS_0001083), but that document similarly makes clear that it is not a legal interpretation of the NZ MMPA and is inconsistent with Section 4(1) of the NZ MMPA, as provided on the record. NMFS_0001070.

Finally, MHDD references the NZ MMPA reporting requirements for accidental take and the existence of a defense against a criminal prosecution when complying with those reporting requirements. MJAR at 21-22 (citing NMFS_001671 and NMFS_0001677-78). As the GNZ itself explained, that provision does not permit taking and, unlike in the United States, where incidental take by commercial fishers may be authorized under certain circumstances, New Zealand "authorities have never issued a permit that authorized the incidental take of a marine mammal during commercial fishing operations since the law prohibits it." NMFS_013882; *see also* NMFS_014013; NMFS_001664-66; NMFS_014441.

This Court should decline MHDD's invitation to engage in "speculative forays into [foreign] legal territories unfamiliar to federal judges." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1099 (2d Cir. 1995). Rather, the best source for determining New Zealand law on this record is the GNZ. *Id.* at 1100 (explaining that "a country's judicial, executive or legislative declarations" generally constitute "authoritative proof" on matters of foreign law).

Accordingly, MHDD has not demonstrated that NMFS exercised clear error by concluding that because "the GNZ does not authorize or permit commercial fisheries in the manner that the U.S. does, there is no utility (or even relevance) in applying a negligible impact process that is specific to such authorizations." NMFS_014441; *see also* ECF No. 37 at 29.

C. New Zealand Has Processes to Calculate Bycatch Limits

NMFS reasonably concluded that New Zealand has processes to calculate bycatch limits for marine mammal stocks that are incidentally killed or seriously injured in its commercial fisheries, as required under 50 C.F.R. § 216.24(h)(6)(iii)(C)(5). NMFS_014434-35.

1. New Zealand Calculates Bycatch Limits Using a Biological Reference Point

Under the U.S. regulatory program, NMFS utilizes PBR (a "biological reference point") "as a mechanism to respond to the uncertainty associated with assessing and reducing human-caused mortality and serious injury of marine mammals, including from incidental bycatch in fisheries." NMFS_014425-26.

For its domestic regulatory efforts, the GNZ uses its abundance estimates to calculate a Population Sustainability Threshold (PST), which represents "the maximum number of marine mammal deaths per year that can occur while still allowing the population outcome to be achieved and is used to assess whether human-caused mortality (especially from fisheries bycatch) is sustainable for the long-term viability of protected species populations." NMFS_014427. This definition is remarkably similar to the definition of PBR "as the maximum number of animals, not including natural deaths that may be removed from a marine mammal stock while allowing the population to reach the management objective of maintaining or recovering to its optimum sustainable population size (OSP)." NMFS_014426.

Like the NMFS's PBR calculation, PST uses a maximum growth rate variable and a risk factor variable. NMFS_014428. The GNZ references PST to determine the effectiveness of the management of its fisheries to meet its long-term sustainability goal, as well as whether additional action should be taken. NMFS_014427, NMFS_014439; *see also* NMFS_014433 (explaining that "Fisheries New Zealand would assess the impact of those mortalities against the

bycatch limit (e.g., PBR or PST) for the species and advise the Minister of Fisheries on what action should be taken" following specific trigger events); NMFS_013898-99 (same).

MHDD unpersuasively argues that the GNZ's use of PST as an applicable bycatch limit should be rejected simply because it purportedly produces higher results than PBR. *E.g.*, MJAR at 28 n.6. The MMPA Import Rule "does not require that nations calculate PBR," but that a harvesting nation should establish a "*comparable scientific metric*" that "incorporate[s] scientific uncertainty about the population estimate and trend and results in sustainable levels of incidental mortality and serious injury while still allowing the marine mammal stock to grow or recover." NMFS_014428-29. PST is one such metric. NMFS_014427-28. Besides, as explained further below, the calculation of the bycatch limit using PST has achieved effectively comparable results because the GNZ demonstrated that bycatch has not exceeded PBR since the 2020 regulatory changes took effect. NMFS_014428.

Accordingly, MHDD has not demonstrated that NMFS exercised clear error by concluding that New Zealand calculates bycatch limits, as required by 50 C.F.R. § 216.24(h)(6)(iii)(C)(5). NMFS_014425-35; *see also* ECF No. 37 at 34.

2. <u>ZMRG Is Not A Required Consideration</u>

When PBR for a marine mammal stock is exceeded within a given fishery (or when certain percentages of PBR is exceeded for a strategic stock), NMFS relies on the TRP process to reduce incidental bycatch of the stock. NMFS_014382. The long-term objective of the TRP process is to reduce the incidental mortality and serious injury of marine mammals to insignificant levels approaching a zero mortality and serious injury rate goal (ZMRG). *Id.*

MHDD erroneously argues, MJAR at 15, that NMFS employed "logical fallacies" to conclude the GNZ's fisheries management program is comparable in effectiveness to ZMRG. MHDD appears to admit that PBR—the applicable bycatch limit under U.S. law—and ZMRG

are "two separate standards." MJAR at 17. But MHDD apparently fails to appreciate that only one of those standards is a relevant consideration for determining whether to issue a comparability finding.

ZMRG does not appear in the MMPA Imports Rule and is not one of the factors required to be considered before issuing a comparability finding. When promulgating the final rule, NMFS explicitly *rejected* a recommendation to "adopt a bycatch standard that fully mirrors" ZMRG. MMPA Import Rule, 81 Fed. Reg. at 54,398. NMFS explained that it "will consider the application of the ZMRG, or metrics/measures comparable in effectiveness to ZMRG, to foreign fisheries providing the same flexibility to foreign fisheries as it has applied to analogous U.S. fisheries that have not met ZMRG." *Id.* MHDD's argument, MJAR at 15-19, that the GNZ was required to demonstrate that the challenged fisheries maintained bycatch below the U.S. ZMRG target is unfounded and insisting on such a demonstration would be contrary to law.

D. New Zealand Has Comparably Effective Measures Designed to Reduce the Total Incidental Take of Māui and Hector's Dolphins Below the Bycatch Limit

NMFS reasonably concluded that the laws, regulations, and policies governing the challenged fisheries achieve results that are effectively comparable to those achieved by U.S. measures designed to reduce take below the bycatch limit, as required by 50 C.F.R. § 216.24(h)(6)(iii)(C)(3)(ii). NMFS_014404-14; NMFS_014438. This is true whether or not ZMRG was a required consideration of the comparability analysis.

1. The TRP Process Does Not Guarantee ZMRG is Reached

MHDD incorrectly asserts that "U.S. law requires the implementation of regulatory measures to ensure that bycatch is *actually* reduced to [the ZMRG] target." MJAR 16 (emphasis added). Congress clarified the exact opposite of MHDD's errant inference when it used the word "goal" rather than "requirement" and removed any doubt when it explained that "[i]t may never

be possible to achieve this goal, human fallibility being what it is" and noting that NMFS must consider practical realities, like economic conditions, in regulating domestic fisheries. NMFS_014436.

