**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| MĀUI AND HECTOR'S DOLPHIN DEFENDERS NZ INC.,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE, et al.,<br><br>Defendants, and<br><br>NEW ZEALAND GOVERNMENT,<br><br>Defendant-Intervenor. | Court No. 26-02462 |

**OPPOSITION OF THE NEW ZEALAND GOVERNMENT TO THE PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Submitted by:

Warren E. Connelly
Robert G. Gosselink
Kenneth N. Hammer
MacKensie R. Sugama

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
Phone: 202-223-3760
wconnelly@tradepacificlaw.com

Date: November 20, 2026

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES ........ v

I. INTRODUCTION ........ 1

II. THE STANDARD OF REVIEW ........ 4

III. THE "5-YEAR REVIEW" THAT NMFS PREPARED UNDER THE ENDANGERED SPECIES ACT DID NOT CONSIDER WHETHER THE GNZ'S MEASURES WERE COMPARABLE IN EFFECTIVENESS TO U.S. STANDARDS UNDER THE MMPA ........ 4

IV. REASONABLE PROOF SUPPORTED NMFS' DETERMINATION THAT THE GNZ IMPLEMENTED MEASURES THAT WERE COMPARABLE IN EFFECTIVENESS TO THE MMPA's ZERO MORTALITY RATE GOAL ........ 7

A. NMFS Assessed the GNZ's Goals and Implementing Measures ........ 8

B. The MMPA Does Not Require the GNZ to Establish a "Bycatch Target" that Equals 10% of a Potential Biological Removal Level to Satisfy the Comparable in Effectiveness Standard ........ 12

C. The MMPA Does Not Require an Import Ban When a ZMRG Has Not Been Achieved ........ 13

D. The GNZ's Program Combines Regulatory Requirements with Policy Measures to Pursue Goals Comparable in Effectiveness to the ZMRG ........ 14

E. MHDD Erroneously Asserts that the GNZ Is Not Achieving Results Comparable in Effectiveness to the ZMRG ........ 15

F. A Single Year's Captures of Hector's Dolphins Does Not Establish that the GNZ's Measures Are Not Comparable in Effectiveness to the ZMRG ........ 17

V. REASONABLE PROOF SUPPORTED NMFS' FINDING THAT THE GNZ IMPLEMENTED MEASURES COMPARABLE IN EFFECTIVENESS TO THE NEGLIGIBLE IMPACT STANDARD ........ 18

Page


A. New Zealand's Statutory Take Prohibition and Reporting Defense Differ from the Advance Incidental Take Authorization under the MMPA ........ 20

B. The GNZ Has Adopted Measures Comparable in Effectiveness to the Negligible Impact Standard ........ 21

C. An Incidental Take that Exceeds the Negligible Impact Standard Does Not Require Closure of a U.S. Fishery or an Import Ban for a Foreign Fishery ........ 22

VI. REASONABLE PROOF SUPPORTED NMFS' ASSESSMENT OF THE GNZ'S BYCATCH ESTIMATES ........ 23

A. The 5-Year Review Did Not Find that the GNZ's Bycatch Estimates Were Critically Flawed ........ 24

B. The GNZ's Bycatch Estimate for Hector's Dolphins is Supported by Reasonable Proof ........ 26

C. The GNZ's Bycatch Estimate for Māui Dolphins Is Supported by Reasonable Proof ........ 28

VII. REASONABLE PROOF SUPPORTED NMFS' CONCLUSION THAT THE GNZ IMPLEMENTED MEASURES TO ENSURE THAT BYCATCH LIMITS WOULD NOT BE EXCEEDED ........ 29

VIII. REASONABLE PROOF SUPPORTED NMFS' FINDING THAT THE GNZ'S MONITORING PROGRAM WAS COMPARABLE IN EFFECTIVENESS TO THE U.S. STANDARD ........ 33

A. The U.S. Monitoring Standard ........ 33

B. The GNZ's Monitoring Program ........ 35

C. NMFS Found that the GNZ's Monitoring Program Was Comparable in Effectiveness to the U.S. Standard ........ 37

D. MHDD's Position on What a Monitoring Program Requires Is Not Supported by Substantial Evidence ........ 38

**Page**

E. The Comparability Finding Addresses the Explanatory Deficiency that the Sea Shepherd Decision Identified ........................ 39

F. NMFS Has Not Expressed "Concerns" About the Adequacy of the GNZ's Monitoring Program under the Comparable in Effectiveness Standard ........................ 40

G. The MMPA Does Not Require a Monitoring Program that Will Detect 100% of Bycatch ........................ 42

H. Reasonable Proof Supports NMFS' Finding that Monitoring Coverage, Footage Review, and Camera Performance Are Comparable in Effectiveness to U.S. Standards ........................ 43

1. The Geographic Scope of the GNZ's Monitoring Program Encompasses All New Zealand Fisheries ........................ 43

a. West Coast North Island Māui Dolphin Monitoring ....... 43

b. South Island Hector's Dolphin Monitoring ........................ 44

2. MHDD's Allegation of Geographic Deficiencies Has No Merit ........................ 45

a. Monitoring in Harbors ........................ 45

b. Monitoring on Trawl Vessels over 32 Meters in Length ........................ 47

c. Monitoring by Inshore Trawl Vessels ........................ 48

d. Monitoring Around the Banks Peninsula on the South Island ........................ 49

e. Monitoring Off the East Coast of the North Island ......... 50

3. MHDD's Allegation that Not Enough West Coast North Island Vessels Carry Cameras Does Not Constitute Substantial Evidence of Inadequate Camera Monitoring ......... 51

4. MHDD's Allegation that Not Enough South Island Vessels Carry Cameras Does Not Constitute Substantial Evidence of Inadequate Monitoring ........................ 52

**Page**


5. MHDD's Footage Review Challenge Ignores NMFS' Assessment of Actual Review Rates ........................................... 53

IX. MHDD HAS VIOLATED RULE 56.1 BY SUBMITTING INFORMATION THAT IS NOT PART OF THE ADMINISTRATIVE RECORD........................................................................................................ 55

X. CONCLUSION........................................................................................ 56

# TABLE OF AUTHORITIES

**Cases** **Page**

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,* 462 U.S. 87 (1983)

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989) ........................................... 4

*Māui and Hector's Dolphins Defenders NZ Inc. v. United States*,
799 F. Supp. 3d 1327 (Ct. Int'l Trade 2025) ........................................................ 4

*Māui and Hector's Dolphin Defenders NZ Inc. v. United States,*
Court No. 26-02462, Slip op. 26-73 (Ct. Int'l Trade 2026........................... 8, 19, 24, 38

*Sea Shepherd New Zealand v. United States*, 606 F. Supp. 3d 1286
(Ct. Int'l Trade 2022) ........................................................................................... 40

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................................................ 4

16 U.S.C. § 1362(20) ............................................................................................... 29

16 U.S.C. § 1371(a) (5)(E) ................................................................................. 18, 20

16 U.S.C. § 1375...................................................................................................... 23

16 U.S.C. § 1386(a)(4) ............................................................................................. 17
.
16 U.S.C. § 1387...................................................................................................... 37

16 U.S.C. § 1387(b) ................................................................................................. 14

16 U.S.C. § 1387(d)(1)(A) ........................................................................................ 33

16 U.S.C. § 1387(d)(6) ........................................................................................ 35, 46

16 U.S.C. § 1387(f) ............................................................................................ 15, 32

28 U.S.C. § 1581(i) .................................................................................................... 4

**Regulations** **Page**

50 C.F.R. § 216.3 .......... 29

50 C.F.R. § 216.24(h)(6)(iii)(B) .......... 1

50 C.F.R. § 216.24(h)(6)(iii)(C) .......... 29, 30, 33, 37

50 C.F.R. § 229.2 .......... 12

50 C.F.R. § 229.7(c)(3) .......... 46

**Federal Register Notices**

81 Fed. Reg. 54,390 (Aug. 15, 2016) .......... 1, 8, 23

88 Fed. Reg. 7,362 (Feb. 3, 2023) .......... 14

## I. INTRODUCTION

The Comparability Finding contained in NMFS' March 2, 2026 Decision Memorandum ("Dec. Memo"), includes a thorough description of the measures the Government of New Zealand ("GNZ") adopted that the agency deemed "comparable in effectiveness" to U.S. standards.[1] NMFS considered the GNZ's program as a whole, as well as each specific measure, including spatial closures, gear restrictions, monitoring requirements, electronic reporting requirements, mortality and serious injury estimation, and response mechanisms in case of marine mammal bycatch in the course of commercial fishing.

The GNZ's program uses statutory mechanisms and numerical concepts that may differ from those used in U.S. fisheries. However, these differences do not constitute a failure to implement measures that are "comparable in effectiveness" to the standards that the MMPA has established for domestic fisheries.[2]

The Plaintiff, MHDD, asserts that this Court should find that the GNZ has not adopted measures that satisfy the comparable in effectiveness standard because the GNZ: (1) failed to establish a bycatch target of 1 Māui dolphin per 100 years and 6.65 Hector's dolphins per year, which it claims are the only permissible metrics for satisfying the Zero Mortality Rate Goal ("ZMRG"); (2) failed to comply with the

---

[1] The 81-page Decision Memorandum appears in the record beginning at NMFS_014378.

[2] The "comparable in effectiveness" standard is contained in NMFS' Final Rule, which was published at 81 Fed. Reg. 54,390 (Aug. 15, 2016). *See* 50 C.F.R. § 216.24(h)(6)(iii)(B).

"negligible impact" standard by allowing the "unlimited incidental take of Endangered Species Act ("ESA") listed marine mammals"; (3) erroneously determined bycatch estimates by basing them on the "flawed and unreliable" methodology contained in the GNZ's SEFRA model;[3] (4) failed to "implement" the "Potential Biological Removal ("PBR")-based" bycatch limits that the GNZ calculated for Māui and Hector's dolphins; and (5) failed to implement the measures required for the GNZ's monitoring program to be deemed comparable in effectiveness to the U.S. standard. MHDD then alleges that the only permissible remedy for these failures is the immediate imposition of an import ban.

The fundamental defects in MHDD's allegations are:

First, in contrast to MHDD's "one size fits all" approach, NMFS evaluated each of the GNZ's measures under the comparable in effectiveness standard. This standard provides "flexibility" to the harvesting nation by authorizing the adoption of measures that are not identical to those used in domestic fisheries but achieve comparable results. Moreover, it allows NMFS to evaluate whether that nation achieves the overall objectives of the MMPA. In addition, neither the MMPA nor the Final Rule requires a harvesting nation to adopt the identical numerical metrics that MHDD has proposed.

---

[3] SEFRA is an acronym for the GNZ's Spatially Explicit Fisheries Risk Assessment model. The GNZ provided an extensive explanation of its use of the SEFRA model in Appendix G to its September 2020 Comparability Application. NMFS_0100874-010886. *See also* October 2025 Supplemental Information submission ("Supp.") at 57-63. NMFS_013930-013936.

Second, comparability findings are made on a fishery-specific basis, and MHDD's Complaint identifies 15 New Zealand fisheries from which all seafood imports should be banned. MHDD's failure to identify and substantiate fishery-specific deficiencies constitutes a sufficient basis to reject them.