Consistent with the text and intent of the MMPA, many U.S. fisheries continue to operate despite not reaching ZMRG, even for long periods of time. In fact, "no U.S. commercial fishery has been closed in its entirety while regulatory measures have been modified to reduce bycatch below the PBR level pursuant to the MMPA." NMFS_014382. For example, several U.S. fisheries are subject to the Atlantic Large Whale Take Reduction Plan (ALWTRP), which was developed in the late 1990s to address the incidental take of several species, including the endangered North Atlantic right whale. NMFS_014386. Incidental bycatch of North Atlantic right whales from these fisheries continues to be above PBR, and ZMRG has *never* been achieved over the course of three decades. *Id.* NMFS has responded by repeatedly amending the TRP and implementing a variety of measures aimed to approach ZMRG by mitigating marine mammal bycatch and continues to re-assess and evaluate the take reduction plan to better protect this stock, "while meeting the needs of fishermen and conditions and circumstances related to the fishery itself." *Id.* This "iterative approach" is "consistent with Congress's preference of avoiding shutting down fisheries or putting an overwhelming economic burden on fisheries to achieve the ZMRG." NMFS_014437. The GNZ has adopted a similar iterative approach to managing bycatch of Māui and Hector's dolphins in the challenged fisheries.

2. <u>The TMP Process is Comparable in Effectiveness to a TRP</u>

NMFS reasonably concluded that the GNZ's implementation of its bycatch management program for the challenged fisheries achieves comparable results to what could be achieved under the U.S. regulatory program, as required by 50 C.F.R. § 216.24(h)(6)(iii)(C)(3)(ii). NMFS_014414.

"[T]he Fisheries Act is the primary legislative framework governing New Zealand's fishery management system and is used to manage fishing-related risks to marine mammals." NMFS_014438-39. For the challenged fisheries, the GNZ utilizes the TMP process as the applicable mechanism to reduce bycatch of Māui and Hector's dolphins. *E.g.*, NMFS_014394. Like TRPs, TMPs follow an iterative process to manage risk and regulate fisheries. *Id.* Among other things, the goals of the TMPs are to achieve certain population outcomes by reducing human-induced deaths to be as near as practicable to zero, to reduce the risk of localized depletion, to ensure that there are no substantial barriers to dispersal or connectivity between subpopulations, and to ensure populations are stable or increasing within 20 years and to ultimately achieve a non-threatened status. NMFS_014394; NMFS_014440. The targeted population outcome under the TMP for the Māui and Hector's dolphins is 95 and 90 percent, respectively, of the maximum number of dolphins the environment can support. NMFS_014427 & n.250.

MHDD asserts that the "GNZ states that [its TMP] objectives are equivalent to 'the population sustainability threshold (PST).'" MJAR at 17 (citing NMFS_013937, NMFS_000258 n.8). This is not what NMFS determined.

NMFS considered the GNZ's iterative TMP process and concluded that it "provides specific details to assist New Zealand regulators in making conservation decisions to facilitate managing the maximum acceptable level of impact for each human-induced threat for Hector's and Maui dolphin subpopulations" and that the objectives of the TMP process were similar to the concept of ZMRG. NMFS_014439. NMFS thus explained that the long-term goal of the TMP to reach certain population thresholds is equivalent to the U.S. target of ZMRG, NMFS_014439, which MHDD appears to concede, MJAR at 16-17, and then ignore.

The TMP process is not, as MHDD protests, "some nebulous aspiration to try one's best to reduce bycatch." MJAR at 16. TMPs are a "comprehensive, science-driven framework that assesses risks and implements mitigation measures for marine mammals most at risk from fishing" and TMPs are "implemented via a range of legislative and regulatory mechanisms, and voluntary measures." NMFS_014394. The TMP process is designed as a dynamic plan to reduce fishing-related mortality to near zero and support recovery of marine mammals to non-threatened status. NMFS_013887. NMFS thus reasonably determined that the TMP's long-term goals of 90 to 95 percent of the maximum number of individuals that the environment can support is comparable to the U.S. ZMRG target of optimum sustainable population (typically spanning 50 to 85 percent of carrying capacity).[3] *See, e.g.*, NMFS_014414; NMFS_14426; NMFS_014439-40; NMFS_014442.

MHDD criticizes the TMP process because it is "non-statutory." MJAR at 18. But nothing in the MMPA or the MMPA Import Rule requires that foreign fisheries management frameworks be statutory. In fact, much of the domestic management framework is non-statutory. *See* NMFS_014383 ("A TRP includes a variety of regulatory and non-regulatory measures designed to reduce the incidental mortality and serious injury of certain marine mammal stocks incidental to the fishery or fisheries subject to the TRP."); NMFS_014405 ("TMPs are

[3] NMFS has explained that it uses ten percent of PBR as a stand-in for ZMRG because "this small amount of mortality and serious injury will not significantly delay the time to recovery for most stocks and therefore still allows for the MMPA's overarching goal of recovering all stocks to their optimum sustainable population levels to be met." NMFS_014382-83. The term "optimum sustainable population level" is defined in the MMPA as "the number of animals which will result in the maximum productivity of the population or the species," 16 U.S.C. § 1362(9), and "is thought to occur between 50 and 85 percent of carrying capacity for marine mammals," NMFS_014426.

implemented using a mix of legislative, regulatory, and voluntary measures, which is similar to how the U.S. manages its strategic stocks through TRPs.") (footnote omitted).

Besides, NMFS evaluated the TMP process in the context of the other "laws, regulations, non-statutory policies, and voluntary measures" that the GNZ provided to NMFS and that are used to manage its fisheries. NMFS_014393. And the TMPs were specifically developed "to give effect to New Zealand's international and legal obligations on managing the effects of fishing on protected species." NMFS_014394.

Accordingly, MHDD has not demonstrated that NMFS clearly erred in determining that the TMP process achieves results that are effectively comparable to those achieved by U.S. measures designed to reduce take below the bycatch limit, as required by 50 C.F.R. § 216.24(h)(6)(iii)(C)(3)(ii). NMFS_014414.

3. The Mitigation Measures Employed by the GNZ Are Comparable in Effectiveness to U.S. Measures

NMFS reasonably concluded that the specific measures implemented by the GNZ are designed to reduce the total incidental mortality and serious injury of Māui and Hector's dolphins below the applicable bycatch limit, as required under 50 C.F.R. § 216.24(h)(6)(iii)(C)(3)(ii). NMFS_014414; NMFS_014435.

Fishing area closures constitute the primary mitigation measure employed by New Zealand to ensure that total incidental take of Māui and Hector's dolphins remains below PST. NMFS_014405. Based on its scientific analysis, the GNZ prohibits commercial set net and trawl fishing across the majority of the Māui dolphin's range. *Id.* Depending on the season, set net fishing is prohibited in 83.8 to 92.6 percent of its spatial distribution and trawl fishing is prohibited in 50 to 73.3 percent of its spatial distribution. *Id.* Similar prohibitions cover

substantial portions of the Hector's dolphins' distribution, ranging in the winter from 16.7 to 74.1 percent for set net and 12.3 to 26 percent for trawl. NMFS_014406.

MHDD views these percentages as insignificant, MJAR at 8, but they are comparable to the take reduction plan the U.S. put in place for the False Killer Whale. *See* 50 C.F.R. § 229.37(d) (identifying prohibited fishing areas); NMFS_014414 & n.178. MHDD also insists it is "troubling" that the closures do not include all harbor areas, MJAR at 8-9, but MHDD fails to acknowledge that there have only been "rare sightings or acoustic detections in harbours [and where they have occurred], they were mainly near harbour mouths," where fishing is already prohibited. NMFS_013925; *see also* NMFS_014406-07 & n.153; NMFS_014409.

Additional measures to mitigate bycatch are used to varying degrees in the challenged fisheries and include requiring particular fishing practices, safe handling and release practices, marine mammal ID guides, avoidance of high marine mammal activity areas, good offal management, gear operational procedures, and deterrent devices. NMFS_014393-94; NMFS_014410; NMFS_014456-57. As NMFS does in the U.S. program, the GNZ considers the economic impact of fisheries management on its commercial industry. *See* NMFS_013982; NMFS_014393 & n.85.