Third, MHDD has claimed that the NMFS 5-Year Review ("Review") contains agency "findings" concerning the GNZ's compliance with the MMPA. This claim is demonstrably incorrect because the Review addressed subjects that arose under the ESA, not the MMPA.

Fourth, MHDD has ignored the relevance of undisputed facts, including extensive information the GNZ provided in its comparability applications and in its three most recent supplemental information submissions, dated October 2025, November 2025, and February 2026.

Fifth, MHDD has failed to address the relevance of how NMFS has applied U.S. standards to *domestic* fisheries.

In summary, the MMPA authorizes a harvesting nation to adopt a program that is "completely different" from a U.S. program, so long as it achieves "comparable results." Dec. Memo at 12, fn. 64. MHDD has ignored NMFS' finding that the GNZ's fishing-related measures, as designed and implemented, when considered both collectively and individually, satisfy this flexible requirement. The GNZ's measures embody its own statutory, policy, and conservation responsibilities, which the MMPA authorizes.

## II. THE STANDARD OF REVIEW

This Court reviews 28 U.S.C. § 1581(i) actions under 5 U.S.C. § 706(2)(A), which provides that a court may "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." The scope of review under this standard is narrow, and a court may not substitute its judgment for that of the agency.[4]

When analyzing complex scientific assessments and considering how a regulatory program operates in full, an agency entrusted by Congress with "special expertise," like NMFS, is entitled to heightened deference. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,* 462 U.S. 87, 103 (1983). Moreover, "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts" even if a court might "find contrary views more persuasive." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

## III. THE "5-YEAR REVIEW" THAT NMFS PREPARED UNDER THE ENDANGERED SPECIES ACT DID NOT CONSIDER WHETHER THE GNZ'S MEASURES WERE COMPARABLE IN EFFECTIVENESS TO U.S. STANDARDS UNDER THE MMPA

MHDD alleges that NMFS' 5-Year Review in 2024 "found New Zealand's regulatory mechanisms 'inadequate' to protect the dolphin populations from bycatch

---

[4] MHDD asserts that Section 706(1) of the APA compels both the Treasury Department and this Court to implement an import ban. Pl's Br. at 35-39. However, this Court previously rejected this assertion: "the Court does not conclude that NMFS has unlawfully withheld or unreasonably delayed the performance of an action that it is required to take legally such that § 706(1) applies." *Māui and Hector's Dolphins Defenders NZ Inc. v. United States*, 799 F. Supp. 3d 1327, 1349 (Ct. Int'l Trade 2025).

in set net and trawl fisheries." Pl's Br. at 1.[5] However, although the Review provides some relevant background information, which NMFS considered where deemed relevant, it addresses whether the ESA listing classifications remain accurate. Thus, the Review did not determine whether the measures that apply to any of New Zealand's export fisheries were comparable in effectiveness to U.S. standards under the MMPA.

Instead, the Review acknowledges that:

> A 5-year review is a periodic analysis of a species' status conducted to ensure that the listing classification of a species currently listed as threatened or endangered on the List of Endangered and Threatened Wildlife and Plants (List) . . . is accurate. (Citation omitted.)

*See* Section 1.2. NMFS_015941. In support of its conclusion that Māui and Hector's dolphins should not be removed from the ESA list, the Review synthesized the available information concerning species status and threats. The Review then lists "References" to third party opinions and analyses, most of which were issued before the GNZ enacted its comprehensive protection measures in 2020 and 2022. NMFS_016044-016072.

Moreover, the Review did not consider the effect of the GNZ's completion of its comprehensive electronic monitoring requirements in May 2025. In contrast, NMFS' March 2026 Comparability Finding considered fishery-specific information, as well as the protection measures implemented in 2020 and 2022, the completed camera rollout in May 2025, and New Zealand's October 2025, November 2025, and

[5] The Review appears in the record beginning at NMFS_015931.

February 2026 supplemental information submissions. The latter three submissions were not available when the Review was completed.[6] These submissions, totaling over 165 single-spaced pages, discussed every aspect of the GNZ's measures and explained why they satisfied the comparable in effectiveness standard.

Thus, even assuming, which the GNZ does not concede, that the Review contained any U.S. standards-related findings, it did not reflect the fuller and differently focused record upon which NMFS repeatedly relied in making its March 2026 Comparability Finding.

Equally important, the Review's literature synthesis must be read with attention to both attribution and qualification. Some passages express a "concern," a "suggestion," or an "estimation,'" or else they use conditional or qualifying language derived from a cited study or opinion piece. Other passages state NMFS' own conclusions about species status and continuing threats. Neither category, without more, resolves the fishery-specific comparability inquiry that the MMPA requires.

A comparability finding requires analyses that include, but are not limited to: evaluation of the effectiveness of measures in particular export fisheries; evaluation of the effects of spatial restrictions and monitoring provisions that took

[6] These submissions appear in the record beginning, respectively, at NMFS_013874, 013972, and 013985. They provided extensive reasonable proof that further supported NMFS' conclusion that the GNZ's measures were comparable in effectiveness to U.S. standards.

effect after the 2024 Review was issued; and comparisons with the U.S. regulatory program.

NMFS analyzed those issues in the Decision Memorandum and referenced, where relevant, the administrative record, including: (1) how the GNZ determined bycatch limits and bycatch risk; (2) fishery-specific impacts of the measures the GNZ implemented; (3) whether the GNZ's current measures were sufficient under the MMPA; and (4) an assessment of comparability to U.S. standards. It also included a determination of whether the information that the Review relied upon was the best scientific data available.

The Review concludes with "Recommendations for Future Actions." *See* Section 4.0. NMFS_016042-016043. There, the Review states that the GNZ should "consider" its recommendations "to better monitor the status of the two subspecies and the threats that they face." It does not say that the MMPA's comparable in effectiveness standard requires implementation of any recommendation.

## IV. REASONABLE PROOF SUPPORTED NMFS' DETERMINATION THAT THE GNZ IMPLEMENTED MEASURES THAT WERE COMPARABLE IN EFFECTIVENESS TO THE MMPA's ZERO MORTALITY RATE GOAL

NMFS has comprehensively explained why the GNZ has adopted a program comparable in effectiveness to the MMPA's Zero Mortality Rate Goal. Dec. Memo at 59-65. This Court preliminarily found that NMFS was likely to succeed on the merits of this issue because:

> Considering New Zealand's marine mammal protection legal authorities, and NMFS' explanation of the systems put in place in New Zealand and the bycatch rates produced, the Court concludes that

> NMFS' determination on the Zero Mortality Rate Goal is rationally connected to the facts presented.

*Māui and Hector's Dolphin Defenders NZ Inc. v. United States,* Court No. 26-02462, Slip op. 26-73 at 26 (Ct. Int'l Trade 2026).

**A. NMFS Assessed the GNZ's Goals and Implementing Measures**

The term "comparable in effectiveness" means "the harvesting nation's regulatory program effectively achieves comparable results to the U.S. regulatory program." Dec. Memo at 2. Neither the MMPA nor the Final Rule identifies the precise reduction in mortality or serious injury that a harvesting nation's measures must achieve or the time within which the reduction must be achieved to successfully implement a program comparable in effectiveness to the ZMRG. Rather, NMFS has:

> prioritized reducing bycatch to sustainable levels (e.g., below the bycatch limit) and will consider the application of the ZMRG, *or metrics/measures comparable in effectiveness to ZMRG*, to foreign fisheries providing the same flexibility to foreign fisheries as it has applied to analogous U.S. fisheries that have not met the ZMRG.

Final Rule, 81 Fed. Reg. at 54,398 (Aug. 15, 2016); Dec. Memo at 61. Therefore, the question is not whether New Zealand's legislation contains a single obligation stated in the same terms as the ZMRG or a specific numerical threshold or timeframe. Instead, the relevant question is whether the GNZ's combined program achieves comparable conservation results.

The GNZ's 2020 Threat Management Plan ("TMP") expresses two goals comparable in effectiveness to the ZMRG. For Māui dolphins, the "goal" is that human impacts are managed to allow the population to increase to a level at or

above 95% of the maximum number of dolphins the environment can support. "A population outcome of 95% means that human-induced deaths *need to be as near as practicable to zero*." Dec. Memo at 62. (Emphasis added.) Underpinning this goal is a fisheries management objective that, when met, means that with 95% confidence, the population can recover to and/or maintain a level that is no more than 5% lower than what it would be in the absence of fishing.

For Hector's dolphins, the "goal" is that human impacts are managed to "allow the population to increase to a level at or above 90% of the maximum number of dolphins the environment can support." *Id.* Since the Hector's dolphin population is much larger than the Māui dolphin population, the "acceptable level of impact can be higher than for Māui dolphins." *Id.* at 62, fn. 323.

NMFS described the measures that the GNZ has adopted to achieve these two goals as a "Broad Suite of Efforts" and a "comprehensive regulatory system". *See, e.g.,* Dec. Memo at 59-65. Those measures include, but are not limited to: (1) the TMP, which sets objectives to reduce human impacts and fishing-related mortality to support the recovery of Hector's and Māui dolphins; (2) the Aotearoa New Zealand Biodiversity Strategy 2020, which is intended to ensure that natural resources are sustainably managed and includes a goal that the mortality of non-target species from marine fisheries, including marine mammal species, has been reduced to zero; (3) the GNZ's commitment to the United Nation Convention on Biological Diversity; (4) the GNZ's Conservation General Policy no. 4.4(f), which states that "marine protected species should be managed for their long term

viability and recovery throughout their natural range;" (5) the establishment of marine mammal sanctuaries; (6) the use of Population Sustainability Thresholds ("PST") as scientific reference points to assess mortality risks against the population outcomes established in the TMP[7]; (7) the calculation of bycatch limits; (8) the implementation of extensive regulatory restrictions on where set nets and trawls may be used; (9) the setting of extensive regulatory monitoring requirements, including electronic reporting and onboard cameras; (10) the establishment of a Māui Dolphin Habitat Zone and a Fishing-Related Mortality Limit ("FRML") that applies within that Zone; (11) the establishment of FRMLs for five local and one sub-population of Hector's dolphins around the South Island; (12) specific gear requirements (e.g., mesh size, length and height of net); and (13) a Bycatch Reduction Plan for Hector's dolphins.

The goal of the GNZ's comprehensive regulatory system is "to reduce fishing-related mortality near zero and support recovery of marine mammal populations to non-threatened status." Dec. Memo at 17. NMFS found that these measures, which

[7] MHDD claims that NMFS accepted PST as "metrics/measures comparable in effectiveness to ZMRG," which constitutes "double counting." Pl's Br. at 17. This statement is incorrect, and MHDD's citation to the Decision Memorandum (at 50-51) (NMFS_014427-28) does not say this. NMFS did not treat PST as equivalent to ZMRG. It could not be an equivalent because it has a different purpose than the ZMRG. PST serves as a sustainability reference point within New Zealand's framework; it is determined in a different way; it has a different time horizon; and it treats uncertainty in a different way. For these reasons, the GNZ does not rely on PST as comparable in effectiveness to the ZMRG, nor has it ever claimed that it does. *See* Dec. Memo at 50 (the GNZ uses population sustainability thresholds "to assess whether human-caused mortality (especially from fisheries bycatch) is sustainable for the long-term viability of protected species populations.")

are a "mix of legislative, regulatory, and voluntary measures," are "similar to how the U.S. manages its strategic stocks through TRPs," i.e., Take Reduction Plans. Dec. Memo at 28. Moreover, the record establishes that the GNZ is moving toward zero mortality through its measures. For example, there has been no reported or observed Māui or Hector's dolphin capture off the west coast of the North Island since 2012.