These measures are comparable to those used in the U.S. fisheries management "because both New Zealand and the United States have processes to establish bycatch limits, identify and implement bycatch mitigation measures such as gear modifications or area closures to reduce bycatch, and have a review process if the bycatch limit is exceeded to reduce bycatch levels below the bycatch limit." NMFS_014374; NMFS_014414; *see also* ECF No. 37 at 26-27.

4. <u>Neither Observed Nor Estimated Bycatch Exceeds Applicable Limits</u>

NMFS reasonably concluded that New Zealand has comparably effective measures to demonstrate that each of the challenged fisheries do not exceed the bycatch limit for Māui and

Hector's dolphins or that the level of bycatch for each fishery is such that "if the other export fisheries interacting with the same marine mammal stock or stocks were at the same level, would not result in cumulative incidental mortality and serious injury in excess of the bycatch limit for that stock or stocks," as required by 50 C.F.R. § 216.24(h)(6)(iii)(C)(6).

New Zealand has not updated its PST calculation for Māui dolphins following the most recent population estimate. NMFS_013929 n.47. For purposes of its comparability finding application, the GNZ thus adopted PBR to demonstrate that its measures were effective in ensuring mortality and serious injury of Māui and Hector's dolphins do not exceed PBR. NMFS_014427-28 & n.256. NMFS gave all harvesting nations the choice to demonstrate this factor in this manner. NMFS_014429.[4]

To make bycatch estimates, the GNZ used a model called the Spatially Explicit Fisheries Risk Assessment (SEFRA), which "estimates the likelihood of protected species encountering fishing events based on their spatio-temporal overlap," to approximate the annual incidental captures for marine mammals in its fisheries. NMFS_014426-27. The GNZ employed species-specific modeling to estimate annual the incidental take of Māui and Hector's dolphins in its set net and trawl fisheries. NMFS_014427. MHDD argues that this model was unreliable and claims that NMFS should have demanded that the GNZ provide the "data," "methods," and "assumptions" on which the SEFRA estimates were based. *E.g.*, MJAR at 23, 26-27.

[4] MHDD insists, without citation, that NMFS "concluded that New Zealand implements a PBR-based bycatch limit." MJAR at 15; *see also id.* at 27-28. NMFS reached no such conclusion. Rather, NMFS determined that the GNZ calculates a bycatch limit with reference to PST. NMFS_014427. For the purpose of demonstrating the *effectiveness* of its mitigation measures to maintain bycatch below the limit, the GNZ adopted PBR as a reference point at the invitation of NMFS. NMFS_014427-29. There is nothing "illogical," *see* MJAR at 15, 27, about concluding that, regardless of whether PST would result in a higher *theoretical* limit, it nonetheless achieves results that are comparable to a lower limit when, in fact, that lower limit has not been exceeded.

Contrary to MHDD's suggestion, NMFS is not required to undertake an academic peer review of a harvesting nation's modeling. Instead, NMFS explained that the "reasonable proof" requirement under the statute requires harvesting nations to provide evidence of "sufficient detail, quality, and reliability for NMFS to fully evaluate the regulatory program for a given export fishery." MMPA Import Rule, 81 Fed. Reg. at 54,406. The GNZ provided ample evidence of its approach to estimating bycatch for the challenged fisheries. NMFS_014427 n.249. NMFS, in an exercise of its specialized scientific judgment, found that GNZ had provided reasonable proof of its estimates, *e.g.*, NMFS_014400, and in support of its species-specific SEFRA model, *e.g.*, NMFS_014396 & n.100.

MHDD speculates, MJAR at 24, that the SEFRA model employed by the GNZ was the same model published in a 2019 Roberts report and that was critically examined by NMFS in its 2024 Five-Year Review of the Māui and Hector's dolphins required under the Endangered Species Act, *see generally* NMFS_015931-16075. MHDD's speculation is contradicted by the record. The GNZ explained that it estimated the annual mortality and serious injury of Hector's dolphins based on a revised multi-species model used in a 2022 MacKenzie report with specific manual modifications to meet the nature of NMFS's requests, including species-specific inputs, and to account for the effects of restrictions imposed after the fishing data on which the model relied was collected. NMFS_013998-99; NMFS_014431. This is the same model MHDD argues the GNZ should have employed. *Compare* MJAR at 25 (arguing that "NMFS arbitrarily dismissed GNZ's most recent, publicly available bycatch estimate: a 2022 GNZ report from MacKenzie et al.") *with* NMFS_013999 ¶ 56 *and* NMFS_014430 & n.266.

MHDD also cannot meaningfully dispute that the SEFRA model is producing evidence of "sufficient detail, quality and reliability" for Māui and Hector's dolphins because it produced

estimates largely in line with observed data. For Hector's dolphins, the GNZ presented evidence that observed bycatch has remained below PBR and that none of the South Island fishing related mortality limits have been met or exceeded since it began implementing its current fisheries management program. NMFS_014009-11. Specifically, it provided evidence that in the 2022-23, 2023-24, and 2024-25 fishing seasons, observed bycatch of Hector's dolphins was 6, 15, and 8 animals, respectively. NMFS_014011. It also demonstrated that, using data from the 2020-21 fishing season, estimated total annual mortality and injury for the six challenged fisheries likely to impact Hector's dolphins at 1.08, 3.63, 0.86, 0.31, 1.17, and 1.75 (or cumulatively 8.8). NMFS_014431; NMFS_013999.

Even assuming that the SEFRA model resulted in underestimates, as MHDD argues, MJAR at 24, the GNZ has not hesitated to take additional action when bycatch is observed, even if the take did not exceed PBR, ZMRG, or the GNZ's own internal limits. For example, when a single Hector's dolphin was taken during each of the 2022-2023 and 2023-2024 fishing seasons in an area of the east coast South Island where the vulnerable Ortago sub-population is located, "a voluntary avoidance area was agreed to with industry for the remainder of the fishing year" and the GNZ actively monitored adherence using electronic and geospatial tools. NMFS_014010. In the one year the observed data exceeded the species-specific estimate (although falling well below PBR), "the GNZ initiated a series of management actions" that "are comparable to the types of measures the United States could require of its domestic commercial fishing fleet." NMFS_014434; *see also* NMFS_014445-48 (timeline of fisheries management actions by the GNZ since 1978).