And, although the PBR level for Hector's dolphins is 66.5 individuals per year, the mean modelled estimate of Hector's dolphin bycatch, which includes cryptic mortality, is 23 Hector's dolphins per year.[8] *See* Feb. 2026 Supp. at 16. NMFS_014000. In addition, the reported or observed Hector's dolphin captures in the three fishing years ending in 2024/2025, were 6, 15, and 8. *See* Feb. 2026 Supp. at 27, Table 8. NMFS_014011.

Nevertheless, MHDD rejects NMFS' analysis because: (1) the GNZ's "bycatch targets are an order of magnitude higher than the U.S. ZMRG"; (2) New Zealand law "does not require regulatory action to achieve even those lax objectives"; and (3) NMFS "does not even address that bycatch in the New Zealand fisheries quantitatively exceeds the ZMRG standard." Pl's Br. at 16. Moreover, MHDD argues that the only standard comparable in effectiveness to the ZMRG is a

---

[8] The term cryptic mortality refers to an animal that may die in a net but remains unobserved because the body has fallen out of the net without being detected. When estimating bycatch, a cryptic mortality multiplier can be applied to account for unobserved deaths.

"concrete, biologically relevant bycatch target no more than 1 Māui dolphin per 100 years (0.01) and 6.65 Hector's dolphins per year." *Id.*

These figures equal 10 percent of PBR, i.e., *they are identical to the MMPA's definition of the regulatory insignificance threshold associated with the ZMRG in 50 C.F.R. § 229.2.* In this way, MHDD alleges that NMFS must apply the ZMRG's metric for a domestic fishery to every foreign fishery. Moreover, MHDD asserts that, since ZMRG has been surpassed, an import ban is required.

### B. The MMPA Does Not Require the GNZ to Establish a "Bycatch Target" that Equals 10% of a Potential Biological Removal Level to Satisfy the Comparable in Effectiveness Standard

Neither the MMPA nor the Final Rule mandates a "concrete biologically relevant bycatch target" for an export fishery that must equal 10 percent of a PBR level. Pl's Br. at 16, fn.3. MHDD also errs by conflating a bycatch metric with a goal that Congress has said may be implemented in different ways and that, for practical reasons, may never be achieved. Dec. Memo at 59.

Equally deficient is MHDD's assertion that "the TMP's objectives are more than an order of magnitude higher than the U.S. standards for the ZMRG." Pl's Br. at 17. MHDD can only make this claim by alleging that the comparable in effectiveness standard for all fisheries for all harvesting nations must be identical to the ZMRG definition. However, the relevant question is whether the GNZ's measures will advance an objective *that is comparable to the ZMRG.* MHDD fails to address this question.

Instead, MHDD characterizes the GNZ's comprehensive measures as a "nebulous aspiration." Pl's Br. at 16. However, NMFS found that the GNZ has relied on specific measures intended to achieve the short- and long-term goal of sustainability, which is what the MMPA requires. Dec. Memo at 59-65.

**C. The MMPA Does Not Require an Import Ban When a ZMRG Has Not Been Achieved**

MHDD insists that this Court must order an import ban if it finds that the GNZ failed to adopt the ZMRG's metric. Pl's Br. at 14-15. But failure to achieve the ZMRG does not mean that a foreign fishery's program is not comparable in effectiveness to the ZMRG. And even assuming that the GNZ has not implemented measures comparable in effectiveness to the ZMRG, which the GNZ does not concede, an import ban, which is the foreign fishery equivalent of a domestic fishery closure, is not NMFS' response when progress toward a domestic fishery's goal is not being made.

> A {domestic} fishery would not be closed under the ZMRG simply because its incidental mortality and serious injury rate was above the target level at the deadline. The ZMRG states that, if mortality is higher than target levels, then NMFS should take appropriate action under MMPA section 118(f), which provides for developing and implementing TRPs . . . thus the ZMRG threshold is not defined in such a manner to shut-down or significantly curtail the activities of commercial fishing simply because a fishery exceeds the threshold.

Dec. Memo at 60, fn. 313. (Citations omitted.)

NMFS' application of the ZMRG standard in a domestic fishery is demonstrated by its ongoing efforts to reduce the mortality and serious injury of endangered North Atlantic right whales. In 1997, NMFS first issued regulations

intended to reduce anthropogenic threats to North Atlantic right whales, including implementing an Atlantic Large Whale Take Reduction Plan ("ALWTRP") to reduce entanglement in fishing gear.

The original plan has been continuously amended because the PBR level and, therefore, the ZMRG have consistently been exceeded. *See, e.g.,* 88 Fed. Reg. 7,362 (Feb. 3, 2023); *see also* Dec. Memo at 9 (discussing amendments to the ALWTRP). Thus, rather than closing a fishery, NMFS has continued to afford "flexibility" to domestic commercial fishing interests to continue operating despite the failure of right whale fisheries to reduce bycatch to a level approaching the ZMRG.

### D. The GNZ's Program Combines Regulatory Requirements with Policy Measures to Pursue Goals Comparable in Effectiveness to the ZMRG

MHDD asserts that:

> Neither the TMP, nor New Zealand's Biodiversity Strategy 2020 or Conservation General Policy cited in the Decision Memorandum (NMFS_014394) are "regulatory requirements"; they are non-binding, "non-statutory" documents. Moreover, it is arbitrary for NMFS to conclude a TMP that "does not require New Zealand to do anything on a particular timeframe following a fishery-related interaction."

Pl's Br. at 18. Here, MHDD propounds two ZMRG-related requirements that do not exist.

Section 118(b) of the MMPA, 16 U.S.C. § 1387(b), contains the ZMRG. However, that provision does not require that the ZMRG be contained in a "regulatory requirement" for every domestic fishery. Moreover, the MMPA does not require a domestic fishery to close merely because it fails to achieve the ZMRG

within the prescribed timeframe, as demonstrated by the fact that the ALWTRP has been in effect for almost 30 years.

Instead, for strategic stocks, where incidental mortality or serious injury exceeds the PBR level, NMFS must convene a Take Reduction Team ("TRT") to develop a TRP. 16 U.S.C. § 1387(f). NMFS relied on reasonable proof to find that the GNZ has implemented regulatory and other requirements like those applicable to TRTs and TRPs to achieve its sustainability goals.

> As explained throughout this Decision Memorandum, when considered in its entirety, all of the information the GNZ provided regarding this issue demonstrates that the GNZ's regulatory program and the individual efforts that have been enacted to date are designed to reduce incidental mortality and serious injury of marine mammals to insignificant levels comparable to the U.S. ZMRG across all of New Zealand's fisheries, including the North Island and South Island set net and trawl fisheries.

Dec. Memo at 61.

**E. MHDD Erroneously Asserts that the GNZ Is Not Achieving Results Comparable in Effectiveness to the ZMRG**

MHDD asserts that the estimated bycatch levels listed in the Decision Memorandum "are far higher than the 0.01 and 6.65 ZMRG bycatch levels for Māui and Hector's dolphins, respectively." Pl's Br. at 19. MHDD claims these are the only permissible metrics for measuring compliance with the ZMRG standard that it further claims apply to every foreign fishery. However, an estimated bycatch level is not the same as comprehensive measures aimed at ensuring the long-term sustainability of a marine mammal population.

As noted above, MHDD regards its 10-percent-of-PBR calculation as the only permissible expression of comparable effectiveness to the ZMRG. In contrast, the Final Rule asks whether the foreign regulatory program, considered as a whole, as well as on a fishery-specific basis, achieves comparable results. NMFS found that the GNZ's implemented controls and supporting processes met that standard:

> Although New Zealand's standard and associated timeframes for reducing incidental mortality and serious injury may not be the exact same as the MMPA's concept of ZMRG, the MMPA and the Final Rule do not mandate a "like for like" standard; rather, the harvesting nation must provide sufficient documentary evidence that it is capable of achieving comparable results as the U.S. regulatory program. The GNZ informed NMFS that its extensive closure areas to set net fishing and trawl fishing are designed to reduce the mean estimated bycatch rate of Māui dolphins from the two fisheries to 0.056 dolphins per year (or one Māui dolphin every 17.8 years), and this bycatch rate is insignificant approaching a zero mortality and serious injury rate because it is below the estimated PBR of 0.10 dolphins per year. In addition, the measures aimed at the South Island Hector's dolphins are also designed to reduce the mean estimated rate of Hector's dolphin bycatch. In this case, NMFS has determined that the GNZ's laws, policies, and current efforts to address marine mammal risks from its Export fisheries are designed to ensure an insignificant impact on the species/stocks and, therefore, achieve comparable results to NMFS' processes aimed at achieving ZMRG.

Dec. Memo at 63. Thus, NMFS relied on the combined operation of the GNZ's measures, not solely on the fact that the post-2020 mean estimated Māui dolphin bycatch was 0.056 dolphins per year or the separately calculated estimates for Hector's dolphin bycatch. NMFS considered these estimates and associated uncertainty together with closures, gear restrictions, monitoring, reporting, population objectives, and response arrangements. Dec. Memo at 59-65.

### F. A Single Year's Captures of Hector's Dolphins Does Not Establish that the GNZ's Measures Are Not Comparable in Effectiveness to the ZMRG

MHDD asserts that the GNZ exceeded what it treats as the required ZMRG goal of 6.65 Hector's dolphin captures per year because 15 observed mortalities occurred in the 2023/2024 fishing year. Pl's Br. at 19. This claim has no merit for four reasons.

First, MHDD has failed to show that exceeding an estimated bycatch level in a single year constitutes a violation of the ZMRG standard in a domestic fishery.

Second, estimated bycatch levels are calculated on a fishery-specific basis, and MHDD has not made this calculation for any of the LOFF fisheries identified in its Complaint. *See* 16 U.S.C. § 1386(a)(4).

Third, 15 Hector's dolphin captures in a single year does not, by itself, establish that the GNZ is not progressing towards its sustainability goal. Dec. Memo at 57-58. MHDD omits that Hector's dolphin reported or observed captures were 6 in 2022/23, 15 in 2023/24, and 8 in 2024/25, illustrating annual variation. This is why NMFS evaluates progress towards the ZMRG and comparable harvesting nation measures over a five-year period using statistically reliable estimates of bycatch as well as reported and observed bycatch. In short, NMFS has concluded that reliance on bycatch data from a single year is not statistically reliable.

Fourth, the mean combined annual estimate of bycatch for Hector's dolphins, including cryptic mortality, is 23 individuals, which is well below the 66.5 individual PBR level. Dec. Memo at 54, fn. 274.