There has been no observed bycatch of Māui dolphins in New Zealand's commercial fisheries for more than a decade. NMFS_014435. With no observed bycatch for many years,

NMFS relied on estimated bycatch rates to determine if the measures employed by the GNZ since 2020 to limit bycatch of Māui dolphins were comparable in effectiveness those in a similar U.S. fishery. The GNZ employed a species-specific SEFRA model to estimate annual bycatch of Māui dolphins in the set net fisheries at 0.048 and in the trawl fisheries at 0.008. NMFS_014429. This estimate for trawl fisheries is already below what would be, according to MHDD, the ZMRG of 0.01. Even considered cumulatively with set net fisheries, overall estimated annual bycatch is approximately half of PBR, which is 0.10. NMFS_014429-30. Moreover, this SEFRA model estimate might be overly conservative as the fishing data used to calculate it includes cryptic mortality and also pre-dates the imposition of many of the measures summarized above. *Id.*

There is no record evidence that PBR for Māui or Hector's dolphins has been exceeded by any of the challenged fisheries, either individually or collectively, since the GNZ began implementing its current fisheries management program in 2020. MHDD therefore resorts to estimates derived from data generated in prior fishing seasons, before the applicable fisheries management program was in place and that are thus not relevant to NMFS's analysis. *Compare* MJAR at 25 (stating that MacKenzie report estimated annual bycatch of Māui dolphins at 0.38) *with* NMFS_014430 & n.266 (explaining that MacKenzie report was based on 2016-2019 data and did not reflect more recent restrictions).[5] Even assuming that the estimates accurately

[5] Elsewhere, MHDD asserts that the "records also shows that bycatch is exceeding PBR for . . . Hector's dolphins." MJAR at 36 n.7 (citing the 2024 Five-Year Review at NMFS_016040). The 2024 Five-Year Review does not indicate that bycatch levels for Hector's dolphins have been exceeded but simply states that PST for the species is mathematically larger than PBR—a point not in dispute. NMFS_016040. Tellingly, MHDD fails to cite the MacKenzie report for Hector's dolphins, which estimated that the mean annual take for Hector's dolphins at 53.48, less than the PBR of 66.5, even without accounting for the more recent restrictions. NMFS_014431 & n.275; NMFS_017573.

reflected bycatch rates in excess of PBR from 2016-2019, U.S. law would require that NMFS engage in the TRP process to attempt to bring bycatch down to levels below PBR. *E.g.*, NMFS_014386. This is precisely the approach the GNZ took by implementing the TMPs. *E.g.*, NMFS_014414; NMFS_014439.

MHDD's response to this record evidence is to insist that the Māui dolphin estimate produced by the GNZ is larger than ZMRG. MJAR at 19. As a mathematical claim, MHDD's insistence that 0.056 > 0.01 is indisputable. *Id.* As a legal claim, it has no meaning because ZMRG is not the applicable bycatch limit for comparing foreign fisheries to their U.S. counterparts under the MMPA Import Rule. 81 Fed. Reg. at 54,398. If a U.S. fishery exceeded ZMRG, it would simply mean that a TRP might be developed, regulations issued, and/or its measures reconsidered, taking into account the economic burden on that fishery. NMFS_014437. This is what the GNZ did and continues to do. *E.g.*, NMFS_014414; NMFS_014439. MHDD does not identify any evidence on this record that bycatch actually exceeded PBR, nor does it explain why the TMP process is insufficient for moving bycatch toward sustainable levels when compared to U.S. measures. *Cf.* NMFS_014386 (explaining ALWTRP).

MHDD is also incorrect that NMFS failed to follow its own guidelines regarding cryptic mortality. MJAR at 25. As noted above, the species-specific model for Māui dolphins *does* include cryptic mortality. NMFS_014429 & n.265. While the species-specific model for Hector's dolphins on which NMFS relied does not, the GNZ provided estimates that did include cryptic mortality, but they were derived from the 2019 Roberts multi-species model that MHDD insists is unreliable. NMFS_013999-14000 (providing a combined mean annual estimated bycatch by each of 24.18). Nonetheless, since the rollout of cameras in 2023, the observed data of bycatch continue to fall within the multi-species SEFRA estimates, below the mean, and well below the

comparator bycatch limit of 66.5 (that is, PBR). *E.g.*, NMFS_014011; NMFS_014431; NMFS_014434.

Accordingly, MHDD has not demonstrated that NMFS clearly erred in concluding that GNZ's fisheries management of the challenged fisheries achieves comparable results to U.S. measures designed to reduce the total incidental mortality and serious injury of Māui and Hector's dolphins below the applicable bycatch limit, as required under 50 C.F.R. § 216.24(h)(6)(iii)(C)(3)(ii) and (6). NMFS_014414; NMFS_014435; *see also* ECF No. 37 at 31-32.

E. New Zealand Has Implemented Monitoring Designed to Estimate Incidental Mortality and Serious Injury in Its Set Net and Trawl Fisheries

NMFS reasonably concluded that New Zealand implements monitoring procedures designed to estimate incidental mortality and serious injury of marine mammals of Māui and Hector's dolphins resulting from commercial set net and trawl fisheries interacting with those stocks, and that such procedures are capable of producing statistically reliable estimates, as required by 50 C.F.R. § 216.24(h)(6)(C)(4). NMFS_014418, NMFS_014424-25.

As NMFS explained, New Zealand maintains an extensive monitoring program that relies on "self-reporting through vessel logbooks, electronic catch and geospatial position reporting, and at-sea monitoring achieved through human observers and electronic monitoring." NMFS_014418. For the west coast North Island fisheries—that is, those most likely to interact with Māui dolphins—at-sea monitoring "is now predominantly undertaken using electronic monitoring (on-board cameras) and the level of monitoring coverage applicable to the fisheries varies depending on fishing location, size of vessel, type of gear, etc." NMFS_014419. Certain vessels are exempted from electronic monitoring due to size, location or method of operation, or other criteria, but New Zealand explained that the vessels subject to these electronic monitoring

requirements (in-scope vessels) "are responsible for a large proportion of New Zealand's inshore fish catch (approximately 85 percent), tend to take significant amounts of bycatch, and pose the greatest risk to at-risk protected species due to fishing area and fishing method." NMFS_013977.

The GNZ reviews the footage from these electronic monitoring efforts and it adjusts the rates of review "based on analysis of risk, fisher misreporting rates, and additional monitoring objectives." NMFS_014422. NMFS concluded that this "electronic monitoring program acts as a strong incentive for commercial fishers to report any marine mammal interactions accurately and in a timely fashion," especially in high-risk areas where the GNZ targets 100 percent of footage for review. NMFS_014424.

NMFS determined that the GNZ has been able to attain high levels of monitoring coverage in the challenged fisheries through a mix of its electronic monitoring program and human observers. *Id.* The coverage achieved by the GNZ generally surpasses the extent of monitoring undertaken under the U.S. fisheries management program and thus it was reasonable for NMFS to conclude that it produces statistically reliable results. *Id.*

MHDD's arguments do not show otherwise; indeed, MHDD does not even cite the applicable regulation. *See generally* MJAR 29-34. Rather, it misreads the record to further several arguments, none of which has merit.

Contrary to MHDD's assertion, MJAR at 30-31, NMFS evaluated monitoring across the distribution of both species without "gaps" because it was not only concerned with onboard camera monitoring, as MHDD appears to suggest, *e.g.*, *id.* at 30 (incorrectly asserting that "there is effectively *no* monitoring in most of the rest of the Māui dolphin habitat"). All 15 of the challenged fisheries are subject to monitoring. NMFS_014420-22. This includes multiple fisheries that NMFS concluded pose no or negligible risk to either dolphin population,

NMFS_014392 n.81, even though such fisheries in the United States would not be subjected to *any* monitoring other than self-reporting, NMFS_014389 n.70; NMFS_014386 n.49. NMFS also acknowledged that self-reporting requirements are stricter in New Zealand, allowing the GNZ to quickly consider incidents of bycatch that might take a week or more for U.S. regulators to identify from disconnected reporting systems. NMFS_014424-25.

MHDD also incorrectly asserts that the GNZ engages in no monitoring in harbors where 95 to 99 percent of the set net fishing effort occurs within the Māui Dolphin Habitat Zone. MJAR at 31. NMFS explained the monitoring program for these fisheries: "GNZ relies on mandatory fisher reporting and real-time geospatial position reporting to monitor these small vessels" and "Fisheries Compliance also regularly patrol the harbours and inspect these operators." NMFS_014421. Further, "Māui dolphin sightings within the harbors have occurred mainly near harbor mouths where set net fishing is already prohibited." NMFS_014421.