## V. REASONABLE PROOF SUPPORTED NMFS' FINDING THAT THE GNZ IMPLEMENTED MEASURES COMPARABLE IN EFFECTIVENESS TO THE NEGLIGIBLE IMPACT STANDARD

The MMPA's negligible impact provisions govern authorization of incidental take for ESA-listed marine mammals in domestic fisheries. 16 U.S.C. § 1371(a)(5)(E)(i). The comparability inquiry asks whether the foreign program limits fishing-related mortality through measures that achieve comparable conservation results.

NMFS found that the GNZ does not operate the "unique" United States-style advance incidental take authorization for its own fisheries and that the GNZ's program manages risk to protected stocks through closures, restrictions, monitoring, mortality estimation, FRMLs, and response processes. Dec. Memo at 64.

MHDD asserts that "New Zealand law allows its commercial fisheries to incidentally catch endangered Māui dolphins at levels that have more than a numerically defined negligible impact." Pl's Br. at 20. MHDD calculated the negligible impact threshold ("NIT") for Māui dolphins as 0.013, (which equals one mortality every 77 years) and 1.729 mortalities per year for Hector's dolphins.[9] Pl's Br. at 21. *See also* NMFS' Criteria for Determining Negligible Impact under MMPA Section 101(a)(5)(E). NMFS_014668-014687.

[9] MHDD's allegation is also defective because the NIT level must be calculated and then compared against estimated bycatch on a fishery-specific basis, not on an aggregate, country-wide basis.

MHDD first errs in contending that the MMPA required the GNZ to adopt the identical NIT calculation metric as the law requires for domestic fisheries. However, *the MMPA does not require a harvesting nation to implement the identical metric.* NMFS, in recognition of this fact, evaluated whether the GNZ had adopted measures comparable in effectiveness to the NIT, and found that it had done so. Dec. Memo at 64-65. MHDD has not demonstrated that the GNZ's measures are not comparable in effectiveness to the NIT, so its contention fails for this reason alone.

Moreover, this Court preliminarily found that NMFS articulated "a plausible connection between the record evidence and the determination regarding the applicability of the negligible impact standard, *or the lack thereof*." Slip op. at 29. (Emphasis added.)

Nevertheless, MHDD alleges that "New Zealand law expressly *does* allow its commercial fisheries to incidentally take marine mammals without limitation or penalty, so long as its fishers report the bycatch." Pl's Br. at 21. In addition, estimated bycatch is "*far* in excess of negligible impact levels." Pl's Br. at 2. Also, "Under New Zealand law, incidentally taking marine mammals is *legal* by default." *Id.*

These claims are inaccurate, especially considering the extensive measures that the GNZ has imposed to reduce bycatch.

### A. New Zealand's Statutory Take Prohibition and Reporting Defense Differ from the Advance Incidental Take Authorization under the MMPA

This Court must decide whether the GNZ has adopted measures that restrict incidental take and, therefore, are comparable in effectiveness to the negligible impact standard.[10] It has done so.

Specifically, Section 4(1)(b) of the GNZ's Marine Mammals Protection Act 1978 ("NZ MMPA") provides that no person shall "take any marine mammal, whether alive or dead, in or from its habitat . . . without first obtaining a permit to do so from the Minister or from any person or persons authorized in that behalf by the Minister." NMFS_001652-001687. Section 6 allows the Minister to grant or refuse a permit. No permits have been issued authorizing the bycatch of marine mammals. *See* Oct. 2025 Supp. at 9. NMFS_013882.

New Zealand has never granted a permit that authorizes the incidental take of a marine mammal under the same or similar circumstances and requirements as authorized by 16 U.S.C. § 1371(a)(5)(E). Dec. Memo at 64, fn. 332.

Since the NZ MMPA does not permit the incidental take of any marine mammal, MHDD instead seizes upon Section 26(4) of the NZ MMPA, which provides a defense to an incidental taking if the vessel has complied with the reporting requirements of Section 16 of the Act. Failure to comply is an offense punishable under Sections 23 and 23A.

---

[10] Since NMFS found that the MMPA's incidental permitting scheme was unique, reasonable proof supported the GNZ's adoption of different measures, albeit ones comparable in effectiveness, to ensure sustainability of its marine mammal populations.

To MHDD, the availability of this defense means that "New Zealand law authorizes unlimited incidental take of ESA-listed marine mammals." Pl's Br. at 22. In other words, MHDD asserts that New Zealand law will not penalize a fisher who indiscriminately kills an "unlimited" number of marine mammals so long as each mortality is reported. Nothing in the record even remotely suggests that such an outcome is possible.

In addition, MHDD errs by conflating the GNZ's statutory prohibition on incidental taking without a permit with a possible, but not automatic, defense to a penalty proceeding. Moreover, the GNZ's comprehensive fishing restrictions, monitoring measures, and electronic reporting measures are all intended to reduce, if not eliminate, the possibility of an incidental taking.

### B. The GNZ Has Adopted Measures Comparable in Effectiveness to the Negligible Impact Standard

After finding that the GNZ does not permit the incidental taking of a marine mammal, NMFS described the measures that the GNZ has implemented to ensure that incidental take is minimized:

> Even if there were a requirement for NMFS to evaluate whether the GNZ applied the negligible impact standard or an effective equivalent, which NMFS does not concede, the GNZ has demonstrated it manages commercial fisheries risks to depleted marine mammal species or stocks, such as the Māui and Hector's dolphin and New Zealand sea lion, in a manner comparable in effectiveness to the U.S. regulatory program. For example, the GNZ conducts population assessments, estimates bycatch limits for marine mammals, estimates whether incidental mortality or serious injury of a threatened or endangered marine mammal from commercial fishing exceeds the bycatch limits, requires monitoring of commercial fishing activities, requires bycatch mitigation measures to reduce bycatch below the bycatch level (and in the case of endangered species to a negligible level as quickly as

> possible), and it has a process to determine if a bycatch limit is exceeded and is capable of implementing measures to address such exceedances. Moreover, the GNZ has developed TMPs that aim to reduce fishing-related mortality to an insignificant level and support recovery of marine mammal populations to non-threatened status. The TMPs identify acceptable levels of fishing-related mortality for critically endangered species to help ensure the species are able to recover and/or maintain a sustainable population limit, which is comparable to the MMPA's TRP process.
>
> ***
>
> Therefore, *NMFS finds that the goals and objectives of New Zealand's regulatory program are comparable in effectiveness because they are designed to limit fishing-related impacts to low enough levels to achieve the same conservation purposes as the negligible impact process.*

Dec. Memo at 64-65. (Emphasis added.) *See also* NMFS' description of the GNZ's laws, regulations, and policies that are designed to reduce incidental take of marine mammals during commercial fishing. Dec. Memo at 16-18.

### C. An Incidental Take that Exceeds the Negligible Impact Standard Does Not Require Closure of a U.S. Fishery or an Import Ban for a Foreign Fishery

MHDD insists that: "the plain text of the MMPA requires Defendants to ban imports because the rate of bycatch 'is in excess' of the U.S. negligible impact standard." *See* Preliminary Injunction Motion at 18. ECF No. 13. However, the MMPA does not require the closure of a domestic fishery when the NIT standard has been exceeded.

Instead, where an authorized domestic commercial fishery exceeds the permitted bycatch limit established by either the PBR or the NIT, the MMPA requires development and implementation of the additional measures needed "to

further reduce the incidental mortality and serious injury of the marine mammals" at issue. Dec. Memo at 7.

Thus, even if a fishery's bycatch exceeded the MHDD's calculation of the NIT, which the GNZ does not concede applies, the MMPA does not require an import ban. Instead, the MMPA's remedy for violation of a U.S. incidental take permit is found in 16 U.S.C. § 1375. That section provides financial penalties for a violation of any provision of the MMPA or a violation of any permit or regulation, including any "unlawful taking."

## VI. REASONABLE PROOF SUPPORTED NMFS' ASSESSMENT OF THE GNZ'S BYCATCH ESTIMATES

The MMPA requires NMFS to rely on reasonable proof of the effects of commercial fishing technology on marine mammals. Moreover,

> the information provided by a harvesting nation in its application for a comparability finding must include documentary evidence of sufficient detail, quality, and reliability for NMFS to fully evaluate the regulatory program for a given export fishery.

Final Rule, 81 Fed. Reg. at 54,406 (Aug. 15, 2016). Thus, the standard necessarily requires consideration of the available estimates, their assumptions, uncertainty, and relevance to the fisheries under review.

MHDD's challenge does not establish that NMFS ignored competing bycatch evidence. Instead, MHDD asks the Court to adopt different estimates without accounting for the different periods, geographic scope, methods, and treatment of cryptic mortality associated with record information. Pl's Br. at 24-26.

However, NMFS evaluated the available bycatch estimates, their assumptions and their uncertainty. NMFS considered the material competing evidence and explained its selection and use of estimates relevant to the fishing activity and restrictions being assessed. Dec. Memo at 52-54.

### A. The 5-Year Review Did Not Find that the GNZ's Bycatch Estimates Were Critically Flawed

MHDD erroneously claims that "NMFS concluded in its 5-Year Review that based on the best available science, GNZ's bycatch estimates are critically flawed and likely underestimate bycatch." Pl's Br. at 23. A few sentences later, MHDD states that NMFS "concluded" that "GNZ's SEFRA-derived {bycatch} estimates are flawed and unreliable." Pl's Br. at 24.

NMFS made no such findings, and this Court preliminarily found that NMFS described "New Zealand's {bycatch} calculation formula and explained NMFS' reasoning for how the estimates compare to the PBR calculations." Slip op. at 34. The Court's preliminary finding remains fully justified by reasonable proof.

Specifically, NMFS expressly considered the available information on estimated bycatch, including estimates of cryptic mortality. NMFS also considered the alternative bycatch estimate of MacKenzie, et al. (2022), along with reported and observed bycatch data. In addition, NMFS considered the comments of the IWC's Scientific Committee concerning the utility of the SEFRA methodology, which the GNZ used to estimate bycatch, including the nature of the uncertainty within all estimates. Dec. Memo at 52-54.

Nevertheless, MHDD claims that the Review expresses NMFS' "notable concerns" about the SEFRA analysis that the GNZ used to derive its bycatch estimates. Pl's Br. at 24. The Review's Section 2.4.2.5.3.2 allegedly contains NMFS' "concerns." *See* NMFS_016028-016034.

The Review's discussion reveals that:

(1) It consists of a literature review of papers that critique some aspect of the GNZ's measures, but the Review repeatedly couches that critique in conditional language, such as expressing "concerns" or that something is "likely";

(2) Most of the cited papers authored by third parties were issued before the GNZ completed its implementation of its fishing related restrictions in 2020 and 2022 and completed the rollout of its camera monitoring program in May 2025.

(3) Despite MHDD's reliance on third party criticisms of the Roberts, et al. (2019) SEFRA model, NMFS relied on the fact that:

> The {IWC's Scientific Committee} workshop report noted "the ability {of the SEFRA model} to identify risks spatially is a strength of the approach, allowing it to be used to assess spatial management strategies." The workshop report also noted that "the pre-meeting did not identify obvious flaws in the SEFRA and its application that would preclude its application to support management" and that "considerable additional work should be conducted to better explore uncertainty and understand which parameters are both uncertain and consequential in terms of management-related outcomes."