These efforts are comparable to the U.S. regulatory program. The applicable U.S. monitoring program "primarily relies on mandatory self-reporting and human observers to track marine mammal mortality and injury incidental to commercial fisheries." NMFS_014415. The U.S. monitoring program, unlike the New Zealand program, does not rely heavily on onboard cameras. NMFS_014415. In harbors, away from the harbor mouths where Māui dolphins have previously been observed, monitoring is effected using human observers, self-reporting, and electronic geo-spatial tracking. NMFS_014421.

It is also not accurate to conclude that video-based monitoring is ineffective unless it is reviewed 100 percent of the time. MJAR at 33-34. Fishers do not know when or whether review of camera footage will occur. Like drivers arriving on a road with a hidden traffic camera to capture speed limit violations, fishers have an incentive to remain compliant with regulatory

requirements, including reporting obligations, whenever onboard cameras are present. *E.g.*, NMFS_014015 ("The on-board camera programme operates in a way that all in-scope vessels have cameras operating and footage is recorded during all fishing events, but fishers are not aware at what point they are being monitored. This acts as a deterrent to fishers and strongly incentivises fishers to accurately report.").[6]

MHDD also erroneously insists that NMFS previously "determined" there was insufficient monitoring occurring in New Zealand fisheries to provide reliable data. MJAR at 29-30 (citing the 2024 Five-Year Review at NMFS_015969, NMFS_015979, NMFS_015983, NMFS_015984, NMFS_016029). As discussed further below, the 2024 Five-Year Review was developed on a different record, for a different statutory purpose, and the considerations required in the Review are not equivalent to the MMPA Import Rule. *Compare* 16 U.S.C. § 1533(c)(2) *with* 16 U.S.C. § 1371 *and* 50 C.F.R. § 216.24(h)(6). Any purportedly contradictory statements in the 2024 Five-Year Review did not account for more recent information supplied by the GNZ and that NMFS was *required* to consider in determining comparability. *Compare* NMFS_014420-22 (electronic monitoring for in-scope vessels near 100 percent as of June 2025); NMFS_013977 (explaining electronic monitoring program as of November 2025) *with* NMFS_015969 (2021 analysis of monitoring); NMFS_015979 (pre-2025 data for institution of camera coverage); NMFS_015983 (same); NMFS_016029 (same); NMFS_015984 (2016 recommendation for additional observers or cameras).

---

[6] MHDD also argues, MJAR at 33, that NMFS's analysis of the GNZ's electronic monitoring program is undermined by a stray statement that electronic monitoring "*may* not be as effective for night time hauling," NMFS_014416 (emphasis added), because "set netting and trawl fishing in New Zealand are both permitted to occur at night," MJAR at 33. MHDD provides no citation on the record to support the statement that night-time fishing occurs in any of the challenged fisheries, nor does it apparently recognize the other monitoring practices (including geo-spatial tracking and self-reporting) that are not affected by the time of day that fishing occurs.

In any event, NMFS directly addressed some of the supposed deficiencies discussed in the 2024 Five-Year Review. NMFS determined that the previous conclusion with respect to the Māui dolphin population range was incorrect. NMFS_014458 ("[U]pon closer inspection, the references cited in these reports do not support the existence of a historical Maui dolphin population in that region."). Relevant to the Hector's dolphin, the conclusion in the 2024 Five-Year Review that monitoring fishing around the Banks Peninsula should be increased was premised on the assertion that the GNZ intended to view only five percent of video footage from trawling vessels in that region. NMFS_016029; *see also* MJAR at 30. The record demonstrates that these presumed levels of viewing are incorrect. *See* NMFS_014018 (providing electronic monitoring review and human monitoring efforts in the Banks Peninsula since the rollout of cameras); NMFS_014423 (describing monitoring rates).

There is no reason for NMFS to credit a prior analysis under a different statutory scheme, developed for a different statutory purpose, and that relied on outdated evidence and inaccurate assumptions when more recent evidence and additional explanation from the GNZ was available on this record. Accordingly, MHDD has not demonstrated that NMFS exercised clear error by concluding that the monitoring program in New Zealand is comparable to that of the United States, as required by 50 C.F.R. § 216.24(h)(6)(iii)(C)(4); *see also* ECF No. 37 at 35-36.

### F. MHDD Misinterprets the Record and Confuses the Regulatory Considerations

MHDD dedicates much of its MJAR to misunderstandings and irrelevant considerations, not included in the MMPA Import Rule and that NMFS, in promulgating the regulations, rejected as considerations for determining U.S. standards. The Court should disregard MHDD's clear misconstruction of record evidence and decline MHDD's invitation to require foreign fisheries to comply with extra-regulatory requirements.

1. MHDD Misunderstands Bycatch Limit Comparison

Throughout the MJAR, MHDD repeatedly conflates the different regulatory requirements concerning bycatch limits. *E.g.*, MJAR at 17-18 (characterizing ZMRG as a bycatch limit); *id.* at 21 (same for the negligible impact standard); *id.* at 27 (same for PBR). The MMPA Import Rule requires that a harvesting nation's fisheries management program either includes the calculation of bycatch limits or that it has measures in place that "effectively achieves comparable results" to having such limits in place. 50 C.F.R. § 216.24(h)(6)(iii)(C)(5). New Zealand calculates bycatch limits for its domestic fisheries based on PST but as noted earlier, the GNZ adopted the U.S. PBR calculation to estimate marine mammal bycatch limits for the fisheries identified in its application. NMFS_014427-28.

The MMPA Import Rule also requires that the fisheries management of a harvesting nation "effectively achieves comparable results as . . . implement[ing] measures in the export fishery designed to reduce" the take of marine mammals below the bycatch limit. 50 C.F.R. § 216.24(h)(6)(iii)(C)(3)(ii). This is demonstrated through a comparison of incidental take for each marine mammal stock caused by each fishery and by all fisheries cumulatively to determine that the bycatch limit is not exceeded or, if the bycatch limit is cumulatively exceeded, that an individual fishery's contribution to exceeding the bycatch limit is less than the pro-rated amount of take that each fishery would need to contribute for cumulative bycatch to be in excess of the bycatch limit. *Id.* § 216.24(h)(6)(iii)(C)(6).

For this comparison, NMFS considered observed and estimated bycatch data to determine whether the data demonstrated that PBR, which is the bycatch limit used for U.S. fisheries management, was exceeded. NMFS_014427-28. PST was simply not relevant to this comparative analysis. *Id.* Even if it were, the comparison of bycatch rates to PBR (rather than PST) unequivocally demonstrates that a bycatch limit calculated using PST and other mitigation

measures are "effectively achiev[ing] comparable results." 50 C.F.R. § 216.24(h)(6)(iii)(C). It appears that MHDD fails to grasp this simple concept.

2. <u>MHDD Mischaracterizes U.S. and New Zealand Law</u>

At several points in its motion, MHDD mischaracterizes U.S. and New Zealand law. Correcting these points further undercut MHDD's motion.

***"Permitted" bycatch.*** MHDD insists that New Zealand law permits additional bycatch beyond the limit set by the GNZ because it might allow fisheries to continue to operate despite overall bycatch in excess of PBR. MJAR at 27-28. But the GNZ has explicitly stated that such bycatch is a criminal offense and, in any event, the MMPA has a comparable provision that also "permits" U.S. fisheries to operate under such conditions. *See, e.g.*, NMFS_014381 & n.19; NMFS_014382.