Dec. Memo at 53.

In addition, the record does not support MHDD's assertion that the "Decision Memorandum does not even acknowledge the contradictory findings by its own scientists" in the Review. Pl's Br. at 24. NMFS' repeated citations of information in the Review contradict MHDD's claim that NMFS ignored it. *See* Dec. Memo at 22, 23, 75, 76, and 77. For that reason, NMFS did not "flip flop" as MHDD asserts. Pl's Br. at 23.

### B. The GNZ's Bycatch Estimate for Hector's Dolphins is Supported by Reasonable Proof

MHDD asserts that "NMFS failed to use the "best available science" when it accepted the GNZ's estimate that Hector's dolphin bycatch was 8.8 dolphins per year. This error was allegedly the product of the GNZ's use of data from the 2020-2021 fishing season, before New Zealand implemented its electronic monitoring program on South Island set net and trawl vessels." Pl's Br. at 25. MHDD's Declarant, Ms. Slooten, opined that the mandatory use of cameras "suggests that bycatch of {South Island} Hector's dolphins may be higher than {earlier} estimates." *Id.* Moreover, "the 8.8.-dolphin estimate does not incorporate cryptic mortality – dolphins that are captured and killed but not observed." *Id.*

However, Ms. Slooten's "suggestion" of possibly higher bycatch in her 2024 paper does not, without more, constitute substantial evidence or reasonable proof that NMFS' estimates lacked adequate evidentiary support. For example, MHDD provides no evidence that Ms. Slooten's "suggestion" caused the IWC's Scientific Committee to make a formal recommendation in response to this so-called "new information."

The IWC report also notes that "New Zealand did not consider the numbers reported in {her paper} regarding observer coverage and camera monitoring to be accurate but unfortunately did not have enough time in advance of the meeting to provide updated numbers." *See* Annex Q to the May 2024 Report of the IWC's Scientific Committee (at 11) available at: https://archive.iwc.int/pages/download.php?ref=22181&ext=pdf&alternative=6765&noattach=true.

Equally erroneous is MHDD's assertion that NMFS failed to recognize that the GNZ's 8.8 dolphin annual bycatch estimate "does not incorporate cryptic mortality," which could be a third of all bycatches." Pl's Br. at 25. In fact, *the GNZ clearly explained the relevance of the 8.8 annual bycatch estimate (which excluded cryptic mortality) and provided its bycatch estimates for Hector's dolphins, which did "incorporate estimates of cryptic mortality".* *See* Feb. 2026 Supp. at Section 2.3.2. *NMFS*_013999-014000.

The combined bycatch estimate, including cryptic mortality, for all Hector's dolphin subpopulations is "23 Hector's dolphins per year" with a 95% confidence interval of 9.19 - 46.27 individuals.[11] NMFS considered the bycatch estimates (with and without cryptic mortality), and their associated uncertainty, which were well below the Hector's dolphin PBR level of 66.5 individuals. Dec. Memo at 54, and fn.

[11] A 95% confidence interval is a range of values calculated using a method that, if repeated multiple times, would be expected to contain the true bycatch figure 95% of the time.

274. Accordingly, despite MHDD's contrary claim, NMFS followed its guidelines by evaluating the bycatch estimates both with and without considering cryptic mortality.

### C. The GNZ's Bycatch Estimate for Māui Dolphins Is Supported by Reasonable Proof

NMFS found that the GNZ's bycatch estimate for Māui dolphins of 0.056 dolphins per year was supported by reasonable proof. Dec. Memo at 52-54. Nevertheless, MHDD asserts that the bycatch estimate should be 0.38 dolphins per year, from MacKenzie, et al. (2022). Pl's Br. at 25. This estimate allegedly exceeds the PBR level of 0.10. *Id.* The flaw in MHDD's logic is that the MacKenzie, et al. estimate is based on fishing effort from the 2016/2017 to 2018/2019 fishing years.

NMFS reasonably declined to use the MacKenzie, et al. estimate as the operative post-2020 estimate because it "did not include the effect of the extensive set net and trawl restrictions applied in 2020 off the West Coast North Island." Dec. Memo at 53, fn. 266. *See also* Feb. 2026 Supp. at Section 2.3.1, para. 54, which references Section 3.3 of the MacKenzie, et al. paper and which identifies the fishing year data MacKenzie, et al. relied upon. NMFS_013998.

MHDD next alleges that the fishing effort data that NMFS relied upon was even older than the data MacKenzie, et al. used. Pl's Br. at 26. MHDD further alleges that the record lacks reasonable proof concerning the data the GNZ (and NMFS) relied upon, how the data were collected, and what methods and assumptions were used to produce the estimates. Pl's Br. at 26.

However, NMFS summarized the SEFRA inputs, collection methods, assumptions, and uncertainty (a feature of any estimate), drawing from GNZ's extensive descriptions of the SEFRA model. Dec. Memo at 49-57. *See also* Oct. 2025 Supp. at 20-22 (NMFS_013893-013895) and at 57-62 (NMFS_013930-013935); Nov. 2025 Supp. at 7-9 (NMFS_013978-013980); Feb. 2026 Supp. at 14-16 (NMFS_013998-014000); and 2020 Comparability Application at 15-19 (NMFS_010783-010788) and Appendixes F and G (NMFS_010866-010886). NMFS explained why it considered the GNZ's estimates to be more relevant as they considered the effect of the 2020 restrictions, while acknowledging continuing model review and improvement.

## VII. REASONABLE PROOF SUPPORTED NMFS' CONCLUSION THAT THE GNZ IMPLEMENTED MEASURES TO ENSURE THAT BYCATCH LIMITS WOULD NOT BE EXCEEDED

The MMPA defines the PBR in 16 U.S.C. § 1362(20). The implementing regulations require a harvesting nation to calculate a bycatch limit based on PBR or a comparable scientific metric for each protected marine mammal species. 50 C.F.R. §§ 216.3 and 216.24(h)(6)(iii)(C)(5). The regulations further require implementation of measures designed to reduce total incidental mortality and serious injury below the bycatch limit. *Id.* § 216.24(h)(6)(iii)(C)(3)(ii). Thus, PBR is a reference point, not a "measure."

MHDD asserts that:

> GNZ adopted NMFS's calculated PBR *values* for purposes of its comparability finding application, {but} it does not *implement* a PBR-based bycatch limit . . . . NMFS's conclusion that the performative

> computation of a metric in the application is comparable in effectiveness to a regulatory bycatch limit is illogical.

Pl's Br. at 27. (Emphasis in original.) This is a confusing new argument that does not hold water, and it seems to be another attempt by MHDD to overcome its inability to provide substantial evidence that the GNZ's bycatch estimates exceeded PBR.

Since it cannot identify any *statutory* support for its "failure to implement" claim, MHDD instead asserts that the *regulation* that requires a foreign fishery to "implement measures in the export fishery designed to reduce the total incidental mortality and serious injury of a marine mammal stock below the bycatch limit" somehow includes a second requirement, which is to "implement" the PBR itself. *See* 50 C.F.R. § 216.24(h)(6)(iii)(C)(3)(*ii*). Pl's Br. at 28. Having invented this requirement by disregarding the plain language of the regulation, MHDD then asserts that the GNZ "does not actually implement PBR as a bycatch limit." Pl's Br. at 27.

MHDD's argument fails for the following reasons.

First, as noted, *a PBR value is not a measure.* The regulation requires *implementation* of "measures" in the export fishery designed to reduce total incidental mortality and serious injury of a marine mammal stock below the applicable bycatch limit. The relevant inquiry is whether the GNZ's implemented measures satisfy that requirement. For that reason, neither the GNZ nor NMFS treated calculation of PBR as alone sufficient.

NMFS' determination instead depended on its assessment of measures implemented in the export fisheries, their expected effect on stock-level mortality, and the GNZ's means for detecting and addressing exceedances. Dec. Memo at 16-37. In contrast, MHDD conflated two concepts. In other words, "implementing" a bycatch limit requires implementing *measures* intended to manage bycatch below the reference point.

Second, the GNZ has in fact implemented measures and supporting processes designed to reduce mortality and serious injury below the PBR levels, including, but not limited to: the statutory closure of vast areas to set net and trawl fishing; the statutory ban on use of specific types of commercial fishing and fishing gear; the required use of camera monitoring and targeted review of camera footage; the required electronic daily reporting of fish caught and any non-fish or protected species and use of electronic geospatial position reporting; the calculation and use of Population Sustainability Threshold metrics as New Zealand's sustainability reference points, alongside PBR calculations supplied for the comparability assessment, which inform implementation of measures to ensure sustainability; and the regulation of FRMLs for both Māui and Hector's dolphins that provide a backstop for ministerial intervention to ensure that a FRML has not been exceeded.

NMFS assessed these measures collectively for their effectiveness in reducing mortality and serious injury below the applicable bycatch limits. Dec. Memo at 37-58. NMFS' assessment of the effectiveness of those measures, not the calculation of

PBR levels alone, rebuts MHDD's contention that the GNZ did not implement "any comparable regulatory limit." Pl's Br. at 27.

Third, NMFS assessed the available mortality estimates against the applicable PBR levels and found that estimated mortality, considered across the relevant fisheries, was below those levels. Dec. Memo at 52-54. This finding supported NMFS' assessment of the measures' effectiveness; it did not replace the requirement to implement those measures.

Fourth, MHDD contends that "A number that does not, when reached, prohibit additional bycatch is not a 'limit.'" Pl's Br. at 28. That argument would treat the automatic prohibition of further bycatch as the defining feature of a limit. Yet, contrary to MHDD's implication, and as discussed above, the U.S. standard does not require closure of a domestic fishery whenever a PBR level has been exceeded. The North Atlantic right whale example demonstrates that the U.S. response to mortality exceeding PBR includes additional mitigation measures rather than automatic closure of a fishery.

Finally, MHDD asserts that New Zealand law does not require "corrective action if PBR is exceeded." Pl's Br. at 28. Therefore, it "does nothing to actually limit bycatch from exceeding PBR." *Id.* However, under the U.S. standard, when PBR is exceeded in a domestic fishery, "corrective action" takes the form of convening a TRT, whose job is to develop a TRP. If the TRP does not deliver the expected results, then the TRT will reconvene and develop a revised plan. *See* 16 U.S.C. § 1387(f).

NMFS found that the GNZ's arrangements for detecting and responding to PBR exceedances were comparable in effectiveness to the TRT and TRP requirements:

> Overall, New Zealand's bycatch management program is comparable to what is required by the U.S. regulatory program because both New Zealand and the United States have processes to establish bycatch limits, identify and implement bycatch mitigation measures such as gear modifications or area closures to reduce bycatch, and have a review process if the bycatch limit is exceeded to reduce bycatch levels below the bycatch limit.

Dec. Memo at 37; *see also* Dec. Memo at 55-57. Thus, MHDD's claim that the GNZ will do nothing to limit bycatch if a PBR level is exceeded is incorrect. Accordingly, NMFS reasonably relied on the GNZ's implemented controls, its assessment of their effects against the applicable bycatch limits, and the measures available to respond to PBR exceedances.