***"Implementing" a bycatch limit.*** MHDD suggests that, notwithstanding the extensive measures the GNZ has put in place to limit bycatch in the challenged fisheries, the GNZ has not "implement[ed]" a bycatch limit. MJAR at 27. MHDD does not cogently explain what it means for the GNZ to "implement" a bycatch limit in comparison to the United States, which authorizes commercial fisheries to operate, even when PBR is exceeded by such fisheries. *Cf.* NMFS_014386 (describing fisheries subject to ALWTRP). In contrast, the Decision Memorandum clearly explains the various responsive actions the GNZ has taken when bycatch has risen, even without exceeding PBR or PST, which are similar to what NMFS undertakes through a TRP. NMFS_014434-35 (explaining how the GNZ responded to incidental captures of Hector's dolphins during the 2023-24 fishing year, when 15 Hector's dolphins were captured).

New Zealand law also requires a response when a fishing-related mortality limit (FRML) is exceeded, which MHDD appears at points to concede. MJAR at 28 n.6. The FRML, which creates a non-discretionary authority for the Minister of Fisheries to take action to ensure that

further bycatch does not occur, does not have a precise statutory corollary in U.S. law. NMFS_014434. As NMFS explained, the presence of a FRML for Māui and Hector's dolphins supports the conclusion that New Zealand's fisheries management achieves results comparable to that of the United States, regardless of the official bycatch limit. NMFS_014432.

MHDD does not propose a clear alternative bycatch limit for Māui dolphins beyond the FRML of a single animal. *Compare id. with* MJAR at 28. It is not possible to take a partial dolphin, so if any dolphin were taken in any fishing season within the protected zone, the FRML would be exceeded, and the Minister would be obligated to take some emergency action. NMFS_014434.[7] Even were a single Māui dolphin taken outside of the protected area, it "would trigger the need for New Zealand to develop 'emergency regulations' in conformity with the U.S. standard in 16 U.S.C. § 1387(g)." NMFS_013943.

Thus, "[t]he establishment of a [FRML] provides greater certainty that PBR is not exceeded," NMFS_014432, and the GNZ's demonstrated efforts to prevent additional bycatch even when applicable limits have not been reached, NMFS_014434-35, support NMFS's conclusion that New Zealand satisfied the bycatch limit conditions required by 50 C.F.R. § 216.24(h)(6)(iii)(C)(3)(ii), (5), and (6), NMFS_014414; NMFS_014435.

***Duty to take specific action.*** MHDD again mischaracterizes the U.S. regulatory program by suggesting that NMFS must take some specific action against a U.S. fishery if take exceeds

[7] MHDD relies on a law review article published by a law professor in New Zealand to assert that taking action in response to exceeding FRML is "discretionary." MJAR at 9. MHDD provides no basis to conclude that this professor accurately characterized New Zealand law and the cited article is not part of the record, so relying on it would be error. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The record clearly demonstrates that "the Minister of Fisheries does not have discretion to choose whether to act or not, but rather the Minister has discretion as to what additional prohibitions they consider are necessary to ensure the limit is not exceeded." NMFS_013942.

the negligible impact standard. MJAR at 22. Under 16 U.S.C. § 1371(a)(5)(E), NMFS will authorize incidental take of a marine mammal species in a commercial fishery when, among other things, the incidental taking will have a negligible impact on the stock of that species. But U.S. fisheries operate despite causing incidental bycatch of marine mammals that exceed the negligible impact standard. *See, e.g.*, NMFS_014381 & n.19; NMFS_014382; *see also* MMPA Import Rule, 81 Fed. Reg. 54,398 (negligible impact standard addressed through monitoring and take reduction plans). That U.S. Category I fisheries operate despite contributing to take at rates greater or equal to 50 percent of PBR does not render their incidental mortality and serious injury of marine mammals *permitted* pursuant to § 1371(a)(5)(E) any more than New Zealand law would *authorize* accidental take that it is statutorily prohibited. Whatever enforcement steps, if any, are taken in response to such unpermitted or unauthorized bycatch in light of potential defenses or other factors is fundamentally a question of prosecutorial discretion that is not relevant to the comparability findings at issue here.

3. MHDD Misconstrues The Five-Year Review

MHDD dedicates much of its MJAR to out-of-context statements in the 2024 Five-Year Review. *E.g.*, MJAR at 8-11, 23-25, 28-29, 33. The 2024 Five-Year Review is a document required by § 4(c) of the Endangered Species Act (ESA), which obligates NMFS to periodically review threatened or endangered species and determine whether they should remain on the applicable list. 16 U.S.C. § 1533(c)(2). This review is governed by a separate statutory regime and serves an entirely different purpose from a comparability finding under the MMPA. The review ensures that a listed species has the appropriate level of protection under the ESA and determines whether its status under that law has changed since the time of listing or its last status review. 16 U.S.C. § 1533(c)(2)(A). Importantly, the five-year review does not require NMFS to

compare foreign governments' regulatory regimes to U.S. practice, which is the focal point of the MMPA comparability determination at issue here.

The out-of-context statements that MHDD cherry-picks from the 2024 Five-Year Review, MJAR at 29-30, are irrelevant and outdated when considered in context with the larger record. For example, the 2024 Five-Year Review discussed shortcomings in comprehensive bycatch data for Māui and Hector's dolphins. NMFS_015982. However, the comparability determination was based on more recent and more complete data than the 2024 Five-Year Review. All but one of the citations NMFS identifies in the Review were published in or before 2020. *Id.* The single source published after 2020 is a paper presented to the Scientific Committee of the International Whaling Commission in April and May 2024. *Id.*; *see also* NMFS_017835-51. Relying on observed bycatch of Hector's dolphins from a portion of the 2023-2024 fishing season, this paper generally asserts that camera monitoring has demonstrated bycatch rates higher than previous estimates. NMFS_017836. But the paper explicitly cites the 2019 Roberts model to supply those estimates. *Id.* Putting aside MHDD's own criticisms of the 2019 Roberts model, *e.g.*, MJAR at 29 (citing NMFS_016028-34), the information provided by the GNZ demonstrates that the most recent estimates derived from this model show observed bycatch remaining well *below* the estimated mean, NMFS_014011 (estimates derived from the multi-species model of annual bycatch of roughly 24 Hector's dolphins and no observed bycatch in excess of 15). And observed data from the two other fishing seasons following implementation of many of the relevant management actions developed under the TMP demonstrate that this fishing year was likely an outlier. NMFS_014011.

Although NMFS was critical of the GNZ's efforts to protect Māui and Hector's dolphins in portions of the 2024 Five-Year Report, the 2026 Comparability Findings are based on

additional information provided by the GNZ and a detailed analysis of the elements of New Zealand's fisheries management program that did not inform the 2024 Five-Year Review. *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014) ("[E]ach administrative [action] is a separate exercise of [the agency]'s authority that allows for different conclusions based on different facts in the record."); *see also Humane Soc'y v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010) ("We do not suggest that an agency has a duty to identify and address any potential tension between current and earlier factual determinations in marginally related administrative actions.").

* * *

Congress directed that the Government determine whether harvesting of fish or fish products from foreign nations resulted in the incidental mortality or serious injury of marine mammals "in excess of United States standards" and, if so, to prohibit the importation of those goods. 16 U.S.C. § 1371(a)(2). Bringing its expertise to bear, NMFS concluded that GNZ's program achieved comparable results to the domestic program, and in some respects surpasses it, and so the statutory prerequisite to an import embargo has not been met.