## VIII. REASONABLE PROOF SUPPORTED NMFS' FINDING THAT THE GNZ'S MONITORING PROGRAM WAS COMPARABLE IN EFFECTIVENESS TO THE U.S. STANDARD

### A. The U.S. Monitoring Standard

The MMPA requires that the monitoring program in a domestic fishery "obtain statistically reliable estimates of incidental mortality and serious injury." 16 U.S.C. § 1387(d)(1)(A). This requirement was extended to foreign fisheries in 50 C.F.R. § 216.24(h)(6)(iii)(C)(4). Neither the MMPA nor the Final Rule specifies the monitoring percentages required of a domestic or foreign fishery to assure statistical reliability. Dec. Memo at 40. Instead, the "MMPA provides NMFS with significant discretion to determine the methods and levels of monitoring, including the

discretion to allocate and distribute observers among domestic commercial fisheries." Dec. Memo at 38.

The U.S. monitoring standard "primarily relies on mandatory self-reporting and human observers" to track marine mammal mortality and serious injury. Dec. Memo at 38. Similarly, the GNZ's program utilizes mandatory electronic self-reporting and electronic geospatial position reporting, supported by observers and onboard cameras to monitor marine mammal mortality and serious injury, as well as to verify the accuracy of fisher reporting.

NMFS has identified the advantages of cameras over observers:

> Electronic monitoring can capture a consistent visual record of 100% of fishing effort, including bycatch and precise time/location, eliminating the "observer effect," which can result in observer data that does not accurately reflect bycatch that occurred on the observed trips.

Dec. Memo at 39. Camera monitoring programs have limitations, but "{d}espite these limitations, electronic monitoring is still considered to be valuable for detecting protected species bycatch."[12] *Id.*

Regardless of whether observers or cameras are used, the MMPA does not require every fishing vessel to carry either an observer or a camera regardless of its length, fishing method, or where or when it fishes. For example, observers are not

---

[12] As of 2024, NMFS had authorized camera monitoring programs in 18 domestic fisheries. Dec. Memo at 39. MHDD alleges that the GNZ's program generates "unreliable" monitoring results because cameras may not be effective in monitoring nighttime fishing. Pl's Br. at 34. However, NMFS has not found that cameras can never be effective when used at night. Moreover, MHDD has not explained why NMFS has authorized camera use in numerous domestic fisheries despite its so-called unreliability at night.

required in a domestic fishery where "the facilities on a vessel for quartering of an observer, or for carrying out observer functions, are so inadequate or unsafe that the health or safety of the observer or the safe operation of the vessel would be jeopardized." 16 U.S.C. § 1387(d)(6)(B).

**B. The GNZ's Monitoring Program**

The GNZ's monitoring program contains the following elements: (1) at sea monitoring through onboard cameras and human observers, with observer deployment based on monitoring objectives and priorities; (2) targeted review of camera footage based on risk assessment; (3) mandatory near real time electronic catch reporting; (4) mandatory electronic geospatial position reporting; and (5) financial penalties for failure to timely comply with electronic catch reporting and geospatial position reporting requirements. Financial penalties also apply to the failure to report an incidental catch of a marine mammal.

*Electronic catch and geospatial reporting have been required since 2019 by all commercial fishers, including all set net and trawl fishers, regardless of where they operate around the North or South Islands.*

The GNZ requires onboard cameras for all "in-scope" vessels, which its regulations define as including trawl vessels 32 meters or less in length and set net vessels 8 meters or more in length. These vessels account for a large proportion of inshore catch volumes. Oct. 2025 Supp. at 77-78. NMFS_013950-013951. They are also able to carry and operate cameras. As of May 2025, *every in-scope vessel must carry at least one camera and have it switched to "active and recording" during*

*fishing, fishing-related activities, and while transiting to and from fishing locations.* Feb. 2026 Supp. at 30. NMFS_014014.

"Out of scope" vessels consist of large trawlers and small set net vessels. Large trawlers may not carry cameras, but they have high levels of observer coverage, averaging 36% of sea days during the past three fishing years. Dec. Memo at 43, fn. 208.

The GNZ explained the constraints on small set net vessels, including health and safety considerations, safe vessel operations, lack of space, and lack of an independent power supply. Dec. Memo at 41-42; *see also* Oct. 2025 Supp. at 34. NMFS_013907. These vessels primarily operate in the upper reaches of harbors where Māui dolphin presence is considered rare. Oct. 2025 Supp. at 77. NMFS_013952. Commercial fishers on these small vessels must still provide electronic catch and geospatial position reporting, and their activities are monitored by Fisheries Compliance personnel.

All onboard camera footage is available for the GNZ's review. Footage review targets are established on a fishery-by-fishery basis depending on the extent of residual risk to marine mammals and other protected species.[13] A higher target percentage for footage review is assigned where the risk to a protected species is significant or else is the consequence of an interaction that is significant to the population, even if the risk is very low. The GNZ provided its target and actual

---

[13] The term "residual risk" means the risk that dolphin bycatch will occur outside the extensive areas where set net and trawl fishing are banned.

review percentages. Dec. Memo at 45-47. A much higher percentage of footage review occurs within areas identified as presenting the greatest residual risk to Hector's and Māui dolphins. Dec. Memo at 46.

The GNZ also explained how its monitoring program generates statistically reliable bycatch estimates in its supplemental information. *See, e.g.,* Oct. 2025 Supp. at 38-39. NMFS_013911-013912; and at 79-80. NMFS_013952-013953; Nov. 2025 Supp. at 9-10. NMFS_013980-013981; Feb. 2026 Supp. at 14-16. NMFS_013998-014000.

### C. NMFS Found that the GNZ's Monitoring Program Was Comparable in Effectiveness to the U.S. Standard

NMFS assessed New Zealand's monitoring program as an integrated system, including: mandatory catch reporting; geospatial position reporting; observers; cameras on in-scope vessels; targeted footage review; and risk estimation. Dec. Memo at 38-48. NMFS found that GNZ's monitoring program is "designed to estimate incidental mortality or serious injury and that its procedures are comparable in effectiveness to the U.S. monitoring program." It also found that GNZ's monitoring levels are "comparable to, or exceed, the requirements of 16 U.S.C § 1387 for statistically reliable bycatch estimates," and that GNZ "satisfied the condition at 50 CFR 216.24(h)(6)(iii)(C)(4)." Dec. Memo at 47 and 48, respectively.

NMFS relied in part on the undisputed fact that the GNZ's program requires *every commercial fisher* to electronically report their catch of fish and any non-fish or protected species. This report must identify the species and quantities caught,

the fishing method used, and the date, time, and location of the fishing event. The commercial fisher must submit this report on the same day the catch occurs.

Each commercial fishing vessel must also use a geospatial position reporting device that transmits the vessel's location in near real time (at least every 10 minutes). Furthermore, each commercial fisher must maintain an "E-logbook" that can transmit reports specified in published technical specifications. Dec. Memo at 41. Penalties can be assessed for failure to comply with reporting requirements. Dec. Memo at 41 and Appendix B thereto.

NMFS concluded that the data obtained from these measures generate "statistically reliable estimates" of incidental mortality and serious injury. Dec. Memo at 41. This Court also preliminarily found that NMFS provided "a plausible explanation of the monitoring procedures implemented in New Zealand that likely satisfy the MMPA's regulatory requirements, especially at this early stage". Slip. op at 35.

### D. MHDD's Position on What a Monitoring Program Requires Is Not Supported by Substantial Evidence

MHDD challenges the absence of cameras or observers on some set net and trawl vessels, as well as the GNZ's targets for footage review and actual footage review rates. Specifically, MHDD contends that cameras must be installed, or observers must be placed, on every set net and trawl vessel regardless of where it operates or the risk, if any, that a particular vessel poses to marine mammals. Moreover, the GNZ must review 100% of camera footage from every vessel to

determine whether any marine mammal has been killed or seriously injured. Pl's Br. at 31-33.

MHDD implies that "certainty" must be achieved by every monitoring program:

> Certainty {concerning the amount of bycatch} would require perfect {monitoring} coverage by observers and performance by observers or cameras, 100% footage review, and no dropouts before the net comes into view.
>
> ***
>
> A ban on the main fishing methods known to cause dolphin mortality (gillnets and trawling), throughout their habitat, is now the only method likely to be effective in order to avoid losing the Maui dolphin population of about 50 individuals. The IUCN option of banning gillnet and trawl fisheries in waters less than 100m {meters} deep . . . is the only management option likely to reduce the risk of extinction to acceptable levels.

*See* Exhibit G to (First) Slooten Declaration at 5, 6. ECF No.13-35. *See also* Pl's Br. at 32-34.

However, "certainty" about every capture is not the statutory standard. The question is whether reasonable proof supported NMFS' finding that the GNZ's monitoring program provided statistically reliable bycatch estimates. The GNZ now demonstrates why a program that is comparable in effectiveness to the U.S. standard does not require the measures that MHDD insists upon.

### E. The Comparability Finding Addresses the Explanatory Deficiency that the *Sea Shepherd* Decision Identified

MHDD asserts that the *Sea Shepherd I* decision holds that the level of monitoring coverage must be high enough to "reliably detect any non-zero capture

rate" of Māui dolphins. Pl's Br. at 29. However, *Sea Shepherd New Zealand v. United States*, 606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) concerned a previous comparability finding based on a different record.

The court there *did not find that the GNZ's monitoring program was not comparable in effectiveness to the U.S. standard.* Instead, Judge Katzmann found that NMFS had *failed to explain* its basis for: (a) excluding from the camera requirement those set net vessels 8 meters or less in length; and (b) using the number of fishing days, not the percentage of observed set net and/or trawls, "to measure the robustness of New Zealand's monitoring program." *Id.* at 1319-21.

In contrast, in the March 2026 Comparability Finding, NMFS addressed the "failure to explain" issue:

> The court found that NMFS did not address the United States monitoring standards sufficiently, what U.S. standards applied to New Zealand's fisheries, and how New Zealand's standards were comparable. The information provided by New Zealand and other information in NMFS' files establishes that New Zealand maintains monitoring procedures in its Export fisheries that are designed to estimate incidental mortality or serious injury and that its procedures are comparable in effectiveness to the U.S. monitoring program.

Dec. Memo at 38. In addition, the GNZ's monitoring program has been substantially modified and expanded as of May 2025.

**F. NMFS Has Not Expressed "Concerns" About the Adequacy of the GNZ's Monitoring Program under the Comparable in Effectiveness Standard**

MHDD relies upon the 5-Year Review's statement that "there are concerns that monitoring of fisheries interactions is insufficient to detect all bycatch." NMFS_015984. Specifically, MHDD asserts that "NMFS expressed concern that

only a small percentage of vessels from the most problematic fishery {set nets} have cameras, and several areas with intense fishing effort (such as harbors) have no monitoring." MHDD adds that NMFS found that "there has been little monitoring of inshore {trawl} fisheries." Pl's Br. at 29.

The Review sections that MHDD relies upon summarize concerns expressed by Ms. Slooten and other third parties, as part of NMFS' review of the available literature. *See* Review Sections 2.3.2.4.1.3 and 2.3.2.5.2. Many of these "concerns" were expressed long before the GNZ had fully implemented its monitoring program in May 2025.