NMFS correctly determined that the GNZ has bycatch limits derived from a scientific metric that is comparable to PBR because it incorporates scientific uncertainty about population estimates of Māui and Hector's dolphins to allow the stock of both species to grow or recover, notwithstanding a sustainable level of incidental take. NMFS_014428-29. NMFS also correctly determined that the GNZ has iterative processes in place to evaluate actual and estimated bycatch rates, including through monitoring procedures, and to respond with reasonable measures to avoid unsustainable levels of bycatch of Māui and Hector's dolphins in commercial fishing

activities, including when bycatch limits are exceeded, while permitting those commercial activities to continue. NMFS_014414. This is all the MMPA requires.

MHDD advocates, largely without reference to the MMPA Import Rule or U.S. fisheries management, for more stringent policies. But mere policy preferences, or a disagreement with NMFS's expert scientific judgment, do not render the comparability finding arbitrary and capricious as a matter of law. *Marsh*, 490 U.S. at 378. NMFS's decision is "reasonable and reasonably explained," *Prometheus Radio Proj.*, 592 U.S. at 423, and MHDD has not demonstrated otherwise.

II. MHDD Seeks Unlawful Relief

Under the APA, the Court may hold unlawful agency action that, among other things, is "arbitrary or capricious." 5 U.S.C. § 706(2). Alternatively, the Court may "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). As the Supreme Court has explained, § 706(1) "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (*SUWA*).

MHDD nevertheless contends that this Court has the authority not only to vacate the existing comparability finding, but to *direct* that the Government reach a certain result and impose an import ban. MJAR at 37-39. MHDD's premise is that, in the absence of a comparability finding, Treasury has no choice but to impose an import ban. MJAR at 39. This is incorrect. The opposite is the case: the Departments of Treasury and Homeland Security have no statutory *authority* under § 1371 to prohibit imports from the challenged fisheries in the absence of an *adverse* determination (reserved to the Secretary of Commerce) that each of these foreign fisheries is contributing to marine mammal take "in excess of United States standards." 16 U.S.C. § 1371(a)(1). An agency's purported "failure to act is not the same thing as a denial."

*SUWA*, 542 U.S. at 63. "The latter is the agency's act of saying no to a request; the former is simply the omission of an action without formally rejecting a request." *Id.* (internal quotation marks omitted). The appropriate relief, then, would be to allow NMFS to revisit its determination with the guidance of this Court's opinion, *not* to direct the Government to violate those provisions.

MHDD's requested relief asks the Court to take the extraordinary step of imposing a judicial embargo, usurping the express statutory role of the agency to determine *whether* United States standards have been exceeded. MHDD's zeal (and impatience) is no occasion to circumvent the MMPA's plain provisions and short-circuit black-letter principles of administrative law. This Court's role is limited to *review* of that determination, and it "is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *accord Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381 (Fed. Cir. 2003) (holding that this Court exceeded its authority because "[u]nder the statute, only the [agency] may find the facts and determine causation and ultimately material injury"). And it would "exceed" the Court's "authority" to direct NMFS and Treasury to "reach a particular outcome." *NEXTEEL Co. v. United States*, 28 F.4th 1226, 1238 (Fed. Cir. 2022). The Court should steer clear of the reversible error MHDD requests and, if it agrees that there are errors in NMFS's comparability finding, allow the agency to apply its expertise anew in accordance with law, not with MHDD's extra-statutory demands.

## III. MHDD Cannot Show That It Will Be Irreparably Injured Absent Injunctive Relief

MHDD has made no effort to demonstrate that any of the particular 15 fisheries it has challenged in this litigation have actually contributed to the bycatch of either Māui or Hector's dolphins. Determinations of comparability findings are made on a fishery-by-fishery basis.

50 C.F.R. §§ 216.24(h)(1)(i), (6). NMFS determined that three of the challenged fisheries likely pose no risk to either species, NMFS_014392-93 & n.81, and there is no evidence on the record that any commercial fishery has contributed to Māui dolphin bycatch since at least 2012, NMFS_014435. MHDD does not respond to this determination or point to contradictory record evidence. Rather, it broadly argues that *all* set net and trawl fisheries pose a danger to both species. *E.g.*, MJAR at 14, 25-26, 35-36, 41. The origination of the harm matters. The range of the Māui and Hector's dolphins is disputed and varies from location to location. *E.g.*, NMFS_014458 (explaining that statements concerning the range of the Māui dolphins in the 2024 Five-Year Review were not supported); NMFS_016040 (citing research "suggesting that subpopulations of SI Hector's dolphins have been extirpated in several areas"). If one of the challenged fisheries operates in an area where both dolphins have been extirpated (or have never occupied), then it would be contrary to the statute to conclude that such fishery harvested products resulting in marine mammal take "in excess of United States standards," 16 U.S.C. § 1371(a)(1), when, in fact, the fishery does not contribute to take of these animals at all.

Even if the Court agreed with MHDD's unsupported allegation that bycatch from *all* 15 fisheries *collectively* exceeds U.S. standards—and it should not—that would not be sufficient to conclude that any one of them should have been denied a comparability finding under 50 C.F.R. § 216.24(h)(6)(iii)(C)(6)(ii), which authorizes comparability when an individual fishery contributes to overall take below certain levels, notwithstanding cumulative bycatch exceeding an applicable limit, like PBR.

Because MHDD cannot show that any of specific fisheries it chose to challenge are actually contributing to any bycatch of Māui or Hector's dolphins, it cannot show it will suffer irreparable harm in the absence of relief from this Court.

Furthermore, even if it could link the actions of any of the challenged fisheries to its alleged aesthetic and other injuries, this Court can only speculate about what, if anything the GNZ might do to regulate its fisheries to ameliorate harm to Māui and Hector's dolphins.

Regulatory, policy, or other legal change in New Zealand must be consistent with internal law and international treaty obligations. ECF No. 16-3 ¶¶ 2-3. It is highly speculative to assume that the GNZ would respond to avoid additional purported harms when the GNZ is restricted by law in what in can consider before modifying current fisheries management, which is explicitly limited to "ensuring fishing activity does not constitute a risk to sustainability and long-term viability of marine mammal populations." *Id.* ¶ 3. "An import ban or a change to the current level of export market access does not constitute a risk to sustainability." *Id.* ¶ 4. Accordingly, MHDD has failed to meet its burden to demonstrate that the relief it requests from this Court is necessary to avoid irreparable harm.

MHDD's assertions that it is suffering irreparable harm due to the uncertainty of bycatch numbers and that "set net and trawl fisheries pose a viable threat of deadly bycatch to marine mammals every day they operate," MJAR at 40-41, relies primarily on the same evidence that NMFS considered and rejected as outdated in the Decision Memorandum, despite being repackaged and regurgitated by MHDD's self-proclaimed expert, *e.g.*, ECF No. 50-2 ¶¶ 37, 38, 40, 41, 44 (discussing, among other things, the 2019 Roberts analysis, the 2024 Five-Year Review, and the unmodified 2022 MacKenzie analysis). And repeating argumentative declarations does nothing to demonstrate that *these individual fisheries* are contributing to bycatch in excess of U.S. standards or that their fishing efforts would change in any way in response to a Court-imposed import embargo, and thus MHDD has not demonstrated irreparable harm in the absence of an injunction. *Cf. Food & Drug Admin. v. All. for Hippocratic Med.*, 602

U.S. 367, 383 (2024) (mere "attenuated links" between Government action and injury cannot demonstrate standing); *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22-23 (2008) (finding of irreparable harm caused generally by sonar-training exercises should have been reconsidered following changed circumstances after preliminary injunction).