Declarant Slooten expressed her concerns in the 2024 paper she submitted to a working group of the IWC's Scientific Committee.[14] That paper is Exhibit G to the (First) Slooten Declaration. ECF No. 13-35. Her Second Declaration states that she "was asked to provide a summary of Otago University's research on Hector's and Māui dolphins for NMFS' 5-Year Review." ECF No. 50-2 at 4.

In addition, the cover page to Ms. Slooten's 2024 paper cautions that "Papers submitted to the IWC are produced to advance discussions within that meeting; *they may be preliminary or exploratory*." The fourth page contains Ms. Slooten's statement that "very few set net vessels carry observers or onboard cameras." However, this statement was made before the GNZ completed its onboard camera rollout in May 2025.

[14] Similarly, NMFS_015969 relies on conclusions that Ms. Slooten, not NMFS, reached in two 2021 papers.

Ms. Slooten's opinions are not NMFS or IWC findings. In addition,, the Small Cetaceans Subcommittee of the IWC's Scientific Committee reported that discussions covered "many topics which the Scientific Committee has discussed at length in the past without reaching consensus." *See* Annex Q to the May 2024 Subcommittee Report at 11.

**G. The MMPA Does Not Require a Monitoring Program that Will Detect 100% of Bycatch**

MHDD asserts that every monitoring program must be so all encompassing as to "detect all bycatch." Pl's Br. at 29. This invented standard would require the use of cameras or observers on 100% of fishing vessels with 100% of fishing effort observed or recorded and all footage reviewed anywhere Māui or Hector's dolphin might range, however rarely. This requirement would have to be applied *regardless of a vessel's size and regardless of where, when or how it fishes or the actual risk it poses to marine mammals*.

However, nothing in the MMPA, the Final Rule, or NMFS' practice requires monitoring to guarantee the detection of "*all bycatch*."

NMFS has explained that:

> For PBRs that are less than 1, observer coverage of greater than 80% would be required to avoid small sample bias *only* if the monitoring program was expected to last for one year. (emphasis added). As monitoring programs typically span additional years, required monitoring coverage necessary to achieve a reliable bycatch estimate using data pooling would decrease depending on the life of the monitoring program. For example, if data are pooled over 5 years for the same stock, the required annual coverage drops to 20%.

Dec. Memo at 40; *see also* Appendix A to NMFS' February 7, 2023 Guidelines for Preparing Stock Assessment Reports (Table 6 at 37), available at: https://www.fisheries.noaa.gov/s3/2023-02/02-204-01-Final%20GAMMS%20IV%20Revisions%20clean_kdr.pdf. This Table illustrates that statistical reliability depends on the design and duration of monitoring measures, rather than a single, unchangeable, coverage percentage. It does not even establish a universal 20% threshold coverage standard.

In summary, MHDD has failed to demonstrate that the GNZ's comparable use of cameras and footage review does not "attain approximately unbiased estimation of average annual commercial fisheries-related M/SI," i.e., mortality and serious injury. *Id.*

**H. Reasonable Proof Supports NMFS' Finding that Monitoring Coverage, Footage Review, and Camera Performance Are Comparable in Effectiveness to U.S. Standards**

**1. The Geographic Scope of the GNZ's Monitoring Program Encompasses All New Zealand Fisheries**

NMFS found that it was reasonable for the GNZ to identify the areas posing the "greatest residual risk" to dolphins as the areas where the most extensive monitoring effort would be required. Dec. Memo at 42. As noted above, all in-scope vessels have been required to carry and operate cameras as of May 2025. *Id.* at 43. *See also* Oct. 2025 Supp. at 29-39. NMFS_013902-013912.

**a. West Coast North Island Māui Dolphin Monitoring**

NMFS found that:

> Effective August 1, 2023, the GNZ required on-board cameras on all set net vessels greater than or equal to 8 metres in overall length operating along the entire West Coast of the North Island and the video camera monitoring area (encompassing the entirety of the MDHZ) from the northern extent of Cape Reinga down to the end of the southern extent at Wellington. The expanded spatial coverage of electronic monitoring also focuses on the areas outside of the core Māui dolphin distribution area where the greatest residual risk for Māui dolphin bycatch remained prior to the expansion.

Dec. Memo at 43. This requirement results "in near 100% electronic monitoring coverage of trawl and set net fishing events undertaken by in-scope vessels." *Id.*

Within the coastal portion of the MDHZ (within the west coast North Island LOFF fisheries), footage review levels are very high. *See* Oct 2025 Supp. at confidential Figures 14 and 15. NMFS_013949-013950. The coastal portion of the MDHZ, excluding harbors, encompasses approximately 93.7% of the summer distribution and approximately 86.6% of the winter distribution of Māui dolphins. Less than 3% of the estimated distribution falls within the harbors of the MDHZ. Sightings of Māui or Hector's dolphins within these harbors have occurred mainly where set net fishing is already prohibited. Dec. Memo at 44.

**b. South Island Hector's Dolphin Monitoring**

NMFS found that:

> since October 2023, all commercial trawl vessels less than or equal to 32 meters in total length and set net vessels greater than or equal to 8 meters in total length operating on the north, east, and south coasts of the South Island must have onboard cameras installed and upload footage to the GNZ.

Dec. Memo at 43. In addition, GNZ detailed the monitoring in place for South Island set net and trawl fisheries. *See generally* Feb. 2026 Supp. at 29-37. NMFS_014013-

014021. These requirements form part of the reasonable proof that supported NMFS' finding that the South Island monitoring program was comparable in effectiveness to the U.S. standard.

> The South Island set net and trawl fisheries are subject to similar types of monitoring requirements as the West Coast North Island set net and trawl fisheries. These include the use of vessel logbooks, geospatial position reporting requirements, targeted observer coverage, and electronic monitoring with onboard cameras on in-scope vessels.

Dec. Memo at 45.

**2. MHDD's Allegation of Geographic Deficiencies Has No Merit**

Nevertheless, MHDD alleges that NMFS "fails to address a critical reliability problem with the geographic scope of monitoring." Pl's Br. at 29. MHDD contends that this "problem" has five aspects: (1) lack of camera monitoring in harbors; (2) lack of camera monitoring on large trawl vessels, i.e., those over 32 meters in length; (3) lack of camera monitoring on "inshore trawl fisheries"; (4) lack of camera monitoring around the South Island Banks Peninsula, which is "a core of the Hector's dolphin east coast population"; and (5) lack of camera monitoring off the east coast of the North Island. These deficiencies allegedly create an impermissible "data gap." Pl's Br. at 29-30. NMFS relied on reasonable proof to find that no such deficiencies exist.

**a. Monitoring in Harbors**

MHDD alleges that the monitoring program fails to require cameras on those set net vessels that fish within harbors: "There is 0% monitoring of set netting in harbors, where 95-99% of set net fishing effort in the MDHZ occurs." Pl's Br. at 31.

*But, the set net vessels that fish within harbors are vessels below 8 meters in length.*[15] Domestically, NMFS may waive observer carriage on such vessels where accommodation or observer functions are inadequate or unsafe. 50 C.F.R. § 229.7(c)(3) and 16 U.S.C. § 1387(d)(6). Thus, it is only by ignoring these provisions, as well as the fact that the GNZ still produces bycatch estimates from these vessels, that MHDD can allege that the GNZ's monitoring program in the west coast North Island fisheries is geographically deficient.

In addition, the absence of onboard cameras on smaller, out-of-scope vessels does not mean that their activity is unmonitored. Electronic catch and geospatial position reporting is mandatory for all commercial fishers/vessels. In addition, Fisheries Compliance personnel monitor their fishing activity, and fishing effort from these vessels is included in the estimation of bycatch risk. Dec. Memo at 46, fn. 234.

The adequacy of monitoring must be assessed against the location of that effort, dolphin exposure, existing restrictions, and the estimation methods, which NMFS evaluated and found comparable. MHDD ignores the relevance of these essential elements of the GNZ's monitoring program.

Equally important, Māui/Hector's dolphin sightings in west coast North Island harbor interiors are rare. Rather, infrequent sightings primarily occur in harbor mouths, where set nets are banned.

---

[15] Trawling is not permitted in any harbor on either island.

> Recent information regarding Māui dolphin use of West Coast North Island harbors indicates minimal use of harbor interiors by Māui/Hector's dolphins based on several data sources, including acoustic detections, research sightings, and validated public sightings. The upper reaches of the harbors in the North Island are intertidal, have extensive sand banks, and are a transition area into inlets and river systems. Infrequent use of harbor mouths, particularly at Manukau and Kaipara Harbors, is supported by research, public sightings, and acoustic monitoring. However, a cluster of shallow, estuarine/river-based sightings in 2025 suggests some individuals might venture further into harbors and rivers under poorly understood conditions.

Dec. Memo at 76, citing Roberts, J. (2025), "Harbour use by Māui/Hector's dolphin and commercial net fisheries." NMFS-017543-017602.

**b. Monitoring on Trawl Vessels over 32 Meters in Length**

MHDD alleges that all trawl vessels, regardless of size, must carry cameras or observers. Pl's Br. at 31-32. However, "out-of-scope" trawl vessels (over 32-meters in length) operate in waters that are 100-800 meters deep. The record indicates that Māui dolphin occurrence in those deepwater fisheries is rare. Dec. Memo at 15-16, fn. 81.

NMFS concluded that three trawl fisheries, i.e., Fishery ID nos. 2067, 1883, and 2041, which are located around the North and South Islands, are deepwater fisheries where large trawl vessels operate. The size of these vessels, the nature of the species they target, their fishing effort, the location of that effort, and other restrictions mean these fisheries present a "negligible" risk. *Id.*

Nevertheless, the GNZ requires observers on deepwater trawl vessels. Observer coverage on deepwater and middle depth trawl fleets has averaged 36% in the past three fishing years. Dec. Memo at 43, fn. 208. For LOFF 2067 and 2041

this coverage has been even higher (45% and 73%, respectively). NMFS_014023. MHDD has not challenged this level of observer coverage as deficient.

#### c. Monitoring by Inshore Trawl Vessels

MHDD alleges that the GNZ does not require sufficient monitoring of inshore trawl fisheries, and it relies upon NMFS_015969. This page is an excerpt from the 5-Year Review that cites two papers co-authored by Ms. Slooten in 2021. The first paper, "Delays in Protecting a Small Endangered Cetacean: Lessons Learned for Science and Management," addresses Hector's dolphins and the alleged dangers posed by trawl vessels that operate around the South Island in shallow water. The second paper, "Hector's and Maui dolphin bycatch following 2020 management decisions," contains the following opinion (at 8): "Observer coverage in New Zealand's inshore fisheries is exceptionally low, and patchy in space and time."

Ms. Slooten's papers fail to consider three important developments and, therefore, cannot, without more, establish that NMFS' determination on the later record was unreasonable.

First, the papers do not analyze the impact of the regulatory and voluntary measures contained in the November 2022 South Island Hector's Dolphin Bycatch Reduction Plan. *See* NMFS_016427-016442. Within this plan, Fishing Related Mortality Limits ("FRMLs") have been established for the five local Hector's dolphin populations off the east coast of the South Island and the one south coast subpopulation. *Id.* The bycatch reduction plan provides for prompt and escalating

responses to address any captures to ensure that FRMLs are not exceeded. This is consistent with the GNZ's goal of reducing bycatch towards zero. Dec. Memo at 57.