For these reasons, MHDD has also not met its burden to demonstrate that it has satisfied Article III standing requirements of causation and redressability at this stage of the litigation. The Court determined at the pleading stage that MHDD bore the burden to "allege facts" supporting standing unless controverted by a motion to dismiss. *See* ECF No. 37 at 8, 17-18 (decision denying motion to dismiss for lack of standing at the pleading stage). At the summary judgment stage, however, "the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see also Phigenix, Inc. v. Immunogen, Inc.*, 845 F.3d 1168, 1172-73 (Fed. Cir. 2017) (requiring "summary judgment burden of production" to establish contested standing in an APA action).

As we explained when moving to dismiss, MHDD's theory of standing must "connect the dots" between (1) this Court's order rejecting the 2026 Comparability Finding, which (2) MHDD hopes would decrease overall demand for fish caught in the challenged fisheries such that (3) the price for those fish falls, in turn (4) reducing the incentive to continue fishing efforts with challenged equipment, so (5) fishers from these particular fisheries leave the trade, invest in new fishing gear, or take other unidentified action leading to (6) the reduction in bycatch of Maui and Hector's dolphins and (7) it is consequently more likely that MHDD's members will be able to view and enjoy the animals. *See* ECF No. 34 at 1-4. MHDD does not present evidence to the dots between the particular fishers participating in the challenged fisheries and the reaction it hopes to

elicit, but instead can only provide vague, high-level theories. That is not sufficient. *E.g.*, *Murthy v. Missouri*, 603 U.S. 43, 74 (2024) (available evidence did not demonstrate that enjoining the Government would likely affect the decisions of third-party actors); *Gill v. Whitford*, 585 U.S. 48, 73 (2018) ("We caution, however, that 'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury.") (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)).

The burden now rests on MHDD to provide the Court with *evidence* of its standing and on a fishery-by-fishery basis. *Lujan*, 504 U.S. at 561. Any purported Congressional conclusion that import bans would be an "effective remedy," *e.g.*, ECF No. 30 at 8, does not relieve this Court from independently assessing whether MHDD has met its burden to produce evidence in support of each element of Article III standing, *e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) ("Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III any more than, for example, Congress's enactment of a law regulating speech relieves courts of their responsibility to independently decide whether the law violates the First Amendment."). To the extent that MHDD seeks to rely on the previously submitted declaration of its self-proclaimed expert on purported economic incentives, ECF No. 13-23, the statements made by the declarant are disputed for the reasons stated in the Government's prior briefing, ECF No. 16 at 25-26, ECF No. 34 at 11-12; *cf.* USCIT R. 56(a) (the Court may grant summary judgment only when "there is no genuine dispute as to any material fact"). And the Government has not had an opportunity to cross-examine the witness on those hearsay statements and test the limits of his personal knowledge of the actions that could be undertaken by absent third-party fishers. *See* Fed. R. Evid. 806; USCIT R. 56(c)(4).

The questions of how absent third parties that are directly causing MHDD's alleged injuries might respond to a Court order in this action remain unanswered and, under the more demanding burden to demonstrate standing at this stage, MHDD has failed to meet its burden. Accordingly, not only has MHDD failed to demonstrate irreparable harm, the case should be dismissed for lack of standing.

## IV. The Public Interest Would Not Be Better Served By an Injunction and the Balance Of Hardships Favor the Government

When the Government is a party, the last two factors of the test for injunction are merged. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). MHDD proposes that this Court disrupt tens, if not hundreds, of millions of dollars in trade with no obvious benefit to the aesthetic and other interests of its members. Imposing an extensive ban would cause untold damage to numerous third parties who are not before this Court, including commercial fishers, U.S. importers, and other affected communities. There is also *zero* evidence that an injunction would render Māui and Hector's dolphins better off because there is no evidence that any New Zealand fisheries have contributed to Māui dolphin bycatch for at least a dozen years and the record lacks any evidence to determine which, if any, of these specific fisheries have contributed to the bycatch of Hector's dolphins (which has at all times remained below PBR). Nor is there any evidence on record to suggest that these particular fisheries would decrease fishing efforts in response to a U.S.-imposed import ban.

The core purpose of the § 1371(a)(2) import provision and other foreign diplomacy tools provided by the MMPA are to encourage international cooperation to protect marine mammal species. 16 U.S.C. § 1378; *see also* Sen. Rep. No. 92-863, at 10-11 (1972); H.R. Rep. No. 92-707, at 14, 16 (1971); H.R. Rep. No. 100-970, at 30 (1998); H.R. Rep. No. 92-1488, at 25 (1972) (Conf. Rep.). A judicial embargo on fish products with no particularized connection on a

fishery-by-fishery basis to any bycatch in excess of PBR would not further cooperation in protecting marine mammals with the GNZ. *Cf. Gill*, 585 U.S. at 73 (remedy must redress particularized injury). Rather, it would seem to arbitrarily punish fishers, and the New Zealand commercial fishing industry, in a manner disproportional to actions taken to manage U.S. fishers and without any actual proof of wrongdoing. This would cause damage to the Government as it would interfere with the Executive Branch's ability to engage in foreign affairs, with likely negative ramifications for vulnerable marine mammal species that MHDD purports to want to protect. *See, e.g.*, ECF No. 16 at 19-20 (discussing breakdown of MMPA negotiations with Mexico over vaquita protections following imposition of judicial embargo).

Inherent in the Congressional mandate to negotiate and enter into agreements to protect marine mammals with harvesting nations, *e.g.*, 16 U.S.C. § 1378; 50 C.F.R. § 216.24(h)(7)(iii), (11), is the discretion to determine the types of commitments harvesting nations could make to be consistent with the MMPA. Retaining that discretion over foreign policy objectives is precisely why the type of lawsuit brought by MHDD is not thought to be traditionally redressable through the judicial process. *E.g.*, *United States v. Texas*, 599 U.S. 670, 679-81 (2023). Additional judicial interference risks dissuading harvesting nations from committing to terms that would benefit marine mammal species when those nations cannot rely on NMFS's assurance that implementing them would render a program comparable.

Accordingly, the public interest and balance of equities weigh against a Court-imposed embargo with the potential to disrupt hundreds of millions of dollars in trade and, as history has shown, to cause lasting damage to the foreign relations of the United States, including to achieve the objectives of the MMPA, when the Court can only speculate what, if any, benefit it may have on the aesthetic or other interests of MHDD's members.

**CONCLUSION**

For these reasons, we respectfully request that the Court deny the MJAR and enter judgment in favor of the Government.

Respectfully Submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/Agatha Koprowski
AGATHA KOPROWSKI
OLIVER J. MCDONALD
Trial Attorneys
U.S. Department of Justice Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 507-6081
Fax: (202) 353-0461
Email: agatha.koprowski@usdoj.gov

*Attorneys for Defendants*

OF COUNSEL:
MARK HODOR
Office of the General Counsel
National Oceanic & Atmospheric Administration

EVA BOGDEWIC
GARY W. NEIMAN
ROBERT MATHAI
Office of the Chief Counsel
U.S. Customs and Border Protection

DANIEL PAISLEY
Office of the General Counsel
Department of the Treasury

November 20, 2026

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this Response in Opposition to Plaintiff's Motion Judgment on the Agency Record contains 13,532 words, excluding any materials excluded from those Procedures' requirements, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/Agatha Koprowski