Second, they do not reflect the north, east, and south coast South Island camera monitoring requirements that took effect in October 2023:

> New Zealand also reported that since October 2023, all commercial trawl vessels less than or equal to 32 meters in total length and set net vessels greater than or equal to 8 meter in total length operating on the north, east, and south coasts of the South Island must have onboard cameras installed and upload footage to the GNZ.

Dec. Memo at 43.

Third, they do not consider the effects of the full camera rollout completed in May 2025. This included onboard camera requirements that took effect in March 2025 for all remaining in-scope trawls operating off the west coast of the South Island and north and east coasts of the North Island. Dec. Memo at 44. All commercial fishers/vessels have also been required since 2019 to provide electronic catch reporting and geospatial position reporting.

#### d. Monitoring Around the Banks Peninsula on the South Island

The GNZ bans set net fishing out to between 12 and 19 nautical miles around the Banks Peninsula. Dec. Memo at 31 and Figures 4 and 5. Trawling is banned out to 2 nautical miles unless low headline heights are used.[16] *Id.* at 34-35 and Figure 7. These closures and restrictions are substantial, and NMFS relied on reasonable

---

[16] A low headline height means that the vertical height of the trawl net opening is no more than one meter. Dec. Memo at 35.

proof to find that they significantly reduced the risk of fishing-related mortality and serious injury. Dec. Memo at 42-48.

Nevertheless, MHDD alleges that, around the Banks Peninsula, NMFS determined that "it is very unlikely that bycatches would be detected." Pl's Br. at 30. MHDD cites NMFS_016029 as support for this alleged "determination".

That is yet another page from the 5-Year Review that cites Ms. Slooten's opinion in her 2024 paper: "For the Banks Peninsula, it is intended that only 5% of the video footage from trawling vessels will be viewed, (Fig. 37; Slooten 2024), therefore it is very unlikely that bycatches would be detected." However, Ms. Slooten relies on *targets* for camera footage review, not the *actual* percentages of footage review. The relevant comparison is with the actual review rate for each fishery and its use in estimating bycatch, which NMFS assessed. *See* Subsection VIII(H)(5) below.

#### e. Monitoring Off the East Coast of the North Island

As noted above, onboard cameras are now required for all in-scope trawl and set net vessels regardless of where they operate, including those operating off the east coast of the North Island. MHDD's allegation of an absence of monitoring in that area does not reflect the completed onboard camera rollout. Further, NMFS considered the available scientific information on Māui or Hector's dolphin presence and found that "apart from the recognized core range of Māui dolphins, to date there is no evidence of a resident dolphin stock of either subspecies (Māui or South Island Hector's dolphins) in other areas of the North Island". Dec. Memo 76.

### 3. MHDD's Allegation that Not Enough West Coast North Island Vessels Carry Cameras Does Not Constitute Substantial Evidence of Inadequate Camera Monitoring

MHDD alleges that NMFS expressed "concern" that only "a small percentage of vessels" have cameras. Pl's Br. at 29. However, third parties, not NMFS, expressed this "concern" in the 5-Year Review which preceded completion of the camera rollout in May 2025. Undaunted, MHDD asserts that, at present, "approximately 21%-27% of fishing vessels in Māui dolphin habitat have onboard cameras for monitoring." Pl's Br. at 30-31. Thus, "there is effectively no monitoring in most of the rest of the Māui dolphin habitat." *Id.* at 30. In support of this claim, MHDD cites NMFS_015972, which summarizes Ms. Slooten's 2024 paper. There, she relies on her count of North Island vessels that do or do not have cameras.

The defect in her analysis is that vessel counts do not establish the proportion of fishing effort that is monitored or the risk posed by unrecorded effort.[17] She also fails to consider the extensive set net and trawl fishing restrictions in place across most of the estimated Māui dolphin distribution. Moreover, the only set net and trawl vessels that do not have cameras are small out-of-scope set net vessels and large out-of-scope trawlers. The latter carry observers and both vessel types operate in areas where NMFS assessed Māui dolphin exposure and risk of bycatch as low.

[17] To measure fishing effort, New Zealand uses kilometers of set net gear and the number of trawl tows, not vessel counts.

MHDD never rebuts NMFS' basis for finding that the GNZ's monitoring program was comparable in effectiveness to the U.S. standard even though some vessels were not required to carry cameras. NMFS found that these out-of-scope vessels posed little or no risk to dolphins. Dec. Memo at 44, 53. MHDD failed to address this finding.

#### 4. MHDD's Allegation that Not Enough South Island Vessels Carry Cameras Does Not Constitute Substantial Evidence of Inadequate Monitoring

As of May 2025, all in-scope trawl and set net vessels must carry cameras, regardless of where they operate around the South Island. Feb. 2026 Supp. at 29-34. NMFS_014013-014019. As a result, "the GNZ has near 100% monitoring coverage {i.e., 100% recording} of trawl and set net fishing events undertaken by "in-scope vessels." Dec. Memo at 45.

Ms. Slooten has acknowledged that "Fisheries around the South Island of New Zealand have a relatively high proportion of fishing vessels with onboard cameras." (First) Slooten Declaration, Exhibit G at 3. Accordingly, MHDD has ignored the fact that the GNZ has required those vessels posing the greatest residual risk to Hector's and Māui dolphins to carry cameras. In contrast, as noted, simply counting vessels that do or do not carry cameras does not answer the relevant question, which is whether the required coverage of fishing effort and assessment of residual risk is sufficient under the MMPA.

### 5. MHDD's Footage Review Challenge Ignores NMFS' Assessment of Actual Review Rates

In its October 2025 supplement, the GNZ presented in confidence its most recent levels of monitoring coverage of the west coast North Island set net and trawl fisheries. NMFS_013945-013951. In its February 2026 supplement, it presented in confidence its monitoring levels of the South Island, deepwater and remaining North Island set net and trawl fisheries. NMFS_014013-014018. After assessing these footage review levels, which differ from fishery to fishery, NMFS stated that "The risk of bycatch determines the different levels of video review for the on-board camera footage from the electronic monitoring program." Dec. Memo at 46. Lower risk fisheries had lower review percentages, while, for example, "the core area for Māui dolphin distribution" will have 100% footage review. *Id.*

Nevertheless, MHDD alleges that the monitoring program contains a "bycatch data gap" that undermines the statistical reliability of results. Pl's Br. at 30. MHDD complains that the "GNZ's review rate is not 100%." Pl's Br. at 33. It then cites a few review rates for individual fisheries that are less than 100%. *Id.* at 33-34. The flaw in MHDD's cherry picking of fishery-specific review rates is that it has not addressed the risk or lack of risk to dolphin mortality or serious injury that supports a particular footage review rate. In contrast, NMFS did evaluate whether each of the GNZ's footage review rates reflected a reasonable assessment of residual risk from set net or trawl vessels.

MHDD also complains that NMFS' "discussion of footage review rates does not address whether the level of review from only in-scope vessels is sufficient to

produce statistically reliable results or, critically, detect a non-zero bycatch rate for Māui dolphins." Pl's Br. at 34. However, after discussing at length all the elements of the GNZ's North and South Island monitoring programs, as well as the extensive information that the GNZ provided in its three supplemental information submissions, NMFS did address this issue.

Specifically, NMFS assessed the GNZ's monitoring program in the context of the residual fishery risk after extensive spatial and gear controls had been imposed. NMFS considered the fishing methods and vessel classes subject to cameras, the targeted footage-review settings for different areas, fisher reporting, geospatial information, observers, compliance data, and bycatch estimation.[18]

NMFS found that the GNZ had presented reasonable proof that its monitoring program took account of the residual risk with regard to the fishing method and size of vessels for which it required cameras, as well as with regard to the level of targeted footage review depending on the fishing event's location. Dec. Memo at 41-48. NMFS concluded that "New Zealand's {monitoring} levels are comparable to, or exceed, the requirements of 16 U.S.C. § 1387 for statistically reliable bycatch estimates." *Id.* at 47.

---

[18] For this reason, MHDD's allegation that monitoring requirements outside the MDHZ are lower than within it does not, without more, establish inadequate monitoring. The allegation also ignores the discretion that the MMPA affords both domestic and foreign fisheries, which permits differentiated monitoring and footage review rates, provided the resulting estimates are statistically reliable.

In summary, the relevant MMPA standard is statistically reliable estimation, not 100% review of footage from every fishing event. The MMPA does not specify a single level or percentage of monitoring coverage required. NMFS' finding rested on the combined monitoring system, actual review rates, and their use in bycatch estimation. Dec. Memo at 38-41.[19]

## IX. MHDD HAS VIOLATED RULE 56.1 BY SUBMITTING INFORMATION THAT IS NOT PART OF THE ADMINISTRATIVE RECORD

USCIT Rule 56.1(a) states that a motion for judgment on an agency record "is to be made solely on the basis of the record made before the agency." Therefore, any document dated after issuance of the Decision Memorandum on March 2, 2026 is irrelevant. Accordingly, the GNZ requests that the Court not consider the following extra-record documents.

(1) Pl's Br. at 8, fn. 2: citation to June 30, 2026 law review article.

(2) Exhibit C to Second Slooten Declaration: Updated Spatial Risk Assessment of Threats to Hector's and Māui Dolphins, dated April 29, 2026.

(3) Exhibit D to Second Slooten Declaration: Report of the Pre-Meeting on Updated Spatial Risk Assessment of Threats to Hector's and Maui Dolphins in New Zealand, dated April 25-26, 2026.

---

[19] In support of its "data gap" allegation, MHDD relies once again on the 5-Year Review in the section captioned "Recommendations for Future Action," which states that:

> Accurate information on bycatch and all types of mortality is a data gap. Monitoring of set gillnet and trawl fisheries should be increased in areas where Māui's and SI Hector's dolphins occur.

NMFS_016042. A recommendation does not constitute a finding that the GNZ's monitoring program is not comparable in effectiveness to the U.S. standard. Nor does this recommendation state that 100% monitoring is required.

In addition, MHDD has exceeded the 14,000-word count limit in Standard Chambers Procedure 2(b)(1) by submitting arguments on the merits through the Declarations of Ms. Slooten and Ms. Rose. Therefore, the GNZ requests that the Court not consider these Declarations or their exhibits to the extent that they address the merits.

## X. CONCLUSION

For the foregoing reasons, the Court should deny MHDD's Motion for Judgment on the Administrative Record.

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly (Lead counsel)
Robert G. Gosselink
Kenneth N. Hammer
MacKensie R. Sugama

Trade Pacific PLLC
700 Pennsylvania Avenue, S.E.
Suite 500
Washington, D.C. 20003
Phone: 202-223-3760
wconnelly@tradepacificlaw.com

*Counsel for the Government of New Zealand*

**<u>CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATION</u>**

This Response Brief contains 13,923 words and, therefore, complies with the 14,000-word count limitation in Standard Chambers Procedures 2(B)(1).

<u>/s/ Warren E. Connelly</u>
Warren E. Connelly